UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK<br>1229 Connecticut Avenue, N.W.<br>Washington, DC 20036, | ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. _____ |
| v. | ) ) | |
| BRE/Connecticut L.L.C.<br>c/o The Blackstone Group<br>345 Park Avenue<br>New York, NY 10154, | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

Pursuant to Local Rules 65.1(c) of the Rules of Civil Procedure for the United States District Court for the District of Columbia, Plaintiff, Independence Federal Savings Bank, by and through its undersigned counsel, hereby applies for preliminary injunctive relief against Defendant, BRE/Connecticut, L.L.C. pursuant to the terms of the proposed Order submitted herewith, and for such other and further relief as may be appropriate. In support hereof, Plaintiff respectfully refers to and incorporates herein its Verified Complaint and its Memorandum (and Exhibits thereto) in support of this Application for Preliminary Injunctive Relief.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com
*Attorneys for Plaintiff*
  *Independence Federal Savings Bank*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK )
1229 Connecticut Avenue, N.W. )
Washington, DC 20036, )
           )
       Plaintiffs, )    C.A. No. _____
           )
       v. )
           )
BRE/Connecticut L.L.C. )
c/o The Blackstone Group )
345 Park Avenue )
New York, NY 10154, )
           )
           )
       Defendant. )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff, Independence Federal Savings Bank, by and through its undersigned counsel, submits this Memorandum of Points and Authorities in support of its Application for Preliminary Injunctive Relief and states as follows:

### INTRODUCTION

Plaintiff Independence Federal Savings Bank ("IFSB" or the "Bank") is a federally-chartered savings bank, with its principal place of business in the District of Columbia. The Bank operates two branches in the District of Columbia, one branch in Chevy Chase, Maryland, and one branch in Silver Spring, Maryland. The address of the Bank's headquarters is 1229 Connecticut Avenue, N.W., Washington, D.C. (the "Premises"), which is located in the

building whose address is 1225 Connecticut Avenue, N.W., Washington, D.C. (the "1225 Building").  On or about December 16, 1988, IFSB, as tenant, and Pool 1225 Associates ("Pool"), as landlord, entered into an Agreement of Lease ("Lease") for the Premises.  The initial lease term was twelve years, beginning January 1, 1989 and ending December 31, 2000.  A copy of the Lease is attached hereto as Exhibit A. Defendant BRE/Connecticut L.L.C. ("BRE") succeed to the interests of Pool and on or about April 25, 2001, IFSB and BRE entered into a First Amendment to Lease ("Lease Amendment") which pursuant to its express terms was effective as of January 1, 2001.

Pursuant to the Lease Amendment, the lease term now extends through December 31, 2010.  Notwithstanding the extension through December 31, 2010 of the lease term, IFSB was notified in the spring of 2007 that BRE would be undertaking an 18 month Repositioning Project at the 1225 Building, with initial construction set-up to begin July 23, 2007 and ending August 4, 2007; interior demolition to occur from August 2007 through April 2008; and exterior demolition to occur from April 2008 through June 2008.  Not only will the Repositioning Project breach the express and implied terms of the Lease and Lease Amendment, it will have a devastating impact on IFSB's ability to carry on its business at the Premises.

2

## FACTS

The Plaintiff and BRE/Pool entered into a Lease and Lease Amendment pursuant to which Plaintiff has possession, use and enjoyment of 6,870 square feet at the 1225 Building.  Verified Compl. at ¶¶5,11; Declaration of John Hall ("Hall Decl.") at ¶¶4, 10.   A copy of the Lease is attached hereto as Exhibit A; Mr. Hall's Declaration is attached hereto as Exhibit H.  Section 2.01 of the Lease provided for an initial lease term of twelve years, beginning January 1, 1989 and ending December 31, 2000.  Verified Compl. at ¶5; Hall Decl. at ¶4.  Section 1.01 of the Lease describes the leased premises as "the portion of the Lobby Space (containing approximately 6,450 square feet in total) as delineated on the plan attached [hereto](the "demised premises"), **and as presently constructed** . . .."  (Emphasis added). Verified Compl. at ¶6; Hall Decl. at ¶5.[1]  Section 1.01 of the Lease further provides that "[t]he lease of the demised premises includes the right, together with other tenants of the Building and members of the public, to use the common and public areas of the Land and Building providing access to the demised premises, but includes no other rights not specifically set forth herein."

---

[1] On or about December 16, 1988, IFSB and Pool entered into a Memorandum of Lease ("MOL").  The MOL similarly provides that the property which is leased is "the portion of Lobby Space (containing approximately 6,450 square feet in total) as described in the said lease **and as presently constructed** . . .." (Emphasis added).  Verified Compl. at ¶8; Hall Decl. at ¶7.

Verified Compl. at ¶7; Hall Decl. at ¶6.

Section 16.02 of the Lease provides as follows:

> Landlord reserves the right, without the same
> constituting an actual or constructive
> eviction and without incurring liability to
> Tenant therefore, to change the arrangement
> and/or location of public entrances,
> passageways, doors, doorways, corridors,
> elevators, stairways, toilets and other
> public parts of the Building; provided,
> however that the demised premises shall be
> visible from the street, public access on the
> street level directly into the demised
> premises shall not be cut off, access to the
> Building shall not be cut off and that there
> shall be no unreasonable obstruction of
> access to the demised premises or
> unreasonable interference with the use or
> enjoyment thereof.

Section 20.01 of the Lease is the "Quiet Enjoyment" Article pursuant to which BRE agrees and covenants that IFSB's "rights under th[e] Lease shall not be cut off or ended before the expiration of the Term of th[e] Lease[.]"

On or about April 25, 2001, IFSB and BRE entered into a First Amendment to Lease ("Lease Amendment") which, pursuant to its express terms, was effective as of January 1, 2001. Verified Compl. at ¶11; Hall Decl. at ¶10. A copy of the Lease Amendment is attached hereto as Exhibit B. Section 2 of the Lease Amendment amends the square footage total of the Premises to reflect the total square footage is 6,870 square feet and not 6,450 square feet. Verified Compl. at ¶12; Hall Decl. at ¶11. Section 3 of the Lease Amendment amended Section 2.01 of the

4

Lease resulting in a new lease term, for ten years, beginning January 1, 2001 and ending December 31, 2010. Verified Compl. at ¶13; Hall Decl. at ¶12.

Section 42.01 of the Lease provides: "Landlord shall use reasonable efforts to cause the parking garage operator to provide to Tenant, at the prevailing market rate, two (2) parking spaces in the parking garage located beneath the Building [in which the demised premises are located.]" Verified Compl. at ¶14; Hall Decl. at ¶13. Section 11 of the Lease Amendment deleted the foregoing Section 42.01, replacing it with language providing, in pertinent part, that "[t]hroughout the Term, Landlord agrees to provide to Tenant, at Landlord's expense, two (2) parking spaces . . . in the below grade par[k]ing structure on the Land . . .." Verified Compl. at ¶14; Hall Decl. at ¶13.

Section 14 of the Lease Amendment provides that "[e]xcept as expressly set forth in this Amendment, the terms and conditions of the Lease shall continue in full force and effect without any change or modification and shall apply for the balance of the term of the Lease." Verified Compl. at ¶15; Hall Decl. at ¶14. There have been no other amendments to the Lease. Verified Compl. at ¶16; Hall Decl. at ¶15.

In or about April 2007, Robert Isard, the Vice Chairman of IFSB, met with Christine V. Olfus-Campos regarding a renovation project at the 1225 Building, but no detailed information about

the project was given to IFSB at that meeting. Verified Compl. at
¶17; Hall Decl. at ¶16.  On or about May 11, 2007, Brookfield
Properties (the property manager for the 1225 Building) delivered
a letter to IFSB (a copy of the May 11, 2007 letter is attached
hereto as Exhibit C).  Verified Compl. at ¶17; Hall Decl. at ¶
16.  The letter states announced that on July 1, 2007, work would
commence for the 1225 Connecticut Avenue Repositioning Project
(the "Repositioning Project").  Verified Compl. at ¶17; Hall
Decl. at ¶16. The letter further advised that the project is
currently scheduled to continue for approximately 18 months.
Verified Compl. at ¶17; Hall Decl. at ¶16. IFSB does not know
whether, at the time the Lease Amendment was entered into, BRE
already had plans for the Repositioning Project.  Verified Compl.
at ¶17; Hall Decl. at ¶16.

On or about June 12, 2007, representatives of IFSB,
including Morton Bender and Mr. Isard, met with representatives
of Brookfield Properties regarding the proposed Repositioning
Project.  Verified Compl. at ¶18; Hall Decl. at ¶17.  They also
met with the architect and contractor.  Verified Compl. at ¶18;
Hall Decl. at ¶17.  IFSB expressed its concern at that meeting
about the substantial business disruptions and safety hazards
that the Repositioning Project would cause. Verified Compl. at
¶18; Hall Decl. at ¶17.  On July 2, 2007, Mr. Bender met with
Paul Schulman of Brookfield Properties in an attempt to resolve

6

the concerns that IFSB had about the Repositioning Project.
Verified Compl. at ¶18; Hall Decl. at ¶17.  No resolution was
reached.  Verified Complaint at ¶18; Hall Decl. at ¶17.  On or
about July 20, 2007, Brookfield Properties, delivered a Memo to
the tenants of the 1225 Building, including IFSB, setting forth a
tentative schedule for the Repositioning Project.  Verified
Compl. at ¶19; Hall Decl. at ¶ 18.  A copy of the July 20, 2007
Memo is attached hereto as Exhibit D.  Other than IFSB and a
branch of CitiBank located at a corner opposite to the Premises,
IFSB does not know of any other tenants remaining in the 1225
Building. Verified Compl. at ¶19; Hall Decl. at ¶ 18.  According
to the July 20, 2007 Memo, "Initial Construction Set-Up" will
take place from July 23 through August 3, 2007.  Verified Compl.
at ¶20; Hall Decl. at ¶19.

   The Initial Construction Set-Up will include: adding
partitions in the lobby area to separate construction crews,
offices and entrances from the rest of the main lobby and the
tenants' areas (to occur July 23 through July 27, 2007); the
demolition and removal of the sidewalk tree planters (to occur
July 28, 2007); the placement of a crane on the N Street side of
the building to install trash chutes for interior demolition (to
occur July 28, 2007); the blocking off of the metered parking and
one lane of traffic on N Street to allow for the construction
staging area (to occur July 30 through August 3, 2007); the

7

placement of scaffolding in the form of a covered walkway on 18th Street in front of the retail spaces (to occur August 4, 2007); and the installation of temporary signage for the retail spaces (to occur August 4, 2007). The July 20, 2007 Memo also provides that the interior demolition will occur August 2007 through April 2008 and the exterior demolition April 2008 through June 2008. Verified Compl. at ¶20; Hall Decl. at ¶19. Attached hereto as Exhibit E is the site layout plan illustrating the foregoing construction.

On July 25, 2007, Brookfield Properties sent a letter to IFSB regarding "Asbestos Containing Materials Abatement Notice," a copy of which is attached hereto as Exhibit F. Pursuant to this Notice, IFSB has been informed that "abatement of certain Asbestos Containing Materials will be taking place within the building soon[.]" Verified Compl. at ¶22; Hall Decl. at ¶21. The letter further states that the abatement work will begin within thirty days of July 25, 2007 (i.e., by August 24, 2007). Verified Compl. at ¶22; Hall Decl. at ¶21. Beginning on or about July 9, 2007, the air conditioning at the Premises is being turned off at 6:00 p.m. even though not all Bank employees have left by that time and are still working. Verified Compl. at ¶23; Hall Decl. at ¶22. Although interior demolition was not to begin until August 2007, and asbestos abatement work is not to begin until August 24, 2007, it appears that interior demolition has already begun.

8

Verified Compl. at ¶23; Hall Decl. at ¶22.  There are garbage dumpsters outside of the 1225 Building which have already been filled with debris, including dry wall.  Verified Compl. at ¶23; Hall Decl. at ¶22. A copy of pictures of the dumpsters taken by Mr. Isard on the afternoon of July 30, 2007 is attached hereto as Exhibit G.  According to Mr. Isard, the dumpsters do not appear to contain any identification plate, telephone number or permit. Verified Compl. at ¶23; Hall Decl. at ¶22.

### ARGUMENT

I.  **SUBSTANTIVE REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF**

"In considering a request for preliminary injunctive relief, a district court must examine whether '(1) there is a substantial likelihood [movant] will succeed on the merits; (2) [movant] will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the [non-movant]; and (4) the public interest will be furthered by an injunction.'" Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc., 295 F. Supp. 2d 75, 81 (D.D.C. 2003)(Collyer, J.) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360 (D.C. Cir. 1999)).  See Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  As this Court explained in its decision in Atlantic Coast, the four factors "'interrelate on a sliding scale' and a particularly strong showing on one may compensate for a weak showing on another." Atlantic Coast, 295

9

F. Supp.2d at 81 (citations omitted).  Injunctive relief is
appropriate in matters of landlord/tenant relations, including
actions implicating the covenant of quiet enjoyment. Cho v. ITCO,
Inc., 782 F. Supp. 1183 (E.D. Tex. 1991) (court enjoined
defendant from attempting in any way to interface with
plaintiff's possession and quiet enjoyment of the commercial
premises); The Southland Corp. V. Shulman, 331 F. Supp. 1024
(D.Md. 1971) (court granted preliminary and then final injunction
prohibiting defendant from interfering with plaintiff's quiet
enjoyment and possession of all of the covenants and obligations
under the commercial sublease); Jacobs v. Concord Village
Condominium X Association, 2004 WL 741384 (S.D. Fla. 2004)
(defendant enjoined from discriminating on the basis of
plaintiff's handicap in her use and quiet enjoyment of her
condominium).

## II.   THERE IS SUBSTANTIAL LIKELIHOOD THAT IFSB WILL SUCCEED ON THE MERITS OF THEIR CLAIMS

IFSB seeks preliminary injunctive relief requiring BRE to
cease its Repositioning Project until after December 31, 2010
when the current lease term ends.  There is a substantial
likelihood that the Plaintiff will succeed on the merits of its
claim.  IFSB has both an express and an implied right under the
Lease and Lease Amendment to the use and enjoyment of the
Premises.  In addition, it also has an express contractual right
under the Lease and Lease Amendment to the following:

(A) the use and possession of the Premises as they existed in December 1988 when the Lease was entered into; and the right of IFSB and its customers to use all the common and public areas of the Land and Building providing access to the demised premises (all as provided by Section 1.01 of the Lease);

(B) to limit BRE's alteration of the Premises to making changes in the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the Building; to have the Premises visible from the street; to have public access on the street level directly into the Premises; to have access to the Building; to have the Premises free of any unreasonable obstruction of access to the Premises; and to have the Premises free of any unreasonable interference with the use or enjoyment of the Premises (all as provided by Section 16.02 of the Lease)

(C) the use of two parking garage spaces (as provided by Section 11 of the Lease Amendment); and

(D) the quiet enjoyment of the Premises (as provided by Section 20.01 of the Lease).

The Plaintiff is likely to succeed in demonstrating that the Repositioning Project will substantially interfere and/or destroy the foregoing express and implied rights.  Even the general outline of the Repositioning Project, as set forth in the July 20, 2007 Memo which was given to IFSB by Brookfield Properties, the property manager, demonstrates the Plaintiff's rights will be violated.  As the Memo explains, the Initial Construction Set-Up will include: adding partitions in the lobby area to separate construction crews, offices and entrances from the rest of the main lobby and the tenants' areas (to occur July 23 through July 27, 2007); the demolition and removal of the sidewalk tree

11

planters (to occur July 28, 2007); the placement of a crane on
the N Street side of the 1225 Building to install trash chutes
for interior demolition (to occur July 28, 2007); the blocking
off of the metered parking and one lane of traffic on N Street to
allow for the construction staging area (to occur July 30 through
August 3, 2007); the placement of scaffolding in the form of a
covered walkway on 18th Street in front of the retail spaces (to
occur August 4, 2007); and the installation of temporary signage
for the retail spaces (to occur August 4, 2007).  The July 20,
2007 Memo also provides that the interior demolition will occur
August 2007 through April 2008 and the exterior demolition April
2008 through June 2008.  Already, problems have arisen.  There is
a blockage of the lobby entrance and there will be no access to
the alley, resulting in the inability of the cleaning staff to
take the garbage out. Verified Compl. at ¶23; Hall Decl. at ¶22.
The air conditioning is being shut-off at 6:00, as of July 9,
even though bank employees continue to be present on-site working
after 6:00.  This is the tip of what is undoubtedly the iceberg
to come.  BRE intends to cut off substantial access to the Bank
for anyone driving to the Bank by virtue of blocking off of the
metered parking and one lane of traffic on N Street.  See Exhibit
E. The 1225 Building will be shrouded in scaffolding.  Id. BRE
expects the Bank to conduct its business and "quietly enjoy" the
Premises, while construction crews literally demolish the

interior and exterior of the 1225 Building, including the removal of asbestos from the building.

Thus, IFSB has a substantial likelihood that it will succeed on the merits of its claim.  The major renovation project planned by the Defendant, with the ultimate demolition of the building's exterior and interior, is likely to be found to materially breach the express provisions of the Lease and the Lease Amendment, as well as the implied covenant of quiet enjoyment.  "In a commercial setting the covenant [of quiet enjoyment] protects the lessee . . . from the actions of the lessor . . . that interfere unreasonably with the lessee's . . . ability to conduct business."  American Dairy Queen Corp. V. Brown-Port Company, 621 F.28 255, 258 (7th Cir. 1980).  Neither the Lease, the Lease Amendment, nor the implied covenant of quiet enjoyment permits the Defendant to undertake such a project during IFSB's tenancy.

## III. THE REPOSITIONING PROJECT IS CAUSING THE BANK TO SUFFER, AND WILL CONTINUE TO CAUSE IT TO SUFFER, IRREPARABLE HARM

The Repositioning Project is causing the Bank to suffer, and will continue to cause the Bank to suffer, irreparable harm.  If the Project is allowed to proceed, the Bank will suffer incalculable financial losses through the loss of current and future customers.  IFSB is not a bank with hundreds of conveniently located branches. It is a small bank with only 4

branches, including its headquarters location in the 1225
Building.  If customers, both new and current, are unable to
easily access the Bank (or fear for their physical safety if they
do access the bank), the Bank risks losing those customers to
nearby more easily accessible banks.  Indeed, a branch of
Wachovia Bank is located across the street.

There is a substantial likelihood the Plaintiff will suffer
irreparable harm if an injunction is not granted.  "The threat
that a party will be driven out of business or loss customer
goodwill if a preliminary injunction is not granted may
constitute irreparable harm."  Cho v. ITCO, Inc., 782 F. Supp.
1183, 1185 (E.D. Tex 1991).  In Cho, the Court found irreparable
harm where "the plaintiffs [would] be forced to vacate the space
in which they have conducted their business for seven years.  The
plaintiffs' customers will be forced to use other merchants,
depriving the plaintiffs of the goodwill established in seven
years at the same location.  The disruption which would be caused
by loss of possession of the premises would constitute
irreparable harm to the plaintiffs."  Id. at 1185.  While the
Bank is not being deprived of possession of the Premises, the
disruption to the Bank's business will be significant enough that
the Bank's customers are likely to use other banks nearby,
depriving IFSB of the goodwill established in the twenty-four
years at the same location.

14

## IV.    BALANCING THE HARMS WEIGHS IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION

The balance of harms weighs in favor of granting IFSB the preliminary injunctive relief it seeks.  If the preliminary injunction granting the requested relief is wrongfully denied, IFSB will suffer great irreparable harm as discussed above.  By contrast, there is little risk that the Defendant will suffer irreparable harm if the injunction is granted.  Any harm suffered by Defendant from having to delay the project will be purely economic.[2]  The only non-economic harm suffered would be that if the injunction is granted, BRE will not be able to do with its property as it wishes but this harm is not the same as the "imminent demise or debilitation of a business in which [it has] invested" over twenty-four years as the Bank has.  See Cho, 782 F. Supp. at 1185-86.  There is also no harm to requiring that BRE honor its contractual obligations in the Lease and Lease Amendment.

## V.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING THE RELIEF REQUESTED

The injunctive relief requested by IFSB would further the public's interest in the enforcement of tenant's rights. The public interest weighs in favor of the protection of lease terms inuring to the benefit of a federal bank - especially a bank that

---

[2]  It appears that all other tenants except IFSB and CitiBank have relocated.  Verified Compl. at ¶19; Hall decl. at ¶8.

15

has historically served the minority community, and is working diligently under new management to emerge from its OTS designation as a "troubled" institution. Verified Compl. at ¶4; Hall Decl. at ¶3. Moreover, the public has an interest in being safe and protected from hazards when entering public building to conduct business, nor to members of the public expect that active asbestos removal is ongoing as they conduct their banking business.  Accord Texas Eastern Transmission Corp. V. Giannaris, 818 F. Supp. 755, 76-61 (M.D. Pa. 1993) (public has an interest in the granting an injunction that "protects human life and the environment from the catastrophe that could result if the subject pipelines are not adequately maintained and inspected).

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter the Preliminary Injunction as requested.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.


Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Plaintiff*
*Independence Federal Savings Bank*

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of July 2007, a copy of the foregoing Plaintiff's Application for Preliminary Injunctive Relief, Memorandum of Points and Authorities in support thereof, and proposed Order was served by hand on:

> CT Corporation System
> 1015 15th Street, N.W.
> Suite 1000
> Washington, DC 20005
> *Registered Agent for Defendant*


_____
Donna S. Mangold

17

# EXHIBIT A

AGREEMENT OF LEASE, made this _16th_ day of December, 1988, by and between POOL 1225 ASSOCIATES, a District of Columbia limited partnership, having an office c/o Jones Lang Wootton, Five Hanover Square, New York, New York 10004 ("Landlord") and INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, having an office at 1225 Connecticut Avenue, N.W., Washington, D.C. ("Tenant").

RECITALS

A.  Landlord is currently leasing to Tenant approximately 6,450 square feet of the first or main lobby floor (the "Lobby Space") and 610 square feet of the first basement level (the "Basement Space") of the Building (as defined in Section 1.01 hereof) pursuant to separate leases. Tenant is occupying 1,252 square feet of the Lobby Space pursuant to a lease dated December 27, 1983, between 1225 Connecticut Avenue Associates (the "Landlord's predecessor in interest") and Tenant, commencing December 1, 1983 and terminating on April 30, 1988.  Tenant is occupying 5,198 square feet of the Lobby Space and the Basement Space pursuant to a lease dated February 15, 1982 between Landlord's predecessor in interest and Tenant, commencing May 1, 1983 and terminating April 30, 1988 (collectively, the "Prior Leases").

B.  Pursuant to this Lease, Landlord and Tenant agree that as of the Commencement Date (as defined in Section 2.01 hereof), Tenant shall surrender the Basement Space and the provisions of the Prior Leases shall be terminated and superceded in their entirety by the terms, provisions and conditions set forth herein, except, however, for those terms, provisions and conditions which survive the expiration of the Prior Leases.

AGREEMENT

ARTICLE I

PREMISES

1.01.  Subject to and upon the terms, provisions and conditions set forth herein, Landlord hereby leases to Tenant, and Tenant hereby leases and hires from Landlord the portion of the Lobby Space (containing approximately 6,450 square feet in total), as delineated on the plan attached hereto as Exhibit A (the "demised premises"), and as presently constructed, in the building known as 1225 Connecticut Avenue, N.W., Washington, D.C. (the "Building").  The Building is situated on the land (the "Land") more fully described in Exhibit B attached hereto and made a part hereof.  (The Land and Building are hereinafter collectively referred to as the "Property".) The lease of the

- 2 -

demised premises includes the right, together with other
tenants of the Building and members of the public, to use the
common and public areas of the Land and Building providing
access to the demised premises, but includes no other rights
not specifically set forth herein.

ARTICLE II

TERM AND DELIVERY

2.01.   The term of this Lease shall be a period of
twelve (12) years (the "Term") commencing on January 1, 1989
(the "Commencement Date"), and expiring at 5:00 p.m. on
December 31, 2000 the "Expiration Date"), unless such Term
shall sooner cease and expire as hereinafter provided.

2.02.   Tenant occupies the demised premises pursuant
to the Prior Leases and will continue to occupy the demised
premises on a month to month basis pursuant to the Prior Leases
until the Commencement Date hereof.

ARTICLE III

RENT

3.01.   Tenant agrees to pay to Landlord a fixed annual
rent (the "fixed annual rent") equal to the product of the
number of square feet, which shall for the purposes of this
Lease be deemed to be 6,450, attributable to the demised
premises, multiplied by the annual rate as follows:

| During the Period | Per Square Foot Per Annum |
|---|---|
| 1/1/89 – 12/31/89 | $20.00 and additional rent, if any, as set forth in this Lease. |
| 1/1/90 – 12/31/91 | $39.90, plus the CPI Increase computed as set forth in Article IV hereof. |
| 1/1/92 – 12/31/94 | $44.90, plus the CPI (3) 289,605 Increase computed as set forth in Article IV hereof. |
| 1/1/95 – Expiration Date | $48.90, plus the CPI (6) 315,405 Increase computed as set forth in Article IV hereof. |

- 3 -

Fixed annual rent shall be payable in advance on the first day of each calendar month during the Term from and after the Commencement Date at the office of Landlord set forth above or such other place as Landlord may designate, without any set-off or deduction whatsoever.

3.02.    Tenant shall pay the fixed annual rent and all additional rent payable hereunder in lawful money of the United States by check (subject to collection) drawn to Landlord's order on a local branch of a bank (including Tenant) doing business in the Washington, D.C. metropolitan area.  All sums, other than fixed annual rent, payable by Tenant hereunder shall be deemed additional rent and shall be payable on demand unless other payment dates are hereinafter provided.  Landlord shall have the same rights and remedies for a default in the payment of additional rent as for a default in the payment of fixed annual rent, notwithstanding that Tenant may not then also be in default in the payment of fixed annual rent.

3.03.    If Tenant shall fail to pay when due any installment of fixed annual rent or any payment of additional rent for a period of 5 days after such installment or payment shall have become due, Tenant shall pay interest thereon at the Interest Rate (as such term is defined in Article XXII hereof), from the date when such installment or payment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent.  Notwithstanding the foregoing, upon presentment by Tenant to Landlord of evidence satisfactory to Landlord that such fixed annual rent or additional rent was paid in full by Tenant when due and such payment was not received by Landlord on a timely basis through no fault on the part of the Tenant, then in such event Tenant shall pay interest thereon at the Interest Rate from the date Landlord notifies Tenant of Landlord's failure to receive payment to the date of payment thereof.  The provisions of this Section 3.03 are in addition to all other remedies available to Landlord for nonpayment of fixed annual rent or additional rent.

3.04.    If any of the fixed annual rent or additional rent payable under this Lease shall be or become uncollectible, reduced or required to be refunded because of any Legal Requirement (as such term is defined in Article XXII hereof), Tenant shall enter into such agreements and take such other legally permissible steps as Landlord may request to permit Landlord to collect the maximum rents which from time to time during the continuance of such Legal Requirement may be legally permissible and not in excess of the amounts reserved therefor under this Lease.  Upon the termination of such Legal

- 4 -

Requirement, (a) the rents hereunder shall be payable in the amounts reserved herein for the periods following such termination, and (b) Tenant shall pay to Landlord, to the maximum extent legally permissible, an amount equal to (i) the rents which would have been paid pursuant to this Lease but for such Legal Requirement less (ii) the rents paid by Tenant during the period such Legal Requirement was in effect.

ARTICLE IV

COST OF LIVING ADJUSTMENT

4.01.  For purposes of Section 3.01, the CPI Increase shall equal the product obtained by multiplying "x" by the CPI Percentage Change.  The "CPI Percentage Change" shall equal 30% of a fraction:

(a)  the numerator of which shall be the Price Index for the month immediately preceding the Annual Review Date minus the Base Price Index; and

(b)  the denominator of which shall be the Base Price Index.

For purposes of determining the CPI Increase, "x" (in dollars per square foot) shall be:

(1)  For the lease year January 1, 1989 through December 31, 1989:  not applicable;

(2)  For the lease years commencing January 1, 1990 through December 31, 1992:  $39.90;

(3)  For the lease years commencing January 1, 1993 through December 31, 1995:  $44.90; and

(4)  For the lease year January 1, 1996 through December 31, 1996 and for each lease year thereafter through the Expiration Date:  $48.90.

(c)  For the purposes of calculating the CPI Increase, the CPI Percentage Change shall be deemed not to exceed four percent (4.0%).  To the extent that the CPI Percentage Change is actually greater than four percent, then for the purposes of calculating the CPI Increase in succeeding lease years of the Term, such difference will be carried forward and added (to the extent of such difference) to the actual CPI Percentage Change computed for one or more succeeding lease years.

— 5 —

4.02.  If on any Annual Review Date the Price Index has not been issued for the immediately preceding month, then any increase hereunder shall be based upon the last Price Index issued prior to such Annual Review Date.  Upon the issuance of the Price Index for the immediately preceding month, the fixed annual rent shall be recomputed based upon such Price Index. If any such recomputation indicates that the fixed annual rent paid by Tenant from the Annual Review Date until such recomputation was less than the amount due and payable based upon such recomputation, Tenant shall pay to Landlord, within 30 days after being furnished with such recomputation, the amount of any underpayment; and if the fixed annual rent paid by Tenant from the Annual Review Date until such recomputation was more than the amount due and payable based upon such recomputation, Tenant shall be entitled to a credit in the amount of such overpayment against subsequent payments of fixed annual rent.

4.03.  For purposes of this Article IV the following terms shall have the following meanings:

(a)  "Annual Review Date" shall mean each anniversary date of the Commencement Date;

(b)  "Bureau" means the Federal Bureau of Labor Statistics or any successor agency that shall issue indices or data referred to in this Article IV;

(c)  "Price Index" shall mean the Revised Consumer Price Index for all Urban Consumers for Washington, D.C. – Maryland – Virginia (All Items, 1982–1984 = 100) issued by the Bureau, or any other measure hereafter employed by the Bureau in lieu of such Consumer Price Index that measures cost of living in the Washington, D.C. area (adjusted to make such Index comparable to the Base Price Index);

(d)  "Base Price Index" shall mean the last Price Index issued by the Bureau prior to the execution of this Lease; and

(e)  "issue" shall mean the release to the public of any such Price Index, and the date of issue shall be the date on which such Index is released, whether or not the Index released is for the month in which it is released or any preceding period.

4.04.  Notwithstanding the foregoing, in no event shall the fixed annual rent ever be reduced by operation of the provisions of this Article IV.  The obligation of Tenant with

– 6 –

respect to the payment of fixed annual rent or additional rent shall survive the termination of this Lease.

4.05. If Tenant shall fail to pay when due any installment of fixed annual rent or any payment of additional rent for a period of 5 days after such installment or payment shall have become due, Tenant shall pay interest thereon at the Interest Rate (as such term in defined in Article XXII hereof), from the date when such installment or payment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent. The provisions of this Section 4.05 are in addition to all other remedies available to Landlord for nonpayment of fixed annual rent or additional rent.

ARTICLE V

RENTAL ADJUSTMENTS FOR INCREASES IN
OPERATING EXPENSES AND TAXES

5.01. <u>Operating Expenses</u>. "Operating Expenses" means all expenses (and taxes thereon, if any) incurred by Landlord (computed on an accrual basis) in connection with managing, operating, maintaining, servicing, insuring and repairing the Building and all appurtenances thereto (including without limitation the costs of employee salaries and benefits, water and sewerage, maintenance and service contracts, security systems, management fees, contesting tax levies or assessments or assessed valuations of the Building and the Land, and all other costs of operating and maintaining a first-class commercial building in the Washington, D.C. Central Business District except the costs of elevator maintenance, electric service, HVAC and cleaning). Operating Expenses shall not include capital improvements, amortization of mortgages, depreciation, ground rent, leasing commissions or legal expenses with respect to the negotiation of leases; provided, however, that Operating Expenses shall include the costs of capital improvements, which are necessary to comply with any legal requirement or which Landlord reasonably estimates would reduce the costs otherwise includable in Operating Expenses, so long as the costs of such capital improvements are included in Operating Expenses only as amortized over the estimated useful life thereof.

5.02. <u>Taxes</u>. "Taxes" means all taxes and assessments, general and special, ordinary and extraordinary, foreseen and unforeseen, now or hereafter levied, assessed or imposed on the Building, the Land or appurtenances thereto, including without limitation any tax, excise or fee measured

- 7 -

by, or payable with respect to, any rent, which is levied against Landlord, the Building or the Land. Taxes shall not include income or franchise taxes or other such taxes imposed or measured by the net income of Landlord from the operation of the Building, unless such taxes are imposed in lieu of, or as a supplement to, real estate taxes or assessments.

5.03. <u>Base Year; Tenant's Share</u>. For the purpose of calculating Operating Expense and Tax Adjustments (as defined in Section 5.04 hereof), the base year shall be the calendar year 1988 (the "Base Year"), and Tenant's share of Operating Expenses shall be three and one-half percent (3.50%) and Tenant's share of Taxes shall be three percent (3.00%). If the number of square feet of rentable area of the Building changes, then Tenant's share of Operating Expenses and Taxes shall be adjusted effective as of the date of any such change.

5.04. <u>Operating Expense and Tax Adjustment</u>. "Operating Expense and Tax Adjustment" means the sum of: (1) Tenant's share of the increase in Operating Expenses for the then current calendar year over Operating Expenses for the Base Year; and (2) Tenant's share of the increase in Taxes for the then current calendar year over Taxes for the Base Year.

(a)  As soon as practicable after January 1 of each calendar year which occurs during the Term, Landlord shall give Tenant a statement setting forth: (1) the actual Operating Expense and Tax Adjustment, if any, for the immediately preceding calendar year; (2) the amount of Tenant's overpayment or underpayment, if any, of additional rent on account of the estimated Operating Expense and Tax Adjustment for the immediately preceding calendar year; (3) Landlord's reasonable estimate of the Operating Expense and Tax Adjustment for the current calendar year; and (4) the current amount of Tenant's overpayment or underpayment, if any, of additional rent on account of the estimated Operating Expense and Tax Adjustment for the current calendar year ("Landlord's Operating Statement"). An estimate by Landlord that Operating Expenses for the current calendar year will be one hundred ten percent (110%) of Operating Expenses for the immediately preceding calendar year shall be deemed to be reasonable. As soon as practicable at any time that Landlord shall receive notice of an increase in Taxes, Landlord shall give to Tenant a Landlord's Operating Statement.

(b)  Pending the giving of Landlord's Operating Statement to Tenant, Tenant shall pay to Landlord as additional rent on the first day of each month of the current calendar year one-twelfth (1/12) of the estimated Operating Expense and

– 8 –

Tax Adjustment for the immediately preceding calendar year. After the giving of Landlord's Operating Statement to Tenant: (1) Tenant shall pay to Landlord as additional rent on the first day of each month of the current calendar year one-twelfth (1/12) of the estimated Operating Expense and Tax Adjustment for the current calendar year; and (2) the parties shall reconcile all overpayments or underpayments of additional rent on account of Operating Expense and Tax Adjustments; provided that immediately following the giving of Landlord's Operating Statement to Tenant, if Tenant owes Landlord such additional rent, Tenant shall pay such rent to Landlord on the first day of the next month or, if Landlord owes Tenant a refund of such additional rent, Tenant shall deduct the same from one or more monthly installments of rent thereafter due.

(c)   After the end of the Term and as soon as practicable after Landlord's next customary financial reporting period, Landlord shall give Tenant Landlord's Operating Statement for the portion of the calendar year in which the Term ends.  Landlord and Tenant shall thereupon make the appropriate adjustment of amounts then owing on account of the Operating Expense and Tax Adjustment for such year, and the appropriate payment shall be made promptly by the appropriate party.

5.05.   The rights and obligations of Landlord and Tenant under the provisions of this Article V shall survive the termination of this Lease, and payment shall be made pursuant to this Article V notwithstanding the fact that an Escalation Statement is furnished to Tenant after the expiration or other termination of the Term.

5.06.   Landlord's failure to render a Landlord's Operating Statement with respect to any Tax Fiscal Year shall not prejudice Landlord's right to thereafter render a Landlord's Operating Statement with respect thereto or with respect to any subsequent Tax Fiscal Year within 180 days of such Tax Fiscal Year.

ARTICLE VI

ELECTRICITY

6.01. All electricity to the demised premises shall be furnished directly by the public utility and shall be separately metered and paid for by Tenant.

6.02. Without limiting the generality of Section 6.01 and Article VIII hereof, Tenant's use of electric current in

- 9 -

the demised premises shall not at any time exceed the capacity of any of the electrical conductors and equipment in or otherwise serving the demised premises.  Tenant shall not make or perform or permit the making or performing of any alterations to wiring, installations or other electrical facilities in or serving the demised premises without the prior consent of Landlord in each instance which consent shall not be unreasonably withheld or delayed.  Should Landlord grant any such consent, all additional risers or other equipment required therefor shall be installed by Landlord and the cost thereof shall be paid by Tenant upon Landlord's demand.

6.03. Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric energy furnished to the demised premises by reason of any requirement, act or omission of the public utility providing the Building with electricity or for any other reason whatsoever.

ARTICLE VII

USE

7.01.  The demised premises shall be used solely for operating a savings bank or any other federally insured financial institution and for no other purpose.

7.02.  Tenant shall not use or permit the use of the demised premises or any part thereof in any way which would violate any of the covenants, agreements, terms, provisions and conditions of this Lease or for any unlawful purposes or in any unlawful manner or in violation of the certificate of occupancy for the demised premises or the Building, and Tenant shall not permit the demised premises or any part thereof to be used in any manner or anything to be done, brought into or kept therein which, in Landlord's reasonable judgment shall, or shall tend to, impair or interfere with (i) the character, reputation or appearance of the Building as a high quality office building, (ii) any of the Building services or the proper and economic heating, cleaning, air conditioning or other servicing of the Building or the demised premises; or (iii) the use of any of the other areas of the Building by, or cause discomfort, inconvenience or annoyance to, any of the other tenants or occupants of the Building.  Tenant shall not install any electrical or other equipment of any kind which, in the reasonable judgment of Landlord, might cause any such impairment, interference, discomfort, inconvenience or annoyance or which might overload the risers or feeders servicing the demised premises or other portions of the Building.

– 10 –

## ARTICLE VIII

### PREMISES "AS IS" AND TENANT ALTERATIONS

8.01.    Tenant acknowledges that, as the present occupant of the demised premises, it has inspected and is fully familiar with the condition thereof.   Tenant is taking the Premises "as is" except for structural defects not caused by Tenant and that are not known to Tenant and should not be known to Tenant.

8.02.   (a)   Tenant will not make or permit anyone to make any alterations, installations, additions or improvements (hereinafter referred to collectively as "improvements"), in or to the demised premises, without the prior written consent of Landlord which consent shall not be unreasonably withheld. Tenant will not make or permit anyone to make any structural improvements or improvements to the Building without the prior written consent of Landlord which consent shall be in Landlord's sole discretion.

(b)   When granting its consent pursuant to subparagraph (a) above, Landlord may impose any reasonable conditions, which conditions shall include, but not limited to, reasonable approval of the contractor or other persons who will perform the work, and the obtaining of specified general liability insurance.   All improvements permitted by Landlord must conform to all rules and regulations established from time to time by the Underwriters' Association of the District of Columbia and to all Legal Requirements. As a condition precedent to such written consent of Landlord in all situations involving improvements estimated or contracted to cost at least $20,000 including, but not limited to, the costs of materials, labor, architectural fees, engineering fees and contractor fees, Tenant shall obtain and deliver to Landlord (i) evidence of worker's compensation insurance covering all persons employed for such work and (ii) written, unconditional waivers of mechanics' and materialmen's liens against the Property from all proposed contractors, subcontractors, laborers and material suppliers of all work, labor and services to be performed and materials to be furnished in connection with improvements to the demised premises. If, notwithstanding the foregoing, any mechanic's or materialman's lien is filed against the demised premises and/or the Property, for work claimed to have been done for, or materials claimed to have been furnished to, the demised premises, such lien shall be discharged by Tenant within twenty days after notice thereof, at Tenant's sole cost and expense, by the payment thereof or by the filing of a bond.   If Tenant shall fail to discharge any such lien,

- 11 -

Landlord may, at its option, discharge such lien and treat the cost thereof (including attorneys' fees incurred in connection therewith) as additional rent payable with the next monthly installment of fixed annual rent falling due; it being expressly agreed that such discharge by Landlord shall not be deemed to waive or release the default of Tenant in not discharging such lien. Any improvements to the demised premises shall be made on behalf of Tenant and not on behalf of Landlord, and Tenant shall be deemed to be "owner" (and not the "agent" of Landlord) for purposes of the application of Section 38-101 of the District of Columbia Code. In the event Landlord shall give its written consent to the making of any improvements to the demised premises, such written consent shall not be deemed to be an agreement or consent by Landlord to subject its interest in the demised premises, the Building or the Land to any mechanic's or materialman's lien which may be filed in connection therewith.

(c) All improvements shall be performed in accordance with plans and specifications first approved by Landlord. Tenant shall reimburse Landlord on demand for any costs and expenses incurred in connection with Landlord's review of such plans and specifications.

(d) Tenant contemplates making substantial improvements to the demised premises in accordance with the provisions of this Article VIII. Landlord shall contribute $85,000 toward the cost of such improvements in the form of a payment to Tenant at any time within four (4) months of the Commencement Date, which such time of payment shall be decided by Landlord. Tenant shall deliver to Landlord, within six (6) months of the Commencement Date, evidence that such improvements have been completed and paid for.

8.03. Tenant shall indemnify and hold Landlord harmless from and against any and all expenses, liens, claims, liabilities and damages based on or arising, directly or indirectly, by reason of the Tenant's making of any improvements to the demised premises. If any improvements are made without the prior written consent of Landlord, Landlord shall have the right to remove and correct such improvements and restore the demised premises to their condition immediately prior thereto, and Tenant shall be liable for all expenses incurred by Landlord in connection therewith.

8.04. All improvements made and installed by Tenant, or at Tenant's expense, upon or in the demised premises which are of a permanent nature and which cannot be removed without damage to the demised premises or Building shall become and be

- 12 -

the property of Landlord, and shall remain upon and be
surrendered with the demised premises as a part thereof at the
end of the Term, except that Landlord shall have the right at
any time up to six months prior to the expiration of the Term
to serve notice upon Tenant that any of such improvements shall
be removed, and in the event of service of such notice, Tenant
will, at Tenant's own cost and expense, remove the same in
accordance with such request, and restore the demised premises
to substantially the same condition as delivered on the
Commencement Date, ordinary wear and tear and casualty excepted.

8.05.  Where furnished by or at the expense of Tenant,
all moveable furniture, furnishings and trade fixtures shall
remain the property of Tenant which may at its option remove
all or any part thereof at any time prior to the expiration of
the Term.  Notwithstanding the foregoing, Tenant may at its
option remove any and all trade fixtures and equipment,
specialty lighting, art and decorations, whether or not such
items are affixed to the demised premises, provided, however,
that Tenant shall, at Tenant's own cost and expense, restore
the demised premises to the above-stated condition.  In case
Tenant shall decide not to remove any part of such property,
Tenant shall notify Landlord in writing not less than three
months prior to the expiration of the Term, specifying the
items of property which it has decided not to remove.  If,
within 30 days after the service of such notice, Landlord shall
request Tenant to remove any of such property, Tenant shall at
its expense remove the same.  As to such property which
Landlord does not request Tenant to remove, the same shall be,
if left by Tenant, deemed abandoned by Tenant and thereupon the
same shall become the property of Landlord.

8.06.  If any improvements or other property which
Tenant shall have the right to remove or be requested by
Landlord to remove as provided in Sections 8.04 and 8.05 hereof
(herein in this Section 8.06 called the "property") are not
removed on or prior to the expiration of the Term, Landlord
shall have the right to remove the property and to dispose of
the same without accountability to Tenant and at the sole cost
and expense of Tenant.  In case of any damage to the demised
premises or the Building resulting from Tenant's removal of the
property, or in case of any unavoidable damage resulting from
Landlord's removal, Tenant shall repair such damage or, at
Landlord's option, shall reimburse Landlord for Landlord's cost
in repairing such damage.  This obligation shall survive any
termination of this Lease.

8.07.  Without limiting the generality of the
foregoing, Tenant may install or operate in the demised

- 13 -

premises, with the prior written consent of Landlord, which consent shall not be unreasonably withheld, at Tenant's sole cost and expense, any equipment of any kind or nature whatsoever even if such equipment will or may necessitate any changes, replacements or additions to, or require the use of, the water, plumbing, heating, air conditioning or electrical systems in the Building.

8.08.  Landlord shall have the right to prescribe the weight and method of installation and position of safes and other heavy fixtures or equipment.  No freight, furniture or other bulky matter of any description will be received into the Building or carried in the elevators, except as approved by Landlord, which approval shall not be unreasonably withheld. Tenant shall promptly remove from the public areas in or adjacent to the Building any of Tenant's property there delivered or deposited.

ARTICLE IX

MAINTENANCE AND REPAIRS

9.01.  (a)  Tenant shall keep the demised premises and the fixtures and equipment therein in clean, safe and sanitary condition, will take good care thereof, and will suffer no waste or injury thereto.  Tenant shall only store trash and garbage in areas designated by Landlord for such storage and accumulation.  Landlord agrees that, at no cost to Tenant, Tenant shall have the right to deposit its trash in the trash room of the Building, provided such trash is placed in plastic containers furnished by Tenant.

(b)  At the expiration or other termination of this Lease, Tenant will surrender the demised premises broom clean and in the same order and condition in which they were on the Commencement Date, ordinary wear and tear and casualty excepted.  The provisions of this Section 9.01(b) shall survive the expiration or earlier termination of this Lease.

9.02.  Without limiting the generality of Section 9.01 Tenant shall, at its sole cost and expense, make such repairs to the demised premises and the fixtures and appurtenances therein as are necessitated by any act, omission, occupancy or negligence of Tenant, or of any agent, employee, subtenant, contractor, customer or invitee of Tenant or by the use of the demised premises in a manner contrary to the purposes for which same are leased to Tenant, as and when needed to preserve them in good working order and condition.  Except as otherwise provided in Article XI hereof, all damage or injury to the

- 14 -

demised premises and to its fixtures, appurtenances and
equipment caused by Tenant moving property in or out of the
Building or by installation or removal of furniture, fixtures
or other property, shall be repaired, restored or replaced
promptly by Tenant at its sole cost and expense, which repairs,
restorations and replacements shall be in quality and class
equal to the original work or installations.  If Tenant fails
to make such repairs, restorations or replacements, same may be
made by Landlord at the expense of Tenant and such expense
shall be collectible as additional rent and shall be paid by
Tenant upon demand therefor.

9.03.  Business machines and mechanical equipment used
by Tenant which cause vibration, noise, cold or heat that may
be transmitted to the Building structure or to any leased space
to such a degree as to be objectionable to Landlord or to any
other tenant in the Building shall be placed and maintained by
Tenant, at its expense, in settings of cork, rubber or spring
type vibration eliminators sufficient to absorb and prevent
such vibration or noise, or prevent transmission of such cold
or heat.  The parties hereto recognize that the operation of
elevators, air conditioning and heating equipment will cause
some vibration, noise, heat or cold which may be transmitted to
other parts of the Building and demised premises.  Landlord
shall be under no obligation to endeavor to reduce such
vibration, noise, heat or cold beyond what is customary in
current good building practice for buildings of the same type
as the Building.

9.04.  Landlord shall make all structural repairs as
soon as practicable after receipt by Landlord of written notice
from Tenant specifying the nature and extent of the repairs
requested.  There shall be no allowance to Tenant for a
diminution of rental value and no liability on the part of
Landlord by reason of inconvenience, annoyance or injury to
business arising from the making of any repairs, alterations,
additions or improvements in or to any portion of the Building
or the demised premises or in or to fixtures, appurtenances or
equipment thereof.  Landlord shall exercise reasonable
diligence so as to minimize any interference with Tenant's
business operations, but shall not be required to perform the
same on an overtime or premium pay basis.

ARTICLE X

REQUIREMENTS OF LAW

10.01.  Tenant shall comply with all Legal
Requirements which shall impose any violation, order or duty

– 15 –

upon Landlord or Tenant with respect to Tenant's use or occupation of the demised premises, except for structural items which shall be Landlord's responsibility.

10.02. Notwithstanding the provisions of Section 10.01 hereof, Tenant may contest, at its own cost and expense, in its name and/or (whenever necessary) Landlord's name, in any manner permitted by law (including appeals to a court or governmental department or authority having jurisdiction in the matter), the validity or the enforcement of any Legal Requirement with which Tenant is required to comply pursuant to this Lease, and may defer compliance therewith provided that:

(a) such non-compliance shall not subject Landlord to criminal prosecution or subject the Property to lien or sale;

(b) such non-compliance shall not be in violation of any mortgage, or of any ground or underlying lease or any mortgage thereon;

(c) Tenant shall first deliver to Landlord a surety bond issued by a surety company of recognized responsibility, or other security satisfactory to Landlord, indemnifying and protecting Landlord against any loss or injury by reason of such non-compliance; and

(d) Tenant shall promptly, diligently and continuously prosecute such contest.

Landlord, without expense or liability to it, shall cooperate with Tenant and execute any documents or pleadings required for such purpose, provided that Landlord shall reasonably be satisfied that the facts set forth in any such documents or pleadings are accurate.

10.03. Tenant shall be responsible for, and pay before delinquent, all federal and local taxes assessed presently or hereafter during the term of this Lease against any leasehold interest or personal property of any kind, owned by or placed in, upon or about the demised premises by Tenant.

ARTICLE XI

INSURANCE, LOSS, REIMBURSEMENT, LIABILITY

11.01. (a) Landlord shall carry policies of fire and casualty insurance with respect to the Building in an amount equal to the full insurable value of the Building. Landlord

– 16 –

shall not be obligated to carry any fire or casualty insurance
with respect to the Premises, any portion thereof or any
property located therein and, except as provided by law, shall
not be obligated to repair any damage thereto or restore the
same, or any decorations, installations, equipment or fixture
installed by or for Tenant at Tenant's expense.  Tenant shall
carry such insurance coverages as Tenant may deem are necessary
or desirable to protect Tenant's property located in or around
the Premises.

          (b)   Tenant shall not do or permit to be done
any act or thing upon the demised premises which will
invalidate or be in conflict with the fire insurance policies
covering the Building and fixtures and property therein, or
which would increase the rate of fire insurance applicable to
the Building.  If by virtue of any act or omission of Tenant or
any person under Tenant's reasonable control (whether or not
such act or omission would otherwise constitute a default
hereunder) any such fire or casualty insurance premium is
increased, Tenant shall promptly pay Landlord the amount of
such increase as additional rent.  Tenant shall neither do nor
permit to be done any act or thing upon the demised premises
which shall or might subject Landlord to any liability or
responsibility for injury to any person or persons or to
property by reason of any business or operation being carried
on within the demised premises.

          11.02.  If, as a result of any act or omission by
Tenant other than an act or omission which is considered
customary in Tenant's permitted use of the demised premises as
provided in Article VII hereof, or violation of this Lease, the
rate of fire insurance applicable to the Building shall be
increased to an amount higher than it otherwise would be,
Tenant shall reimburse Landlord for all increases of Landlord's
fire insurance premiums so caused; such reimbursement to be
additional rent payable within 5 days after demand therefor by
Landlord.  In any action or proceeding wherein Landlord and
Tenant are parties, a schedule or "make-up" of rates for the
Building or demised premises issued by the body making fire
insurance rates for the demised premises shall be presumptive
evidence of the facts stated therein, including the items and
charges taken into consideration in fixing the fire insurance
rate then applicable to the demised premises.

          11.03.  Landlord or its agents shall not be liable for
any injury or damage to persons or property resulting from
fire, explosion, falling plaster, steam, gas, electricity,
water, rain or snow or leaks from any part of the Building, or
from the pipes, appliances or plumbing works or from the roof,

- 17 -

street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature, unless any of the foregoing shall be caused by or due to the negligence or intentional act or omission of Landlord, its agents, servants or employees.

11.04.   Tenant covenants and agrees to indemnify and save harmless Landlord against and from all claims, expenses, damages or fines incurred or suffered by Landlord, by reason of any breach, violation or non-performance by Tenant, or its agents, servants or employees, of any covenant or provision of this Lease, or by reason of damage to persons or property caused by moving property of or for Tenant in or out of the Building, or by the installation or removal of furniture or other property of or for Tenant.

11.05.   Tenant shall give Landlord prompt notice of any fire or accidents in the demised premises.

11.06.   Tenant agrees to look solely to Landlord's interest in the Property or the lease of the Building or of the Property and the demised premises for the satisfaction of any right or remedy of Tenant for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any liability by Landlord, and no other property or assets of Landlord shall be subject to levy, execution, attachment, or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the demised premises, or any other liability of Landlord to Tenant.

11.07.   (a)   Tenant and Landlord agree that each will, at its sole cost and expense, cause its fire insurance policies to contain appropriate clauses pursuant to which the insurance companies (i) waive all right of subrogation against the other, and (ii) agree that such policies shall not be invalidated as a result of any waiver under this Lease of any or all right of recovery against any party for losses covered by such policies.

(b)   Provided that Landlord's right of full recovery under its fire insurance policies is not adversely affected or prejudiced thereby, Landlord hereby waives any and all right of recovery which it might otherwise have against Tenant, its servants, agents and employees, for loss or damage occurring to the Building and the fixtures, appurtenances and equipment therein, to the extent the same is covered by Landlord's insurance, notwithstanding that such loss or damage may result from the negligence or fault of Tenant, its

- 18 -

servants, agents or employees.  Provided Tenant's rights of
full recovery are not affected or prejudiced thereby, Tenant
hereby waives any and all right of recovery which it might
otherwise have against Landlord, its servants, and employees,
and against every other tenant in the Building who shall have
executed a similar waiver as set forth in this Section 11.07(b)
for loss or damage to Tenant's furniture, furnishings, fixtures
and other property removable by Tenant under the provisions
hereof to the extent that the same is covered by Tenant's
insurance, notwithstanding that such loss or damage may result
from the negligence or fault of Landlord, its servants, agents
or employees, or such other tenant and the servants, agents or
employees thereof.

      11.08.  Tenant shall provide on or before the
Commencement Date and keep in force during the Term a
comprehensive general liability insurance policy protecting
Landlord and Tenant against any liability whatsoever,
occasioned by any occurrence on or about the demised premises
or any appurtenances thereto and naming Landlord, its servants
and employees, and Tenant as insured parties.  In addition, if
requested by the holder of any mortgage or deed of trust
against the Building and/or the Land, such insurance shall also
contain a standard mortgagee loss payable endorsement for the
benefit of such holder.  Such policy shall be written by good
and solvent insurance companies licensed to do business in the
District of Columbia satisfactory to Landlord, and shall be in
such limits as Landlord may from time to time require.  As of
the date hereof, Landlord reasonably requires limits of
liability thereunder of not less than $3,000,000 per occurrence
for bodily or personal injury (including death) and in the
amount of $1,000,000 per occurrence in respect of property
damage.  Such insurance may be carried under a blanket policy
covering the demised premises and other locations of Tenant, if
any, provided that each such policy shall in all respects
comply with this Article and shall specify that the portion of
the total coverage of such policy that is allocated to the
demised premises is in the amounts required pursuant to this
Section 11.08.  Prior to the time such insurance is first
required to be carried by Tenant and thereafter, at least 15
days prior to the effective date of any such policy, Tenant
shall deliver to Landlord either a duplicate original of the
aforesaid policy or a certificate evidencing such insurance.
Such certificate shall contain an endorsement that such
insurance may not be cancelled except upon 30 days' prior
notice to Landlord.  Such certificate shall also have the
indemnity clause referred to in Article XXXVI hereof typed on
the certificate evidencing that the "hold harmless" clause has
been insured.  Tenant's failure to provide and keep in force

– 19 –

the aforementioned insurance shall be regarded as a material
default hereunder entitling Landlord to exercise any or all of
the remedies provided in this Lease in the event of Tenant's
default.

### ARTICLE XII

### DAMAGE BY FIRE OR OTHER CAUSE

12.01.  If the Building or the demised premises shall
be partially or totally damaged or destroyed by fire or other
cause (and if this Lease shall not have been terminated
pursuant to this Article XII), Landlord shall repair the damage
and restore and rebuild the Building and/or the demised
premises, with reasonable dispatch after notice to it of the
damage or destruction and allowing for reasonable time required
for adjustment and settlement of insurance claims.

12.02.  If the Building or the demised premises shall
be partially or totally damaged or destroyed by fire or other
cause, the rents payable hereunder shall be abated to the
extent that the demised premises shall have been rendered
untenantable for the period from the date of such damage or
destruction to the date the damage shall be substantially
repaired or restored unless such fire or damage shall have
resulted from the negligence of Tenant then the rents, payable
thereunder shall abate, but only to the extent that Landlord
shall collect insurance proceeds covering the loss of rent
incurred by Landlord, provided, however, that should Tenant
reoccupy a portion of the demised premises during the period
the restoration work is taking place and prior to the date that
the whole of said demised premises are made tenantable, fixed
annual rent and additional rent allocable to such portion shall
be payable by Tenant from the date of such occupancy.

12.03.  (a)  If the Building shall be so damaged or
destroyed by fire or other cause (whether or not the demised
premises are damaged or destroyed) as to require a reasonably
estimated expenditure made by Landlord or a reputable
contractor designated by Landlord of more than 30% of the full
insurable value of the Building immediately prior to the
casualty, and the Landlord elects not to repair, restore or
rebuild the Building and the demised premises, if damaged or
destroyed, then Landlord may terminate this Lease by giving
Tenant notice to such effect within 120 days after the date of
the casualty and, upon such notice, this Lease and the estate
hereby granted shall terminate as if the date of such notice
were the Expiration Date.

- 20 -

(b)   If more than 30% of the demised premises
shall be damaged or destroyed by fire or other cause and if a
reputable contractor would reasonably require more than 180
days to restore the demised premises to their condition
immediately prior to the casualty, then Landlord or Tenant may
terminate this Lease by giving notice to such effect within 120
days after the date of casualty and, upon such notice, this
Lease and the estate hereby granted shall terminate fifteen
(15) days after the date of such notice, whereupon Tenant shall
wholly vacate the demised premises.

12.04.   No damages, compensation or claim shall be
payable by Landlord for inconvenience, loss of business or
annoyance arising from any repair or restoration of any portion
of the demised premises or of the Building pursuant to this
Article XII.

12.05.   Notwithstanding any of the foregoing
provisions of this Article XII, if Landlord or the lessor of
any superior lease or the holder of any superior mortgage shall
be unable to collect all of the insurance proceeds (including
rent insurance proceeds) applicable to damage or destruction of
the demised premises or the Building by fire or other cause, by
reason of some action or inaction on the part of Tenant or any
of its employees or agents ~~or contractors~~, then, without
prejudice to any other remedies which may be available against
Tenant, there shall be no abatement of Tenant's rents, but the
total amount of such rents not abated (which would otherwise
have been abated) shall not exceed the amount of uncollected
insurance proceeds.

12.06.   To the extent permitted by law, Tenant hereby
expressly waives the provisions of any law or statute now or
hereafter in force giving Tenant the right to terminate this
Lease because of fire or other casualty.

ARTICLE XIII

ASSIGNMENT, MORTGAGING, SUBLETTING, ETC.

13.01.   Except as otherwise expressly provided in this
Article XIII, Tenant shall not, without, in each instance,
obtaining the prior consent of Landlord (which consent shall
not be unreasonably withheld or delayed), (a) assign or
otherwise transfer this Lease or the estate hereby granted,
(b) sublet all or part of the demised premises, (c) permit
others to use or occupy the demised premises (including without
limitation by the granting of a concession or license),
(d) mortgage, pledge or encumber this Lease or all or part of

- 21 -

the demised premises in any manner, or (e) advertise for a
subtenant or for an assignee of this Lease.  For purposes of
this Article XIII, (i) the transfer of a majority of the issued
and outstanding capital stock of any corporate tenant or
subtenant, or the transfer of a majority of the total interest
in any other entity (partnership or otherwise) which is a
tenant or subtenant, however accomplished, whether in one or
more transactions, shall be deemed an assignment of this Lease,
or of such sublease, as the case may be, (ii) any person or
legal representative of Tenant to whom Tenant's interest under
this Lease passes by operation of law, or otherwise, shall be
bound by the provisions of this Article XIII, and (iii) a
modification, amendment or extension without Landlord's prior
written consent of a sublease previously consented to by
Landlord shall be deemed a new sublease.  Tenant agrees to
furnish to Landlord upon demand from time to time such
information and assurances as Landlord may reasonably request
that neither Tenant, nor any subtenant, shall have violated the
provisions of this Section 13.01.

     13.02.   (a)  The provisions of clauses (a), (b) and
(c) of Section 13.01 hereof shall not apply to transactions
entered into by Tenant with (i) an "affiliated corporation" (as
hereinafter defined) or (ii) a corporation into or with which
Tenant is merged or consolidated or with an entity to which
substantially all of Tenant's assets are transferred, provided
(a) such merger, consolidation or transfer of assets is for a
good business purpose and not principally for the purpose of
transferring the leasehold estate created hereby, and (b) the
assignee or successor entity has a net worth at least equal to
or in excess of the net worth of Tenant either (i) immediately
prior to such merger, consolidation or transfer or (ii) as of
the date hereof, whichever is greater.

          (b)  For purposes of this Article XIII, an
affiliated corporation means (i) a corporation controlled by,
controlling or under common control with Tenant or (ii) a
partnership or joint venture in which Tenant or an affiliated
corporation is either a managing general partner or owns at
least 51% of the interest therein.

     13.03.  No assignment or transfer, whether made with
Landlord's consent as required by Section 13.01 or without
Landlord's consent pursuant to Section 13.02, shall be
effective unless and until (a) the assignee shall execute,
acknowledge and deliver to Landlord a recordable agreement, in
form and substance reasonably satisfactory to Landlord, whereby
the assignee shall (i) assume the obligations and performance
of this Lease and agree to be bound by all of the covenants,

- 22 -

agreements, terms, provisions and conditions hereof on the part
of Tenant to be performed or observed on and after the
effective date of any such assignment and (ii) agree that the
provisions of this Article XIII shall, notwithstanding such
assignment or transfer, continue to be binding upon it in the
future, and (b) in the case of any assignment or transfer
pursuant to Section 13.02, Tenant or its successor shall have
delivered to Landlord financial statements certified by a
reputable firm of certified public accountants evidencing
satisfaction of the net worth requirements referred to in
Section 13.02.  Tenant covenants that, notwithstanding any
assignment or transfer, whether or not in violation of the
provisions of this Lease, and notwithstanding the acceptance of
fixed annual rent by Landlord from an assignee or transferee or
any other party, Tenant shall remain fully and primarily and
jointly and severally liable for the payment of the fixed
annual rent and all additional rent due and to become due under
this Lease and for the performance and observance of all of the
covenants, agreements, terms, provisions and conditions of this
Lease on the part of Tenant to be performed or observed.

     13.04.  (a) Should Tenant agree to assign this Lease
or to sublet all or any portion of the demised premises (other
than by an assignment or sublease permitted by Section 13.02
hereof), Tenant shall, as soon as the form of any such
agreement is finalized but no later than 60 days prior to the
effective date thereof (the "Effective Date"), deliver to
Landlord the proposed form of any such agreement and of all
ancillary agreements with the proposed assignee or sublessee,
as applicable, and Landlord shall then have the right to elect
by notice to Tenant given within 30 days after such delivery
(x) to consent or refuse to consent to such assignment or
sublease in accordance with the terms of this Lease or (y) to
elect to:

     A.  With respect to a proposed assignment of this
Lease or a proposed subletting of the entire demised
premises, terminate this Lease as of the Effective
Date as if it were the Expiration Date set forth
herein; or

     B.  With respect to a proposed subletting of less than
the entire demised premises, terminate this Lease as
to the portion of the demised premises affected by
such subletting as of the Effective Date, in which
case Tenant shall promptly execute and deliver to
Landlord an appropriate modification of this Lease in
form satisfactory to Landlord, effectuating such
termination and providing that the fixed annual rent

- 23 -

payable hereunder and the additional rent payable pursuant to Article V hereof shall be adjusted in proportion to the portion of the demised premises affected by such termination.

(b)  If Landlord shall give its consent to any assignment of this Lease or to any sublease, Tenant shall, in consideration therefor, pay to Landlord as additional rent:

(i) in the case of an assignment, an amount equal to all sums and other consideration paid to Tenant by the assignee for or by reason of such assignment (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of a lease or sale thereof, the then fair market rental or sale value, as the case may be); and

(ii) in the case of a sublease, an amount equal to all rents, additional charges and other consideration payable under the sublease to Tenant by the subtenant which is in excess of the fixed annual rent and additional rent accruing during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of the lease or sale thereof, the then fair market rental or sale value, as the case may be).

The sums payable under this Section 13.04(b) shall be paid to Landlord as and when paid by the assignee or subtenant to Tenant.

(c)  If Landlord exercises any of its options under Section 13.04(a), Landlord shall be free to, and shall have no liability to Tenant if Landlord shall, lease the demised premises or any portion thereof to Tenant's proposed assignee or subtenant, as the case may be.

ARTICLE XIV

ADJACENT EXCAVATION - SHORING

14.01.  If an excavation or other substructure work shall be made upon land adjacent to the Property, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to

- 24 -

enter upon the demised premises for the purpose of doing such work as shall be necessary to preserve the wall of the Building from injury or damage and to support the same by proper foundations without diminution or abatement of rent.

ARTICLE XV

CONDEMNATION

15.01.  In the event that the whole of the demised premises shall be lawfully condemned or taken in any manner for any public or quasi-public use, this Lease and the term and estate hereby granted shall forthwith cease and terminate as of the date of vesting of title.  In the event that only a part of the Building shall be so condemned or taken, then (a) Landlord (whether or not the demised premises be affected) may, at Landlord's option, terminate this Lease and the term and estate hereby granted as of the date of such vesting of title by notifying Tenant in writing of such termination within 120 days following the date on which Landlord shall have received notice of vesting of title, or (b) if such condemnation or taking shall be of a substantial part of the demised premises or of a substantial part of the means of access thereto, Tenant may, at Tenant's option, by delivery of notice in writing to Landlord within 30 days following the date on which Tenant shall have received notice of vesting of title, terminate this Lease and the term and estate hereby granted as of the date of vesting of title, or (c) if neither Landlord nor Tenant elects to terminate this Lease, as aforesaid, this Lease shall be and remain unaffected by such condemnation or taking, except that (i) the fixed annual rent and the additional rent payable under Article V hereof shall be abated proportionately according to the reduction in the rentable area of the demised premises (if any) resulting from such condemnation or taking, and (ii) Landlord, at its expense, shall proceed with reasonable diligence to repair, alter and restore the remaining parts of the Building and the demised premises to substantially their former condition to the extent that the same may be feasible and so as to constitute a complete and tenantable Building and demised premises.

15.02.  In the event of any condemnation or taking of all or a part of the Building, Landlord shall be entitled to receive the entire award in the condemnation proceeding. Tenant hereby expressly assigns to Landlord any and all right, title and interest of Tenant now, or hereafter arising in or to any such award or any part thereof, and agrees that it shall not be entitled to receive any part of such award.  Nothing contained herein, however, shall prevent Tenant from pursuing a

- 25 -

separate claim against the condemning authority for the value of furnishings, equipment, and trade fixtures installed in the demised premises at Tenant's expense and for relocation expenses; provided, that such claim does not in any way diminish the award or compensation payable to or recoverable by Landlord in connection with such taking or condemnation.

15.03.   In the event any part of the demised premises be taken to effect compliance with any law or requirement of public authority other than in the manner hereinabove provided in this Article XV, then, (i) if such compliance is the obligation of Tenant under this Lease, Tenant shall not be entitled to any diminution or abatement of rent or other compensation from Landlord therefor, but (ii) if such compliance is the obligation of Landlord under this Lease, the fixed annual rent payable hereunder shall be reduced and additional rents under Article V shall be adjusted in the same manner as is provided in Section 15.01 according to the reduction in rentable area of the demised premises resulting from such taking.

## ARTICLE XVI

## ACCESS TO DEMISED PREMISES; CHANGES

16.01.   Tenant shall permit Landlord to erect, use and maintain pipes, ducts and conduits in and through the demised premises, provided the same are installed adjacent to or concealed behind walls and ceilings of the demised premises. Tenant shall permit Landlord or its agents or representatives to enter into and upon any part of the demised premises (including security areas accompanied by representatives of Tenant) at all reasonable hours without incurring any liability to Tenant (i) to inspect the same, clean or make repairs and other alterations or additions as Landlord may deem necessary or appropriate for the proper operation of the Building and in connection therewith Landlord may keep and store in the demised premises necessary tools, materials and equipment, (ii) to show the demised premises to prospective purchasers, or to any prospective or existing underlying landlord or mortgagee, (iii) to comply with the demand of any receiver, trustee, or assignee for the benefit of creditors, sheriff, marshal or court officer entitled to or reasonably purporting to be entitled to such access for the purpose of taking possession of or removing Tenant's property or for any other lawful purpose (but this provision and any action by Landlord hereunder shall not be deemed a recognition by Landlord that the person or official making such demand has any right or interest whatsoever), (iv) to comply with the demand of any

- 26 -

representative of the fire, police, building, sanitation or other department of the District of Columbia or federal government, and (v) within the last twelve months of the Term to show the demised premises to prospective tenants.  The exercise of any such rights shall not give rise to any liability by Landlord to Tenant and shall not constitute an eviction of Tenant in whole or in part and the rent shall not be abated by reason thereof or by reason of loss or interruption of Tenant's business, or otherwise.

16.02.  Landlord reserves the right, without the same constituting an actual or constructive eviction and without incurring liability to Tenant therefor, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the Building; provided, however, that the demised premises shall be visible from the street, public access on the street level directly into the demised premises shall not be cut off, access to the Building shall not be cut off and that there shall be no unreasonable obstruction of access to the demised premises or unreasonable interference with the use or enjoyment thereof.

16.03.  In the event of any emergency, Landlord or Landlord's agents may forcibly enter the demised premises without notice and without liability therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property) and without in any manner affecting the obligations and covenants of this Lease.

ARTICLE XVII

DEFAULT BY TENANT

17.01.  This Lease and the term and estate hereby granted are subject to the limitation that whenever Tenant shall make an assignment of the property of Tenant for the benefit of creditors, or if a petition shall be filed by or against Tenant under any provisions of the United States Bankruptcy Code or under the provisions of any other bankruptcy or insolvency law or any law of like import, or whenever a permanent receiver of Tenant or of or for the property of Tenant shall be appointed, then, Landlord may (a) at any time after receipt of notice of the occurrence of any such event, or (b) if such event occurs without the acquiescence of Tenant, at any time after the event continues for thirty (30) days, give Tenant a notice of intention to end the Term of this Lease at the expiration of five days from the date of service of such notice of intention, and upon the expiration of said five-day

- 27 -

period, this Lease and the term and estate hereby granted shall terminate with the same effect as if such day were the Expiration Date, but Tenant shall remain liable for damages as provided in Article XVIII.

17.02. This Lease and the term and estate hereby granted are subject to further limitation as follows:

(a) whenever Tenant shall fail to pay any installment of fixed annual rent or any additional rent or any other charge payable by Tenant to Landlord on the day the same is due and payable pursuant to the terms hereof, and such default shall continue for seven days after Landlord shall have given Tenant a notice specifying such default, or

(b) whenever Tenant shall do or permit anything to be done, whether by action or inaction, contrary to any of Tenant's obligations hereunder (except as provided in clauses (a), (c), (d), (e), (f), (g) or (h) of this Section 17.02) and if such situation shall continue and shall not be remedied by Tenant within 15 days after Landlord shall have given to Tenant a notice specifying the same, or, in the case of a happening or default which cannot with due diligence be cured within a period of 15 days and the continuation of the period required for cure will not subject Landlord to the risk of criminal liability or termination of any superior lease or foreclosure of any superior mortgage, if Tenant shall not, (i) within said 15-day period advise Landlord of Tenant's intention to duly institute all steps necessary to remedy such situation and (ii) duly institute within said 15-day period, and thereafter diligently and continuously prosecute to completion, all steps necessary to remedy the same, or

(c) whenever this Lease or the estate hereby granted or the unexpired balance of the Term hereof would, by operation of law or otherwise, devolve upon or pass to any person, firm or corporation other than Tenant, except as expressly permitted by Article XIII, or

(d) whenever Tenant shall abandon the demised premises for a continuous period of at least 30 days (unless as a result of a casualty), or

(e) whenever in case any other lease held by Tenant from Landlord shall expire and terminate as a result of the default of Tenant thereunder, or

(f) whenever Tenant shall default in complying with the provisions of Section 8.02 with respect to the

— 28 —

discharge or bonding of mechanic's liens within the time period therein provided, or

(g) whenever Tenant shall default in the due keeping, observing or performance of any covenant, agreement, provision or condition of Article VII hereof on the part of Tenant and if such default shall continue and shall not be remedied by Tenant within ten business days after Landlord shall have given to Tenant a notice specifying the same, or

(h) whenever Tenant shall default pursuant to clauses (a)-(d), (f) or (g) above and Landlord shall give Tenant notice of three such defaults in any twelve-month period, regardless of whether Tenant remedies the same within any period of time specified in such clauses, then Landlord may give to Tenant a notice of intention to end the Term at the expiration of three days from the date of the service of such notice of intention, and upon the expiration of such three-day period this Lease and the term and estate hereby granted shall terminate with the same effect as if such day were the Expiration Date, but Tenant shall remain liable for damages as provided in Article XVIII.

17.03.  In the event of the occurrence of any of the events specified in Section 17.01 or 17.02 with or without terminating this Lease, Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter the demised premises, or any part thereof, by summary dispossess proceedings or by any suitable action or proceeding at law or in equity, without being liable to indictment, prosecution or damages therefrom.  The word re-enter, as herein used, is not restricted to its technical legal meaning.

17.04.  In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease, Landlord shall also have the right of injunction.  The special remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Landlord may lawfully be entitled at any time and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

17.05.  If this Lease shall terminate under the provisions of Section 17.01 or 17.02 or if Landlord shall re-enter the demised premises in accordance with Section 17.03, then (a) Tenant shall thereupon pay to Landlord the fixed annual rent and additional rent payable by Tenant to Landlord up to the time of such termination of this Lease, or of such recovery of possession of the demised premises by Landlord, as the case

- 29 -

may be, and shall also pay to Landlord damages as provided in Article XVIII, and (b) Landlord shall be entitled to retain any monies paid by Tenant to Landlord, whether as advance rent or otherwise, but such monies shall be credited by Landlord against any fixed annual rent or additional rent due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under Article XVIII or pursuant to law.

17.06.   Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event Tenant is evicted or dispossessed for any violation of this Lease by Tenant, or in the event Landlord obtains possession of the demised premises, by reason of the violation by Tenant of any of the covenants and conditions of this Lease or otherwise.

## ARTICLE XVIII

### DAMAGES

18.01.   If this Lease is terminated under the provisions of Article 17.01 or 17.02, or if Landlord shall re-enter the demised premises under the provisions of Article 17.03, Tenant shall pay to Landlord as damages, at the election of Landlord, either:

(a)   a sum which at the time of such termination of this Lease or at the time of any such re-entry by Landlord, as the case may be, represents the then value of the excess, if any, of

(1)   the aggregate of the fixed annual rent and the additional rent payable hereunder which would have been payable by Tenant for the period commencing with such earlier termination of this Lease or the date of any such re-entry, as the case may be, and ending with the Expiration Date, had this Lease not so terminated or had Landlord not so re-entered the demised premises, over

(2)   the aggregate rental value of the demised premises for the same period, or

(b)   sums equal to the fixed annual rent and the additional rent payable hereunder which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the demised premises, payable upon the due dates therefor specified herein following such termination or such reentry and until the Expiration Date, provided, however, that

– 30 –

if Landlord shall re-let the demised premises during said period, Landlord shall credit Tenant with the net rents received by Landlord from such re-letting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such re-letting; the expenses incurred or paid by Landlord in terminating this Lease or in re-entering the demised premises and in securing possession thereof, as well as the expenses of re-letting, including altering and preparing the demised premises for new tenants, brokers' commissions, legal fees, and all other expenses properly chargeable against the demised premises and the rental thereof; it being understood that any such re-letting may be for a period shorter or longer than the remaining term of this Lease.   In no event shall Tenant be entitled to receive any excess of such net rents over the sums payable by Tenant to Landlord hereunder for the period of such re-letting, nor shall Tenant be entitled in any suit for the collection of damages pursuant to this subsection to a credit in respect of any net rents from a re-letting, except to the extent that such net rents are actually received by Landlord.   If the demised premises or any part thereof should be re-let in combination with other space, then proper apportionment on a square foot basis shall be made of the rent received from such re-letting and of the expenses of re-letting.

If the demised premises or any part thereof be re-let by Landlord for the unexpired portion of the term of this Lease, or any part thereof, before presentation of proof of such damages to any court, commission or tribunal, the amount of rent payable pursuant to such re-letting shall, prima facie, be the fair and reasonable rental value for the demised premises, or part thereof, so re-let during the term of the re-letting.

18.02.   Suit or suits for the recovery of such damages, or any installments thereof, may be brought by Landlord from time to time at its election, and nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the Term would have expired if it had not been so terminated under the provision of Article 17.01 or 17.02 or under any provision of law, or had Landlord not re-entered the demised premises. Nothing herein contained shall be construed to limit or preclude recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant.   Nothing herein contained shall be construed to limit or prejudice the right of Landlord to provide for and obtain as liquidated damages by reason of the termination of this Lease

- 31 -

or re—entry of the demised premises for the default of Tenant
under this Lease, an amount equal to the maximum allowed by any
statute or rule of law in effect at the time when, and
governing the proceedings in which, such damages are to be
proved whether or not such amount be greater, equal to, or less
than any of the sums referred to in Section 18.01.

## ARTICLE XIX

### LANDLORD'S RIGHT TO PERFORM TENANT'S OBLIGATIONS

19.01.  If Tenant shall default in the observance or
performance of any term or covenant on Tenant's part to be
observed or performed under any of the terms or provisions of
this Lease, (a) Landlord may remedy such default for the
account of Tenant, immediately and without notice in case of
emergency, or in any other case if Tenant shall fail to remedy
such default with all reasonable dispatch after Landlord shall
have notified Tenant in writing of such default and the
applicable grace period for curing such default shall have
expired; and (b) if Landlord makes any expenditures or incurs
any obligations for the payment of money in connection with
such default including, but not limited to, reasonable
attorneys' fees in instituting, prosecuting or defending any
action or proceeding, such sums paid or obligations incurred,
with interest at the Interest Rate, shall be deemed to be
additional rent hereunder and shall be paid by Tenant to Land—
lord upon demand.  The provisions of this Article XIX shall
survive the expiration or other termination of this Lease.

## ARTICLE XX

### QUIET ENJOYMENT

20.01.  Landlord covenants and agrees that, subject to
the terms and provisions of this Lease, if, and so long as,
Tenant keeps and performs each and every covenant, agreement,
term, provision and condition herein contained on the part of
or on behalf of Tenant to be kept or performed, then Tenant's
rights under this Lease shall not be cut off or ended before
the expiration of the Term of this Lease, subject however, to
the terms of this Lease including, without limitation, the
provisions of Article XXV hereof.

## ARTICLE XXI

### SERVICES AND EQUIPMENT

21.01.  So long as Tenant is not in default under any
of the covenants of this Lease, Landlord shall furnish water

– 32 –

for lavatory and drinking and office cleaning purposes and hot and chilled water for heating and cooling. If Tenant requires, uses or consumes water for any other purpose, Landlord may install a meter or meters or other means to measure Tenant's water consumption, and Tenant shall reimburse Landlord for the cost of the meter or meters and the installation thereof, and pay for the maintenance of said meter equipment and/or pay Landlord's cost of other means of measuring such water consumption by Tenant. Tenant shall reimburse Landlord for the cost of all water consumed in excess of that estimated to be consumed for lavatory, drinking and office cleaning purposes, and for hot and chilled water, as measured by said meter or meters or as otherwise measured, including sewer rents.

21.02. So long as Tenant is not in default under any of the covenants of this Lease, Landlord shall maintain electric systems, conduits and connections which are necessary to maintain electric service in the demised premises. The Landlord agrees to furnish hot water for heating and chilled water for cooling to the demised premises during the seasons of the year and during the hours of the day when the same is generally furnished to other tenants in the building. Landlord reserves the right without any liability whatsoever, or abatement of fixed annual rent, or additional rent, to stop the heating, air conditioning, elevator, plumbing, electric and other systems when necessary by reason of accident or emergency or for repairs, alterations, replacements or improvements, provided that except in case of emergency, Landlord will notify Tenant in advance, if possible, of any such stoppage and, if ascertainable, its estimated duration, and will proceed diligently with the work necessary to resume such service as promptly as possible and in a manner so as to minimize interference with Tenant's use and enjoyment of the demised premises, but Landlord shall not be obligated to employ overtime or premium labor therefor.

21.03. Except as otherwise provided in this Lease, Landlord will not be required to furnish any other services, including without limitation electricity, janitorial services or repairs and maintenance within the demised premises, all of which services shall be provided by Tenant at Tenant's sole cost.

ARTICLE XXII

DEFINITIONS

22.01. The term "Landlord" as used in this Lease means only the owner, or the mortgagee in possession, for the

- 33 -

time being of the Building (or the owner of a lease of the Building), so that in the event of any transfer of title to Building, upon notification to Tenant of such transfer or lease the transferor Landlord shall be and hereby is entirely freed and relieved of all existing or future covenants, obligations and liabilities of Landlord hereunder, and it shall be deemed and construed as a covenant running with the land without further agreement between the parties or their successors in interest, or between the parties and the transferee of title to the Building or said lease, that the transferee or the lessee, as applicable, has assumed and agreed to carry out any and all such covenants, obligations and liabilities of Landlord hereunder.

22.02.    The term "Business Days" as used in this Lease shall exclude Saturdays, Sundays and all days observed as legal holidays by the United States Government.

22.03.    "Interest Rate" shall mean a rate per annum equal to the lesser of (a) three percent (3%) above the prime commercial lending rate of The Riggs National Bank of Washington, D.C., or (b) the maximum rate of interest, if any, which Tenant may legally contract to pay.

22.04.    "Legal Requirements" shall mean laws, statutes and ordinances including building codes and zoning regulations and ordinances and the orders, rules, regulations, directives and requirements of all federal, state, county, city and borough departments, bureaus, boards, agencies, offices, commissions and other subdivisions thereof, or of any official thereof, or of any other governmental, public or quasi-public authority, whether now or hereafter in force, which may be applicable to the Land or Building or the demised premises or any part thereof, or the sidewalks, curbs or areas adjacent thereto and all requirements, obligations and conditions of all instruments of record on the date of this Lease.

ARTICLE XXIII

INVALIDITY OF ANY PROVISION

23.01.    If any term, covenant, condition or provision of this Lease or the application thereof to any circumstance or to any person, firm or corporation shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions and provisions of this Lease shall not be affected thereby and each remaining term, covenant, condition and provision of this Lease shall be valid and shall be enforceable to the fullest extent permitted by law.

- 34 -

## ARTICLE XXIV

### BROKERAGE

24.01.   Landlord and Tenant each covenant, represent and warrant to one another that each party has had no dealings or negotiations with any broker or agent other than Jones Lang Wootton in connection with the consummation of this Lease, and Tenant covenants and agrees to pay, hold harmless and indemnify Landlord, and Landlord agrees to pay, hold harmless and indemnify Tenant, from and against any and all cost, expense (including reasonable attorneys' fees and court costs), loss and liability for any compensation, commissions or charges claimed by any broker or agent, other than the brokers named in this Section 24.01, with respect to this Lease or the negotiation thereof if such claim or claims by any such other broker or agent are based in whole or in part on dealing with Tenant or its representatives, or Landlord and its representatives, respectively.   Landlord agrees to pay to the brokers specified in this Section 24.01 such compensation, commission or charges to which they are entitled pursuant to the separate agreements between such brokers and Landlord.

## ARTICLE XXV

### SUBORDINATION

25.01.   This Lease is and shall be subject and subordinate to all ground or underlying leases which may now or hereafter affect the Land or the Building and to all mortgages which may now or hereafter affect such leases, the Land or the Building, and to all renewals, refinancings, modifications, replacements and extensions thereof (hereinafter called "Superior Instruments") provided that the holder thereof agrees, so long as Tenant is not in default hereunder, not to disturb Tenant's possession hereunder.   This Lease shall remain in full force and effect upon any sale or assignment of, or foreclosure upon, the Building or the Land pursuant to a Superior Instrument, and thereupon Tenant shall not be entitled to terminate this Lease.   The provisions of this Section 25.01 shall be self-operative and no further instrument of subordination shall be required.   In confirmation of such subordination, Tenant shall promptly execute and deliver any instrument, in recordable form if required, that Landlord, the holder of any Superior Instrument or any of their respective successors in interest may request to evidence such subordination, within 7 days after such request.   Tenant hereby constitutes and appoints Landlord or its successors in interest to be Tenant's attorney-in-fact, irrevocably and coupled with

- 35 -

an interest, to execute and deliver such instrument for and on
behalf of Tenant, upon the failure of Tenant to execute and
deliver such instrument within such 7-day period.  Landlord
shall use reasonable efforts to obtain non-disturbance and
attornment agreements from any future holder of a Superior
Instrument.

25.02.    In the event of a termination of any ground or
underlying lease, or if the interests of Landlord under this
Lease are transferred by reason of, or assigned in lieu of,
foreclosure or other proceeding for enforcement of any
mortgage, or if the holder of any mortgage acquires a lease in
substitution therefor, then Tenant under this Lease will, at
the option to be exercised in writing by the holder of any such
Superior Instrument or any purchaser, assignee or lessee, as
the case may be, either (i) attorn to it and agree to perform
for its benefit all the terms, covenants and conditions of this
Lease on Tenant's part to be performed with the same force and
effect as if it were the landlord originally named in this
Lease, if such holder, purchaser, assignee or lessee shall
agree to perform all of Landlord's obligations hereunder and
recognize Tenant as its tenant hereunder and agree not to
disturb Tenant's possession under this Lease so long as Tenant
shall not be in default hereunder, or (ii) enter into a new
lease with it for the remaining term of this Lease and
otherwise on the same terms and conditions and with the same
options, if any, then remaining.  The provisions of this
Section 25.02 shall inure to the benefit of such holder of a
Superior Instrument, purchaser, assignee or lessee, and shall
be self-operative upon the exercise of such option, and no
further instrument shall be required to give effect to such
option.  Tenant, however, upon demand of any such holder of a
Superior Instrument, purchaser, assignee or lessee agrees to
execute, from time to time, within 7 days after a request
therefor, instruments in confirmation of the foregoing
provision of this Section 25.02, satisfactory to any such
holder of a Superior Instrument, purchaser, assignee or lessee,
acknowledging such attornment and setting forth the terms and
conditions of its tenancy.  Tenant hereby constitutes and
appoints Landlord or its successors in interest to be Tenant's
attorney-in-fact, irrevocably and coupled with an interest, to
execute and deliver such instrument of attornment, or such new
lease, upon the failure of Tenant to execute such instrument
within such 7-day period.

25.03.    Notwithstanding anything contained herein to
the contrary, under no circumstances shall any such holder of a
Superior Instrument, purchaser, assignee or lessee, as the case
may be, whether or not it shall have succeeded to the interests
of the Landlord under this Lease, be

- 36 -

(a)    liable for any act, omission or default of any prior landlord; or

(b)    subject to any offsets, claims or defenses which Tenant might have against any prior landlord; or

(c)    bound by any rent or additional rent which Tenant might have paid to any prior landlord for more than one month in advance or for more than three months in advance where such rent payments are payable at intervals of more than one month; or

(d)    bound by any modification, amendment or abridgment of the Lease, or any cancellation or surrender of the same, made without its prior written approval.

25.04.    In the event of any act or omission by Landlord which would give Tenant the right to terminate this Lease, Tenant will not exercise such right until Tenant shall have first given written notice of such act or omission to the holder of any Superior Instrument who shall have furnished such holder's last address to Tenant, and until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notices, during which time such holder shall have the right, but shall not be obligated, to remedy or cause to be remedied such act or omission.  Tenant further agrees not to exercise any such right if the holder of any such Superior Instrument commences to cure such act or omission within a reasonable time after having received notice thereof and diligently prosecutes such cure thereafter.

25.05.    If, in connection with the financing of the Building, the holder of any mortgage shall request reasonable modifications in this Lease as a condition of approval thereof, Tenant will not unreasonably withhold, delay or defer making such modifications provided the same are not material modifications of this Lease and do not (i) increase the fixed annual rent or additional rents payable by Tenant, (ii) reduce the Term hereof or (iii) extend the Term hereof.

ARTICLE XXVI

CERTIFICATE OF TENANT

26.01.  (a)    Tenant shall, without charge, at any time and from time to time, within 10 days after request by Landlord, execute, acknowledge and deliver to Landlord, the holder of a Superior Instrument or any other person, firm or corporation specified by Landlord, a written instrument in the

- 37 -

form attached hereto as Exhibit C or such other form as may be required by the holder of any Superior Instrument.

(b)    Landlord shall without charge, upon reasonable request by Tenant, execute, acknowledge and deliver to a proposed assignee or subleasee, permitted in accordance with the provisions of Article XIII of this Lease which such assignee or subleasee has signed an agreement pursuant to Section 13.03 of this Lease, a written instrument stating, if true as of the date thereof that Landlord has no actual knowledge, without performing any inquiry, of any default of the terms and provisions of this Lease by Tenant or any pending claim by Landlord against Tenant and based on these statements, this Lease is in full force and effect.

## ARTICLE XXVII

### LEGAL PROCEEDINGS, WAIVER OF JURY TRIAL

27.01.   Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way in connection with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the demised premises, and/or any other claims.

## ARTICLE XXVIII

### RULES AND REGULATIONS

28.01.   Tenant and Tenant's servants, employees and agents shall observe faithfully and comply strictly with such reasonable rules and regulations as Landlord or Landlord's agents may from time to time adopt; provided, however, that in case of any conflict or inconsistency between the provisions of this Lease and of any of such rules and regulations, the provisions of this Lease shall control and that such rules and regulations are universally applied to and enforced against the tenants of the Building.   Reasonable written notice of any additional rules and regulations shall be given to Tenant prior to Landlord's enforcement of such rules and regulations.   The present rules and regulations are attached on Exhibit D.

28.02.   Nothing in this Lease contained shall be construed to impose upon Landlord any duty or obligation to enforce the rules and regulations or the terms, covenants or conditions in any other lease, against any other tenant of the Building, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.

## ARTICLE XXIX

### CONSENTS AND APPROVALS

29.01.  (a)  Whenever Landlord's consent or approval is required in this Lease, Landlord shall not unreasonably delay notifying Tenant whether its approval shall be granted or withheld.

(b)  Whenever Landlord's consent or approval is required in this Lease and this Lease does not provide that such approval or consent shall not be unreasonably withheld, Landlord may determine in its sole discretion whether to grant such consent or approval, regardless of whether such refusal to consent or approve may be deemed arbitrary.

## ARTICLE XXX

### NOTICES

30.01.  Any notice or demand, consent, approval or disapproval, or statement (collectively called "Notices") required or permitted to be given by the terms and provisions of this Lease, or by any law or governmental regulation, either by Landlord to Tenant or by Tenant to Landlord, shall be in writing and unless otherwise required by such law or regulation, shall be personally delivered or sent by United States mail postage prepaid as registered or certified mail, return receipt requested.  Any Notice shall be addressed to Landlord or Tenant, as applicable, at its address set forth on page 1 of this Lease as such address may be changed from time to time as hereinafter provided and as to Tenant such Notice shall be addressed to Mr. William Fitzgerald, Sr. and shall be delivered to him if such Notice is personally delivered.  After Tenant shall occupy the demised premises, the address of Tenant for Notices shall be at the Building.  By giving the other party at least ten (10) days prior written notice, either party may, by Notice given as above provided, designate a different address or addresses for Notices.

30.02.  Any Notice shall be deemed given as of the date of delivery as indicated by affidavit in case of personal delivery or by the return receipt in the case of mailing; and in the event of failure to deliver by reason of changed address of which no Notice was given or refusal to accept delivery, as of the date of such failure as indicated by affidavit or on the return receipt or by notice of the postal service, as the case may be.

30.03.  In addition to the foregoing, either Landlord or Tenant may, from time to time, request in writing that the other party serve a copy of any Notice on one other person or entity designated in such request, such service to be effected as provided in Section 30.01 hereof.

ARTICLE XXXI

NO WAIVER

31.01.  No agreement to accept a surrender of this Lease shall be valid unless such agreement is in writing and signed by Landlord.  No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the demised premises prior to the termination of this Lease.  The delivery of keys to any employee of Landlord or of Landlord's agent shall not operate as a termination of this Lease or a surrender of the demised premises. In the event Tenant at any time desires to have Landlord sublet the premises for Tenant's account, Landlord or Landlord's agents are authorized to receive said keys for such purpose without releasing Tenant from any of the obligations under this Lease. The failure of Landlord or Tenant to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease or any of the Rules and Regulations set forth herein, or hereafter adopted by Landlord, shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation.  The receipt by Landlord, or the payment by Tenant, of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach.  The failure of Landlord to enforce any of the Rules and Regulations set forth herein, or hereafter adopted, against Tenant and/or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations.  No provision of this Lease shall be deemed to have been waived by Landlord or Tenant unless such waiver be in writing signed by such party.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on the account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment of rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

31.02.  This Lease contains the entire agreement between the parties, and any executory agreement hereafter made

shall be ineffective to change, modify, discharge or effect an abandonment of this Lease in whole or in part unless such executory agreement is in writing and signed by the party against whom enforcement of such change, modification, discharge or abandonment is sought.

## ARTICLE XXXII

### INABILITY TO PERFORM

32.01.    (a)    If, by reason of (1) strike, (2) labor troubles, (3) governmental preemption in connection with a national emergency, (4) any rule, order or regulation of any governmental agency, (5) conditions of supply or demand which are caused by war or other national, district or municipal emergency, or (6) any cause beyond Landlord's reasonable control, Landlord shall be unable to fulfill its obligations under this Lease except Tenant's obligation to pay rent, additional rent, fees, and all other charges whatsoever required hereunder, or shall be unable to supply any service which Landlord is obligated to supply, this Lease and Tenant's obligation to pay rent hereunder shall in no way be affected, impaired or excused except in the event of a constructive eviction.

(b)    If, by reason of (1) strike, (2) labor troubles, (3) governmental preemption in connection with a national emergency, (4) any rule, order or regulation of any governmental agency, (5) conditions of supply or demand which are caused by war or other national, district or municipal emergency, or (6) any cause beyond Tenant's reasonable control, Tenant shall be unable to fulfill its obligations under this Lease or shall be unable to supply any service which Tenant is obligated to supply, this Lease shall in no way be affected, impaired or excused except in the event of a constructive eviction.

## ARTICLE XXXIII

### NO REPRESENTATIONS BY LANDLORD

33.01.    Landlord or Landlord's agents have made no representations or promises with respect to the Building or demised premises except as herein expressly set forth.

ARTICLE XXXIV

NAME OF BUILDING

34.01.  The name of the Building shall be 1225 Connecticut Avenue, N.W.  Landlord shall have the full right at any time to name and change the name of the Building and to change the designated address of the Building.

ARTICLE XXXV

ARBITRATION

35.01.  In each case specified in this Lease in which resort to arbitration shall be required, such arbitration (unless otherwise specifically provided in other sections of this Lease) shall be in the District of Columbia in accordance with the Commercial Arbitration Rules of the American Arbitration Association and the provisions of this Lease.  The decision and award of the arbitrators shall be in writing, shall be final and conclusive on the parties, and counterpart copies thereof shall be delivered to each of the parties.  In rendering such decision and awards, the arbitrators shall not add to, subtract from or otherwise modify the provisions of this Lease.  Judgment may be had on the decision and award of the arbitrators so rendered in any court of competent jurisdiction.

ARTICLE XXXVI

INDEMNITY

36.01.  Except for any loss or damage caused by the wilful misconduct or gross negligence of Landlord, its agents, servants or employees, Tenant hereby indemnifies and agrees to defend and save Landlord harmless from and against any loss, liability, cost and expense (including reasonable attorneys' fees) arising from the use or occupation of the demised premises by Tenant, its agents, servants or employees, and/or from any breach of this Lease by Tenant.

ARTICLE XXXVII

MEMORANDUM OF LEASE

37.01.  Either party shall, at the request of the other, execute and deliver a statutory form of memorandum of this Lease for the purpose of recording; provided, however (i) such memorandum of this Lease shall not in any circumstances be

- 42 -

deemed to modify or to change any of the provisions of this Lease, (ii) the costs of the preparation and recordation of such memorandum shall be the responsibility of the party requesting the execution of same, and (iii) neither party shall record this Lease.

ARTICLE XXXVIII

[Intentionally omitted.]

ARTICLE XXXIX

HOLDOVER

39.01.  In the event that Tenant shall not immediately surrender the demised premises on the Expiration Date, Tenant shall become a month-to-month tenant at a monthly rental equal to the greater of:  (i) one and one-half times the fixed annual rent due during the last full calendar month of the Term plus all additional rent due for such periods (prorated on a monthly basis) or (ii) the then current market rental for space in the Building.  Said monthly tenancy shall commence on the first day following the expiration of the Term.  As a monthly tenant, Tenant shall be subject to all terms, conditions, covenants and agreements of this Lease.  Tenant shall give to Landlord at least 30 days' written notice of any intention to quit the demised premises, and Tenant shall be entitled to 30 days' written notice to quit the demised premises, unless Tenant is in default hereunder, in which event Tenant shall not be entitled to any notice to quit, any right of Tenant in such event to a notice to quit is hereby expressly waived. Notwithstanding the foregoing provision of this Section 39.01, in the event that Tenant shall holdover after the expiration of the Term, and if Landlord shall desire to regain possession of the demised premises promptly at the expiration of the Term, then at any time prior to Landlord's acceptance of rent from Tenant as a monthly tenant hereunder, Landlord, at its option, may forthwith re-enter and take possession of the demised premises without process, or by any legal process in force in the District of Columbia.  If the demised premises are not surrendered after the expiration or sooner termination of this Lease, Tenant hereby indemnifies Landlord against liability resulting from delay by Tenant in so surrendering the demised premises, including any claims made by any succeeding tenant or prospective tenant founded upon such delay and from any loss of rent with respect to such prospective tenant.

- 43 -

ARTICLE XL

[intentionally omitted]

ARTICLE XLI

MISCELLANEOUS

41.01.    This Lease shall be governed by and construed in accordance with the laws of the District of Columbia.

41.02.    This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.

41.03.    Except as otherwise expressly provided in this Lease, each covenant, agreement, obligation or other provision of this Lease on Tenant's part to be performed shall be deemed and construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease.

41.04.    All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

41.05.    Except as otherwise provided herein, whenever payment of interest is required by the terms hereof it shall be at the Interest Rate.

41.06.    The captions are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

41.07.    In the event that Tenant is in arrears in payment of fixed annual rent or additional rent hereunder, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Tenant agrees that Landlord may apply any payments made by Tenant to any items it sees fit irrespective of and notwithstanding any designation or request by Tenant as to the items against which any such payments shall be credited.

41.08.    Tenant hereby acknowledges that in order to avoid delay this Lease has been prepared and submitted to Tenant for signature with the understanding that it shall not be deemed an offer by Landlord or bind Landlord unless and until it is executed and delivered by Landlord.

— 44 —

41.09.  All Exhibits referred to in this Lease are hereby incorporated in this Lease by reference.

41.10.  The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, distributees, executors, administrators, successors, and except as otherwise provided in this Lease, their assigns.

41.11.  The parties agree that the introductory Recitals are intended to be made a part of the provisions of this Lease and are hereby incorporated in this Lease by reference.

41.12.  This Lease represents the entire agreement between the parties as of the date hereof and the provisions hereof supercede any and all prior agreements between the parties.

ARTICLE XLII

PARKING

42.01.  Landlord shall use reasonable efforts to cause the parking garage operator to provide to Tenant, at the prevailing market rate, two (2) parking spaces in the parking garage located beneath the Building.

- 45 -

     IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease under seal as of the day and year first above written.

POOL 1225 ASSOCIATES,
Landlord

By: _____

Name: _A. Fogcty_    [SEAL]

Title: _V.P._


INDEPENDENCE FEDERAL SAVINGS BANK,
Tenant

By: _____

Name: _____    [SEAL]

Title: _____

- 46 -

## EXHIBIT A

[The Demised Premises]

MEMORANDUM OF LEASE

This agreement made the _____*16th*_____ day of December, 1988, between POOL 1225 ASSOCIATES, a District of Columbia Limited Partnership, having an office c/o Jones Lang Wootton, Five Hanover Square, New York, New York 10004, Landlord, and INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, having an office at 1225 Connecticut Avenue, N.W., Washington, D.C., Tenant.

Witnesseth:

That Landlord, in consideration of the rents reserved and on the terms, covenants, agreements and conditions contained in a certain lease between the same parties dated the _____*16th*_____ day of December, 1988, hereby leases to Tenant and Tenant hereby leases and hires from Landlord the portion of Lobby Space (containing approximately 6,450 square feet in total) as described in the said lease and as presently constructed, in the building known as 1225 Connecticut Avenue, N.W., Washington, D.C., on the Land described on Exhibit A annexed hereto, for the term commencing on the first day of January, 1989 and ending at 5:00 p.m. on December 31, 2000.

In witness whereof the parties hereto have executed this Memorandum of Lease the _____*16th*_____ day of December, 1988.

POOL 1225 ASSOCIATES,
Landlord

By: _____

Name: *A. Edgley*                [SEAL]

Title: *V.P.*


INDEPENDENCE FEDERAL SAVINGS BANK,
Tenant

By: _____

Name: _____        [SEAL]

Title: _____

EXHIBIT A

[The Land]

Lot numbered Eighty-two (82) in Square numbered One
Hundred Fifty-nine (159) in the subdivision made by
1225 Connecticut Avenue Associates, as per plat
recorded in the Office of the Surveyor for the
District of Columbia in Liber 150 at folio 197.

EPR7172/78

DISTRICT OF COLUMBIA, to-wit:

I, _Dorothy J. Pindie_, a notary public in and for the District of Columbia, do hereby certify that _William B. Fitzgerald_, party to a certain Memorandum of Lease bearing date on the _19th_ day of December, 1988, and hereto annexed, personally appeared before me in said District, the said _William B. Fitzgerald_ being personally well-known to me as the _President_ of INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, and the person who executed the said Memorandum of Lease and by virtue and in pursuance of the authority conferred upon him/her by the Board of Directors of INDEPENDENCE FEDERAL SAVINGS BANK, acknowledged the same to be the corporate act and deed of INDEPENDENCE FEDERAL SAVINGS BANK and that he/she executed said instrument in the name of INDEPENDENCE FEDERAL SAVINGS BANK as its _President_.

Given under my hand and seal this _19th_ day of _December_, 19_88_.

_Dorothy J. Pindie_
Notary Public

My Commission Expires: MY COMMISSION EXPIRES JULY 31, 1990

DISTRICT OF COLUMBIA, to-wit:

I, _Patricia Scott Hanges_, a notary public in and
for the State of New Jersey   do hereby certify
that _Anthony P.D. Edgley_, _Vice President_
of _Pool 1225 Associates_, General Partner of POOL
1225 ASSOCIATES, a District of Columbia Limited Partnership,
which limited partnership is a party to a certain Memorandum of
Lease bearing date on the ___16th___ day of December, 1988, and
hereto annexed, personally appeared before me in said District,
the said _Anthony P.D. Edgley_, being personally
well-known to me as the _8 Vice President_
of _Pool 1225 Associates_, General Partner of
POOL 1225 ASSOCIATES, and the person who executed the said
Memorandum of Lease and, by virtue and in pursuance of the
authority conferred upon him by _the Board of Directors_
of _Pool 1225 Associates_,
acknowledged the same to be the act and deed
of _Pool 1225 Associates_, General Partner of
POOL 1225 ASSOCIATES and that he executed said instrument in the
name of POOL 1225 ASSOCIATES.

Given under my hand and seal this ___9 TH___ day
of _January_, 19_49_.

_Patricia Scott Hanges_
Notary Public

My Commission Expires:

PATRICIA SCOTT HANGES
Notary Public, State of New Jersey
No. 2039522
Qualified in Bergen County
Commission Expires January 19, 19_93_

**POOL 1225 ASSOCIATES**
**c/o Jones Lang Wootton**
**Five Hanover Square**
**New York, New York 10004**

Independence Federal Savings Bank
1225 Connecticut Avenue, N.W.
Washington, D.C.

Re:    Lease of Premises at 1225 Connecticut
Avenue, N.W., Washington, D.C. dated
January 9, 1989

Ladies and Gentlemen:

In connection with the execution of the referenced lease, you have asked us for
certain information regarding the current status of your tenancy. As of
January 1, 1989, the undersigned has no actual knowledge, having made no
independent investigation or special inquiry, of any default by Tenant (as
defined in the referenced lease) of th terms and provisions of the Prior Leases
(as defined in the referenced lease) pursuant to such Prior Leases and all rents
and charges have been paid through December 31, 1988.

Very truly yours,

POOL 1125 ASSOCIATES

By: _____
Name: *Anthony P. D. Edgley*
Title: *V. P.*

– 47 –

EXHIBIT B

[The Land]

Lot numbered Eighty-two (82) in Square numbered One
Hundred Fifty-nine (159) in the subdivision made by
1225 Connecticut Avenue Associates, as per plat
recorded in the Office of the Surveyor for the
District of Columbia in Liber 150 at folio 197.

0502i

# EXHIBIT B

)

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made this 25 day of April, 2001, but effective for all purposes as of January 1, 2001, by and between INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, having an address at 1225 Connecticut Avenue, N.W., Washington, D.C. 20036 ("**Tenant**"), and BRE/CONNECTICUT L.L.C., a Delaware limited liability company, successor in interest to Pool 1225 Associates, having an address at c/o The Blackstone Group, 345 Park Avenue, New York, New York 10154 ("**Landlord**").

### W I T N E S S E T H:

WHEREAS, pursuant to that certain Agreement of Lease made December 16, 1988 between Landlord and Tenant (the "**Lease**"), Tenant leases from Landlord a certain portion of the first or main lobby floor (the "**Demised Premises**") in the building known as 1225 Connecticut Avenue, N.W., Washington, D.C. 20036 (the "**Building**"); and

WHEREAS, Landlord and Tenant desire to amend the Lease to, among other things, extend the Lease term, reflect the re-measurement of the Demised Premises and the Building and make certain other modifications as more fully set forth herein.

NOW THEREFORE, in consideration of the premises and mutual promises herein contained and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.   Capitalized Terms. All capitalized terms used in this Amendment shall have the meanings ascribed to such terms in the Lease unless expressly provided otherwise herein. The following definition is added to Article XXII of the Lease in the correct alphabetical order:

"**Lease Year**" shall mean the period commencing January 1, 2001 and ending on the last day of the month which completes twelve (12) full calendar months thereafter, and each 12-month period thereafter commencing on the first day after the end of the immediately preceding Lease Year, except that the last Lease Year shall end on the last day of the Term.

2.   Re-Measurement of Demised Premises/Building. Landlord has re-measured the Demised Premises in accordance with the Modified GWCAR standard and the rentable square footage of the Demised Premises as so re-measured is 6,870. Accordingly, the number "**6,450**" is hereby replaced with the number "**6,870**" wherever it appears in the Lease. Landlord has re-measured the Building in accordance with the Modified GWCAR standard and the rentable square footage of the Building (excluding retail areas) as so re-measured is 204,854.

3.    Term.  Section 2.01 of the Lease is hereby deleted in its entirety and replaced with the following:

"2.01    The term of this Lease shall be a period of ten years (the "**Term**") commencing on January 1, 2001 (the "**Commencement Date**"), and expiring at 11:59 p.m. on December 31, 2010 (the "**Expiration Date**") unless such Term shall sooner cease and expire as hereinafter provided."

4.    Extension Option.  The following is hereby inserted in the Lease immediately after current Section 2.02 as Section 2.03 of the Lease:

"2.03    Tenant's Option to Extend Term.

(a)    Extension Option.  Subject to the limitations of Section 2.03(c), Tenant shall have the option (the "**Extension Option**") to extend the Term for one (1) additional period of five (5) years (such additional period being hereinafter referred to as the "**Extension Period**").  The Extension Period shall begin on the day after the end of the Term and shall end on the day which completes five years thereafter.  If Tenant timely exercises the Extension Option in accordance with this Section, the Term and the Expiration Date shall be extended accordingly.  Except as otherwise expressly provided in this Section, the Extension Period shall be upon the same terms, covenants and conditions set forth in this Lease with respect to the Term; except that there shall be no extension option after the Extension Period; and, Landlord shall have no obligation to pay Tenant the Allowance or to make (or pay for) improvements to the demised premises.

(b)    Manner of Exercise.  The Extension Option shall be exercisable by Tenant by giving notice of the exercise of the Extension Option to Landlord at least one hundred eighty (180) days before the end of the last Lease Year in the Term.  Time shall be of the essence in connection with Tenant's exercise of the Extension Option.

(c)    Limitations on Exercise of Extension Option.  Tenant may not exercise the Extension Option if, at the time of a purported exercise of the Extension Option an Event of Default has occurred and is continuing.

(d)    Rent per Square Foot During Extension Period.  If Tenant timely exercises the Extension Option, the Rent per Square Foot for each Lease Year in the Extension Period shall be an amount equal to the Fair Rental Value of the Premises for the Extension Period as determined by mutual agreement between Landlord and Tenant or by appraisal by one or more commercial real estate brokers in the manner provided in Section 2.03(f).  The "**Fair Rental Value of the Premises**" shall be (i) in the case of the first Lease Year in the applicable Extension Period, an amount equal to the fair rental value (per square foot) of the demised premises as of the

first day of such Lease Year, and (ii) in the case of each Lease Year
thereafter in the Extension Period, an amount equal to the fair rental value
(per square foot) of the demised premises for such Lease Year which shall
be expressed either as (x) a fixed amount per square foot, or (y) a specified
percentage increase, or an increase based on a formula that measures
inflation or changes in the cost of living, in the fair rental value of the
demised premises for the immediately preceding Lease Year in the
Extension Period.

(e)    Base Year During Extension Period.  The Base Year for
purposes of calculating Operating Expenses and Tax Adjustments in
accordance with Section 5.04 of the Lease, will be the first Lease Year of
the Extension Period.

(f)    Method of Determining Rent per Square Foot.  If Tenant
exercises the Extension Option, and if Landlord and Tenant are unable
mutually to agree on the Rent per Square Foot for the first Lease Year in
the Extension Period at least one hundred fifty (150) days before the end
of the last Lease Year in the Term, either party (the "**Initiating Party**")
shall have the right to notify the other party (the "**Responding Party**") of
its desire to determine the Fair Rental Value by appraisal pursuant to this
Section 2.03(f) and in such notice the Initiating Party shall designate the
broker appointed by it.  Within twenty (20) days after receipt of the
Initiating Party's notice, the Responding Party shall, by notice to the
Initiating Party, designate a second broker.  If the Responding Party does
not so designate a second broker within the 20-day period, the first broker
appointed by the Initiating Party shall proceed to make his/her valuation,
in which case the Fair Rental Value of the Premises for the Extension
Period shall be the amounts (including, if applicable, the formula for
calculating the amounts) determined by the first broker.  Each broker shall
make an independent determination of the Fair Rental Value of the
Premises for the Extension Period.  If the two brokers so appointed agree
on the Fair Rental Value of the Premises for the Extension Period within
fifteen (15) days after the appointment of the second broker, the Fair
Rental Value of the Premises for the Extension Period shall be the
amounts (including, if applicable, the formula for calculating the amounts)
determined by them.  If the two brokers so appointed do not agree on the
Fair Rental Value of the Premises within fifteen (15) days after the
appointment of the second broker, the Landlord and Tenant shall each
make a separate determination of the applicable Fair Rental Value of the
Premises.  If the two determinations differ by less than ten percent (10%),
the Fair Market Rental Value shall be the average of the two (2)
determinations.  If Landlord's and Tenant's determinations differ by ten
percent (10%) or more, then, either Landlord or Tenant may terminate the
process of determining Fair Rental Value of the Premises by giving written
notice to the other within ten (10) business days following receipt of the

other party's determination of the Fair Rental Value of the Premises. In such event, the Term shall expire on the last day of the initial Term. If neither party terminates the process of determining Fair Rental Value of the Premises within such ten (10) business day period, then the Fair Rental Value of the Premises shall be the average of the two (2) determinations.

(g)    Qualifications of Brokers and Method of Valuation.  Each broker appointed pursuant to Section 2.03(f) shall be an individual of recognized competence who (i) has had a minimum of 10 years' experience in the leasing of commercial office space in Washington, D.C.; (ii) is not compensated on a contingent fee basis; and (iii) is not affiliated with or, except in this limited case, otherwise employed by the Landlord or Tenant. All valuations of the Fair Rental Value of the Premises shall be in writing and, in the case of the valuation for the first Lease Year in the Extension Period, shall be expressed in terms of an annual rent per square foot of Rentable Area. Each broker shall determine the Fair Rental Value of the Premises, as a whole, for the Extension Period on the basis of the criteria set forth in Section 2.03(i). The party appointing each broker shall be obligated, promptly after receipt of the valuation report prepared by the broker appointed by such party, to deliver a copy of such valuation report to the other party in the manner provided elsewhere in this Lease for the giving of notices.

(h)    Expenses of Brokers.  The expenses of each of the first two brokers appointed pursuant to Section 2.03(f) shall be borne by the party appointing such broker.

(i)    Criteria for Determining Fair Rental Value.  Each broker appointed pursuant to Section 2.03(f) shall determine the Fair Rental Value of the Premises in accordance with the following criteria:

(1)    The Extension Period shall be on the same terms and conditions as set forth in this Lease, with the only changes being the change in the fixed annual rent, the change of the Base Year to the first Lease Year of the Extension Period, and the fact that there is no additional Extension Option; and

(2)    All relevant factors affecting the fair rental value, including the rent being charged for the renewal or extension of the terms of leases for comparable space in comparable office buildings located in the sub-markets of Washington, DC, occupied by tenants on floors corresponding in size to the Floors occupied by Tenant, the size of the demised premises and the length of the term, but such rent shall be adjusted to determine a net effective market rent by accounting for (a) the extent, if any, to which rent comparables include (i) landlord payment of renewal tenant

improvements, (ii) rent abatement periods, (iii) other rent concessions, (iv) brokerage fees, (v) tenant payment of operating expenses and real estate taxes; and (vi) the availability of, and charges for, parking ; and (b) the fact that Tenant will be taking the demised premises in its "as is" condition, with no abatement in its obligation to pay rent.

(j)    Documentation.  At any time after Tenant exercises the Extension Option has expired Landlord or Tenant shall, within fifteen (15) days after request by the other party, join with the requesting party in executing and delivering an amendment to this Lease which sets forth the Rent per Square Foot and the Basic Rent for the first Lease Year in the Extension Period and confirms the extension of the initial Term for the Extension Period."

5.    Rent.  Sections 3.01 and 3.02 of the Lease is hereby deleted in its entirety and replaced with the following:



$340,065

"3.01.  (a)    Fixed Rent.  Tenant agrees to pay to Landlord a fixed annual rent (the "**fixed annual rent**") equal to the product of the number of square feet, which shall for the purposes of this Lease be deemed to be 6,870, attributable to the demised premises (the "**Rentable Area**"), multiplied by an annual rate ("**Rent per Square Foot**") of $49.50 during the first Lease Year, and for each Lease Year (or part of a Lease Year) thereafter during the Term, an amount equal to 103% of the Rent per Square Foot for the immediately preceding Lease Year and for each Lease Year during the Option Period, the amount determined pursuant to Section 2.03.  Tenant shall pay the fixed annual rent for each Lease Year in equal monthly installments in advance on January 1, 2001 and thereafter on the first day of each month (or part of a month) during the Term.

(b)    Storage Rent.  Throughout the Term, Landlord shall lease to Tenant, and Tenant shall lease from Landlord, storage space on the Basement Level of the Building (the "**Storage Space**"), for use as storage space.  For the first Lease Year, Tenant shall pay, as additional rent for the storage space, an amount equal to One Hundred Forty Four and 58/100 Dollars ($144.58) per calendar month.  For each Lease Year after the first Lease Year, Tenant shall pay, as additional rent for the Storage Space, an amount equal to 103% of the additional rent for the Storage Space payable for the immediately preceding Lease Year.  All other provisions of the Lease shall apply to the Storage Space to the same extent, and with the same effect, as if it were a part of the demised premises.

(c)    Rent Payment.  Fixed annual rent and all additional rent due under the Lease (including, without limitation, the additional rent payable for the Storage Space) shall be payable in advance on the first day of each calendar month during the Term at the office of Landlord or such other place as Landlord may designate, and Tenant shall not have the right to setoff, recoup or deduct any

amount allegedly owed by Landlord to Tenant under this Lease from any of the fixed annual rent of additional rent payable by Tenant under this Lease, except as otherwise expressly permitted by this Lease. Tenant's sole remedy with respect to any claim against Landlord (other than a setoff or credit expressly permitted by this Lease) shall be to commence an independent legal action against Landlord or file a counterclaim or third party claim (impleader) in a legal action commenced by Landlord.

3.02    The fixed annual rent, additional rent and Storage Rent shall be paid promptly when due, in lawful money of the United States, without notice or demand and without deduction, diminution, abatement, counterclaim or setoff of any amount for any reason whatsoever, except as otherwise provided in this Lease, to Landlord at Landlord's notice address or at such other address or to such other Person (including a successor to Landlord's interest in the Building) as Landlord may from time to time designate. The rent reserved under this Lease shall be the total of all fixed annual rent, additional rent and Storage Rent, increased and adjusted as elsewhere herein provided, payable during the entire Term and, accordingly, the methods of payment provided for herein, namely, annual and monthly rental payments, are for convenience only and are made on account of the total rent reserved hereunder."

6.    The provisions of Article IV of the Lease are hereby deleted in their entirety.

7.    _Operating Expense Definition_. The last sentence of Section 5.01 of the Lease is hereby deleted and the following is inserted in lieu thereof:

The following shall be excluded from the definition of Operating Expenses: (i) repairs or other work occasioned by a casualty, the costs of which are reimbursed to Landlord by insurers or any other person (or which would have been reimbursed if Landlord had carried the insurance required to be carried by it under this Lease or had otherwise enforced its right to collect such costs from such other person) or by governmental authorities in eminent domain proceedings; (ii) the cost of repairs or other work occasioned by an eminent domain, taking or condemnation; (iii) any amount paid to affiliates of Landlord (other than management fees at a rate not to exceed three percent (3%) of Landlord's gross revenue from the Building) for services or goods relating to the Property, to the extent that the cost of such services or goods exceeds competitive costs for such services rendered by unaffiliated persons with similar or reasonably equivalent skill, competence and experience or the competitive costs of such goods provided by unaffiliated persons; (iv) interest, fines or penalties due to late payment of Taxes or Operating Expenses due to Landlord's negligence; (v) financing or mortgage costs, including payment of the interest on or principal of borrowed money; depreciation expense; advertising for vacant space in the Building; leasing commissions; the cost of constructing improvements for space in the Building leased to other tenants; (vi) the cost of any specific work or service performed in

connection with the Building which, in accordance with the terms of this Lease, is to be paid for directly by Tenant or other tenants of the Building; (vii) ground rent; (viii) any costs or expenses incurred in the solicitation or execution of leases for space in the Building (including legal fees, advertising, moving expenses, design fees, rental concessions, rental credits, and lease assumptions); (ix) the cost of electricity and other utility charges for heating, ventilating and air-conditioning which are separately metered to, and payable by, other tenants of the Building; (x) expenses directly resulting from the breach of this Lease by Landlord, or the gross negligence of Landlord, its agents, contractors or employees; (xi) any repairs, alterations, additions, changes, replacements, renovations, or other expenditures which, under generally accepted accounting principles, are properly classified as capital expenditures, however, there shall be included each Lease Year in the Operating Expenses an amount equal to the amortized cost of the same determined on a straight-line basis over a period equal to the useful life of the same, and in accordance with generally accepted accounting principles applied on a consistent basis; (xii) bad debt loss, rent loss, or legal fees incurred in collecting rent or other obligations from Building tenants; (xiii) Landlord's general entity-level overhead and general and administrative expenses and other costs associated with maintaining Landlord's existence or the operation of the business of the entity that constitutes Landlord (as distinguished from the costs of operation of the Building), including accounting and legal matters (except for accountings costs specifically included in Operating Expenses); (xiv) rent associated with any management or leasing office in the Building; (xv) the wages and benefits of any employee of Landlord or Landlord's management agent who does not devote substantially all of his or her time to the Building, except to the extent such wages and benefits are reasonably, properly and equitably allocable to time spent by such employee in directly servicing the Building; (xvi) Taxes, other than sales and use taxes on items the cost of which is properly included in Operating Expenses; (xvii) salaries and other compensation paid to executive employees above the grade of building manager (including profit sharing, bonuses and other employee benefit plans) and any payroll taxes attributable to such employees; (xviii) general overhead and administrative and accounting expenses, except to the extent reasonably and properly directly allocable to the operation of the Building; (xix) legal fees or other costs of enforcing leases for space in the Building; (xx) acquisition costs of any sculpture, paintings or other art work in the Building; (xxi) costs of selling, syndicating, financing, mortgaging or hypothecating any part of or interest in the Property; (xxii) costs incurred to remove or remediate hazardous materials now or hereinafter existing in the Property; (xxiii) increased insurance premiums caused by hazardous materials brought onto, stored, used or disposed of in the Building by Landlord or any other tenant in the Building; (xxiv) the cost of settling disputes with agents which are not directly related to the management, maintenance or operation of the Building; (xxv) the cost of settling disputes with employees which relate to compensation and benefits, work rules and working conditions and other disputes related to the employees' services in managing, maintaining and operating the Building; and (xxvi) the costs incurred

in operating, managing, maintaining, repairing, resurfacing, cleaning or securing the Parking Facility.

8. <u>Operating Expenses and Tax Adjustments</u>. Section 5.03 of the Lease is hereby deleted in its entirety and replaced with the following:

"5.03 <u>Base Year; Tenant's Share</u>. For the purpose of calculating Operating Expense and Tax Adjustments (as defined in Section 5.04 hereof), the base year shall be the calendar year 2001 (the "**Base Year**"), and Tenant's share of Operating Expenses shall be 3.27% and Tenant's share of Taxes shall be 3.13%. If the number of square feet of rentable area of the Building changes, then Tenant's share of Operating Expenses and Taxes shall be adjusted effective as of the date of any such change."

9. <u>Tenant's Right to Review</u>. Section 5.04 of the Lease is hereby amended to add the following:

(d) <u>Initial Review</u>. Tenant shall have the right to review the Landlord records related to Operating Expenses and Taxes for any calendar year, at any time within ninety (90) days after Tenant receives such Landlord's Operating Statement for such calendar, for the purpose of determining whether the statement correctly reflects the Operating Expenses and Real Estate Taxes for such calendar year and the Tenant's share of the same. If Tenant exercises its foregoing right, Tenant shall retain a national accounting firm or a reputable local accounting firm whose fee for its review services is not contingent, in whole or in part, on the amount of an overstatement. If Tenant fails to exercise its foregoing right of review within the 90-day period, the amount of the Tenant's share of the Operating Expenses and Taxes set forth in the Landlord's Operating Statement for the calendar year in question shall be conclusively established as the amount set forth in the Landlord's Operating Statement for such calendar year delivered by Landlord to Tenant pursuant to Section 5.04(a), except as otherwise provided in Section 5.04(f).

(e) <u>Limited Review</u>. If Tenant's review of the Operating Expenses Statement and Taxes for a particular calendar year (the "**first calendar year**") pursuant to Section 5.04(d) discloses that the Tenant's share of Operating Expenses or Taxes for the first calendar year were overstated by more than five percent (5%), Tenant shall have the additional right, within thirty (30) days after Tenant receives the Landlord's Operating Statement for the first calendar year, to review Landlord's records for Operating Expenses and Taxes for the two calendar years immediately preceding the first calendar year, subject to the limitations that Tenant's review shall be limited solely to determining whether the Operating Expenses or Taxes for the two earlier calendar

years were overstated for the same reasons that the Operating Expenses or Taxes for the first calendar year were overstated.

(f)    Expense of Review.  The costs incurred by Tenant to review the Landlord's records pursuant to Section 5.04(d) shall be paid by Tenant, except that, if it is determined on the basis of such review (or if, in accordance with the following provisions, it is otherwise ultimately determined) that the Tenant's share of the Operating Expenses and Taxes for such calendar year was overstated by more than five percent (5%) then the reasonable third party cost of the review (not to exceed $5,000) shall be paid by Landlord.  Landlord shall pay to Tenant any overpayment of the Operating Expenses and Taxes for the calendar year in question within thirty (30) days after the amount of the overpayment has been established by the review as provided in this Section.

(g)    Effect of Review.  If (i) Tenant timely exercises its right to review the Landlord's records pertaining Operating Expenses and Taxes for a calendar year, and (ii) Tenant gives notice to Landlord, together with a copy of the report of its review prepared by its accountants, that Tenant's review discloses an overstatement of Operating Expenses or Taxes for such calendar year, the amount of the Operating Expense and Tax Adjustment for such calendar year shall be conclusively established as the amount determined as a result of such review unless, within ninety (90) days after receipt of Tenant's notice, Landlord, at its expense, shall contest the amount thereof, in which event the amount of the Operating Expenses or Real Estate Taxes (and the amount of the Operating Expense and Tax Adjustment) for such calendar year shall be conclusively established by an arbitration conducted pursuant to Article XXXV of the Lease.  Tenant's exercise of its right to review the Landlord's records pertaining Operating Expenses and Taxes for a particular calendar year pursuant to this Section shall not suspend or defer Tenant's obligation to pay the amount shown to be due by such Annual Operating Expense and Tax Statement pursuant to Section 5.04(a).

10.    Tenant Improvement Allowance.  Tenant contemplates making improvements to the demised premises in accordance with the provisions of this Article VIII (the "**Tenant Improvements**").  Within five (5) business days following execution and delivery this Amendment, Landlord shall give Tenant an allowance for the demised premises (the "**Allowance**") in an amount equal to the product obtained by multiplying (i) $12.50, by (ii) the Rentable Area of the demised premises, which shall be used to pay or reimburse Tenant for any costs paid or incurred by Tenant to third parties in designing, preparing and completing the Tenant Improvements.  The entire amount of the Tenant Allowance shall be disbursed by Landlord to Tenant concurrently with the execution of this Amendment. Upon request, the Tenant will supply the Landlord with lien waivers from the person or entity performing the work or providing the materials for such Tenant Improvements upon the completion of the same.

11.   Parking. Section 42.01 of the Lease is hereby deleted in its entirety and replaced with the following:

"Throughout the Term, Landlord agrees to provide to Tenant, at Landlord's expense, two (2) parking spaces (the "**Parking Spaces**") in the below grade paring structure on the Land (the "**Parking Facility**"). The Parking Spaces shall be made available to Tenant on a self-park but, reserved or assigned basis within the Parking Facility. Tenant acknowledges that the Parking Facility is operated, managed and maintained by a tenant of Landlord (the "**Parking Facility Operator**"), that Landlord has no responsibility for the management, operation and maintenance of the Parking Facility and that Landlord's sole obligation with respect to the Parking Spaces is to obtain the Parking Spaces from the Parking Facility Operator (or its successor) and provide the Parking Spaces to Tenant at Landlord's expense. Tenant agrees that the Parking Spaces will be used solely by Tenant and Tenant's agents, employees, contractors, licensees, customers, clients and guests for the parking of passenger automobiles and other motor vehicles and for no other purpose, and that none of the Parking Spaces will be used by Persons other than the foregoing. The Parking Spaces will be available during the normal operating hours of the Parking Facility as operated by the Parking Facility Operator. If Landlord shall be unable to provide or shall be delayed in providing the parking spaces required by this Section, and if such inability or delay shall result from Landlord's inability to perform as set forth in Article XXXII, such inability or delay shall not constitute an actual or constructive eviction, in whole or in part, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience to Tenant, or injury to, or interruption of, Tenant's business, or otherwise, or entitle Tenant to any abatement or diminution of rent unless Landlord shall fail to use reasonable diligence to correct the event or circumstances causing such inability to perform."

12.   Landlord's Work. Landlord, at its sole cost and expense, shall install, or cause to be installed, a fire suppression sprinkler system in the demised premises in conformance with applicable Legal Requirements. Landlord, at its sole cost and expense, shall renovate the area surrounding the existing Automatic Teller Machine ("**ATM**") to match the appearance of the Building lobby in the location and in accordance with the specifications to be mutually agreed upon by Landlord and Tenant within seven (7) business days following execution and delivery of this Amendment. Landlord shall commence such work promptly after the date Landlord and Tenant agree upon the plans and specifications for Landlord's work, and subject to Landlord's inability to perform as set forth in Article XXXII of the Lease, Landlord shall complete such work in accordance with a mutually agreed upon construction schedule.

13.   Brokers. Landlord and Tenant each represents and warrants to the other that neither of them has employed or dealt with any broker or finder in carrying on the negotiations relative to this Amendment. Landlord and Tenant shall each indemnify and hold harmless the other from and against any claim or claims for brokerage or other

commission arising from or out of any breach of its foregoing representation and warranty.

14.    <u>Ratification of Lease</u>.  Except as expressly set forth in this Amendment, the terms and conditions of the Lease shall continue in full force and effect without any change or modification and shall apply for the balance of the term of the Lease.  In the event of a conflict between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern.

15.    <u>No Amendments</u>.  This Amendment shall not be altered, amended, changed, waived, terminated or otherwise modified in any respect or particular, and no consent or approval required pursuant to this Amendment shall be effective, unless the same shall be in writing and signed by or on behalf of the party to be charged.

16.    <u>Successors</u>.  This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and permitted assigns.

17.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts.  It is not necessary that all parties sign all or any one of the counterparts, but each party must sign at least one counterpart for this Amendment to be effective.

**[SIGNATURE PAGE FOLLOWS]**

WITNESS the following signatures and seals as of the date first above written.

WITNESS/ATTEST:

**LANDLORD:**

**BRE/CONNECTICUT L.L.C.**, a Delaware limited liability company

_____

By:_____
Name:_____
Title:_____

**TENANT:**

**INDEPENDENCE FEDERAL SAVINGS BANK**, a District of Columbia corporation

By: _Donna F Shuler_
Name: _Donna F. Shuler_
Title: _President & CEO_

# EXHIBIT C

**Brookfield Properties**

Brookfield Properties Management LLC
U.S. Commercial Operations
1250 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20036

Tel (202) 659-8349
Fax (202) 467-5620
www.brookfieldproperties.com

*Via Hand Delivery & Mail*

May 11, 2007

Mr. Robert B. Isard, President & CEO
Independence Federal Savings Bank
1229 Connecticut Avenue, N.W.
Washington, DC 20036

Dear Mr. Isard:

We are excited to announce that on July 1, 2007, work will commence for the 1225 Connecticut Avenue Repositioning Project. This project which is currently scheduled to continue for approximately 18 months, will bring a completely "new" look to the entire building. Detailed drawings of the completed project are not yet available, however a rendering is attached.

Realizing that Independence Federal Savings Bank will be a tenant of the building during the length of this project, it would be beneficial to meet to discuss any concerns you may have with regard to its impact on your operations. At your convenience, we would like to schedule this meeting within a few weeks. Please provide a date that best fits your schedule. If you have any questions or concerns, I can be reached at 202-659-8349.

Looking forward to meeting with you.

Sincerely,

Christine V. Olfus-Campos
Assistant Property Manager

cc:    Jackie Duke, General Manager – Brookfield Properties



# EXHIBIT D

ul 20 07 01:12p     Human     sources          202-293-‾‾64          P.2

**Brookfield** Properties

ENTERED JUL 2 4 2007

# Memo

To:     Tenants of 1225 Connecticut Avenue

From:     Karen Hunt, Property Manager

Re:     1225 Renovation – Scheduling/Notification

Date/Time:   July 20, 2007

As you know, Brookfield Properties will soon begin the renovation of 1225 Connecticut Avenue. To give you an understanding of the scope and timing of the work, we are providing a tentative schedule from our general contractor, Davis Construction. As with any construction project, these dates will be subject to change. Also, updated schedules and notices detailing the various project phases and any service interruptions will be provided in advance and coordinated directly with each affected tenant.

The parking garage will remain open during these renovations; however, some spaces will be impacted due to shoring during certain phases. We will continue to provide elevator service from the garage to the building's main lobby. Emergency egress exits will be maintained for the duration of the project for both retail spaces and they shall be clearly marked at all times.

The current schedule for construction is as follows:

A.     **INITIAL CONSTRUCTION SET-UP: July 23 – August 3, 2007**
- **Monday, July 23 -- Friday, July 27, 2007 --** Davis Construction will be adding partitions in the lobby area to separate constructions crews, offices and entrances from the rest of the main lobby and the tenants' areas.
- **Saturday, July 28, 2007 --** The sidewalk tree planters will be demolished and completely removed. A crane will be placed on the N Street side of the building in order to install trash chutes for interior demolition.
- **Monday, July 30 – Friday August 3, 2007 –** The metered parking and one lane of traffic will be blocked off on N Street to allow for the construction staging area.
- **Saturday, August 4, 2007** Scaffolding in the form of a covered walkway will be erected on 18th Street in front of the retail spaces and temporary signage will be installed so that the retail spaces remain clearly visible during construction. Entrances will remain unobstructed.

B.     **INTERIOR DEMOLITION: August 2007 – April 2008**
The first phase of construction will consist of interior demolition. Demolition will initially take place on the upper floors and then progress down the building.

C.     **EXTERIOR DEMOLITION: April 2008 – June 2008**

We will provide regular updates as construction progresses. For any questions throughout this process, please do not hesitate to call the management office at (202) 659-8349. Thank you.



# EXHIBIT E

1225 CONNECTICUT AVENUE, NW

SITE LAYOUT PLAN

11 June 2007

Brookfield Properties

**Legend:**

Construction Fence

Scaffolding System for Structural Modifications

Temporary Toilets

Temporary Signage, through Construction for Bank Tenants

Trash Chute / Dumpsters

CONNECTICUT AVENUE, N.W.

18th STREET, N.W.

Covered Walkway

Low Roof

Main Lobby

Demo Crane

Curb Lane – 9 Parking Meters

Occupied at 1st Floor

Occupied at 1st Floor

Occupied at 1st Floor

Elevator Access

LOT 52 SQUARE 180

Elevator Access

DAVIS Field Office

Existing Garage
A Remain Open During Construction

70.00 WIDE
18' PUBLIC ALLEY

**Temporary Alley Closure
for Weekend Hours**

# EXHIBIT F

**Brookfield** Properties    Brookfield Properties Management LLC    Tel (202) 659-8349
U.S. Commercial Operations    Fax (202) 467-5520
1225 Connecticut Avenue, N.W. Suite 100    www.brookfieldproperties.com
Washington, D.C. 20036

*Via Overnight Delivery*

**July 25, 2007**

Mr. Robert B. Isard, President & CEO
Independence Federal Savings Bank
1229 Connecticut Avenue, N.W.
Washington, DC 20036

RE:    **Asbestos Containing Materials Abatement Notice**

Dear Mr. Isard:

Per the requirements of the 1987 Superfund Amendments and Reauthorization Act/Community
Right-to-Know Requirements, the Landlord is required to inform tenants when any abatement
of Asbestos Containing Materials (ACM) is to take place in an office building. This letter is
being sent to inform all tenants that abatement of certain Asbestos Containing Materials will be
taking place within the building soon and to address any concerns that this information might
cause to tenants.

Background
Historically, asbestos, a naturally occurring mineral fiber, was widely used as a building
material in both commercial and residential structures. Its unique wear and heat resistant
properties made it suitable for use in vinyl flooring, adhesive, roofing, siding, insulation and
fireproofing materials. The term "Asbestos Containing Materials" is considered by the
government to be any material containing more than one (1) percent of asbestos by weight.
Most buildings older then 1981 (when use of ACM in construction was prohibited) typically
have some form of ACM in them. While it is now banned as a construction material, it may
stay in place as long as it is maintained in good condition, not disturbed or broken up, and
inspected regularly.

Potential Health Concerns
Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to
airborne asbestos fibers. As long as ACM is not disturbed and remains intact, it presents very
little risk to the occupants and visitors of 1225 Connecticut Avenue. ACM can become a
concern if damaged during remodeling or demolition, or if allowed to deteriorate over the
course of time. When crumbled or crushed, ACM can be reduced to very fine airborne mineral
fibers that may be harmful if inhaled or swallowed. These fibers cannot be seen or otherwise
detected without specialized instruments.



Page 2 – July 25, 2007
Abatement Notification Letter
Independence FSB

Abatement Information

This letter serves as official notice to all tenants of 1225 Connecticut Avenue, NW that scheduled abatement of identified ACM will be conducted within the building by a licensed asbestos abatement contractor, in support of upcoming renovation activities. All abatement activities will be performed in accordance with all applicable Federal, State and Local regulations governing the removal of asbestos. This work will begin 30 days from the date of this letter. The National Emissions Standard for Hazardous Air Pollutants (NESHAP) classifies the materials scheduled for abatement as Category I non friable materials (vinyl asbestos tile, various mastics, etc.), Category 2 non-friable materials (caulking, fire doors, etc) and regulated ACM (RACM) [thermal system insulation, spray-applied duct insulation, etc]. Environmental controls, including the erection of negative pressure enclosures and the use of High Efficiency Particulate (HEPA) air filtration will be employed by the abatement contractor, and the work practices will be monitored by an independent third-party Industrial Hygiene (IH) firm. The IH firm will provide asbestos project monitoring services in support of asbestos abatement activities in accordance with the requirements of OSHA 29 CFR 1926.1101, to include periodic contractor oversight, pre-abatement inspections, final visual inspections, and final air clearance sampling in support of asbestos abatement activities.

Please feel free to call the management office at 202-659-8349 if you have any questions or concerns regarding this matter. Thank you.

Sincerely,

Karen Hunt
Property Manager

cc:    Lease File
       Christine Olfus - Campos, Assistant Property Manager
       Kevin Parks, Lead Engineer
       Jackie Duke, General Manager



**EXHIBIT G**





# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK   )
1229 Connecticut Avenue, N.W.       )
Washington, DC 20036,               )
                                    )
        Plaintiff,                  )    C.A. No. _____
                                    )
        v.                          )
                                    )
BRE/Connecticut L.L.C.              )
c/o The Blackstone Group            )
345 Park Avenue                     )
New York, NY 10154,                 )
                                    )
        Defendant.                  )
_____)

### DECLARATION OF JOHN HALL IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

I, John Hall, depose and state as follows:

1.  I am over the age of 18 and am competent to testify to the matters contained herein, and testify that the following statements are true and correct and are based upon matters within my personal knowledge.

2.  My office address is 1229 Connecticut Avenue, N.W., Washington, D.C. 20036.  I am the President and Chief Executive Officer of Independence Federal Savings Bank ("IFSB" or the "Bank").

3.  IFSB is a federally-chartered savings bank, with its principal place of business in the District of Columbia.  It is the oldest historically minority banking institution in the District of Columbia.  The Bank operates two branches in the District of Columbia, one branch in Chevy Chase, Maryland, and

one branch in Silver Spring, Maryland.  The address of the Bank's headquarters is 1229 Connecticut Avenue, N.W., Washington, D.C. (the "Premises"), which is located in the building whose address is 1225 Connecticut Avenue, N.W., Washington, D.C. (the "1225 Building").  On November 4, 2003, the Office of Thrift Supervision ("OTS") informed the Bank that it had determined that the Bank is both a "problem association" and in "troubled condition."  This designation has not been lifted.  IFSB has historically served the minority community, and is working diligently under new management to emerge from the OTS designation as a "troubled" institution.

4.  On or about December 16, 1988, IFSB, as tenant, and Pool 1225 Associates ("Pool"), as landlord, entered into an Agreement of Lease ("Lease") for the Premises.  A true and correct copy of the Lease is attached as Exhibit A to the Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Application for a Preliminary Injunction ("Plaintiff's Memo.").
BRE/Connecticut L.L.C. ("BRE") is the successor in interest to Pool under the Lease. Section 2.01 of the Lease provided for an initial lease term of twelve years, beginning January 1, 1989 and ending December 31, 2000.

5.  Section 1.01 of the Lease describes the leased premises as "the portion of the Lobby Space (containing approximately 6,450 square feet in total) as delineated on the plan attached

2

[hereto] (the "demised premises"), **and as presently constructed** .
. .." (Emphasis added).

6. Section 1.01 of the Lease further provides that "[t]he
lease of the demised premises includes the right, together with
other tenants of the Building and members of the public, to use
the common and public areas of the Land and Building providing
access to the demised premises, but includes no other rights not
specifically set forth herein."

7. On or about December 16, 1988, IFSB and Pool entered
into a Memorandum of Lease ("MOL") which provides, in pertinent
part, that Pool leases to IFSB "the portion of Lobby Space
(containing approximately 6,450 square feet in total) as
described in the said lease **and as presently constructed** . . .."
(Emphasis added). The MOL is an attachment to the Lease.

8. Section 16.02 of the Lease provides as follows:

> Landlord reserves the right, without the same
> constituting an actual or constructive
> eviction and without incurring liability to
> Tenant therefore, to change the arrangement
> and/or location of public entrances,
> passageways, doors, doorways, corridors,
> elevators, stairways, toilets and other
> public parts of the Building; provided,
> however that the demised premises shall be
> visible from the street, public access on the
> street level directly into the demised
> premises shall not be cut off, access to the
> Building shall not be cut off and that there
> shall be no unreasonable obstruction of
> access to the demised premises or
> unreasonable interference with the use or
> enjoyment thereof.

9.   Section 20.01 of the Lease is the "Quiet Enjoyment" Article pursuant to which BRE agrees and covenants that IFSB's "rights under th[e] Lease shall not be cut off or ended before the expiration of the Term of th[e] Lease[.]"

10.   On or about April 25, 2001, IFSB and BRE entered into a First Amendment to Lease ("Lease Amendment") which, pursuant to its express terms, was effective as of January 1, 2001.  A true and correct copy is attached as Exhibit B to Plaintiff's Memo.

11.   Section 2 of the Lease Amendment amends the square footage total of the Premises to reflect that the total square footage is 6,870 square feet and not 6,450 square feet.

12.  Section 3 of the Lease Amendment amended Section 2.01 of the Lease resulting in a new lease term, for ten years, beginning January 1, 2001 and ending December 31, 2010.

13.   Section 42.01 of the Lease provides: "Landlord shall use reasonable efforts to cause the parking garage operator to provide to Tenant, at the prevailing market rate, two (2) parking spaces in the parking garage located beneath the Building [in which the demised premises are located.]"  Section 11 of the Lease Amendment deleted the foregoing Section 42.01, replacing it with language providing, in pertinent part, that "[t]hroughout the Term, Landlord agrees to provide to Tenant, at Landlord's expense, two (2) parking spaces . . . in the below grade par[k]ing structure on the Land . . .."

14.  Section 14 of the Lease Amendment provides that
"[e]xcept as expressly set forth in this Amendment, the terms and
conditions of the Lease shall continue in full force and effect
without any change or modification and shall apply for the
balance of the term of the Lease."

15.  There have been no other amendments to the Lease.

16. In or about April 2007, Robert Isard, the Vice Chairman
of IFSB, met with Christine V. Olfus-Campos regarding a
renovation project to the 1225 Building, but no detailed
information about the project was given to IFSB at that meeting.
On or about May 11, 2007, Brookfield Properties (the property
manager for the 1225 Building) delivered a letter to IFSB.  A
true and correct copy is attached as Exhibit C to Plaintiff's
Memo.  The letter states that on July 1, 2007, work would
commence for the 1225 Connecticut Avenue Repositioning Project
("Repositioning Project").  The letter further advised that the
project is currently scheduled to continue for approximately 18
months.  I do not know whether, at the time the Lease Amendment
was entered into, BRE already had plans for the Repositioning
Project.

17. On or about June 12, 2007, representatives of IFSB,
including Morton Bender and Mr. Isard, met with representatives
of Brookfield Properties regarding the proposed Repositioning
Project.  They also met with the architect and contractor.  IFSB

expressed its concern at that meeting about the substantial business disruptions and safety hazards that the Repositioning Project would cause. On July 2, 2007, Mr. Bender met with Paul Schulman of Brookfield Properties in an attempt to resolve the concerns that IFSB had about the Repositioning Project. No resolution was reached.

18.   On or about July 20, 2007, Brookfield Properties, delivered a Memo to the tenants of the 1225 Building, including IFSB, setting forth a tentative schedule for the Repositioning Project.  A true and correct copy is attached as Exhibit D to Plaintiff's Memo.  Other than IFSB and a branch of CitiBank located at the corner opposite from the Premises, I do not know of any other tenants still remaining in the 1225 Building.

19.   According to the July 20, 2007 Memo, "Initial Construction Set-Up" will take place from July 23 through August 3, 2007.  The Initial Construction Set-Up will include: adding partitions in the lobby area to separate construction crews, offices and entrances from the rest of the main lobby and the tenants' areas (to occur July 23 through July 27, 2007); the demolition and removal of the sidewalk tree planters (to occur July 28, 2007); the placement of a crane on the N Street side of the building to install trash chutes for interior demolition (to occur July 28, 2007); the blocking off of the metered parking and one lane of traffic on N Street to allow for the construction

6

staging area (to occur July 30 through August 3, 2007); the placement of scaffolding in the form of a covered walkway on 18th Street in front of the retail spaces (to occur August 4,2007); and the installation of temporary signage for the retail spaces (to occur August 4, 2007). The July 20, 2007 Memo also provides that the interior demolition will occur August 2007 through April 2008 and the exterior demolition April 2008 through June 2008.

20. A true and correct copy of the site layout plan is attached as Exhibit E to Plaintiff's Memo.

21. On July 25, 2007, Brookfield Properties sent a letter to IFSB regarding "Asbestos Containing Materials Abatement Notice." A true and correct copy is attached as Exhibit F to Plaintiff's Memo. Pursuant to this Notice, IFSB has been informed that "abatement of certain Asbestos Containing Materials will be taking place within the building soon[.]" The letter further states that the abatement work will begin within thirty days of July 25, 2007 (i.e., by August 24, 2007).

22. Beginning on or about July 9, 2007, the air conditioning at the Premises is being turned off at 6:00 p.m. even though not all Bank employees have left by that time and are still working. Although interior demolition was not to begin until August 2007, and asbestos abatement work is not to begin until August 24, 2007, it appears that interior demolition has already begun. There are garbage dumpsters outside of the 1225

Building which have already been filled with debris, including
dry wall. A copy of pictures of the dumpsters taken by Mr. Isard
on the afternoon of July 30, 2007 is attached to Plaintiff's
Memo. as Exhibit G. According to Mr. Isard, the dumpsters do not
appear to contain any identification plate, telephone number or
permit.

23. IFSB has fully and adequately performed its obligations
under the Lease and the Lease Amendment.

24. BRE's Repositioning Project has had or will have the
following effects:

(A) the Premises will no longer exist as they were
constructed at the time the Lease was entered into; and
IFSB and its customers will no longer have the right to
use all the common and public areas of the Land and
Building (as those terms are defined in the Lease)
providing access to the demised premises;

(B) the Repositioning Project exceeds merely changing
the arrangement and/or location of public entrances,
passageways, doors, doorways, corridors, elevators,
stairways, toilets and other public parts of the 1225
Building. As a result of the Repositioning Project,
the Premises will no longer be visible from the street;
public access on the street level directly into the
Premises will be cut off; access to the 1225 Building
will be cut off; there will be unreasonable obstruction
of access to the Premises; and there will be
unreasonable interference with the use or enjoyment of
the Premises;

(C) BRE is failing to furnish air conditioning after
6:00 pm.

(D) the Repositioning Project will result in the loss
of the two parking garage spaces to which IFSB is
entitled;

(E) the Repositioning Project will terminate IFSB's

8

quiet enjoyment of the Premises.

(F) the Repositioning Project IFSB will substantially
interfere with IFSB's business. IFSB is not a bank with
hundreds of conveniently located branches. It is a
small bank with only 4 branches, including its
headquarters location in the 1225 Building.  If
customers, both new and current, are unable to easily
access the Bank (or fear for their physical safety if
they do access the bank), the Bank risks losing those
customers to nearby more easily accessible banks.
Indeed, a branch of Wachovia Bank is located across the
street.

25. As a result of the foregoing, IFSB will suffer a loss of
business due to restricted access to, and visibility of, the
Bank.  The loss of business will be so severe as to constitute a
destruction of the Bank's business.

26.  In addition to the foregoing losses, IFSB's employees
and customers will suffer harm and injury as a result of the
asbestos abatement.

9

I swear under the penalties of perjury of the District of Columbia that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in the District of Columbia on the 30th day of July, 2007.


John Hall
_____
John Hall

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK ) <br> 1229 Connecticut Avenue, N.W. ) <br> Washington, DC 20036, ) <br> ) <br>     Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> BRE/Connecticut L.L.C. ) <br> c/o The Blackstone Group ) <br> 345 Park Avenue ) <br> New York, NY 10154, ) <br> ) <br>     Please Serve Registered Agent:) <br> ) <br>         CT Corporation System ) <br>         1015 15th Street, N.W. ) <br>         Suite 1000 ) <br>         Washington, DC 20005 ) <br> ) <br>     Defendant. ) <br> _____) | C.A. No. _____ |

### [PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

UPON CONSIDERATION of the Plaintiff's Application for

Preliminary Injunction, the Memorandum of Points and Authorities

in Support thereof, any opposition thereto and hearing thereon,

the Court makes the following Findings of Fact and Conclusions of

Law this _____ day of _____, 2007:

### Findings of Fact

1.  Plaintiff Independence Federal Savings Bank ("IFSB" or

the "Bank") is a federally-chartered savings bank, with its

principal place of business in the District of Columbia.  It is

the oldest historically minority banking institution in the

District of Columbia. The Bank operates two branches in the
District of Columbia, one branch in Chevy Chase, Maryland, and
one branch in Silver Spring, Maryland.  The address of the Bank's
headquarters is 1229 Connecticut Avenue, N.W., Washington, D.C.
(the "Premises"), which is located in the building whose address
is 1225 Connecticut Avenue, N.W., Washington, D.C.(the "1225
Building").  On November 4, 2003, the Office of Thrift
Supervision (the "OTS") advised the Bank that it had determined
that the Bank is both a "problem association" and in "troubled
condition."  This designation has not been lifted.

    2.    Defendant BRE/Connecticut L.L.C. ("BRE") is a Delaware
limited liability company.  BRE is the successor in interest to
Pool 1225 Associates ("Pool").

    3.    On or about December 16, 1988, IFSB, as tenant, and
Pool, as landlord, entered into an Agreement of Lease ("Lease")
for the Premises.  Section 2.01 of the Lease provided for an
initial lease term of twelve years, beginning January 1, 1989 and
ending December 31, 2000.

    4.    Section 1.01 of the Lease describes the leased premises
as "the portion of the Lobby Space (containing approximately
6,450 square feet in total) as delineated on the plan attached
hereto as Exhibit A (the "demised premises"), *and as presently
constructed* . . .."  (Emphasis added).

2

5.   Section 1.01 of the Lease further provides that "[t]he lease of the demised premises includes the right, together with other tenants of the Building and members of the public, to use the common and public areas of the Land and Building providing access to the demised premises, but includes no other rights not specifically set forth herein."

6.   On or about December 16, 1988, IFSB and Pool entered into a Memorandum of Lease ("MOL") which provides, in pertinent part, that Pool leases to IFSB "the portion of Lobby Space (containing approximately 6,450 square feet in total) as described in the said lease *and as presently constructed* . . .." (Emphasis added).

7.   Section 16.02 of the Lease provides as follows:

> Landlord reserves the right, without the same constituting an actual or constructive eviction and without incurring liability to Tenant therefore, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the Building; provided, however that the demised premises shall be visible from the street, public access on the street level directly into the demised premises shall not be cut off, access to the Building shall not be cut off and that there shall be no unreasonable obstruction of access to the demised premises or unreasonable interference with the use or enjoyment thereof.

8.   Section 20.01 of the Lease is the "Quiet Enjoyment" Article pursuant to which BRE agrees and covenants that IFSB's

3

"rights under th[e] Lease shall not be cut off or ended before the expiration of the Term of th[e] Lease[.]"

9.   On or about April 25, 2001, IFSB and BRE entered into a First Amendment to Lease ("Lease Amendment") which pursuant to its express terms was effective as of January 1, 2001.

10.   Section 2 of the Lease Amendment amends the square footage total of the Premises to reflect the total square footage is 6,870 square feet and not 6,450 square feet.

11. Section 3 of the Lease Amendment amended Section 2.01 of the Lease resulting in a new lease term, for ten years, beginning January 1, 2001 and ending December 31, 2010.

12.   Section 42.01 of the Lease provides: "Landlord shall use reasonable efforts to cause the parking garage operator to provide to Tenant, at the prevailing market rate, two (2) parking spaces in the parking garage located beneath the Building [in which the demised premises are located.]"  Section 11 of the Lease Amendment deleted the foregoing Section 42.01, replacing it with language providing, in pertinent part, that "[t]hroughout the Term, Landlord agrees to provide to Tenant, at Landlord's expense, two (2) parking spaces . . . in the below grade par[k]ing structure on the Land . . .."

13.   Section 14 of the Lease Amendment provides that "[e]xcept as expressly set forth in this Amendment, the terms and conditions of the Lease shall continue in full force and effect

without any change or modification and shall apply for the
balance of the term of the Lease."

    14.   There have been no other amendments to the Lease.

    15.   In or about April 2007, Robert Isard, the Vice Chairman
of IFSB, met with Christine V. Olfus-Campos regarding a
renovation project for the 1225 Building, but no detailed
information about the project was given to IFSB at that meeting.
On or about May 11, 2007, Brookfield Properties (the property
manager for the 1225 Building) delivered a letter to IFSB.  The
letter states that on July 1, 2007, work would commence for the
1225 Connecticut Avenue Repositioning Project ("Repositioning
Project").  The letter further advised that the project is
currently scheduled to continue for approximately 18 months. IFSB
does not know whether, at the time the Lease Amendment was
entered into, BRE already had plans for the Repositioning
Project.

    16. On or about June 12, 2007, representatives of IFSB,
including Morton Bender and Mr. Isard, met with representatives
of Brookfield Properties regarding the proposed Repositioning
Project. They also met with the architect and contractor.  IFSB
expressed its concern at that meeting about the substantial
business disruptions and safety hazards that the Repositioning
Project would cause. On July 2, 2007, Mr. Bender met with Paul
Schulman of Brookfield Properties in an attempt to resolve the

concerns that IFSB had about the Repositioning Project.   No
resolution was reached.

17.   On or about July 20, 2007, Brookfield Properties,
delivered a Memo to the tenants of the 1225 Building, including
IFSB, setting forth a tentative schedule for the renovation of
the Repositioning Project.   Other than IFSB and a branch of
CitiBank located at the corner opposite of the Premises, there
are no other tenants remaining in the 1225 Building.

18.   According to the July 20, 2007 Memo, "Initial
Construction Set-Up" will take place from July 23 through August
3, 2007.   The Initial Construction Set-Up will include: adding
partitions in the lobby area to separate construction crews,
offices and entrances from the rest of the main lobby and the
tenants' areas (to occur July 23 through July 27, 2007); the
demolition and removal of the sidewalk tree planters (to occur
July 28, 2007); the placement of a crane on the N Street side of
the building to install trash chutes for interior demolition (to
occur July 28, 2007); the blocking off of the metered parking and
one lane of traffic on N Street to allow for the construction
staging area (to occur July 30 through August 3, 2007); the
placement of scaffolding in the form of a covered walkway on 18th
Street in front of the retail spaces (to occur August 4, 2007);
and the installation of temporary signage for the retail spaces
(to occur August 4, 2007).   The July 20, 2007 Memo also provides

6

that the interior demolition will occur August 2007 through April 2008 and the exterior demolition April 2008 through June 2008.

19.  On July 25, 2007, Brookfield Properties sent a letter to IFSB regarding "Asbestos Containing Materials Abatement Notice."  Pursuant to this Notice, IFSB has been informed that "abatement of certain Asbestos Containing Materials will be taking place within the building soon[.]" The letter further states that the abatement work will begin within thirty days of July 25, 2007 (i.e., by August 24, 2007).  CitiBank and IFSB are the only remaining tenants at the 1225 Building.

20.  Beginning on or about July 9, 2007, the air conditioning at the Premises is being turned off at 6:00 p.m. even though not all Bank employees have left by that time and are still working. Although interior demolition was not to begin until August 2007, and asbestos abatement work is not to begin until August 24, 2007, interior demolition began in July. Garbage dumpsters were placed outside of the 1225 Building and were already filled with debris, including dry wall, prior to August 2007.  The dumpsters do not appear to contain any identification plate, telephone number or permit.

21.  IFSB is not a bank with hundreds of conveniently located branches. It is a small bank with only 4 branches, including its headquarters location in the 1225 Building.  If customers, both new and current, are unable to easily access the Bank (or fear for their physical safety if they do access the

7

bank), the Bank risks losing those customers to nearby more easily accessible banks.  A branch of Wachovia Bank is located across the street.

## CONCLUSIONS OF LAW

22.  The Lease and the Lease Amendment constitute a valid contract between Plaintiff and Defendant.

23. Plaintiff has fully and adequately performed its obligations under the Lease and the Lease Amendment.

24.  Defendant's Repositioning Project constitutes a material breach of the Lease and the Lease Amendment.  The specific provisions of the Lease and the Lease Amendment which are breached by the Repositioning Project include but may not be limited to, the following:

> (A) Section 1.01 is breached in that as a result of the Repositioning Project the Premises will no longer exist as they were constructed at the time the Lease was entered into; and IFSB and its customers will no longer have the right to use all the common and public areas of the Land and Building providing access to the demised premises;

> (B) Section 16.02 is breached in that the Repositioning Project does not comport with the limited rights of BRE to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the Building.  Section 16.02 is further breached in that during the Repositioning Project, the Premises will no longer be visible from the street; public access on the street level directly into the Premises will be cut off; access to the Building will be cut off; there will be unreasonable obstruction of access

to the Premises; and there will be unreasonable
interference with the use or enjoyment of the Premises;

(C) Section 21.02 is breached in that BRE is failing to
furnish air conditioning after 6:00 pm.

(D) Section 11 of the Lease Amendment is breached in
that the Repositioning Project will result in the loss
of the two parking garage spaces to which IFSB is
entitled;

(E) Section 20.01 of the Lease is breached in that the
Repositioning Project will terminate IFSB's quiet
enjoyment of the Premises.

25. As a result of the foregoing breaches, IFSB will suffer
irreparable harm from a loss of business due to restricted access
to, and visibility of, the Bank.  The loss of business will be so
severe as to constitute a destruction of the Bank's business.

26.  In addition to the foregoing losses, IFSB's employees
and customers will suffer harm and injury as a result of the
asbestos abatement.

27.  Plaintiff has no adequate remedy at law.

28.  There is a covenant of quiet enjoyment implied in the
Lease and Lease Amendment and inuring to the benefit of Plaintiff
in its capacity as a tenant.

29.  In undertaking the Repositioning Project, BRE is
interfering with the Bank's implied covenant of quiet enjoyment
in that the Project is actually disturbing Plaintiff's possession
and use of the Premises.

30.  As a result of BRE's interference, the Bank is
suffering and will continue to suffer harm.

9

**IT IS HEREBY ORDERED,**

(A) that Defendant BRE, be, and it hereby is, enjoined from undertaking its Repositioning Project until after December 31, 2010, the end of the current term of the Lease;

(B) Defendant BRE be, and it hereby is, from commencing asbestos abatement until after December 31, 2010, the end of the current term of the Lease;

(C) Plaintiff is awarded its attorneys' fees and costs of this action.

_____
United States District Judge