# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK

*Plaintiff,*

v.

1225 CONNECTICUT CO. LLC

*Defendant.*

Case No. 07-cv-1389 (JBD)

## DEFENDANT 1225 CONNECTICUT CO. LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

Defendant, 1225 CONNECTICUT CO. LLC ("1225"), by undersigned counsel, hereby opposes Plaintiff Independence Federal Savings Bank's Application for Preliminary Injunctive Relief (the "Application"). As will be explained more thoroughly below, Plaintiff's request for injunctive relief is wholly without support and does not come close to satisfying the criteria justifying the grant of the extreme and extraordinary remedy of preliminary injunctive relief. As a result, the Court must deny the Motion. In further support of its Opposition, 1225 states as follows:

### I.    FACTUAL BACKGROUND

On or about December 16, 1988, 1225's predecessor as the owner of the subject property, Pool 1225 Associates ("Pool"), as landlord, and Plaintiff, as tenant, entered into an Agreement of Lease (the "Lease") for a portion of the commercial property located 1225 Connecticut Avenue, N.W. in Washington, D.C. (the "Property"), specifically, a portion of the main lobby and first basement (the "Premises"). *See, Exhibit 1 at para. 3, Affidavit of Ms. Jackie S. Duke (the "Duke*

*Affidavit"); see also, Exhibit A to Duke Affidavit, Lease.*   The initial term under the Lease was for twelve (12) years, commencing on January 1, 1989 and ending on December 31, 2000.  *See, Exhibit 1 at para. 4; see also, Exhibit A to Duke Affidavit.*

Shortly before 1225 became the owner of the Property, on or about April 25, 2001, BRE/Connecticut L.L.C., a successor to Pool, and the Plaintiff executed a First Amendment to the Lease (the "First Amendment"), effective retroactively to January 1, 2001.  *See, Exhibit 1 at para. 5; see also, Exhibit B to Duke Affidavit, the First Amendment.*  The First Amendment, *inter alia,* extended the Plaintiff's right to possession of the Premises by an additional ten (10) years, or through December 31, 2010.  *See, Exhibit 1 at para. 6; see also, Exhibit B to Duke Affidavit.*

The Property, originally constructed in 1968, is a Class B office building.  *See, Exhibit 1 at para. 7, Duke Affidavit.*  In order to replace certain systems (e.g., HVAC) that were approaching the end of their useful life, more successfully position the Property in the highly competitive District of Columbia commercial leasing market, and bring the Property to Class A standards, 1225 planned for extensive renovations and rehabilitation of the Property, including the exterior shell and mechanical system (specifically, the HVAC system) (the "Repositioning Project").  *Id.*

The Repositioning Project involves the complete interior demolition of each floor of the Property beginning with the 8th floor down to the 2nd floor; lobby improvements; limited removal of asbestos containing materials throughout the building, but not within the Premises or the space occupied by Citibank; and the updating of selected systems in the Property.  *Id. at para. 8.*

As noted, asbestos removal is limited to discrete areas of the building (floor tiles, boiler equipment, fire-rated doors, pipe insulation and roof materials) and does not involve any of the

2

Premises. *Id. at para. 9.* The removal will be performed by Ace Co., a licensed and certified asbestos removal company, selected by 1225 construction contractor, Davis Construction ("Davis"), which adheres to all laws and regulations attendant thereto. *Id.* 1225 has retained ATC Associates to monitor the asbestos abatement program. *Id.* The Asbestos Abatement Plan specifies that all necessary safety precautions, both health and environmental, will be taken during the asbestos removal portion of the Repositioning Project. *Id.; see also, Exhibit C to Duke Affidavit, Asbestos Abatement Plan.*

In order to minimize the impact of the Repositioning Project on the tenants, 1225 elected to forego commencement until such time as the Property was nearly vacant. *See, Exhibit 1 at para. 10.* The last remaining office tenant was Ernst & Young, which had occupied approximately ninety-five percent (95%) of the Property since the inception of their lease, on October 1, 1988, and vacated the Property on June 30, 2007. *Id.* At present, the Plaintiff and Citibank, adjacent ground floor retail tenants, are the only remaining tenants of the Property. *Id. at para. 11.* The Property has not been re-rented in anticipation of the performance of the Repositioning Project and 1225 will suffer significant damages if the same is delayed. *Id.*

In April of 2007, a representative of 1225 met with Plaintiff's representative to discuss the Repositioning Project. *Id. at para. 12.* At this meeting, Plaintiff's representative expressed initial concerns related to the Repositioning Project. *Id.* In response, 1225's representative requested a list of specific issues that Plaintiff's representatives had in order for 1225 to address them accordingly. *Id.*

In a letter dated May 11, 2007, 1225 announced the anticipated commencement date of the Repositioning Project as July 1, 2007, and welcomed the commencement of a dialogue with

3

Plaintiff regarding any concerns they may have with the Repositioning Project. *See, Exhibit 1 at para. 13; see also, Exhibit D to Duke Affidavit, Letter to Plaintiff dated May 11, 2007.*

On or about June 12, 2007, representatives from 1225 and the Plaintiff met to discuss the Repositioning Project and the specific issues raised by Plaintiff. *See, Exhibit 1 at para. 14.* 1225 provided a briefing as to the Repositioning Project overview, scope of work, estimated schedule and impact to the retail tenants. *Id.; see also, Exhibit E to Duke Affidavit, Meeting Agenda.* As the 1225 representatives attempted to address the specific concerns raised by the Plaintiff, the Plaintiff's representative indicated that, regardless of what steps 1225 took to address their concerns, they would not be adequate. *See, Exhibit 1 at para. 14.*

On or about July 2, 2007, another meeting was held between 1225's representatives and Plaintiff's representatives regarding the Repositioning Project. *Id. at para. 15.* During this meeting, the 1225 representative attempted to discuss what 1225 could specifically do for the Plaintiff to address the Plaintiff's concerns regarding the Repositioning Project. *Id.* The 1225 representative agreed to consider possible resolutions and the parties agreed to reconvene at a later date to discuss. *Id.*

On or about July 9, 2007, Plaintiff's representative and 1225's representative had a follow-up telephone call during which 1225's representative attempted to discuss specific steps that 1225 was prepared to take to ensure that the Repositioning Project did not unreasonably interfere with Plaintiff's business operations. *Id. at para. 16.* The Plaintiff's representative was dismissive of 1225's proposed resolution and pressed for even more accommodations. *Id.* The 1225 representative solicited direction from Plaintiff's representative; however, Plaintiff's representative did not offer any alternative suggestions. *Id.*

4

On or about July 20, 2007, 1225, in a memorandum to the Plaintiff and Citibank, 1225 provided an estimated timeline as to the length of the Repositioning Project. *Id. at para. 17; see also, Exhibit F to Duke Affidavit, Memorandum to Plaintiff and Citibank dated July 20, 2007.*

On July 12, 2007, 1225 secured a demolition permit for the Repositioning Project. *See, Exhibit 1 at para. 18; see also, Exhibit G to Duke Affidavit, Construction/Demolition Permit.* Davis built its on-site field office between July 16 and July 18, 2007. *See, Exhibit 1 at para. 18.* The debris that was observed by Plaintiff in the dumpster was a by-product of this work and not work connected to the Repositioning Project. *Id.* This debris has since been removed. *Id.*

1225 has obtained all required construction/demolition permits and public space permits (collectively, the "Permits"). *Id. at para. 19; see also, Exhibit G and Exhibit H to Duke Affidavit, Public Space Permit.* With the exception of the removal of some finishes and some pre-cast concrete from the upper floor of the Property to make room for the trash chutes and Bobcats that will be performing the demolition (which did not require the issuance of the Permits), no work in connection with the Repositioning Project, including asbestos removal and/or remediation, commenced. *See, Exhibit 1 at para. 19.*

With the exception of the removal of two (2) "stacks" of window cladding to make room for the demolition chutes, the remainder of the Property will be sealed. *Id. at para. 20; see also, Exhibit I to Duke Affidavit, Photographs of Removal of Window Cadding.* Once demolition occurs, temporary plywood covers will be placed on these stacks while demolition takes place. *See, Exhibit 1 at para. 20.* The location of the demolition chute is on the N Street side of the Property, around the corner from the Plaintiff's main entrance. *Id.*

When the exterior recladding begins, the entire skin (including windows) of the Property will be removed. *Id. at para. 21.* To prevent intrusion of water into the Premises, and Citibank's

5

space, 1225 will be "roofing" the slab above the Premise. *Id.* Davis will install standard roofing membrane over the Premises (and the Citibank space) which will be tacked down, instead of completely adhered since it is temporary in use and does not need complete protection from the elements. *Id.* All penetrations of the membrane will be sealed and any water will be routed to Property's roof/storm drain system. *Id.* This will remain in place until the Property is made water tight. *Id.*

Article 16.02 of the Lease, which entitles 1225 to undertake work at the Property provided certain conditions are met, states in its entirety:

> Landlord reserves the right, without the same constituting an actual or constructive eviction and without incurring liability to Tenant therefor, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the Building; provided, however, that the demised premises shall be visible from the street, public access on the street level directly into the demised premises shall not be cut off, access to the Building shall not be cut off, and that there shall be no unreasonable obstruction of access to the demised premises or unreasonable interference with the use or enjoyment thereof.

*Exhibit A to Duke Affidavit.*

In order to satisfy its obligations under the Lease, 1225 has undertaken to do the following:

i)  The 18th Street side of the Property will have a "tube and pipe" scaffolding approximately ten (10) feet high (prior to demolition of the exterior of the Property, the initial three (3) feet from the street will also contain wood panels to provide protection from falling objects). *See, Exhibit 1 at para. 23(A).* This type of scaffolding was selected primarily to ensure maximum visibility of the Premises and Property during construction. *Id.; see also, Exhibit J to Duke Affidavit, Photographs of "tube and pipe" scaffolding, covered and lit walkway and temporary signage in front of the Premises.*

ii) Temporary signage has been affixed to the scaffolding identifying the Plaintiff and making it clear to the public that the Plaintiff is open for

business during the construction activities at the Property.  *Id. at para. 23(B).*

iii)    The N Street side of the Property will be bounded by a jersey wall and chain link fence surrounding the "staging area."  *Id. at para. 23(C).*  The contractor has been instructed to not install any opaque mesh on the fencing to ensure visibility of the Premises from N Street.  *Id.*  The contractor agreed to locate the "staging area" further east and away from the retail portion of the Premises, as well as relocating the two (2) dumpsters and trash chutes to not be in front of the Property.  *Id.*  Temporary signage for the N Street side of the Premises and Property will be affixed to the chain link fence.  *See, Exhibit 1; see also, Exhibit L to Duke Affidavit, Photographs of N Street side of Property and Premises.*

iv)    All entrance and exit points for the Premises will be maintained.  There will be covered and lit walkways leading to and from the Premises and the Property.  *Id. at para. 23(D); see also, Exhibit J.*  On the N Street side, a pedestrian walkway will be maintained under the existing covered "arcade" area.  *Id.*  During lobby renovations, if Independence requires access into the Premises lobby area, 1225 will provide escorted access through the work area.  *See, Exhibit 1 at para. 23(D).*  Temporary partitions will be installed in the lobby area to separate pedestrians from the work area and construction activities.  *Id.*

v)    1225 will be scheduling service interruptions after normal business hours so as to minimize or avoid inconvenience to the tenants of the Property, including the Plaintiff.  *Id. at para. 23(E).*

vi)    The parking garage will remain available for use.  *Id. at para. 23(F).*  1225 is taking steps to have contractors maintain the construction site in a tidy fashion so as to not negatively impact the appearance of the Property.  *Id.*

vii)    1225 has a "day porter" available to respond should there be dust or water infiltration.  *Id. at para. 23(G).*  The day porter will also be available to remove trash from the retail tenants' spaces to the loading dock dumpster.  *Id.*

viii)   All utilities and fire/life safety systems will remain operational for the first floor.  *Id. at para. 23(H).*

ix)    The Property's security access control will remain in operation throughout the renovation.  *Id. at para. 23(I).*

x)    A temporary chiller will be provided for cooling when the main system for the Property is undergoing modification.  *Id. at para. 23(J).*

xi)    A new retail boiler will be in place for the retail heating load.  *Id. at para. 23(K).*

xii)   Roofing will be installed on the 2nd floor to reduce the risk of leakage into the retail space. *Id. at para. 23(L).*

xiii)  Temporary toilet facilities have been relocated out of the staging area on N Street. *Id. at para. 23(M).*

xiv)  Davis has been requested to focus on keeping the construction site tidy. *Id. at para. 23(N).*

xv)   The outside air filters will be reviewed regularly and replaced as required. *Id. at para. 23(O).*

In a letter dated July 23, 2007, 1225, through counsel, informed Plaintiff, through counsel, of the steps 1225 was taking to minimize inconvenience to the Plaintiff during the Repositioning Project. *See, Exhibit 1 at para. 24; see also, Exhibit M to Duke Affidavit, Letter to Dale Cooter, Esq. dated July 23, 2007.*

Paragraph 11 of the First Amendment requires 1225 to provide Plaintiff with two (2) reserved parking spaces in the over three hundred (300) space parking garage located in the Property. *See, Exhibit 1 at para. 25; see also, Exhibit B to Duke Affidavit.* The parking garage will remain open during the Repositioning Project, and the Plaintiff will continue to have the two (2) reserved parking spaces as provided in the First Amendment. *See, Exhibit 1 at para. 25.* The parking garage will also be available for customer and general public use during the Repositioning Project. *Id. at para. 26.* In fact, with the departure of Ernst & Young, the garage now has a greater capacity to accommodate transient day parkers, including Plaintiff's customers. *Id.*

Contrary to Plaintiff's allegations, the Lease does not require 1225 to provide air conditioning to Plaintiff, but rather only a supply of "chilled water." *See, Exhibit 1 at para. 27; see also, Exhibit A to Duke Affidavit at para 21.01.* Chilled water is provided to the Plaintiff until 6:00 p.m. each business day. *See, Exhibit 1 at para. 27.* During the period of time from March through June when Ernst & Young was in the process of vacating the Property, Ernst &

Young specially requested extended hours, for which it paid 1225, for air conditioning for the comfort and convenience of their moving crews. *Id.* The following represents the number of days 1225 provided the additional hour (6:00 p.m. to 7:00 p.m.) of chilled water service in the Property to accommodate Ernst & Young's move-out:

> 21 Days in March, 2007
> 22 Days in April, 2007
> 17 Days in May, 2007
> 22 Days in June, 2007

*Id.*

As a result of this extended hour of chiller service, both the Plaintiff and Citibank benefited as they received chilled water beyond the 6:00 p.m. cut-off time, although they did not pay extra for the same. *Id. at para. 28.* 1225 has made no changes to the chilled water supply as it existed before the special circumstances of Ernst & Young's move, nor after such move was completed. *Id.* The chilled water supply to the Premises is as it has been throughout the balance of Plaintiff's Lease. *Id.* Coincidentally, effective on May 29, 2007, the Plaintiff extended its business hours for one (1) additional hour (until 5:00 p.m. instead of 4:00 p.m. on Monday through Friday). *Id.*

Both Citibank and the Plaintiff draw from the same chilled water supply. *Id. at para. 29.* To date, 1225 has received no complaints or other communications from Citibank regarding problems with the air conditioning, chilled water supply or temperature in their leased space. *Id.*

The Plaintiff will have continued access to the alleyway and dumpsters located therein, although the route traveled to reach the dumpster may vary, and the Plaintiff's trash removal will not be adversely impacted by the Repositioning Project. *Id. at para. 30.* The dumpster is kept under lock and key to prevent unauthorized use by non-tenants, and the Plaintiff has been provided with multiple copies of the key to the dumpster locks. *Id.*

Mindful of the potential of a varying route, and in a further effort to minimize inconvenience to Plaintiff during the Repositioning Project, in an email dated Friday, August 10, 2007, 1225 offered the Plaintiff an alternative for trash removal.   *Id. at para. 31; see also, Exhibit N, Email to Plaintiff dated August 10, 2007.*   Under this alternative scenario, the Plaintiff would be permitted to place its trash in a rolling container located near the N Street emergency egress from the Premises, whereupon 1225's representatives would transport the same to the dumpster at the Property.  *Id.*

Citibank has registered no complaints with 1225 with respect to any facet of the Repositioning Project.  *See, Exhibit 1 at para. 32.*  To the contrary, Citibank has been very cooperative and understanding of the situation.  *Id.*

Plaintiff has not brought to 1225's attention even one instance of a customer discontinuing doing business with Plaintiff due to the presence of scaffolding or any perceived traffic or parking disruptions.[1]  *Id. at para. 33.*

## II.    LEGAL ARGUMENT

### A.    PLAINTIFF CANNOT SATISFY THE CRITERIA FOR IMPOSITION OF INJUNCTIVE RELIEF

Preliminary injunctive relief is extraordinary relief that the Supreme Court in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), has stated should "issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Id*. at 312 (*quoting*, *Cavanaugh v. Looney*, 248 U.S. 453, 456(1919)); *see also, Ramirez v. District of Columbia*, 99 U.S. Dist. LEXIS 15964 (D.D.C. 1999). Furthermore, injunctive relief constitutes an extraordinary remedy which is not a matter of right. *See, Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F.Supp. 2d 30, 36 (D.D.C. 2000) ("the power to

---

[1]  Finally, despite the impression Plaintiff attempts to give that it is a minority owned business, the fact of the matter is that the majority ownership of the bank is not in the hands of minorities.  *See, Exhibit 1 at para. 34.*

issue a preliminary injunction, especially a mandatory one, should be sparingly exercised."); *see also, Morgan Stanley DW, Inc. v. Rothe*, 150 F.Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."); *Stamenich v. Markovic*, 462 A.2d 452 (D.C. 1983); *Wieck*, 350 A.2d 384 (D.C. 1976).

In addition, where a plaintiff has an adequate remedy at law, injunctive relief must be denied. *See, Kakaes v. George Washington Univ.*, 790 A.2d 581, 583 (D.C. 2002) ("It is 'axiomatic' that equitable relief will not be granted where the plaintiff has a complete and adequate remedy at law.") (internal citations omitted). Absent a showing of clear and convincing evidence on the part of the moving party, injunctive relief should not be granted. *Johnson v. Holway,* 329 F.Supp 2d 12, 15 (D.D.C. 2004) (*citing, Kahane v. Sec'y of State,* 700 F.Supp. 1162, 1165 (D.D.C. 1998) ("This is an extraordinary form of relief that should not be granted absent a clear and convincing showing by the moving party.").

In order to receive injunctive relief, the moving party must clearly and convincingly demonstrate: (1) a likelihood of irreparable injury if the injunction is not issued; (2) a likelihood of success on the merits of the underlying cause of action; (3) the "balance of injuries" favors the granting of the injunction; and (4) the public interest will be served by granting the injunctive relief sought. *See, Sea Containers Ltd. v. Stema. AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989); *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 151 (D.C.Cir. 1985); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977); *Ramirez,* 99 U.S. Dist. LEXIS 15964 at p. 11; *In re Antioch Univ.,* 418 A.2d 105, 109 (D.C. 1980); *Wieck,* 350 A.2d at 387.

318324v1

As is demonstrated below, as well as in the accompanying affidavit and exhibits, Plaintiff cannot satisfy the required four-part test for receiving injunctive relief.

1.    PLAINTIFF HAS FAILED TO DEMONSTRATE ANY IRREPARABLE INJURY

In determining whether to issue the preliminary injunction, the most important inquiry is that of irreparable injury. *See, Wieck*, 350 A.2d at 387; *see also, American Coastal Line Joint Venture, Inc. v. United States Lines, Inc.,* 580 F. Supp. 932, 936 (D.D.C. 1983) ("Irreparability of injury is a very high standard.").   "An injunction should not be issued unless the threat of injury is imminent and well-founded, and unless the injury itself would be incapable of being redressed after a final hearing on the merits." *Wieck*, 350 A.2d at 388.

"In order to establish irreparable injury justifying preliminary injunctive relief, a plaintiff must establish injury that is certain, great, and actual, not theoretical." *Housing Study Group v. Kemp,* 736 F. Supp. 321, 330 (D.D.C. 1990).  The party seeking injunctive relief bears the burden of proof as to the imminent nature of the harm and that there is a "clear and present" need for the injunctive relief to prevent the alleged irreparable injury. *See, Wisconsin Gas Co. v. Federal Energy Regulatory Com.,* 758 F.2d 669, 674 (D.C. Cir. 1985).  The United States Supreme Court, in *Connecticut v. Massachusetts*, 282 U.S. 660 (1931), stated that injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time." *Id.* at 674; *see also, e.g., N.B.A. Credit Union, Inc. v. Hargrove,* 834 F. Supp. 845 (D. Pa. 1975).

Plaintiff clearly fails to sufficiently demonstrate irreparable injury, as the Complaint and Application each fail to present any evidence of **imminent irreparable harm**.  In the instant matter, Plaintiff alleges that a loss in business will result because customers will no longer want to visit the Premises for their banking needs, both commercial and personal, due to the

12

Repositioning Project. Furthermore, Plaintiff alleges that the construction fencing, scaffolding and other barriers will obstruct the Premises from the passers-by on 18th Street, N.W. and N Street, N.W., and that the passers-by will assume that the Plaintiff's branch is closed, both resulting in economic loss.

Plaintiff's alleged harm - in the form of **anticipated lost business** – is purely speculative, and therefore does not rise to the level of an irreparable injury. *Tozzi v. EPA*, 148 F. Supp. 2d 35, 49 (D.D.C. 2001) ("Speculative harm is not sufficient to constitute irreparable harm."); *see also, N.B.A. Credit Union, Inc.,* 834 F.Supp at 851-2; *Weick,* 350 A.2d at 388 (speculation as to a reduction in property value inadequate to demonstrate a need for immediate injunctive relief). In fact, Plaintiff cannot even point to one customer who has ceased doing business with it due to the presence of scaffolding or lobby partitions. Instead, it seeks to persuade this Court that it so called twenty-four (24) years of goodwill is going to vanish at the drop of a hammer. Plaintiff has not demonstrated any of the alleged access impediments which form the gravaman of its Complaint and Application. Instead, it exclusively relies on its predictions of doom. As demonstrated by the "before" and "after" photos, 1225 has placed temporary signage which is more visible than that which Plaintiff installed during its tenancy. *See, Exhibits J and K to Duke Affidavit, Photographs of Property.* This is not the kind of showing which supports the extraordinary relief Plaintiff seeks from this Court.

Moreover, even entertaining Plaintiff's worst case speculative scenario – i.e., that will result in some impairment of the Premises' visibility from the street, and that the Repositioning Project will produce disruption of business activities due to dust and noise – such harms are may not even occur, and should they occur, will not continue indefinitely into the future. As stated

above, 1225 is taking reasonable steps to accommodate the Plaintiff, one (1) of the only two (2) remaining tenants in the Building.  *See, Exhibit 1 at para. 11 and 23.*

Plaintiff maintains that it will suffer irreparable harm because real property is inherently unique, the Premises, which is one (1) of four (4) locations from which Plaintiff conducts business in the local region, is specially suited for the Plaintiff's business, and the supposed inability to use the Premises will result in monetary and non-monetary loss to Plaintiff.  "While real property is generally considered unique, it is at least arguable that **this principle applies less strongly to commercial office space**."  *Duvin & Associates, Co. v. First Union Management, Inc.*, 1983 Ohio App. LEXIS 12322 (Ohio 1983) (emphasis added).  This is not irreparable injury.

Plaintiff will not suffer irreparable harm because it has an adequate remedy at law. Plaintiff has not been forced from the Premises – no constructive eviction has occurred – and Plaintiff even concedes that it is operating the business in the Premises at this time.  *See, generally, Complaint and Application.*  Moreover, as discussed above, Plaintiff's allegation that it is at risk of going out of business is speculative at best, and is not supported by Affidavit or any other evidence; nor could it reasonably do so because of the nature of the business.

Plaintiff must show a continuing future harm in order to warrant injunctive relief.  *See, Housing Study Group*, 736 F.Supp. at 330 (in order to establish irreparable harm, Plaintiff must show that harm "is likely to occur again, or proof indicating that harm is certain to occur in near future").  In the instant case any "harm" that **may** occur will be (1) for a short period of time; and, (2) will be minimized by the actions taken by 1225 as described above.

As to the Plaintiff's allegation that the dust and noise that may enter the Premises will result in monetary loss due to loss of business, it is self-evident that monetary loss can be

compensated by damages (assuming any exist in this case).    It is well-settled that economic loss does not constituted irreparable injury.  *Wisconsin Gas Co. v. Federal Energy Regulatory Com.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (*citing, Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."); *see also, Grigsby Brandford & Co., Inc.* v. *U.S.*, 869 F.Supp. 984, 1003 (D.D.C. 1994) ("[I]n particular, theoretical economic loss – however substantial – does not constitute irreparable harm" [for purposes of preliminary injunctive relief].); *Washington Metropolitan Area Transit Commission  v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir. 1977) (Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business.).  Plaintiff's statement that it will be driven out of business is nothing more than posturing, and has no value as there is not one scintilla of evidence to support the same.  *Wisconsin Gas Co. v. Federal Energy Regulatory Com.*, 758 F.2d at 674 ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future. Further, the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin.").

The Plaintiff has failed to prove that the alleged harm will occur, especially in light of the steps taken by 1225 to address Plaintiff's concerns, and has not demonstrated that the alleged harm – going out of business – will result from the Reposition Project, especially given

15

Plaintiff's own admission that it has been classified as a "problem association" and in "trouble condition" since 2003.  *See, Complaint at para. 3.*  The standard of proof that the Plaintiff must satisfy in order to receive injunctive relief is not be lessened based on the precarious position of its continued operation.  *See, e.g., Huron Valley Publishing Co., Inc. v. Booth Newspapers, Inc.* 336 F. Supp. 659 (D. Mich. 1972).

Even if a showing is made that there is somehow a continuing harm that will hurt the Plaintiff's business, the same is inadequate to warrant injunctive relief.  Recoverable monetary loss may constitute irreparable harm only where the loss threatens the **very existence** of the movant's business.  *Nichols v. Agency for Intern. Development*, 18 F.Supp. 2d 1, 4 (D.D.C. 1998); *see also, Varicon International v. Office of Personnel Management*, 934 F.Supp. 440, 447 (D.D.C. 1996).  Although Plaintiff alleges the potential loss of some of its clients, there is no allegation that the repositioning project will somehow be the death knell of the Plaintiff's business.

The central aspect of Plaintiff's Complaint, Application and Affidavit was a loss of business due to impaired access.  Plaintiff's pleadings and affidavit make a passing reference to asbestos removal as a part of the Repositioning Project, but does not base any of its damages on this event.  In a teleconference with the Court on August 15, 2007, Plaintiff attempted to change the focus of this case to one of safety and health issues, and constantly referred to asbestos removal.  This is nothing more than a red herring and a desperate attempt by Plaintiff to use scare tactics to convince the Court to grant the requested relief.

The asbestos removal portion of the Repositioning Project is a minor portion of the total work to be performed.  *See, Exhibit 1 at paras. 8 and  9.*  The asbestos removal is limited to discrete areas of the building (floor tiles, boiler equipment, fire-rated doors, pipe insulation and

roof materials) and does not involve any portion of the Premises. *Id. at para. 9.* As detailed in the factual recitation, the Duke Affidavit and the Asbestos Abatement Plan, the asbestos removal will be performed by a licensed and certified asbestos removal company which adheres to all laws and regulations attendant thereto, and 1225 has retained an independent contractor to monitor the asbestos abatement program. *See, Exhibit 1 at paras. 8 and 9; Exhibit C to Duke Affidavit* . The precautions that will be in place during the asbestos removal portion are more than adequate to protect the health and safety of the workers, Plaintiff's employees and the general public. *See, Exhibit C to Duke Affidavit.* When performed correctly and monitored, asbestos removal is no greater hazard than any other aspect of the overall Repositioning Project.

## 2.    THE PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff offers no support for the allegation that it is likely to succeed on the merits of the underlying action. 1225 emphatically denies all of Plaintiff's claims.

The Plaintiff points to Article 16.02 of the Lease as support for the imposition of injunctive relief. Article 16.02 of the Lease enties 1225 to undertake the planned work provided certain conditions are met. All of these conditions have been, or will be, satisfied. Article 16.02 states in its entirety:

> Landlord reserves the right, without the same constituting an actual or constructive eviction and without incurring liability to Tenant therefor, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the Building; **provided, however, that the demised premises shall be visible from the street, public access on the street level directly into the demised premises shall not be cut off, access to the Building shall not be cut off, and that there shall be no unreasonable obstruction of access to the demised premises or unreasonable interference with the use or enjoyment thereof.**

*Exhibit A to Duke Affidavit, Lease (emphasis added).*

17

Plaintiff has not, and cannot, demonstrate that the Premises is not visible from the street, that public access on the street level has been cut off, that there are any unreasonable obstructions to access to the Premises or that there is any unreasonable interference with the use or enjoyment of the Premises. To the contrary, the record clearly establishes that 1225 has taken all appropriate measures to minimize any impact on Plaintiff as detailed *infra* at pages 6-7. *See also, Exhibit 1 at para. 23.*

Plaintiff points to the doctrines of quiet enjoyment and constructive eviction in arguing that 1225 has somehow breached the Lease. Notwithstanding the Lease provision which specifically bars such a cause of action for constructive eviction due to 1225's construction, constructive eviction requires the tenant to abandon the subject premises; yet Plaintiff is conducting its operations as if all was normal. *Rittenberg v. Donohoe Construction, Inc.*, 426 A.2d 338, 342 (D.C. 1991); *International Com. on English in Liturgy v. Schwartz*, 573 A.2d 1303 (D.C. 1990); *Weisman v. Middleton,* 390 A.2d 996, 1001 (D.C. 1978) ("The landlord's covenant for quiet enjoyment … goes only to … possession …. The covenant is not broken unless there is an eviction from, or some actual disturbance in, the possession by the landlord….") (*citing*, *Hyde v. Brandler,* 118 A.2d 398, 299-400 (D.C. 1955)). Furthermore, the Lease does not bar any conceivable obstruction or interference with the use of the Property, but only prohibits that which is unreasonable. As demonstrated above, 1225's actions are not unreasonable under the circumstances.

Plaintiff's interpretation of the covenant of quiet enjoyment is too broad and would effectively bar a landlord from making any construction or repairs. Certainly, 1225 has the right to engage in construction, both inside and outside of the Premises. Naturally, construction is going to make a certain amount of noise and stir up a certain amount of dust. Furthermore,

1225's right to make repairs and improvements under the Lease is independent from the covenant of quiet enjoyment contained therein, and cannot be read out of the Lease. *Interstate Restaurants, Inc. v. Halsa Corporation*, 309 A.2d 108, 110 (D.C. 1973); *Norris v. Green*, 656 A.2d 282, 286 (D.C. 1995).

### 3.    BALANCE OF THE INJURIES FAVORS 1225

Plaintiff is not currently suffering any injury.  The irreparable harm to 1225 outweighs any injury that could result to Plaintiff.  As discussed above, any harm that may be done to Plaintiff is fully compensable in monetary damages, and by definition is not irreparable.  To the contrary, it is, in fact, the infringement on 1225's real property interest in the disputed area which constitutes the irreparable injury in this case.  *See*, *Campbell v. Bishields*, 80 A.2d 262 (Md. 1951); *Fields v. District of Columbia*, 443 F.2d 740 (D.C. Cir. 1971); *see also,* R. Powell, The Law of Real Property, 420 at 233-38.

Specifically, the granting of injunctive relief in favor of Plaintiff (1) delays the replacement of systems in the Property which are approaching the end of their useful lives; (2) interferes with 1225's contracts with construction contractors and construction lenders; (3) delays 1225 ability to lease the rest of the Property and receive a return on their investment; and (4) threatens the existence of 1225.  *See, Exhibit 1 at para. 35.*  These are real, as opposed to speculative consequences, which decidedly tip the balance of hardships in 1225's favor.  At worst, the balance is even, and this requires a denial of the request for injunctive relief.

As Plaintiff failed to demonstrate any irreparable injury, the balance of harm clearly favors 1225.

### 4.    THE PUBLIC INTEREST

This is a dispute between private parties, and the public interest is not substantially affected by that dispute.  The preliminary injunctive relief sought by Plaintiff will not serve the

public interest.  The public has a strong interest in ensuring that owners of property are not

deprived of its use without appropriate adjudication of the parties' rights.  A grant of an

injunction could well prevent that from occurring.  Any alleged inconvenience to Plaintiff is far

outweighed by the public purpose served by improvements to property, either commercial or

residential.  This is an application of the equitable principle of *de minimus non curat lex*.  59A

Am.Jur.2d, Party Walls, §62 (1994); *see, Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir.

1993) (The function of the maxim *de minimus non curat lex* [literally, the law does not care for,

or take notice of, very small or trifling matters] ". . . is to place outside the scope of legal relief

the sorts of intangible injuries normally small and invariably difficult to measure that must be

accepted as the price of living in society, rather than [make] a federal case out of.").  The

preliminary injunctive relief sought by Plaintiff clearly will not serve the public interest.

> **B.     BOND**

Plaintiff's Application is also flawed as it fails to address the requirements for a bond, as

required under the provisions of F.R.C.P. 65, which, except in rare cases, is required to be

posted.  *See,* Fed. R. Civ. Pro. 65(c) (2007)*; L'Enfant Plaza Properties v. Fitness Systems*, 354

A.2d 233 (D.C. 1976).

> **III.     CONCLUSION**

For the aforementioned, the Plaintiff's request for preliminary injunctive relief must be

denied.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated:  August 17, 2007

/S/ Joshua M. Greenberg

Richard W. Luchs, #243931
William C. Casano, #352492
Joshua M. Greenberg, 489323
1620 L Street, N.W., Suite 900
Washington, D.C.  20036-5605
Telephone:  (202) 452-1400
Email:  rwl@gdllaw.com
Email:  wcc@gdllaw.com
Email:  jmg@gdllaw.com

*Counsel for Defendant*
*1225 Connecticut Co. LLC*

21

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Case No. 07-cv-1389 (JDB) |
| | : |
| 1225 CONNECTICUT CO. LLC | : |
| | : |
| Defendant | : |
| | : |

## AFFIDAVIT OF JACKIE DUKE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

I, JACKIE S. DUKE, under penalty of perjury, state as follows:

1.     I am over twenty one (21) years of age and make this Affidavit based on matters within my personal knowledge in support of the Opposition of Defendant 1225 Connecticut Co. LLC("1225") to Plaintiff's Application for Preliminary Injunctive Relief.

2.     I am the General Manager for Brookfield Properties Management LLC ("Brookfield") with an office address of 1250 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20036.

3.     On or about December 16, 1988, 1225's predecessor as the owner of the subject property, Pool 1225 Associates ("Pool"), as landlord, and Plaintiff, as tenant, entered into an Agreement of Lease (the "Lease") for a portion of the commercial property located 1225 Connecticut Avenue, N.W in Washington, D.C. (the "Property"), specifically, a portion of the main lobby and first basement (the "Premises")   A copy of the Lease, without Exhibits C and D to the Lease, is attached hereto as *Exhibit A.*

4.      The initial term under the Lease was for twelve (12) years, commencing on January 1, 1989 and ending on December 31, 2000. *Exhibit A.*

5.      Shortly before 1225 became the owner of the Property, on or about April 25, 2001, BRE/Connecticut L.L.C., a successor to Pool, and the Plaintiff executed a First Amendment to the Lease (the "First Amendment"), effective retroactively to January 1, 2001. A copy of the First Amendment is attached hereto as *Exhibit B.*

6.      The First Amendment, *inter alia,* extended the Plaintiff's right to possession of the Premises by an additional ten (10) years, or through December 31, 2010. *Exhibit B.*

7.      The Property, originally constructed in 1968, is a Class B office building. In order to replace certain systems (e.g., HVAC) that were approaching the end of their useful life, more successfully position the Property in the highly competitive District of Columbia commercial leasing market, and bring the Property to Class A standards, 1225 planned for extensive renovations and rehabilitation of the Property, including the exterior shell and mechanical system (specifically, the HVAC system) (the "Repositioning Project").

8.      The Repositioning Project involves the complete interior demolition of each floor of the Property beginning with the 8th floor down to the 2nd floor; lobby improvements; limited removal of asbestos containing materials throughout the building, but not within the Premises or the space occupied by Citibank; and the updating of selected systems in the Property.

9.      As noted, asbestos removal is limited to discrete areas of the building (floor tiles, boiler equipment, fire-rated doors, pipe insulation and roof materials) and does not involve any of the Premises. The removal will be performed by Ace Co., a licensed and certified asbestos removal company, selected by 1225 construction contractor, Davis Construction ("Davis"), which adheres to all laws and regulations attendant thereto  1225 has retained ATC Associates

2

to monitor the asbestos abatement program  A copy of the Asbestos Abatement plan is attached hereto as *Exhibit C.*  The Asbestos Abatement plan specifies that all necessary safety precautions will be taken during the asbestos removal portion of the Repositioning Project.  *Id.*

10.    In order to minimize the impact of the Repositioning Project on the tenants, 1225 elected to forego commencement until such time as the Property was nearly vacant.  The last remaining office tenant was Ernst & Young, which had occupied approximately ninety-five percent (95%) of the Property since the inception of their lease, on October 1, 1988, until it vacated the Property on June 30, 2007

11.    At present, the Plaintiff and Citibank, adjacent ground floor retail tenants, are the only remaining tenants of the Property.  The Property has not been re-rented in anticipation of the performance of the Repositioning Project, and 1225 will suffer significant damages if the same is delayed.

12.    In April of 2007, a representative of 1225 met with Plaintiff's representative to discuss the Repositioning Project.  At this meeting, Plaintiff's representative expressed initial concerns related to the Repositioning Project.  In response, 1225's representative requested a list of specific issues that Plaintiff's representatives had in order for 1225 to address them accordingly.

13.    In a letter dated May 11, 2007, 1225 announced the anticipated commencement date of the Repositioning Project as July 1, 2007, and welcomed the commencement of a dialogue with Plaintiff regarding any concerns they may have with the Repositioning Project.  A copy of the May 11, 2007 letter is attached hereto as *Exhibit D.*

14.    On or about June 12, 2007, representatives from 1225 and the Plaintiff met to discuss the Repositioning Project and the specific issues raised by Plaintiff.  1225 provided a

3

briefing as to the Repositioning Project overview, scope of work, estimated schedule and impact to the retail tenants. A copy of the meeting agenda is attached hereto as *Exhibit E*. As the 1225 representatives attempted to address the specific concerns raised by the Plaintiff, the Plaintiff's representative indicated that, regardless of what steps 1225 took to address their concerns, they would not be adequate.

15.    On or about July 2, 2007, another meeting was held between 1225's representative and Plaintiff's representative regarding the Repositioning Project. During this meeting, the Plaintiff's representative asked the 1225 representative to provide the Plaintiff with a proposal to address the Plaintiff's concerns regarding the Repositioning Project. The 1225 representative agreed to consider possible resolutions and the parties agreed to reconvene at a later date to discuss.

16.    On or about July 9, 2007, Plaintiff's representative and 1225's representative had a follow-up telephone call during which 1225's representative attempted to discuss specific steps that 1225 was prepared to take to ensure that the Repositioning Project did not unreasonably interfere with Plaintiff's business operations. The Plaintiff's representative was dismissive of 1225's proposed resolution and pressed for even more accommodations. The 1225 representative solicited direction from Plaintiff's representative; however, Plaintiff's representative did not offer any alternative suggestions.

17.    On or about July 20, 2007, 1225, in a memo to the Plaintiff and Citibank, 1225 provided an estimated timeline for the Repositioning Project. A copy of the July 20, 2007 memorandum is attached hereto as *Exhibit F*.

18.    On July 12, 2007, 1225 secured a demolition permit for the Repositioning Project. A copy of the Demolition Permit is attached as *Exhibit G*. Davis built its on-site field office

4

between July 16 and July 18, 2007. The debris that was observed by Plaintiff in the dumpster was a by-product of this work and not work connected to the Repositioning Project. This debris has since been removed.

19.    1225 has obtained all required construction/demolition permits and public space permits (collectively, the "Permits"). Copies of the Permits are attached hereto as *Exhibit G* (the Construction/Demolition Permit) and *Exhibit H* (the Public Space Permit). With the exception of the removal of some finishes and some pre-cast concrete from the upper floor of the Property to make room for the trash chutes and Bobcats that will be performing the demolition (which did not require the issuance of the Permits), no work in connection with the Repositioning Project, including asbestos removal and/or remediation, commenced.

20.    With the exception of the removal of two (2) "stacks" of window cladding to make room for the demolition chutes, the remainder of the Property will be sealed. Once demolition occurs, temporary plywood covers will be placed on these stacks while demolition takes place. Attached as *Exhibit I* are photographs which are a true and accurate representation of the condition of the Property during the removal of the window cladding. The location of the demolition chute is on the N Street side of the Property, which is around the corner from the main entrance to the Premises.

21    When the exterior recladding begins, the entire skin (including windows) of the Property will be removed. To prevent intrusion of water into the Premises, and Citibank's space, 1225 will be "roofing" the slab above the Premise. Davis will install standard roofing membrane over the Premises (and the Citibank space) which will be tacked down, instead of completely adhered since it is temporary in use and does not need complete protection from the elements.

5

All penetrations of the membrane will be sealed and any water will be routed to Property's

roof/storm drain system. This will remain in place until the Property is made water tight.

22.    Article 16.02 of the Lease, which entitles 1225 to undertake work at the Property

provided certain conditions are met, states in its entirety:

> Landlord reserves the right, without the same constituting an actual
> or constructive eviction and without incurring liability to Tenant
> therefor, to change the arrangement and/or location of public
> entrances, passageways, doors, doorways, corridors, elevators,
> stairways, toilets and other public parts of the Building; provided,
> however, that the demised premises shall be visible from the street,
> public access on the street level directly into the demised premises
> shall not be cut off, access to the Building shall not be cut off, and
> that there shall be no unreasonable obstruction of access to the
> demised premises or unreasonable interference with the use or
> enjoyment thereof.

*See Exhibit A.*

23.    In order to satisfy its obligations under the Lease, 1225 has undertaken to do the

following:

A.    The 18th Street side of the Property will have a "tube and pipe"
scaffolding approximately ten (10) feet high (prior to demolition of the
exterior of the Property, the initial three (3) feet from the street will also
contain wood panels to provide protection from falling objects). This type
of scaffolding was selected primarily to ensure maximum visibility of the
Premises and Property during construction. Attached as *Exhibit J* are
photographs which are a true and accurate representation of the Property
with the "tube and pipe" scaffolding, covered and lit walkway and
temporary signage in front of the Premises.

B.    Temporary signage has been affixed to the scaffolding identifying the
Plaintiff and making it clear to the public that the Plaintiff is open for
business during the construction activities at the Property. *See, Exhibit J.*
In fact, the temporary signage is more visible than Plaintiff's original
signage. Contrast *Exhibit J* with *Exhibit K*, photographs which are a true
and accurate depiction of the Premises before the installation of the
scaffolding.

C.    The N Street side of the Property will be bounded by a jersey wall and
chain link fence surrounding the "staging area." The contractor has been
instructed to not install any opaque mesh on the fencing to ensure

6

visibility of the Premises from N Street. The contractor agreed to locate the "staging area" further east and away from the retail portion of the Premises, as well as relocating the two (2) dumpsters and trash chutes to not be in front of the Property. Temporary signage for the N Street side of the Premises and Property will be affixed to the chain link fence. Attached as *Exhibit L* are photographs which are a true and accurate representation of the condition of the N Street side of Property and Premises.

D.    All entrance and exit points for the Premises will be maintained. There will be covered and lit walkways leading to and from the Premises and the Property. *See, Exhibit J.* On the N Street side, a pedestrian walkway will be maintained under the existing covered "arcade" area. *Id.* During lobby renovations, if Independence requires access into the Premises lobby area, 1225 will provide escorted access through the work area. Temporary partitions will be installed in the lobby area to separate pedestrians from the work area and construction activities.

E.    1225 will be scheduling service interruptions after normal business hours so as to minimize or avoid inconvenience to the tenants of the Property, including the Plaintiff.

F.    The parking garage will remain available for use. 1225 is taking steps to have contractors maintain the construction site in a tidy fashion so as to not negatively impact the appearance of the Property.

G.    1225 has a "day porter" available to respond should there be dust or water infiltration. The day porter will also be available to remove trash from the retail tenants' spaces to the loading dock dumpster.

H.    All utilities and fire/life safety systems will remain operational for the first floor.

I.    The Property's security access control will remain in operation throughout the renovation.

J.    A temporary chiller will be provided for cooling when the main system for the Property is undergoing modification.

K.    A new retail boiler will be in place for the retail heating load.

L.    Roofing will be installed on the 2nd floor to reduce the risk of leakage into the retail space.

M.    Temporary toilet facilities have been relocated out of the staging area on N Street.

N.    Davis has been requested to focus on keeping the construction site tidy.

7

      O.    The outside air filters will be reviewed regularly and replaced as required.

24    In a letter dated July 23, 2007, 1225, through counsel, informed Plaintiff, through counsel, of the steps 1225 was taking to minimize inconvenience to the Plaintiff during the Repositioning Project. A copy of the letter is attached as *Exhibit M.*

25.    Paragraph 11 of the First Amendment requires 1225 to provide Plaintiff with two (2) reserved parking spaces in the over 300 space parking garage located in the Property. *See, Exhibit B.* The parking garage will remain open during the construction project, and the Plaintiff will continue to have the two (2) reserved parking spaces as provided in the First Amendment.

26.    The parking garage will also be available for customer and general public use during the construction project. In fact, with the departure of Ernst & Young, the garage now has a greater capacity to accommodate transient day parkers, including Plaintiff's customers.

27.    The Lease does not require 1225 to provide air conditioning to Plaintiff, but rather only a supply of "chilled water." *See, Exhibit A, para 21 01* Chilled water is provided to the Plaintiff until 6:00 p.m. each business day. During the period of time from March through June when Ernst & Young was in the process of vacating the Property, Ernst & Young specially requested extended hours, for which it paid 1225, for air conditioning for the comfort and convenience of their moving crews. The following represents the number of days 1225 provided the additional hour (6:00 p.m. to 7:00 p.m.) of chilled water service in the Property to accommodate Ernst & Young's move-out:

        21 Days in March, 2007
        22 Days in April, 2007
        17 Days in May, 2007
        22 Days in June, 2007

28.    As a result of this extended hour of chiller service, both the Plaintiff and Citibank benefited as they received chilled water beyond the 6:00 p.m. cut-off time. 1225 has made no

320032\1

changes to the chilled water supply as it existed before the special circumstances of Ernst & Young's move, nor after such move was completed. The chilled water supply to the Premises is as it has been throughout the balance of Plaintiff's Lease. Coincidentally, effective on May 29, 2007, the Plaintiff extended its business hours for one (1) additional hour (until 5:00 p.m. instead of 4:00 p.m. on Monday through Friday).

29. Both Citibank and the Plaintiff draw from the same chilled water supply. To date, 1225 has received no complaints or other communications from Citibank regarding problems with the air conditioning, chilled water supply or temperature in their leased space.

30 The Plaintiff will have continued access to the alleyway and dumpsters located therein, although the route traveled to reach the dumpster may vary, and the Plaintiff's trash removal will not be adversely impacted by the Repositioning Project. The dumpster is kept under lock and key to prevent unauthorized use by non-tenants, and the Plaintiff has been provided with multiple copies of the key to the dumpster locks.

31. Mindful of the potential of a varying route, and in a further effort to minimize inconvenience to Plaintiff during the Repositioning Project, in an email dated Friday, August 10, 2007, 1225 offered the Plaintiff an alternative for trash removal. A copy of the August 10, 2007 email is attached as *Exhibit N*. Under this alternative scenario, the Plaintiff would be permitted to place its trash in a rolling container located near the N Street emergency egress from the Premises, whereupon 1225's representatives would transport the same to the dumpster at the Property *Id*.

32. Citibank has registered no complaints with 1225 with respect to any facet of the Repositioning Project. To the contrary, Citibank has been very cooperative and understanding of the situation

9

33.    Plaintiff has not brought to 1225's attention even one instance of a customer discontinuing doing business with Plaintiff due to the presence of scaffolding or any perceived traffic or parking disruptions.

34    Contrary to Plaintiff's implication that it currently is a minority owned institution, its current majority ownership is held by persons not of a minority background.

35.    Should the injunction requested by Plaintiff be imposed, 1225 would be severely damaged   Such action will have the following consequences:

A.    *Lost rental income from the office portion of the Property.* Ernst & Young, who occupied approximately Two Hundred Thousand (200,000) square feet was paying Thirty-Eight Dollars ($38.00) per rentable square foot. It is expected that after the completion of the Repositioning Project that the asking market rate will be approximately Sixty-Five Dollars ($65.00) per rentable square foot.  Therefore, each month of delay could cost 1225 between Six Hundred Thirty-Three Thousand Dollars ($633,000 00) and One Million Eighty-Three Thousand Three Hundred Thirty-Three Dollars ($1,083,333 00) in lost rental revenue.

B.    *Construction Delay Costs.* Delay costs from construction contract (e g , increases in material costs and increases in contractor's general overhead costs).

Jackie S. Duke

10

# EXHIBIT A
# TO AFFIDAVIT

AGREEMENT OF LEASE, made this *16th* day of December,
1988, by and between POOL 1225 ASSOCIATES, a District of
Columbia limited partnership, having an office c/o Jones Lang
Wootton, Five Hanover Square, New York, New York 10004
("Landlord") and INDEPENDENCE FEDERAL SAVINGS BANK, a District
of Columbia corporation, having an office at 1225 Connecticut
Avenue, N.W., Washington, D.C. ("Tenant").

## RECITALS

A.  Landlord is currently leasing to Tenant
approximately 6,450 square feet of the first or main lobby
floor (the "Lobby Space") and 610 square feet of the first
basement level (the "Basement Space") of the Building (as
defined in Section 1.01 hereof) pursuant to separate leases.
Tenant is occupying 1,252 square feet of the Lobby Space
pursuant to a lease dated December 27, 1983, between
1225 Connecticut Avenue Associates (the "Landlord's predecessor
in interest") and Tenant, commencing December 1, 1983 and
terminating on April 30, 1988.  Tenant is occupying 5,198
square feet of the Lobby Space and the Basement Space pursuant
to a lease dated February 15, 1982 between Landlord's
predecessor in interest and Tenant, commencing May 1, 1983 and
terminating April 30, 1988 (collectively, the "Prior Leases").

B.  Pursuant to this Lease, Landlord and Tenant agree
that as of the Commencement Date (as defined in Section 2.01
hereof), Tenant shall surrender the Basement Space and the
provisions of the Prior Leases shall be terminated and
superceded in their entirety by the terms, provisions and
conditions set forth herein, except, however, for those terms,
provisions and conditions which survive the expiration of the
Prior Leases.

## AGREEMENT

## ARTICLE I

## PREMISES

1.01.  Subject to and upon the terms, provisions and
conditions set forth herein, Landlord hereby leases to Tenant,
and Tenant hereby leases and hires from Landlord the portion of
the Lobby Space (containing approximately 6,450 square feet in
total), as delineated on the plan attached hereto as Exhibit A
(the "demised premises"), and as presently constructed, in the
building known as 1225 Connecticut Avenue, N.W., Washington,
D.C. (the "Building").  The Building is situated on the land
(the "Land") more fully described in Exhibit B attached hereto
and made a part hereof.  (The Land and Building are hereinafter
collectively referred to as the "Property".) The lease of the

— 2 —

demised premises includes the right, together with other tenants of the Building and members of the public, to use the common and public areas of the Land and Building providing access to the demised premises, but includes no other rights not specifically set forth herein.

## ARTICLE II

### TERM AND DELIVERY

2.01.    The term of this Lease shall be a period of twelve (12) years (the "Term") commencing on January 1, 1989 (the "Commencement Date"), and expiring at 5:00 p.m. on December 31, 2000 the "Expiration Date"), unless such Term shall sooner cease and expire as hereinafter provided.

2.02.    Tenant occupies the demised premises pursuant to the Prior Leases and will continue to occupy the demised premises on a month to month basis pursuant to the Prior Leases until the Commencement Date hereof.

## ARTICLE III

### RENT

3.01.    Tenant agrees to pay to Landlord a fixed annual rent (the "fixed annual rent") equal to the product of the number of square feet, which shall for the purposes of this Lease be deemed to be 6,450, attributable to the demised premises, multiplied by the annual rate as follows:

| During the Period | Per Square Foot Per Annum |
|---|---|
| 1/1/89 – 12/31/89 | $20.00 and additional rent, if any, as set forth in this Lease. |
| 1/1/90 – 12/31/91 | $39.90, plus the CPI Increase computed as set forth in Article IV hereof. |
| 1/1/92 – 12/31/94 | $44.90, plus the CPI (3) 289,605 Increase computed as set forth in Article IV hereof. |
| 1/1/95 – Expiration Date | $48.90, plus the CPI (6) 315,405 Increase computed as set forth in Article IV hereof. |

- 3 -

Fixed annual rent shall be payable in advance on the first day of each calendar month during the Term from and after the Commencement Date at the office of Landlord set forth above or such other place as Landlord may designate, without any set-off or deduction whatsoever.

3.02. Tenant shall pay the fixed annual rent and all additional rent payable hereunder in lawful money of the United States by check (subject to collection) drawn to Landlord's order on a local branch of a bank (including Tenant) doing business in the Washington, D.C. metropolitan area. All sums, other than fixed annual rent, payable by Tenant hereunder shall be deemed additional rent and shall be payable on demand unless other payment dates are hereinafter provided. Landlord shall have the same rights and remedies for a default in the payment of additional rent as for a default in the payment of fixed annual rent, notwithstanding that Tenant may not then also be in default in the payment of fixed annual rent.

3.03. If Tenant shall fail to pay when due any installment of fixed annual rent or any payment of additional rent for a period of 5 days after such installment or payment shall have become due, Tenant shall pay interest thereon at the Interest Rate (as such term is defined in Article XXII hereof), from the date when such installment or payment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent. Notwithstanding the foregoing, upon presentment by Tenant to Landlord of evidence satisfactory to Landlord that such fixed annual rent or additional rent was paid in full by Tenant when due and such payment was not received by Landlord on a timely basis through no fault on the part of the Tenant, then in such event Tenant shall pay interest thereon at the Interest Rate from the date Landlord notifies Tenant of Landlord's failure to receive payment to the date of payment thereof. The provisions of this Section 3.03 are in addition to all other remedies available to Landlord for nonpayment of fixed annual rent or additional rent.

3.04. If any of the fixed annual rent or additional rent payable under this Lease shall be or become uncollectible, reduced or required to be refunded because of any Legal Requirement (as such term is defined in Article XXII hereof), Tenant shall enter into such agreements and take such other legally permissible steps as Landlord may request to permit Landlord to collect the maximum rents which from time to time during the continuance of such Legal Requirement may be legally permissible and not in excess of the amounts reserved therefor under this Lease. Upon the termination of such Legal

— 4 —

Requirement, (a) the rents hereunder shall be payable in the amounts reserved herein for the periods following such termination, and (b) Tenant shall pay to Landlord, to the maximum extent legally permissible, an amount equal to (i) the rents which would have been paid pursuant to this Lease but for such Legal Requirement less (ii) the rents paid by Tenant during the period such Legal Requirement was in effect.

## ARTICLE IV

## COST OF LIVING ADJUSTMENT

4.01.  For purposes of Section 3.01, the CPI Increase shall equal the product obtained by multiplying "x" by the CPI Percentage Change.  The "CPI Percentage Change" shall equal 30% of a fraction:

(a)  the numerator of which shall be the Price Index for the month immediately preceding the Annual Review Date minus the Base Price Index; and

(b)  the denominator of which shall be the Base Price Index.

For purposes of determining the CPI Increase, "x" (in dollars per square foot) shall be:

(1)  For the lease year January 1, 1989 through December 31, 1989:  not applicable;

(2)  For the lease years commencing January 1, 1990 through December 31, 1992:  $39.90;

(3)  For the lease years commencing January 1, 1993 through December 31, 1995:  $44.90; and

(4)  For the lease year January 1, 1996 through December 31, 1996 and for each lease year thereafter through the Expiration Date:  $48.90.

(c)  For the purposes of calculating the CPI Increase, the CPI Percentage Change shall be deemed not to exceed four percent (4.0%).  To the extent that the CPI Percentage Change is actually greater than four percent, then for the purposes of calculating the CPI Increase in succeeding lease years of the Term, such difference will be carried forward and added (to the extent of such difference) to the actual CPI Percentage Change computed for one or more succeeding lease years.

4.02.   If on any Annual Review Date the Price Index has not been issued for the immediately preceding month, then any increase hereunder shall be based upon the last Price Index issued prior to such Annual Review Date.   Upon the issuance of the Price Index for the immediately preceding month, the fixed annual rent shall be recomputed based upon such Price Index. If any such recomputation indicates that the fixed annual rent paid by Tenant from the Annual Review Date until such recomputation was less than the amount due and payable based upon such recomputation, Tenant shall pay to Landlord, within 30 days after being furnished with such recomputation, the amount of any underpayment; and if the fixed annual rent paid by Tenant from the Annual Review Date until such recomputation was more than the amount due and payable based upon such recomputation, Tenant shall be entitled to a credit in the amount of such overpayment against subsequent payments of fixed annual rent.

4.03.   For purposes of this Article IV the following terms shall have the following meanings:

(a)   "Annual Review Date" shall mean each anniversary date of the Commencement Date;

(b)   "Bureau" means the Federal Bureau of Labor Statistics or any successor agency that shall issue indices or data referred to in this Article IV;

(c)   "Price Index" shall mean the Revised Consumer Price Index for all Urban Consumers for Washington, D.C. – Maryland – Virginia (All Items, 1982–1984 = 100) issued by the Bureau, or any other measure hereafter employed by the Bureau in lieu of such Consumer Price Index that measures cost of living in the Washington, D.C. area (adjusted to make such Index comparable to the Base Price Index);

(d)   "Base Price Index" shall mean the last Price Index issued by the Bureau prior to the execution of this Lease; and

(e)   "issue" shall mean the release to the public of any such Price Index, and the date of issue shall be the date on which such Index is released, whether or not the Index released is for the month in which it is released or any preceding period.

4.04.   Notwithstanding the foregoing, in no event shall the fixed annual rent ever be reduced by operation of the provisions of this Article IV.   The obligation of Tenant with

- 6 -

respect to the payment of fixed annual rent or additional rent shall survive the termination of this Lease.

4.05.  If Tenant shall fail to pay when due any installment of fixed annual rent or any payment of additional rent for a period of 5 days after such installment or payment shall have become due, Tenant shall pay interest thereon at the Interest Rate (as such term in defined in Article XXII hereof), from the date when such installment or payment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent.  The provisions of this Section 4.05 are in addition to all other remedies available to Landlord for nonpayment of fixed annual rent or additional rent.

## ARTICLE V

### RENTAL ADJUSTMENTS FOR INCREASES IN OPERATING EXPENSES AND TAXES

5.01.  _Operating Expenses_.  "Operating Expenses" means all expenses (and taxes thereon, if any) incurred by Landlord (computed on an accrual basis) in connection with managing, operating, maintaining, servicing, insuring and repairing the Building and all appurtenances thereto (including without limitation the costs of employee salaries and benefits, water and sewerage, maintenance and service contracts, security systems, management fees, contesting tax levies or assessments or assessed valuations of the Building and the Land, and all other costs of operating and maintaining a first-class commercial building in the Washington, D.C. Central Business District except the costs of elevator maintenance, electric service, HVAC and cleaning).  Operating Expenses shall not include capital improvements, amortization of mortgages, depreciation, ground rent, leasing commissions or legal expenses with respect to the negotiation of leases; provided, however, that Operating Expenses shall include the costs of capital improvements, which are necessary to comply with any legal requirement or which Landlord reasonably estimates would reduce the costs otherwise includable in Operating Expenses, so long as the costs of such capital improvements are included in Operating Expenses only as amortized over the estimated useful life thereof.

5.02.  _Taxes_.  "Taxes" means all taxes and assessments, general and special, ordinary and extraordinary, foreseen and unforeseen, now or hereafter levied, assessed or imposed on the Building, the Land or appurtenances thereto, including without limitation any tax, excise or fee measured

by, or payable with respect to, any rent, which is levied
against Landlord, the Building or the Land.  Taxes shall not
include income or franchise taxes or other such taxes imposed
or measured by the net income of Landlord from the operation of
the Building, unless such taxes are imposed in lieu of, or as a
supplement to, real estate taxes or assessments.

      5.03.  Base Year; Tenant's Share.  For the purpose of
calculating Operating Expense and Tax Adjustments (as defined
in Section 5.04 hereof), the base year shall be the calendar
year 1988 (the "Base Year"), and Tenant's share of Operating
Expenses shall be three and one-half percent (3.50%) and
Tenant's share of Taxes shall be three percent (3.00%).  If the
number of square feet of rentable area of the Building changes,
then Tenant's share of Operating Expenses and Taxes shall be
adjusted effective as of the date of any such change.

      5.04.  Operating Expense and Tax Adjustment.
"Operating Expense and Tax Adjustment" means the sum of:
(1) Tenant's share of the increase in Operating Expenses for
the then current calendar year over Operating Expenses for the
Base Year; and (2) Tenant's share of the increase in Taxes for
the then current calendar year over Taxes for the Base Year.

      (a)  As soon as practicable after January 1 of
each calendar year which occurs during the Term, Landlord shall
give Tenant a statement setting forth: (1) the actual Operating
Expense and Tax Adjustment, if any, for the immediately
preceding calendar year; (2) the amount of Tenant's overpayment
or underpayment, if any, of additional rent on account of the
estimated Operating Expense and Tax Adjustment for the
immediately preceding calendar year; (3) Landlord's reasonable
estimate of the Operating Expense and Tax Adjustment for the
current calendar year; and (4) the current amount of Tenant's
overpayment or underpayment, if any, of additional rent on
account of the estimated Operating Expense and Tax Adjustment
for the current calendar year ("Landlord's Operating
Statement").  An estimate by Landlord that Operating Expenses
for the current calendar year will be one hundred ten percent
(110%) of Operating Expenses for the immediately preceding
calendar year shall be deemed to be reasonable.  As soon as
practicable at any time that Landlord shall receive notice of
an increase in Taxes, Landlord shall give to Tenant a
Landlord's Operating Statement.

      (b)  Pending the giving of Landlord's Operating
Statement to Tenant, Tenant shall pay to Landlord as additional
rent on the first day of each month of the current calendar
year one-twelfth (1/12) of the estimated Operating Expense and

Tax Adjustment for the immediately preceding calendar year.
After the giving of Landlord's Operating Statement to Tenant:
(1) Tenant shall pay to Landlord as additional rent on the
first day of each month of the current calendar year
one-twelfth (1/12) of the estimated Operating Expense and Tax
Adjustment for the current calendar year; and (2) the parties
shall reconcile all overpayments or underpayments of additional
rent on account of Operating Expense and Tax Adjustments;
provided that immediately following the giving of Landlord's
Operating Statement to Tenant, if Tenant owes Landlord such
additional rent, Tenant shall pay such rent to Landlord on the
first day of the next month or, if Landlord owes Tenant a
refund of such additional rent, Tenant shall deduct the same
from one or more monthly installments of rent thereafter due.

(c)    After the end of the Term and as soon as
practicable after Landlord's next customary financial reporting
period, Landlord shall give Tenant Landlord's Operating
Statement for the portion of the calendar year in which the
Term ends.   Landlord and Tenant shall thereupon make the
appropriate adjustment of amounts then owing on account of the
Operating Expense and Tax Adjustment for such year, and the
appropriate payment shall be made promptly by the appropriate
party.

5.05.   The rights and obligations of Landlord and
Tenant under the provisions of this Article V shall survive the
termination of this Lease, and payment shall be made pursuant
to this Article V notwithstanding the fact that an Escalation
Statement is furnished to Tenant after the expiration or other
termination of the Term.

5.06.   Landlord's failure to render a Landlord's
Operating Statement with respect to any Tax Fiscal Year shall
not prejudice Landlord's right to thereafter render a
Landlord's Operating Statement with respect thereto or with
respect to any subsequent Tax Fiscal Year within 180 days of
such Tax Fiscal Year.

ARTICLE VI

ELECTRICITY

6.01. All electricity to the demised premises shall be
furnished directly by the public utility and shall be
separately metered and paid for by Tenant.

6.02. Without limiting the generality of Section 6.01
and Article VIII hereof, Tenant's use of electric current in

— 9 —

the demised premises shall not at any time exceed the capacity of any of the electrical conductors and equipment in or otherwise serving the demised premises. Tenant shall not make or perform or permit the making or performing of any alterations to wiring, installations or other electrical facilities in or serving the demised premises without the prior consent of Landlord in each instance which consent shall not be unreasonably withheld or delayed. Should Landlord grant any such consent, all additional risers or other equipment required therefor shall be installed by Landlord and the cost thereof shall be paid by Tenant upon Landlord's demand.

6.03. Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric energy furnished to the demised premises by reason of any requirement, act or omission of the public utility providing the Building with electricity or for any other reason whatsoever.

ARTICLE VII

USE

7.01. The demised premises shall be used solely for operating a savings bank or any other federally insured financial institution and for no other purpose.

7.02. Tenant shall not use or permit the use of the demised premises or any part thereof in any way which would violate any of the covenants, agreements, terms, provisions and conditions of this Lease or for any unlawful purposes or in any unlawful manner or in violation of the certificate of occupancy for the demised premises or the Building, and Tenant shall not permit the demised premises or any part thereof to be used in any manner or anything to be done, brought into or kept therein which, in Landlord's reasonable judgment shall, or shall tend to, impair or interfere with (i) the character, reputation or appearance of the Building as a high quality office building, (ii) any of the Building services or the proper and economic heating, cleaning, air conditioning or other servicing of the Building or the demised premises; or (iii) the use of any of the other areas of the Building by, or cause discomfort, inconvenience or annoyance to, any of the other tenants or occupants of the Building. Tenant shall not install any electrical or other equipment of any kind which, in the reasonable judgment of Landlord, might cause any such impairment, interference, discomfort, inconvenience or annoyance or which might overload the risers or feeders servicing the demised premises or other portions of the Building.

- 10 -

## ARTICLE VIII

### PREMISES "AS IS" AND TENANT ALTERATIONS

8.01.   Tenant acknowledges that, as the present occupant of the demised premises, it has inspected and is fully familiar with the condition thereof.   Tenant is taking the Premises "as is" except for structural defects not caused by Tenant and that are not known to Tenant and should not be known to Tenant.

8.02.   (a)   Tenant will not make or permit anyone to make any alterations, installations, additions or improvements (hereinafter referred to collectively as "improvements"), in or to the demised premises, without the prior written consent of Landlord which consent shall not be unreasonably withheld. Tenant will not make or permit anyone to make any structural improvements or improvements to the Building without the prior written consent of Landlord which consent shall be in Landlord's sole discretion.

(b)   When granting its consent pursuant to subparagraph (a) above, Landlord may impose any reasonable conditions, which conditions shall include, but not limited to, reasonable approval of the contractor or other persons who will perform the work, and the obtaining of specified general liability insurance.   All improvements permitted by Landlord must conform to all rules and regulations established from time to time by the Underwriters' Association of the District of Columbia and to all Legal Requirements. As a condition precedent to such written consent of Landlord in all situations involving improvements estimated or contracted to cost at least $20,000 including, but not limited to, the costs of materials, labor, architectural fees, engineering fees and contractor fees, Tenant shall obtain and deliver to Landlord (i) evidence of worker's compensation insurance covering all persons employed for such work and (ii) written, unconditional waivers of mechanics' and materialmen's liens against the Property from all proposed contractors, subcontractors, laborers and material suppliers of all work, labor and services to be performed and materials to be furnished in connection with improvements to the demised premises. If, notwithstanding the foregoing, any mechanic's or materialman's lien is filed against the demised premises and/or the Property, for work claimed to have been done for, or materials claimed to have been furnished to, the demised premises, such lien shall be discharged by Tenant within twenty days after notice thereof, at Tenant's sole cost and expense, by the payment thereof or by the filing of a bond.   If Tenant shall fail to discharge any such lien,

— 11 —

Landlord may, at its option, discharge such lien and treat the cost thereof (including attorneys' fees incurred in connection therewith) as additional rent payable with the next monthly installment of fixed annual rent falling due; it being expressly agreed that such discharge by Landlord shall not be deemed to waive or release the default of Tenant in not discharging such lien.  Any improvements to the demised premises shall be made on behalf of Tenant and not on behalf of Landlord, and Tenant shall be deemed to be "owner" (and not the "agent" of Landlord) for purposes of the application of Section 38-101 of the District of Columbia Code.  In the event Landlord shall give its written consent to the making of any improvements to the demised premises, such written consent shall not be deemed to be an agreement or consent by Landlord to subject its interest in the demised premises, the Building or the Land to any mechanic's or materialman's lien which may be filed in connection therewith.

(c)  All improvements shall be performed in accordance with plans and specifications first approved by Landlord.  Tenant shall reimburse Landlord on demand for any costs and expenses incurred in connection with Landlord's review of such plans and specifications.

(d)  Tenant contemplates making substantial improvements to the demised premises in accordance with the provisions of this Article VIII.  Landlord shall contribute $85,000 toward the cost of such improvements in the form of a payment to Tenant at any time within four (4) months of the Commencement Date, which such time of payment shall be decided by Landlord.  Tenant shall deliver to Landlord, within six (6) months of the Commencement Date, evidence that such improvements have been completed and paid for.

8.03.  Tenant shall indemnify and hold Landlord harmless from and against any and all expenses, liens, claims, liabilities and damages based on or arising, directly or indirectly, by reason of the Tenant's making of any improvements to the demised premises.  If any improvements are made without the prior written consent of Landlord, Landlord shall have the right to remove and correct such improvements and restore the demised premises to their condition immediately prior thereto, and Tenant shall be liable for all expenses incurred by Landlord in connection therewith.

8.04.  All improvements made and installed by Tenant, or at Tenant's expense, upon or in the demised premises which are of a permanent nature and which cannot be removed without damage to the demised premises or Building shall become and be

– 12 –

the property of Landlord, and shall remain upon and be
surrendered with the demised premises as a part thereof at the
end of the Term, except that Landlord shall have the right at
any time up to six months prior to the expiration of the Term
to serve notice upon Tenant that any of such improvements shall
be removed, and in the event of service of such notice, Tenant
will, at Tenant's own cost and expense, remove the same in
accordance with such request, and restore the demised premises
to substantially the same condition as delivered on the
Commencement Date, ordinary wear and tear and casualty excepted.

8.05.  Where furnished by or at the expense of Tenant,
all moveable furniture, furnishings and trade fixtures shall
remain the property of Tenant which may at its option remove
all or any part thereof at any time prior to the expiration of
the Term.  Notwithstanding the foregoing, Tenant may at its
option remove any and all trade fixtures and equipment,
specialty lighting, art and decorations, whether or not such
items are affixed to the demised premises, provided, however,
that Tenant shall, at Tenant's own cost and expense, restore
the demised premises to the above-stated condition.  In case
Tenant shall decide not to remove any part of such property,
Tenant shall notify Landlord in writing not less than three
months prior to the expiration of the Term, specifying the
items of property which it has decided not to remove.  If,
within 30 days after the service of such notice, Landlord shall
request Tenant to remove any of such property, Tenant shall at
its expense remove the same.  As to such property which
Landlord does not request Tenant to remove, the same shall be,
if left by Tenant, deemed abandoned by Tenant and thereupon the
same shall become the property of Landlord.

8.06.  If any improvements or other property which
Tenant shall have the right to remove or be requested by
Landlord to remove as provided in Sections 8.04 and 8.05 hereof
(herein in this Section 8.06 called the "property") are not
removed on or prior to the expiration of the Term, Landlord
shall have the right to remove the property and to dispose of
the same without accountability to Tenant and at the sole cost
and expense of Tenant.  In case of any damage to the demised
premises or the Building resulting from Tenant's removal of the
property, or in case of any unavoidable damage resulting from
Landlord's removal, Tenant shall repair such damage or, at
Landlord's option, shall reimburse Landlord for Landlord's cost
in repairing such damage.  This obligation shall survive any
termination of this Lease.

8.07.  Without limiting the generality of the
foregoing, Tenant may install or operate in the demised

— 13 —

premises, with the prior written consent of Landlord, which
consent shall not be unreasonably withheld, at Tenant's sole
cost and expense, any equipment of any kind or nature
whatsoever even if such equipment will or may necessitate any
changes, replacements or additions to, or require the use of,
the water, plumbing, heating, air conditioning or electrical
systems in the Building.

8.08.    Landlord shall have the right to prescribe the
weight and method of installation and position of safes and
other heavy fixtures or equipment.  No freight, furniture or
other bulky matter of any description will be received into the
Building or carried in the elevators, except as approved by
Landlord, which approval shall not be unreasonably withheld.
Tenant shall promptly remove from the public areas in or
adjacent to the Building any of Tenant's property there
delivered or deposited.

ARTICLE IX

MAINTENANCE AND REPAIRS

9.01.    (a)  Tenant shall keep the demised premises and
the fixtures and equipment therein in clean, safe and sanitary
condition, will take good care thereof, and will suffer no
waste or injury thereto.  Tenant shall only store trash and
garbage in areas designated by Landlord for such storage and
accumulation.  Landlord agrees that, at no cost to Tenant,
Tenant shall have the right to deposit its trash in the trash
room of the Building, provided such trash is placed in plastic
containers furnished by Tenant.

(b)  At the expiration or other termination of
this Lease, Tenant will surrender the demised premises broom
clean and in the same order and condition in which they were on
the Commencement Date, ordinary wear and tear and casualty
excepted.  The provisions of this Section 9.01(b) shall survive
the expiration or earlier termination of this Lease.

9.02.    Without limiting the generality of Section 9.01
Tenant shall, at its sole cost and expense, make such repairs
to the demised premises and the fixtures and appurtenances
therein as are necessitated by any act, omission, occupancy or
negligence of Tenant, or of any agent, employee, subtenant,
contractor, customer or invitee of Tenant or by the use of the
demised premises in a manner contrary to the purposes for which
same are leased to Tenant, as and when needed to preserve them
in good working order and condition.  Except as otherwise
provided in Article XI hereof, all damage or injury to the

— 14 —

demised premises and to its fixtures, appurtenances and
equipment caused by Tenant moving property in or out of the
Building or by installation or removal of furniture, fixtures
or other property, shall be repaired, restored or replaced
promptly by Tenant at its sole cost and expense, which repairs,
restorations and replacements shall be in quality and class
equal to the original work or installations.  If Tenant fails
to make such repairs, restorations or replacements, same may be
made by Landlord at the expense of Tenant and such expense
shall be collectible as additional rent and shall be paid by
Tenant upon demand therefor.

    9.03.  Business machines and mechanical equipment used
by Tenant which cause vibration, noise, cold or heat that may
be transmitted to the Building structure or to any leased space
to such a degree as to be objectionable to Landlord or to any
other tenant in the Building shall be placed and maintained by
Tenant, at its expense, in settings of cork, rubber or spring
type vibration eliminators sufficient to absorb and prevent
such vibration or noise, or prevent transmission of such cold
or heat.  The parties hereto recognize that the operation of
elevators, air conditioning and heating equipment will cause
some vibration, noise, heat or cold which may be transmitted to
other parts of the Building and demised premises.  Landlord
shall be under no obligation to endeavor to reduce such
vibration, noise, heat or cold beyond what is customary in
current good building practice for buildings of the same type
as the Building.

    9.04.  Landlord shall make all structural repairs as
soon as practicable after receipt by Landlord of written notice
from Tenant specifying the nature and extent of the repairs
requested.  There shall be no allowance to Tenant for a
diminution of rental value and no liability on the part of
Landlord by reason of inconvenience, annoyance or injury to
business arising from the making of any repairs, alterations,
additions or improvements in or to any portion of the Building
or the demised premises or in or to fixtures, appurtenances or
equipment thereof.  Landlord shall exercise reasonable
diligence so as to minimize any interference with Tenant's
business operations, but shall not be required to perform the
same on an overtime or premium pay basis.

## ARTICLE X

## REQUIREMENTS OF LAW

    10.01.  Tenant shall comply with all Legal
Requirements which shall impose any violation, order or duty

- 15 -

upon Landlord or Tenant with respect to Tenant's use or occupation of the demised premises, except for structural items which shall be Landlord's responsibility.

10.02.  Notwithstanding the provisions of Section 10.01 hereof, Tenant may contest, at its own cost and expense, in its name and/or (whenever necessary) Landlord's name, in any manner permitted by law (including appeals to a court or governmental department or authority having jurisdiction in the matter), the validity or the enforcement of any Legal Requirement with which Tenant is required to comply pursuant to this Lease, and may defer compliance therewith provided that:

(a)  such non-compliance shall not subject Landlord to criminal prosecution or subject the Property to lien or sale;

(b)  such non-compliance shall not be in violation of any mortgage, or of any ground or underlying lease or any mortgage thereon;

(c)  Tenant shall first deliver to Landlord a surety bond issued by a surety company of recognized responsibility, or other security satisfactory to Landlord, indemnifying and protecting Landlord against any loss or injury by reason of such non-compliance; and

(d)  Tenant shall promptly, diligently and continuously prosecute such contest.

Landlord, without expense or liability to it, shall cooperate with Tenant and execute any documents or pleadings required for such purpose, provided that Landlord shall reasonably be satisfied that the facts set forth in any such documents or pleadings are accurate.

10.03.  Tenant shall be responsible for, and pay before delinquent, all federal and local taxes assessed presently or hereafter during the term of this Lease against any leasehold interest or personal property of any kind, owned by or placed in, upon or about the demised premises by Tenant.

## ARTICLE XI

### INSURANCE, LOSS, REIMBURSEMENT, LIABILITY

11.01. (a)  Landlord shall carry policies of fire and casualty insurance with respect to the Building in an amount equal to the full insurable value of the Building.  Landlord

— 16 —

shall not be obligated to carry any fire or casualty insurance with respect to the Premises, any portion thereof or any property located therein and, except as provided by law, shall not be obligated to repair any damage thereto or restore the same, or any decorations, installations, equipment or fixture installed by or for Tenant at Tenant's expense. Tenant shall carry such insurance coverages as Tenant may deem are necessary or desirable to protect Tenant's property located in or around the Premises.

(b)    Tenant shall not do or permit to be done any act or thing upon the demised premises which will invalidate or be in conflict with the fire insurance policies covering the Building and fixtures and property therein, or which would increase the rate of fire insurance applicable to the Building. If by virtue of any act or omission of Tenant or any person under Tenant's reasonable control (whether or not such act or omission would otherwise constitute a default hereunder) any such fire or casualty insurance premium is increased, Tenant shall promptly pay Landlord the amount of such increase as additional rent. Tenant shall neither do nor permit to be done any act or thing upon the demised premises which shall or might subject Landlord to any liability or responsibility for injury to any person or persons or to property by reason of any business or operation being carried on within the demised premises.

11.02.    If, as a result of any act or omission by Tenant other than an act or omission which is considered customary in Tenant's permitted use of the demised premises as provided in Article VII hereof, or violation of this Lease, the rate of fire insurance applicable to the Building shall be increased to an amount higher than it otherwise would be, Tenant shall reimburse Landlord for all increases of Landlord's fire insurance premiums so caused; such reimbursement to be additional rent payable within 5 days after demand therefor by Landlord. In any action or proceeding wherein Landlord and Tenant are parties, a schedule or "make-up" of rates for the Building or demised premises issued by the body making fire insurance rates for the demised premises shall be presumptive evidence of the facts stated therein, including the items and charges taken into consideration in fixing the fire insurance rate then applicable to the demised premises.

11.03.    Landlord or its agents shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of the Building, or from the pipes, appliances or plumbing works or from the roof,

street or subsurface or from any other place or by dampness or
by any other cause of whatsoever nature, unless any of the
foregoing shall be caused by or due to the negligence or
intentional act or omission of Landlord, its agents, servants
or employees.

11.04.   Tenant covenants and agrees to indemnify and
save harmless Landlord against and from all claims, expenses,
damages or fines incurred or suffered by Landlord, by reason of
any breach, violation or non-performance by Tenant, or its
agents, servants or employees, of any covenant or provision of
this Lease, or by reason of damage to persons or property
caused by moving property of or for Tenant in or out of the
Building, or by the installation or removal of furniture or
other property of or for Tenant.

11.05.   Tenant shall give Landlord prompt notice of
any fire or accidents in the demised premises.

11.06.   Tenant agrees to look solely to Landlord's
interest in the Property or the lease of the Building or of the
Property and the demised premises for the satisfaction of any
right or remedy of Tenant for the collection of a judgment (or
other judicial process) requiring the payment of money by
Landlord in the event of any liability by Landlord, and no
other property or assets of Landlord shall be subject to levy,
execution, attachment, or other enforcement procedure for the
satisfaction of Tenant's remedies under or with respect to this
Lease, the relationship of Landlord and Tenant hereunder, or
Tenant's use and occupancy of the demised premises, or any
other liability of Landlord to Tenant.

11.07.   (a)   Tenant and Landlord agree that each will,
at its sole cost and expense, cause its fire insurance policies
to contain appropriate clauses pursuant to which the insurance
companies (i) waive all right of subrogation against the other,
and (ii) agree that such policies shall not be invalidated as a
result of any waiver under this Lease of any or all right of
recovery against any party for losses covered by such policies.

(b)   Provided that Landlord's right of full
recovery under its fire insurance policies is not adversely
affected or prejudiced thereby, Landlord hereby waives any and
all right of recovery which it might otherwise have against
Tenant, its servants, agents and employees, for loss or damage
occurring to the Building and the fixtures, appurtenances and
equipment therein, to the extent the same is covered by
Landlord's insurance, notwithstanding that such loss or damage
may result from the negligence or fault of Tenant, its

- 18 -

servants, agents or employees. Provided Tenant's rights of
full recovery are not affected or prejudiced thereby, Tenant
hereby waives any and all right of recovery which it might
otherwise have against Landlord, its servants, and employees,
and against every other tenant in the Building who shall have
executed a similar waiver as set forth in this Section 11.07(b)
for loss or damage to Tenant's furniture, furnishings, fixtures
and other property removable by Tenant under the provisions
hereof to the extent that the same is covered by Tenant's
insurance, notwithstanding that such loss or damage may result
from the negligence or fault of Landlord, its servants, agents
or employees, or such other tenant and the servants, agents or
employees thereof.

11.08.    Tenant shall provide on or before the
Commencement Date and keep in force during the Term a
comprehensive general liability insurance policy protecting
Landlord and Tenant against any liability whatsoever,
occasioned by any occurrence on or about the demised premises
or any appurtenances thereto and naming Landlord, its servants
and employees, and Tenant as insured parties. In addition, if
requested by the holder of any mortgage or deed of trust
against the Building and/or the Land, such insurance shall also
contain a standard mortgagee loss payable endorsement for the
benefit of such holder. Such policy shall be written by good
and solvent insurance companies licensed to do business in the
District of Columbia satisfactory to Landlord, and shall be in
such limits as Landlord may from time to time require. As of
the date hereof, Landlord reasonably requires limits of
liability thereunder of not less than $3,000,000 per occurrence
for bodily or personal injury (including death) and in the
amount of $1,000,000 per occurrence in respect of property
damage. Such insurance may be carried under a blanket policy
covering the demised premises and other locations of Tenant, if
any, provided that each such policy shall in all respects
comply with this Article and shall specify that the portion of
the total coverage of such policy that is allocated to the
demised premises is in the amounts required pursuant to this
Section 11.08. Prior to the time such insurance is first
required to be carried by Tenant and thereafter, at least 15
days prior to the effective date of any such policy, Tenant
shall deliver to Landlord either a duplicate original of the
aforesaid policy or a certificate evidencing such insurance.
Such certificate shall contain an endorsement that such
insurance may not be cancelled except upon 30 days' prior
notice to Landlord. Such certificate shall also have the
indemnity clause referred to in Article XXXVI hereof typed on
the certificate evidencing that the "hold harmless" clause has
been insured. Tenant's failure to provide and keep in force

- 19 -

the aforementioned insurance shall be regarded as a material
default hereunder entitling Landlord to exercise any or all of
the remedies provided in this Lease in the event of Tenant's
default.

ARTICLE XII

DAMAGE BY FIRE OR OTHER CAUSE

12.01.  If the Building or the demised premises shall
be partially or totally damaged or destroyed by fire or other
cause (and if this Lease shall not have been terminated
pursuant to this Article XII), Landlord shall repair the damage
and restore and rebuild the Building and/or the demised
premises, with reasonable dispatch after notice to it of the
damage or destruction and allowing for reasonable time required
for adjustment and settlement of insurance claims.

12.02.  If the Building or the demised premises shall
be partially or totally damaged or destroyed by fire or other
cause, the rents payable hereunder shall be abated to the
extent that the demised premises shall have been rendered
untenantable for the period from the date of such damage or
destruction to the date the damage shall be substantially
repaired or restored unless such fire or damage shall have
resulted from the negligence of Tenant then the rents, payable
thereunder shall abate, but only to the extent that Landlord
shall collect insurance proceeds covering the loss of rent
incurred by Landlord, provided, however, that should Tenant
reoccupy a portion of the demised premises during the period
the restoration work is taking place and prior to the date that
the whole of said demised premises are made tenantable, fixed
annual rent and additional rent allocable to such portion shall
be payable by Tenant from the date of such occupancy.

12.03.  (a)  If the Building shall be so damaged or
destroyed by fire or other cause (whether or not the demised
premises are damaged or destroyed) as to require a reasonably
estimated expenditure made by Landlord or a reputable
contractor designated by Landlord of more than 30% of the full
insurable value of the Building immediately prior to the
casualty, and the Landlord elects not to repair, restore or
rebuild the Building and the demised premises, if damaged or
destroyed, then Landlord may terminate this Lease by giving
Tenant notice to such effect within 120 days after the date of
the casualty and, upon such notice, this Lease and the estate
hereby granted shall terminate as if the date of such notice
were the Expiration Date.

— 20 —

(b)    If more than 30% of the demised premises shall be damaged or destroyed by fire or other cause and if a reputable contractor would reasonably require more than 180 days to restore the demised premises to their condition immediately prior to the casualty, then Landlord or Tenant may terminate this Lease by giving notice to such effect within 120 days after the date of casualty and, upon such notice, this Lease and the estate hereby granted shall terminate fifteen (15) days after the date of such notice, whereupon Tenant shall wholly vacate the demised premises.

12.04.   No damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the demised premises or of the Building pursuant to this Article XII.

12.05.   Notwithstanding any of the foregoing provisions of this Article XII, if Landlord or the lessor of any superior lease or the holder of any superior mortgage shall be unable to collect all of the insurance proceeds (including rent insurance proceeds) applicable to damage or destruction of the demised premises or the Building by fire or other cause, by reason of some action or inaction on the part of Tenant or any of its employees or agents ~~or contractors~~, then, without prejudice to any other remedies which may be available against Tenant, there shall be no abatement of Tenant's rents, but the total amount of such rents not abated (which would otherwise have been abated) shall not exceed the amount of uncollected insurance proceeds.

12.06.   To the extent permitted by law, Tenant hereby expressly waives the provisions of any law or statute now or hereafter in force giving Tenant the right to terminate this Lease because of fire or other casualty.

ARTICLE XIII

ASSIGNMENT, MORTGAGING, SUBLETTING, ETC.

13.01.   Except as otherwise expressly provided in this Article XIII, Tenant shall not, without, in each instance, obtaining the prior consent of Landlord (which consent shall not be unreasonably withheld or delayed), (a) assign or otherwise transfer this Lease or the estate hereby granted, (b) sublet all or part of the demised premises, (c) permit others to use or occupy the demised premises (including without limitation by the granting of a concession or license), (d) mortgage, pledge or encumber this Lease or all or part of

- 21 -

the demised premises in any manner, or (e) advertise for a
subtenant or for an assignee of this Lease.  For purposes of
this Article XIII, (i) the transfer of a majority of the issued
and outstanding capital stock of any corporate tenant or
subtenant, or the transfer of a majority of the total interest
in any other entity (partnership or otherwise) which is a
tenant or subtenant, however accomplished, whether in one or
more transactions, shall be deemed an assignment of this Lease,
or of such sublease, as the case may be, (ii) any person or
legal representative of Tenant to whom Tenant's interest under
this Lease passes by operation of law, or otherwise, shall be
bound by the provisions of this Article XIII, and (iii) a
modification, amendment or extension without Landlord's prior
written consent of a sublease previously consented to by
Landlord shall be deemed a new sublease.  Tenant agrees to
furnish to Landlord upon demand from time to time such
information and assurances as Landlord may reasonably request
that neither Tenant, nor any subtenant, shall have violated the
provisions of this Section 13.01.

13.02.  (a)  The provisions of clauses (a), (b) and
(c) of Section 13.01 hereof shall not apply to transactions
entered into by Tenant with (i) an "affiliated corporation" (as
hereinafter defined) or (ii) a corporation into or with which
Tenant is merged or consolidated or with an entity to which
substantially all of Tenant's assets are transferred, provided
(a) such merger, consolidation or transfer of assets is for a
good business purpose and not principally for the purpose of
transferring the leasehold estate created hereby, and (b) the
assignee or successor entity has a net worth at least equal to
or in excess of the net worth of Tenant either (i) immediately
prior to such merger, consolidation or transfer or (ii) as of
the date hereof, whichever is greater.

(b)  For purposes of this Article XIII, an
affiliated corporation means (i) a corporation controlled by,
controlling or under common control with Tenant or (ii) a
partnership or joint venture in which Tenant or an affiliated
corporation is either a managing general partner or owns at
least 51% of the interest therein.

13.03.  No assignment or transfer, whether made with
Landlord's consent as required by Section 13.01 or without
Landlord's consent pursuant to Section 13.02, shall be
effective unless and until (a) the assignee shall execute,
acknowledge and deliver to Landlord a recordable agreement, in
form and substance reasonably satisfactory to Landlord, whereby
the assignee shall (i) assume the obligations and performance
of this Lease and agree to be bound by all of the covenants,

agreements, terms, provisions and conditions hereof on the part
of Tenant to be performed or observed on and after the
effective date of any such assignment and (ii) agree that the
provisions of this Article XIII shall, notwithstanding such
assignment or transfer, continue to be binding upon it in the
future, and (b) in the case of any assignment or transfer
pursuant to Section 13.02, Tenant or its successor shall have
delivered to Landlord financial statements certified by a
reputable firm of certified public accountants evidencing
satisfaction of the net worth requirements referred to in
Section 13.02. Tenant covenants that, notwithstanding any
assignment or transfer, whether or not in violation of the
provisions of this Lease, and notwithstanding the acceptance of
fixed annual rent by Landlord from an assignee or transferee or
any other party, Tenant shall remain fully and primarily and
jointly and severally liable for the payment of the fixed
annual rent and all additional rent due and to become due under
this Lease and for the performance and observance of all of the
covenants, agreements, terms, provisions and conditions of this
Lease on the part of Tenant to be performed or observed.

13.04. (a) Should Tenant agree to assign this Lease
or to sublet all or any portion of the demised premises (other
than by an assignment or sublease permitted by Section 13.02
hereof), Tenant shall, as soon as the form of any such
agreement is finalized but no later than 60 days prior to the
effective date thereof (the "Effective Date"), deliver to
Landlord the proposed form of any such agreement and of all
ancillary agreements with the proposed assignee or sublessee,
as applicable, and Landlord shall then have the right to elect
by notice to Tenant given within 30 days after such delivery
(x) to consent or refuse to consent to such assignment or
sublease in accordance with the terms of this Lease or (y) to
elect to:

A. With respect to a proposed assignment of this
Lease or a proposed subletting of the entire demised
premises, terminate this Lease as of the Effective
Date as if it were the Expiration Date set forth
herein; or

B. With respect to a proposed subletting of less than
the entire demised premises, terminate this Lease as
to the portion of the demised premises affected by
such subletting as of the Effective Date, in which
case Tenant shall promptly execute and deliver to
Landlord an appropriate modification of this Lease in
form satisfactory to Landlord, effectuating such
termination and providing that the fixed annual rent

— 23 —

payable hereunder and the additional rent payable pursuant to Article V hereof shall be adjusted in proportion to the portion of the demised premises affected by such termination.

(b)    If Landlord shall give its consent to any assignment of this Lease or to any sublease, Tenant shall, in consideration therefor, pay to Landlord as additional rent:

(i) in the case of an assignment, an amount equal to all sums and other consideration paid to Tenant by the assignee for or by reason of such assignment (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of a lease or sale thereof, the then fair market rental or sale value, as the case may be); and

(ii) in the case of a sublease, an amount equal to all rents, additional charges and other consideration payable under the sublease to Tenant by the subtenant which is in excess of the fixed annual rent and additional rent accruing during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of the lease or sale thereof, the then fair market rental or sale value, as the case may be).

The sums payable under this Section 13.04(b) shall be paid to Landlord as and when paid by the assignee or subtenant to Tenant.

(c)    If Landlord exercises any of its options under Section 13.04(a), Landlord shall be free to, and shall have no liability to Tenant if Landlord shall, lease the demised premises or any portion thereof to Tenant's proposed assignee or subtenant, as the case may be.

ARTICLE XIV

ADJACENT EXCAVATION – SHORING

14.01.    If an excavation or other substructure work shall be made upon land adjacent to the Property, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to

— 24 —

enter upon the demised premises for the purpose of doing such work as shall be necessary to preserve the wall of the Building from injury or damage and to support the same by proper foundations without diminution or abatement of rent.

ARTICLE XV

CONDEMNATION

15.01.   In the event that the whole of the demised premises shall be lawfully condemned or taken in any manner for any public or quasi-public use, this Lease and the term and estate hereby granted shall forthwith cease and terminate as of the date of vesting of title.   In the event that only a part of the Building shall be so condemned or taken, then (a) Landlord (whether or not the demised premises be affected) may, at Landlord's option, terminate this Lease and the term and estate hereby granted as of the date of such vesting of title by notifying Tenant in writing of such termination within 120 days following the date on which Landlord shall have received notice of vesting of title, or (b) if such condemnation or taking shall be of a substantial part of the demised premises or of a substantial part of the means of access thereto, Tenant may, at Tenant's option, by delivery of notice in writing to Landlord within 30 days following the date on which Tenant shall have received notice of vesting of title, terminate this Lease and the term and estate hereby granted as of the date of vesting of title, or (c) if neither Landlord nor Tenant elects to terminate this Lease, as aforesaid, this Lease shall be and remain unaffected by such condemnation or taking, except that (i) the fixed annual rent and the additional rent payable under Article V hereof shall be abated proportionately according to the reduction in the rentable area of the demised premises (if any) resulting from such condemnation or taking, and (ii) Landlord, at its expense, shall proceed with reasonable diligence to repair, alter and restore the remaining parts of the Building and the demised premises to substantially their former condition to the extent that the same may be feasible and so as to constitute a complete and tenantable Building and demised premises.

15.02.   In the event of any condemnation or taking of all or a part of the Building, Landlord shall be entitled to receive the entire award in the condemnation proceeding. Tenant hereby expressly assigns to Landlord any and all right, title and interest of Tenant now, or hereafter arising in or to any such award or any part thereof, and agrees that it shall not be entitled to receive any part of such award.   Nothing contained herein, however, shall prevent Tenant from pursuing a

- 25 -

separate claim against the condemning authority for the value
of furnishings, equipment, and trade fixtures installed in the
demised premises at Tenant's expense and for relocation
expenses; provided, that such claim does not in any way
diminish the award or compensation payable to or recoverable by
Landlord in connection with such taking or condemnation.

    15.03.   In the event any part of the demised premises
be taken to effect compliance with any law or requirement of
public authority other than in the manner hereinabove provided
in this Article XV, then, (i) if such compliance is the
obligation of Tenant under this Lease, Tenant shall not be
entitled to any diminution or abatement of rent or other
compensation from Landlord therefor, but (ii) if such
compliance is the obligation of Landlord under this Lease, the
fixed annual rent payable hereunder shall be reduced and
additional rents under Article V shall be adjusted in the same
manner as is provided in Section 15.01 according to the
reduction in rentable area of the demised premises resulting
from such taking.

ARTICLE XVI

ACCESS TO DEMISED PREMISES; CHANGES

    16.01.   Tenant shall permit Landlord to erect, use and
maintain pipes, ducts and conduits in and through the demised
premises, provided the same are installed adjacent to or
concealed behind walls and ceilings of the demised premises.
Tenant shall permit Landlord or its agents or representatives
to enter into and upon any part of the demised premises
(including security areas accompanied by representatives of
Tenant) at all reasonable hours without incurring any liability
to Tenant (i) to inspect the same, clean or make repairs and
other alterations or additions as Landlord may deem necessary
or appropriate for the proper operation of the Building and in
connection therewith Landlord may keep and store in the demised
premises necessary tools, materials and equipment, (ii) to show
the demised premises to prospective purchasers, or to any
prospective or existing underlying landlord or mortgagee,
(iii) to comply with the demand of any receiver, trustee, or
assignee for the benefit of creditors, sheriff, marshal or
court officer entitled to or reasonably purporting to be
entitled to such access for the purpose of taking possession of
or removing Tenant's property or for any other lawful purpose
(but this provision and any action by Landlord hereunder shall
not be deemed a recognition by Landlord that the person or
official making such demand has any right or interest
whatsoever), (iv) to comply with the demand of any

— 26 —

representative of the fire, police, building, sanitation or other department of the District of Columbia or federal government, and (v) within the last twelve months of the Term to show the demised premises to prospective tenants. The exercise of any such rights shall not give rise to any liability by Landlord to Tenant and shall not constitute an eviction of Tenant in whole or in part and the rent shall not be abated by reason thereof or by reason of loss or interruption of Tenant's business, or otherwise.

16.02. Landlord reserves the right, without the same constituting an actual or constructive eviction and without incurring liability to Tenant therefor, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the Building; provided, however, that the demised premises shall be visible from the street, public access on the street level directly into the demised premises shall not be cut off, access to the Building shall not be cut off and that there shall be no unreasonable obstruction of access to the demised premises or unreasonable interference with the use or enjoyment thereof.

16.03. In the event of any emergency, Landlord or Landlord's agents may forcibly enter the demised premises without notice and without liability therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property) and without in any manner affecting the obligations and covenants of this Lease.

ARTICLE XVII

DEFAULT BY TENANT

17.01. This Lease and the term and estate hereby granted are subject to the limitation that whenever Tenant shall make an assignment of the property of Tenant for the benefit of creditors, or if a petition shall be filed by or against Tenant under any provisions of the United States Bankruptcy Code or under the provisions of any other bankruptcy or insolvency law or any law of like import, or whenever a permanent receiver of Tenant or of or for the property of Tenant shall be appointed, then, Landlord may (a) at any time after receipt of notice of the occurrence of any such event, or (b) if such event occurs without the acquiescence of Tenant, at any time after the event continues for thirty (30) days, give Tenant a notice of intention to end the Term of this Lease at the expiration of five days from the date of service of such notice of intention, and upon the expiration of said five-day

— 27 —

period, this Lease and the term and estate hereby granted shall terminate with the same effect as if such day were the Expiration Date, but Tenant shall remain liable for damages as provided in Article XVIII.

17.02.    This Lease and the term and estate hereby granted are subject to further limitation as follows:

(a)  whenever Tenant shall fail to pay any installment of fixed annual rent or any additional rent or any other charge payable by Tenant to Landlord on the day the same is due and payable pursuant to the terms hereof, and such default shall continue for seven days after Landlord shall have given Tenant a notice specifying such default, or

(b)  whenever Tenant shall do or permit anything to be done, whether by action or inaction, contrary to any of Tenant's obligations hereunder (except as provided in clauses (a), (c), (d), (e), (f), (g) or (h) of this Section 17.02) and if such situation shall continue and shall not be remedied by Tenant within 15 days after Landlord shall have given to Tenant a notice specifying the same, or, in the case of a happening or default which cannot with due diligence be cured within a period of 15 days and the continuation of the period required for cure will not subject Landlord to the risk of criminal liability or termination of any superior lease or foreclosure of any superior mortgage, if Tenant shall not, (i) within said 15-day period advise Landlord of Tenant's intention to duly institute all steps necessary to remedy such situation and (ii) duly institute within said 15-day period, and thereafter diligently and continuously prosecute to completion, all steps necessary to remedy the same, or

(c)  whenever this Lease or the estate hereby granted or the unexpired balance of the Term hereof would, by operation of law or otherwise, devolve upon or pass to any person, firm or corporation other than Tenant, except as expressly permitted by Article XIII, or

(d)  whenever Tenant shall abandon the demised premises for a continuous period of at least 30 days (unless as a result of a casualty), or

(e)  whenever in case any other lease held by Tenant from Landlord shall expire and terminate as a result of the default of Tenant thereunder, or

(f)  whenever Tenant shall default in complying with the provisions of Section 8.02 with respect to the

- 28 -

discharge or bonding of mechanic's liens within the time period therein provided, or

(g) whenever Tenant shall default in the due keeping, observing or performance of any covenant, agreement, provision or condition of Article VII hereof on the part of Tenant and if such default shall continue and shall not be remedied by Tenant within ten business days after Landlord shall have given to Tenant a notice specifying the same, or

(h) whenever Tenant shall default pursuant to clauses (a)-(d), (f) or (g) above and Landlord shall give Tenant notice of three such defaults in any twelve-month period, regardless of whether Tenant remedies the same within any period of time specified in such clauses, then Landlord may give to Tenant a notice of intention to end the Term at the expiration of three days from the date of the service of such notice of intention, and upon the expiration of such three-day period this Lease and the term and estate hereby granted shall terminate with the same effect as if such day were the Expiration Date, but Tenant shall remain liable for damages as provided in Article XVIII.

17.03.  In the event of the occurrence of any of the events specified in Section 17.01 or 17.02 with or without terminating this Lease, Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter the demised premises, or any part thereof, by summary dispossess proceedings or by any suitable action or proceeding at law or in equity, without being liable to indictment, prosecution or damages therefrom.  The word re-enter, as herein used, is not restricted to its technical legal meaning.

17.04.  In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease, Landlord shall also have the right of injunction.  The special remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Landlord may lawfully be entitled at any time and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

17.05.  If this Lease shall terminate under the provisions of Section 17.01 or 17.02 or if Landlord shall re-enter the demised premises in accordance with Section 17.03, then (a) Tenant shall thereupon pay to Landlord the fixed annual rent and additional rent payable by Tenant to Landlord up to the time of such termination of this Lease, or of such recovery of possession of the demised premises by Landlord, as the case

may be, and shall also pay to Landlord damages as provided in Article XVIII, and (b) Landlord shall be entitled to retain any monies paid by Tenant to Landlord, whether as advance rent or otherwise, but such monies shall be credited by Landlord against any fixed annual rent or additional rent due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under Article XVIII or pursuant to law.

17.06.  Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event Tenant is evicted or dispossessed for any violation of this Lease by Tenant, or in the event Landlord obtains possession of the demised premises, by reason of the violation by Tenant of any of the covenants and conditions of this Lease or otherwise.

<h2 style="text-align:center">ARTICLE XVIII</h2>

DAMAGES

18.01.  If this Lease is terminated under the provisions of Article 17.01 or 17.02, or if Landlord shall re-enter the demised premises under the provisions of Article 17.03, Tenant shall pay to Landlord as damages, at the election of Landlord, either:

(a)  a sum which at the time of such termination of this Lease or at the time of any such re-entry by Landlord, as the case may be, represents the then value of the excess, if any, of

(1)  the aggregate of the fixed annual rent and the additional rent payable hereunder which would have been payable by Tenant for the period commencing with such earlier termination of this Lease or the date of any such re-entry, as the case may be, and ending with the Expiration Date, had this Lease not so terminated or had Landlord not so re-entered the demised premises, over

(2)  the aggregate rental value of the demised premises for the same period, or

(b)  sums equal to the fixed annual rent and the additional rent payable hereunder which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the demised premises, payable upon the due dates therefor specified herein following such termination or such reentry and until the Expiration Date, provided, however, that

– 30 –

if Landlord shall re-let the demised premises during said
period, Landlord shall credit Tenant with the net rents
received by Landlord from such re-letting, such net rents to be
determined by first deducting from the gross rents as and when
received by Landlord from such re-letting, the expenses
incurred or paid by Landlord in terminating this Lease or in
re-entering the demised premises and in securing possession
thereof, as well as the expenses of re-letting, including
altering and preparing the demised premises for new tenants,
brokers' commissions, legal fees, and all other expenses
properly chargeable against the demised premises and the rental
thereof; it being understood that any such re-letting may be
for a period shorter or longer than the remaining term of this
Lease.   In no event shall Tenant be entitled to receive any
excess of such net rents over the sums payable by Tenant to
Landlord hereunder for the period of such re-letting, nor shall
Tenant be entitled in any suit for the collection of damages
pursuant to this subsection to a credit in respect of any net
rents from a re-letting, except to the extent that such net
rents are actually received by Landlord.   If the demised
premises or any part thereof should be re-let in combination
with other space, then proper apportionment on a square foot
basis shall be made of the rent received from such re-letting
and of the expenses of re-letting.

          If the demised premises or any part thereof be
re-let by Landlord for the unexpired portion of the term of
this Lease, or any part thereof, before presentation of proof
of such damages to any court, commission or tribunal, the
amount of rent payable pursuant to such re-letting shall, prima
facie, be the fair and reasonable rental value for the demised
premises, or part thereof, so re-let during the term of the
re-letting.

          18.02.  Suit or suits for the recovery of such
damages, or any installments thereof, may be brought by
Landlord from time to time at its election, and nothing
contained herein shall be deemed to require Landlord to
postpone suit until the date when the Term would have expired
if it had not been so terminated under the provision of Article
17.01 or 17.02 or under any provision of law, or had Landlord
not re-entered the demised premises. Nothing herein contained
shall be construed to limit or preclude recovery by Landlord
against Tenant of any sums or damages to which, in addition to
the damages particularly provided above, Landlord may lawfully
be entitled by reason of any default hereunder on the part of
Tenant.  Nothing herein contained shall be construed to limit
or prejudice the right of Landlord to provide for and obtain as
liquidated damages by reason of the termination of this Lease

- 31 -

or re—entry of the demised premises for the default of Tenant
under this Lease, an amount equal to the maximum allowed by any
statute or rule of law in effect at the time when, and
governing the proceedings in which, such damages are to be
proved whether or not such amount be greater, equal to, or less
than any of the sums referred to in Section 18.01.

## ARTICLE XIX

### LANDLORD'S RIGHT TO PERFORM TENANT'S OBLIGATIONS

19.01.  If Tenant shall default in the observance or
performance of any term or covenant on Tenant's part to be
observed or performed under any of the terms or provisions of
this Lease, (a) Landlord may remedy such default for the
account of Tenant, immediately and without notice in case of
emergency, or in any other case if Tenant shall fail to remedy
such default with all reasonable dispatch after Landlord shall
have notified Tenant in writing of such default and the
applicable grace period for curing such default shall have
expired; and (b) if Landlord makes any expenditures or incurs
any obligations for the payment of money in connection with
such default including, but not limited to, reasonable
attorneys' fees in instituting, prosecuting or defending any
action or proceeding, such sums paid or obligations incurred,
with interest at the Interest Rate, shall be deemed to be
additional rent hereunder and shall be paid by Tenant to Land-
lord upon demand.   The provisions of this Article XIX shall
survive the expiration or other termination of this Lease.

## ARTICLE XX

### QUIET ENJOYMENT

20.01.  Landlord covenants and agrees that, subject to
the terms and provisions of this Lease, if, and so long as,
Tenant keeps and performs each and every covenant, agreement,
term, provision and condition herein contained on the part of
or on behalf of Tenant to be kept or performed, then Tenant's
rights under this Lease shall not be cut off or ended before
the expiration of the Term of this Lease, subject however, to
the terms of this Lease including, without limitation, the
provisions of Article XXV hereof.

## ARTICLE XXI

### SERVICES AND EQUIPMENT

21.01.  So long as Tenant is not in default under any
of the covenants of this Lease, Landlord shall furnish water

- 32 -

for lavatory and drinking and office cleaning purposes and hot
and chilled water for heating and cooling. If Tenant requires,
uses or consumes water for any other purpose, Landlord may
install a meter or meters or other means to measure Tenant's
water consumption, and Tenant shall reimburse Landlord for the
cost of the meter or meters and the installation thereof, and
pay for the maintenance of said meter equipment and/or pay
Landlord's cost of other means of measuring such water
consumption by Tenant.  Tenant shall reimburse Landlord for the
cost of all water consumed in excess of that estimated to be
consumed for lavatory, drinking and office cleaning purposes,
and for hot and chilled water, as measured by said meter or
meters or as otherwise measured, including sewer rents.

     21.02.  So long as Tenant is not in default under any
of the covenants of this Lease, Landlord shall maintain
electric systems, conduits and connections which are necessary
to maintain electric service in the demised premises.  The
Landlord agrees to furnish hot water for heating and chilled
water for cooling to the demised premises during the seasons of
the year and during the hours of the day when the same is
generally furnished to other tenants in the building.  Landlord
reserves the right without any liability whatsoever, or
abatement of fixed annual rent, or additional rent, to stop the
heating, air conditioning, elevator, plumbing, electric and
other systems when necessary by reason of accident or emergency
or for repairs, alterations, replacements or improvements,
provided that except in case of emergency, Landlord will notify
Tenant in advance, if possible, of any such stoppage and, if
ascertainable, its estimated duration, and will proceed
diligently with the work necessary to resume such service as
promptly as possible and in a manner so as to minimize
interference with Tenant's use and enjoyment of the demised
premises, but Landlord shall not be obligated to employ
overtime or premium labor therefor.

     21.03.  Except as otherwise provided in this Lease,
Landlord will not be required to furnish any other services,
including without limitation electricity, janitorial services
or repairs and maintenance within the demised premises, all of
which services shall be provided by Tenant at Tenant's sole
cost.

ARTICLE XXII

DEFINITIONS

     22.01.  The term "Landlord" as used in this Lease
means only the owner, or the mortgagee in possession, for the

— 33 —

time being of the Building (or the owner of a lease of the
Building), so that in the event of any transfer of title to
Building, upon notification to Tenant of such transfer or lease
the transferor Landlord shall be and hereby is entirely freed
and relieved of all existing or future covenants, obligations
and liabilities of Landlord hereunder, and it shall be deemed
and construed as a covenant running with the land without
further agreement between the parties or their successors in
interest, or between the parties and the transferee of title to
the Building or said lease, that the transferee or the lessee,
as applicable, has assumed and agreed to carry out any and all
such covenants, obligations and liabilities of Landlord
hereunder.

22.02.   The term "Business Days" as used in this Lease
shall exclude Saturdays, Sundays and all days observed as legal
holidays by the United States Government.

22.03.   "Interest Rate" shall mean a rate per annum
equal to the lesser of (a) three percent (3%) above the prime
commercial lending rate of The Riggs National Bank of
Washington, D.C., or (b) the maximum rate of interest, if any,
which Tenant may legally contract to pay.

22.04.   "Legal Requirements" shall mean laws, statutes
and ordinances including building codes and zoning regulations
and ordinances and the orders, rules, regulations, directives
and requirements of all federal, state, county, city and
borough departments, bureaus, boards, agencies, offices,
commissions and other subdivisions thereof, or of any official
thereof, or of any other governmental, public or quasi-public
authority, whether now or hereafter in force, which may be
applicable to the Land or Building or the demised premises or
any part thereof, or the sidewalks, curbs or areas adjacent
thereto and all requirements, obligations and conditions of all
instruments of record on the date of this Lease.

ARTICLE XXIII

INVALIDITY OF ANY PROVISION

23.01.   If any term, covenant, condition or provision
of this Lease or the application thereof to any circumstance or
to any person, firm or corporation shall be invalid or
unenforceable to any extent, the remaining terms, covenants,
conditions and provisions of this Lease shall not be affected
thereby and each remaining term, covenant, condition and
provision of this Lease shall be valid and shall be enforceable
to the fullest extent permitted by law.

- 34 -

## ARTICLE XXIV

### BROKERAGE

24.01.  Landlord and Tenant each covenant, represent and warrant to one another that each party has had no dealings or negotiations with any broker or agent other than Jones Lang Wootton in connection with the consummation of this Lease, and Tenant covenants and agrees to pay, hold harmless and indemnify Landlord, and Landlord agrees to pay, hold harmless and indemnify Tenant, from and against any and all cost, expense (including reasonable attorneys' fees and court costs), loss and liability for any compensation, commissions or charges claimed by any broker or agent, other than the brokers named in this Section 24.01, with respect to this Lease or the negotiation thereof if such claim or claims by any such other broker or agent are based in whole or in part on dealing with Tenant or its representatives, or Landlord and its representatives, respectively.  Landlord agrees to pay to the brokers specified in this Section 24.01 such compensation, commission or charges to which they are entitled pursuant to the separate agreements between such brokers and Landlord.

## ARTICLE XXV

### SUBORDINATION

25.01.  This Lease is and shall be subject and subordinate to all ground or underlying leases which may now or hereafter affect the Land or the Building and to all mortgages which may now or hereafter affect such leases, the Land or the Building, and to all renewals, refinancings, modifications, replacements and extensions thereof (hereinafter called "Superior Instruments") provided that the holder thereof agrees, so long as Tenant is not in default hereunder, not to disturb Tenant's possession hereunder.  This Lease shall remain in full force and effect upon any sale or assignment of, or foreclosure upon, the Building or the Land pursuant to a Superior Instrument, and thereupon Tenant shall not be entitled to terminate this Lease.  The provisions of this Section 25.01 shall be self-operative and no further instrument of subordination shall be required.  In confirmation of such subordination, Tenant shall promptly execute and deliver any instrument, in recordable form if required, that Landlord, the holder of any Superior Instrument or any of their respective successors in interest may request to evidence such subordination, within 7 days after such request.  Tenant hereby constitutes and appoints Landlord or its successors in interest to be Tenant's attorney-in-fact, irrevocably and coupled with

- 35 -

an interest, to execute and deliver such instrument for and on behalf of Tenant, upon the failure of Tenant to execute and deliver such instrument within such 7-day period. Landlord shall use reasonable efforts to obtain non-disturbance and attornment agreements from any future holder of a Superior Instrument.

25.02. In the event of a termination of any ground or underlying lease, or if the interests of Landlord under this Lease are transferred by reason of, or assigned in lieu of, foreclosure or other proceeding for enforcement of any mortgage, or if the holder of any mortgage acquires a lease in substitution therefor, then Tenant under this Lease will, at the option to be exercised in writing by the holder of any such Superior Instrument or any purchaser, assignee or lessee, as the case may be, either (i) attorn to it and agree to perform for its benefit all the terms, covenants and conditions of this Lease on Tenant's part to be performed with the same force and effect as if it were the landlord originally named in this Lease, if such holder, purchaser, assignee or lessee shall agree to perform all of Landlord's obligations hereunder and recognize Tenant as its tenant hereunder and agree not to disturb Tenant's possession under this Lease so long as Tenant shall not be in default hereunder, or (ii) enter into a new lease with it for the remaining term of this Lease and otherwise on the same terms and conditions and with the same options, if any, then remaining. The provisions of this Section 25.02 shall inure to the benefit of such holder of a Superior Instrument, purchaser, assignee or lessee, and shall be self-operative upon the exercise of such option, and no further instrument shall be required to give effect to such option. Tenant, however, upon demand of any such holder of a Superior Instrument, purchaser, assignee or lessee agrees to execute, from time to time, within 7 days after a request therefor, instruments in confirmation of the foregoing provision of this Section 25.02, satisfactory to any such holder of a Superior Instrument, purchaser, assignee or lessee, acknowledging such attornment and setting forth the terms and conditions of its tenancy. Tenant hereby constitutes and appoints Landlord or its successors in interest to be Tenant's attorney-in-fact, irrevocably and coupled with an interest, to execute and deliver such instrument of attornment, or such new lease, upon the failure of Tenant to execute such instrument within such 7-day period.

25.03. Notwithstanding anything contained herein to the contrary, under no circumstances shall any such holder of a Superior Instrument, purchaser, assignee or lessee, as the case may be, whether or not it shall have succeeded to the interests of the Landlord under this Lease, be

— 36 —

(a)  liable for any act, omission or default of any prior landlord; or

(b)  subject to any offsets, claims or defenses which Tenant might have against any prior landlord; or

(c)  bound by any rent or additional rent which Tenant might have paid to any prior landlord for more than one month in advance or for more than three months in advance where such rent payments are payable at intervals of more than one month; or

(d)  bound by any modification, amendment or abridgment of the Lease, or any cancellation or surrender of the same, made without its prior written approval.

25.04.  In the event of any act or omission by Landlord which would give Tenant the right to terminate this Lease, Tenant will not exercise such right until Tenant shall have first given written notice of such act or omission to the holder of any Superior Instrument who shall have furnished such holder's last address to Tenant, and until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notices, during which time such holder shall have the right, but shall not be obligated, to remedy or cause to be remedied such act or omission.  Tenant further agrees not to exercise any such right if the holder of any such Superior Instrument commences to cure such act or omission within a reasonable time after having received notice thereof and diligently prosecutes such cure thereafter.

25.05.  If, in connection with the financing of the Building, the holder of any mortgage shall request reasonable modifications in this Lease as a condition of approval thereof, Tenant will not unreasonably withhold, delay or defer making such modifications provided the same are not material modifications of this Lease and do not (i) increase the fixed annual rent or additional rents payable by Tenant, (ii) reduce the Term hereof or (iii) extend the Term hereof.

ARTICLE XXVI

CERTIFICATE OF TENANT

26.01.  (a)    Tenant shall, without charge, at any time and from time to time, within 10 days after request by Landlord, execute, acknowledge and deliver to Landlord, the holder of a Superior Instrument or any other person, firm or corporation specified by Landlord, a written instrument in the

– 37 –

form attached hereto as Exhibit C or such other form as may be required by the holder of any Superior Instrument.

(b)    Landlord shall without charge, upon reasonable request by Tenant, execute, acknowledge and deliver to a proposed assignee or subleasee, permitted in accordance with the provisions of Article XIII of this Lease which such assignee or subleasee has signed an agreement pursuant to Section 13.03 of this Lease, a written instrument stating, if true as of the date thereof that Landlord has no actual knowledge, without performing any inquiry, of any default of the terms and provisions of this Lease by Tenant or any pending claim by Landlord against Tenant and based on these statements, this Lease is in full force and effect.

## ARTICLE XXVII

### LEGAL PROCEEDINGS, WAIVER OF JURY TRIAL

27.01.    Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way in connection with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the demised premises, and/or any other claims.

## ARTICLE XXVIII

### RULES AND REGULATIONS

28.01.    Tenant and Tenant's servants, employees and agents shall observe faithfully and comply strictly with such reasonable rules and regulations as Landlord or Landlord's agents may from time to time adopt; provided, however, that in case of any conflict or inconsistency between the provisions of this Lease and of any of such rules and regulations, the provisions of this Lease shall control and that such rules and regulations are universally applied to and enforced against the tenants of the Building. Reasonable written notice of any additional rules and regulations shall be given to Tenant prior to Landlord's enforcement of such rules and regulations. The present rules and regulations are attached on Exhibit D.

28.02.    Nothing in this Lease contained shall be construed to impose upon Landlord any duty or obligation to enforce the rules and regulations or the terms, covenants or conditions in any other lease, against any other tenant of the Building, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.

— 38 —

## ARTICLE XXIX

### CONSENTS AND APPROVALS

29.01.  (a)  Whenever Landlord's consent or approval is required in this Lease, Landlord shall not unreasonably delay notifying Tenant whether its approval shall be granted or withheld.

(b)  Whenever Landlord's consent or approval is required in this Lease and this Lease does not provide that such approval or consent shall not be unreasonably withheld, Landlord may determine in its sole discretion whether to grant such consent or approval, regardless of whether such refusal to consent or approve may be deemed arbitrary.

## ARTICLE XXX

### NOTICES

30.01.  Any notice or demand, consent, approval or disapproval, or statement (collectively called "Notices") required or permitted to be given by the terms and provisions of this Lease, or by any law or governmental regulation, either by Landlord to Tenant or by Tenant to Landlord, shall be in writing and unless otherwise required by such law or regulation, shall be personally delivered or sent by United States mail postage prepaid as registered or certified mail, return receipt requested.  Any Notice shall be addressed to Landlord or Tenant, as applicable, at its address set forth on page 1 of this Lease as such address may be changed from time to time as hereinafter provided and as to Tenant such Notice shall be addressed to Mr. William Fitzgerald, Sr. and shall be delivered to him if such Notice is personally delivered.  After Tenant shall occupy the demised premises, the address of Tenant for Notices shall be at the Building.  By giving the other party at least ten (10) days prior written notice, either party may, by Notice given as above provided, designate a different address or addresses for Notices.

30.02.  Any Notice shall be deemed given as of the date of delivery as indicated by affidavit in case of personal delivery or by the return receipt in the case of mailing; and in the event of failure to deliver by reason of changed address of which no Notice was given or refusal to accept delivery, as of the date of such failure as indicated by affidavit or on the return receipt or by notice of the postal service, as the case may be.

- 39 -

30.03.  In addition to the foregoing, either Landlord or Tenant may, from time to time, request in writing that the other party serve a copy of any Notice on one other person or entity designated in such request, such service to be effected as provided in Section 30.01 hereof.

ARTICLE XXXI

NO WAIVER

31.01.  No agreement to accept a surrender of this Lease shall be valid unless such agreement is in writing and signed by Landlord.  No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the demised premises prior to the termination of this Lease.  The delivery of keys to any employee of Landlord or of Landlord's agent shall not operate as a termination of this Lease or a surrender of the demised premises. In the event Tenant at any time desires to have Landlord sublet the premises for Tenant's account, Landlord or Landlord's agents are authorized to receive said keys for such purpose without releasing Tenant from any of the obligations under this Lease. The failure of Landlord or Tenant to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease or any of the Rules and Regulations set forth herein, or hereafter adopted by Landlord, shall not prevent a subsequent act, which would have all the force and effect of an original violation.  The receipt by Landlord, or the payment by Tenant, of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach.  The failure of Landlord to enforce any of the Rules and Regulations set forth herein, or hereafter adopted, against Tenant and/or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations.  No provision of this Lease shall be deemed to have been waived by Landlord or Tenant unless such waiver be in writing signed by such party.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on the account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment of rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

31.02.  This Lease contains the entire agreement between the parties, and any executory agreement hereafter made

− 40 −

shall be ineffective to change, modify, discharge or effect an abandonment of this Lease in whole or in part unless such executory agreement is in writing and signed by the party against whom enforcement of such change, modification, discharge or abandonment is sought.

ARTICLE XXXII

INABILITY TO PERFORM

32.01.    (a)    If, by reason of (1) strike, (2) labor troubles, (3) governmental preemption in connection with a national emergency, (4) any rule, order or regulation of any governmental agency, (5) conditions of supply or demand which are caused by war or other national, district or municipal emergency, or (6) any cause beyond Landlord's reasonable control, Landlord shall be unable to fulfill its obligations under this Lease except Tenant's obligation to pay rent, additional rent, fees, and all other charges whatsoever required hereunder, or shall be unable to supply any service which Landlord is obligated to supply, this Lease and Tenant's obligation to pay rent hereunder shall in no way be affected, impaired or excused except in the event of a constructive eviction.

(b)    If, by reason of (1) strike, (2) labor troubles, (3) governmental preemption in connection with a national emergency, (4) any rule, order or regulation of any governmental agency, (5) conditions of supply or demand which are caused by war or other national, district or municipal emergency, or (6) any cause beyond Tenant's reasonable control, Tenant shall be unable to fulfill its obligations under this Lease or shall be unable to supply any service which Tenant is obligated to supply, this Lease shall in no way be affected, impaired or excused except in the event of a constructive eviction.

ARTICLE XXXIII

NO REPRESENTATIONS BY LANDLORD

33.01.    Landlord or Landlord's agents have made no representations or promises with respect to the Building or demised premises except as herein expressly set forth.

## ARTICLE XXXIV

### NAME OF BUILDING

34.01.   The name of the Building shall be 1225 Connecticut Avenue, N.W.   Landlord shall have the full right at any time to name and change the name of the Building and to change the designated address of the Building.

## ARTICLE XXXV

### ARBITRATION

35.01.   In each case specified in this Lease in which resort to arbitration shall be required, such arbitration (unless otherwise specifically provided in other sections of this Lease) shall be in the District of Columbia in accordance with the Commercial Arbitration Rules of the American Arbitration Association and the provisions of this Lease.   The decision and award of the arbitrators shall be in writing, shall be final and conclusive on the parties, and counterpart copies thereof shall be delivered to each of the parties.   In rendering such decision and awards, the arbitrators shall not add to, subtract from or otherwise modify the provisions of this Lease.   Judgment may be had on the decision and award of the arbitrators so rendered in any court of competent jurisdiction.

## ARTICLE XXXVI

### INDEMNITY

36.01.   Except for any loss or damage caused by the wilful misconduct or gross negligence of Landlord, its agents, servants or employees, Tenant hereby indemnifies and agrees to defend and save Landlord harmless from and against any loss, liability, cost and expense (including reasonable attorneys' fees) arising from the use or occupation of the demised premises by Tenant, its agents, servants or employees, and/or from any breach of this Lease by Tenant.

## ARTICLE XXXVII

### MEMORANDUM OF LEASE

37.01.   Either party shall, at the request of the other, execute and deliver a statutory form of memorandum of this Lease for the purpose of recording; provided, however (i) such memorandum of this Lease shall not in any circumstances be

— 42 —

deemed to modify or to change any of the provisions of this Lease, (ii) the costs of the preparation and recordation of such memorandum shall be the responsibility of the party requesting the execution of same, and (iii) neither party shall record this Lease.

## ARTICLE XXXVIII

[Intentionally omitted.]

## ARTICLE XXXIX

### HOLDOVER

39.01.   In the event that Tenant shall not immediately surrender the demised premises on the Expiration Date, Tenant shall become a month-to-month tenant at a monthly rental equal to the greater of:   (i) one and one-half times the fixed annual rent due during the last full calendar month of the Term plus all additional rent due for such periods (prorated on a monthly basis) or (ii) the then current market rental for space in the Building.   Said monthly tenancy shall commence on the first day following the expiration of the Term.   As a monthly tenant, Tenant shall be subject to all terms, conditions, covenants and agreements of this Lease.   Tenant shall give to Landlord at least 30 days' written notice of any intention to quit the demised premises, and Tenant shall be entitled to 30 days' written notice to quit the demised premises, unless Tenant is in default hereunder, in which event Tenant shall not be entitled to any notice to quit, any right of Tenant in such event to a notice to quit is hereby expressly waived. Notwithstanding the foregoing provision of this Section 39.01, in the event that Tenant shall holdover after the expiration of the Term, and if Landlord shall desire to regain possession of the demised premises promptly at the expiration of the Term, then at any time prior to Landlord's acceptance of rent from Tenant as a monthly tenant hereunder, Landlord, at its option, may forthwith re-enter and take possession of the demised premises without process, or by any legal process in force in the District of Columbia.   If the demised premises are not surrendered after the expiration or sooner termination of this Lease, Tenant hereby indemnifies Landlord against liability resulting from delay by Tenant in so surrendering the demised premises, including any claims made by any succeeding tenant or prospective tenant founded upon such delay and from any loss of rent with respect to such prospective tenant.

- 43 -

ARTICLE XL

[intentionally omitted]

ARTICLE XLI

MISCELLANEOUS

41.01.   This Lease shall be governed by and construed in accordance with the laws of the District of Columbia.

41.02.   This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.

41.03.   Except as otherwise expressly provided in this Lease, each covenant, agreement, obligation or other provision of this Lease on Tenant's part to be performed shall be deemed and construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease.

41.04.   All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

41.05.   Except as otherwise provided herein, whenever payment of interest is required by the terms hereof it shall be at the Interest Rate.

41.06.   The captions are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

41.07.   In the event that Tenant is in arrears in payment of fixed annual rent or additional rent hereunder, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Tenant agrees that Landlord may apply any payments made by Tenant to any items it sees fit irrespective of and notwithstanding any designation or request by Tenant as to the items against which any such payments shall be credited.

41.08.   Tenant hereby acknowledges that in order to avoid delay this Lease has been prepared and submitted to Tenant for signature with the understanding that it shall not be deemed an offer by Landlord or bind Landlord unless and until it is executed and delivered by Landlord.

— 44 —

41.09.   All Exhibits referred to in this Lease are hereby incorporated in this Lease by reference.

41.10.   The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, distributees, executors, administrators, successors, and except as otherwise provided in this Lease, their assigns.

41.11.   The parties agree that the introductory Recitals are intended to be made a part of the provisions of this Lease and are hereby incorporated in this Lease by reference.

41.12.   This Lease represents the entire agreement between the parties as of the date hereof and the provisions hereof supercede any and all prior agreements between the parties.

ARTICLE XLII

PARKING

42.01.   Landlord shall use reasonable efforts to cause the parking garage operator to provide to Tenant, at the prevailing market rate, two (2) parking spaces in the parking garage located beneath the Building.

- 45 -

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease under seal as of the day and year first above written.

POOL 1225 ASSOCIATES,
Landlord

By: _____

Name: *A. Fogarty*

Title: *V.P.*                    [SEAL]

INDEPENDENCE FEDERAL SAVINGS BANK,
Tenant

By: _____

Name: _____

Title: _____         [SEAL]

<u>EXHIBIT A</u>

[The Demised Premises]

MEMORANDUM OF LEASE

This agreement made the _16th_ day of December, 1988, between POOL 1225 ASSOCIATES, a District of Columbia Limited Partnership, having an office c/o Jones Lang Wootton, Five Hanover Square, New York, New York 10004, Landlord, and INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, having an office at 1225 Connecticut Avenue, N.W., Washington, D.C., Tenant.

### Witnesseth:

That Landlord, in consideration of the rents reserved and on the terms, covenants, agreements and conditions contained in a certain lease between the same parties dated the _16th_ day of December, 1988, hereby leases to Tenant and Tenant hereby leases and hires from Landlord the portion of Lobby Space (containing approximately 6,450 square feet in total) as described in the said lease and as presently constructed, in the building known as 1225 Connecticut Avenue, N.W., Washington, D.C., on the Land described on Exhibit A annexed hereto, for the term commencing on the first day of January, 1989 and ending at 5:00 p.m. on December 31, 2000.

In witness whereof the parties hereto have executed this Memorandum of Lease the _16th_ day of December, 1988.

POOL 1225 ASSOCIATES,
Landlord

By: _____
Name: A. EDGLEY.          [SEAL]
Title: V.P.

INDEPENDENCE FEDERAL SAVINGS BANK,
Tenant

By: _____
Name: _____
                           [SEAL]
Title: _____

## EXHIBIT A

### [The Land]

Lot numbered Eighty-two (82) in Square numbered One Hundred Fifty-nine (159) in the subdivision made by 1225 Connecticut Avenue Associates, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 150 at folio 197.

EPR7172/78

DISTRICT OF COLUMBIA, to-wit:

I, Dorothy J. Pindie _____, a notary public in and for the District of Columbia, do hereby certify that William B. Fitzgerald _____, party to a certain Memorandum of Lease bearing date on the 19th _____ day of December, 1988, and hereto annexed, personally appeared before me in said District, the said William B. Fitzgerald being personally well-known to me as the President _____ of INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, and the person who executed the said Memorandum of Lease and by virtue and in pursuance of the authority conferred upon him/her by the Board of Directors of INDEPENDENCE FEDERAL SAVINGS BANK, acknowledged the same to be the corporate act and deed of INDEPENDENCE FEDERAL SAVINGS BANK and that he/she executed said instrument in the name of INDEPENDENCE FEDERAL SAVINGS BANK as its President _____.

Given under my hand and seal this 19th _____ day of November _____, 19 88.

Dorothy J. Pindie
Notary Public

My Commission Expires: MY COMMISSION EXPIRES JULY 31, 1990

DISTRICT OF COLUMBIA, to-wit:

I, _Patricia Scott Hanges_, a notary public in and for the State of New Jersey do hereby certify that _Anthony P.D. Edgley_, _Vice President_ of _Pool 1225 Associates_, General Partner of POOL 1225 ASSOCIATES, a District of Columbia Limited Partnership, which limited partnership is a party to a certain Memorandum of Lease bearing date on the _16th_ day of December, 1988, and hereto annexed, personally appeared before me in said District, the said _Anthony P.D. Edgley_ being personally well-known to me as the _8 Vice President_ of _Pool 1225 Associates_, General Partner of POOL 1225 ASSOCIATES, and the person who executed the said Memorandum of Lease and, by virtue and in pursuance of the authority conferred upon him by _the Board of Directors_ of _Pool 1225 Associates_, acknowledged the same to be the act and deed of _Pool 1225 Associates_, General Partner of POOL 1225 ASSOCIATES and that he executed said instrument in the name of POOL 1225 ASSOCIATES.

Given under my hand and seal this _9TH_ day of _January_, 19_89_.

_Patricia Scott Hanges_
Notary Public

My Commission Expires:

PATRICIA SCOTT HANGES
Notary Public, State of New Jersey
No. 2039522
Qualified in Bergen County
Commission Expires January 19, 19_93_

**POOL 1225 ASSOCIATES**
**c/o Jones Lang Wootton**
**Five Hanover Square**
**New York, New York 10004**


Independence Federal Savings Bank
1225 Connecticut Avenue, N.W.
Washington, D.C.

Re:    Lease of Premises at 1225 Connecticut
Avenue, N.W., Washington, D.C. dated
January 9, 1989

Ladies and Gentlemen:

In connection with the execution of the referenced lease, you have asked us for
certain information regarding the current status of your tenancy. As of
January 1, 1989, the undersigned has no actual knowledge, having made no
independent investigation or special inquiry, of any default by Tenant (as
defined in the referenced lease) of th terms and provisions of the Prior Leases
(as defined in the referenced lease) pursuant to such Prior Leases and all rents
and charges have been paid through December 31, 1988.

Very truly yours,

POOL 1125 ASSOCIATES

By:
Name:  Anthony P. D. Edgley
Title:  V. P.

— 47 —

EXHIBIT B

[The Land]

Lot numbered Eighty-two (82) in Square numbered One
Hundred Fifty-nine (159) in the subdivision made by
1225 Connecticut Avenue Associates, as per plat
recorded in the Office of the Surveyor for the
District of Columbia in Liber 150 at folio 197.

05021

# EXHIBIT B
# TO AFFIDAVIT

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made this ⟨25⟩ day of April, 2001, but effective for all purposes as of January 1, 2001, by and between INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, having an address at 1225 Connecticut Avenue, N.W., Washington, D.C. 20036 ("**Tenant**"), and BRE/CONNECTICUT L.L.C., a Delaware limited liability company, successor in interest to Pool 1225 Associates, having an address at c/o The Blackstone Group, 345 Park Avenue, New York, New York 10154 ("**Landlord**").

## W I T N E S S E T H :

**WHEREAS**, pursuant to that certain Agreement of Lease made December 16, 1988 between Landlord and Tenant (the "Lease"), Tenant leases from Landlord a certain portion of the first or main lobby floor (the "**Demised Premises**") in the building known as 1225 Connecticut Avenue, N.W., Washington, D.C. 20036 (the "**Building**"); and

**WHEREAS**, Landlord and Tenant desire to amend the Lease to, among other things, extend the Lease term, reflect the re-measurement of the Demised Premises and the Building and make certain other modifications as more fully set forth herein.

**NOW THEREFORE**, in consideration of the premises and mutual promises herein contained and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Capitalized Terms</u>. All capitalized terms used in this Amendment shall have the meanings ascribed to such terms in the Lease unless expressly provided otherwise herein. The following definition is added to Article XXII of the Lease in the correct alphabetical order:

"**Lease Year**" shall mean the period commencing January 1, 2001 and ending on the last day of the month which completes twelve (12) full calendar months thereafter, and each 12-month period thereafter commencing on the first day after the end of the immediately preceding Lease Year, except that the last Lease Year shall end on the last day of the Term.

2.    <u>Re-Measurement of Demised Premises/Building</u>. Landlord has re-measured the Demised Premises in accordance with the Modified GWCAR standard and the rentable square footage of the Demised Premises as so re-measured is 6,870. Accordingly, the number "**6,450**" is hereby replaced with the number "**6,870**" wherever it appears in the Lease. Landlord has re-measured the Building in accordance with the Modified GWCAR standard and the rentable square footage of the Building (excluding retail areas) as so re-measured is 204,854.

3.    Term.  Section 2.01 of the Lease is hereby deleted in its entirety and replaced with the following:

"2.01  The term of this Lease shall be a period of ten years (the "**Term**") commencing on January 1, 2001 (the "**Commencement Date**"), and expiring at 11:59 p.m. on December 31, 2010 (the "**Expiration Date**") unless such Term shall sooner cease and expire as hereinafter provided."

4.    Extension Option.  The following is hereby inserted in the Lease immediately after current Section 2.02 as Section 2.03 of the Lease:

"2.03  Tenant's Option to Extend Term.

(a)    Extension Option.  Subject to the limitations of Section 2.03(c), Tenant shall have the option (the "**Extension Option**") to extend the Term for one (1) additional period of five (5) years (such additional period being hereinafter referred to as the "**Extension Period**").  The Extension Period shall begin on the day after the end of the Term and shall end on the day which completes five years thereafter.  If Tenant timely exercises the Extension Option in accordance with this Section, the Term and the Expiration Date shall be extended accordingly.  Except as otherwise expressly provided in this Section, the Extension Period shall be upon the same terms, covenants and conditions set forth in this Lease with respect to the Term; except that there shall be no extension option after the Extension Period; and, Landlord shall have no obligation to pay Tenant the Allowance or to make (or pay for) improvements to the demised premises.

(b)    Manner of Exercise.  The Extension Option shall be exercisable by Tenant by giving notice of the exercise of the Extension Option to Landlord at least one hundred eighty (180) days before the end of the last Lease Year in the Term.  Time shall be of the essence in connection with Tenant's exercise of the Extension Option.

(c)    Limitations on Exercise of Extension Option.  Tenant may not exercise the Extension Option if, at the time of a purported exercise of the Extension Option an Event of Default has occurred and is continuing.

(d)    Rent per Square Foot During Extension Period.  If Tenant timely exercises the Extension Option, the Rent per Square Foot for each Lease Year in the Extension Period shall be an amount equal to the Fair Rental Value of the Premises for the Extension Period as determined by mutual agreement between Landlord and Tenant or by appraisal by one or more commercial real estate brokers in the manner provided in Section 2.03(f).  The "**Fair Rental Value of the Premises**" shall be (i) in the case of the first Lease Year in the applicable Extension Period, an amount equal to the fair rental value (per square foot) of the demised premises as of the

first day of such Lease Year, and (ii) in the case of each Lease Year thereafter in the Extension Period, an amount equal to the fair rental value (per square foot) of the demised premises for such Lease Year which shall be expressed either as (x) a fixed amount per square foot, or (y) a specified percentage increase, or an increase based on a formula that measures inflation or changes in the cost of living, in the fair rental value of the demised premises for the immediately preceding Lease Year in the Extension Period.

(e)    <u>Base Year During Extension Period</u>.  The Base Year for purposes of calculating Operating Expenses and Tax Adjustments in accordance with Section 5.04 of the Lease, will be the first Lease Year of the Extension Period.

(f)    <u>Method of Determining Rent per Square Foot</u>.  If Tenant exercises the Extension Option, and if Landlord and Tenant are unable mutually to agree on the Rent per Square Foot for the first Lease Year in the Extension Period at least one hundred fifty (150) days before the end of the last Lease Year in the Term, either party (the "**Initiating Party**") shall have the right to notify the other party (the "**Responding Party**") of its desire to determine the Fair Rental Value by appraisal pursuant to this Section 2.03(f) and in such notice the Initiating Party shall designate the broker appointed by it.  Within twenty (20) days after receipt of the Initiating Party's notice, the Responding Party shall, by notice to the Initiating Party, designate a second broker.  If the Responding Party does not so designate a second broker within the 20-day period, the first broker appointed by the Initiating Party shall proceed to make his/her valuation, in which case the Fair Rental Value of the Premises for the Extension Period shall be the amounts (including, if applicable, the formula for calculating the amounts) determined by the first broker.  Each broker shall make an independent determination of the Fair Rental Value of the Premises for the Extension Period.  If the two brokers so appointed agree on the Fair Rental Value of the Premises for the Extension Period within fifteen (15) days after the appointment of the second broker, the Fair Rental Value of the Premises for the Extension Period shall be the amounts (including, if applicable, the formula for calculating the amounts) determined by them.  If the two brokers so appointed do not agree on the Fair Rental Value of the Premises within fifteen (15) days after the appointment of the second broker, the Landlord and Tenant shall each make a separate determination of the applicable Fair Rental Value of the Premises.  If the two determinations differ by less than ten percent (10%), the Fair Market Rental Value shall be the average of the two (2) determinations.  If Landlord's and Tenant's determinations differ by ten percent (10%) or more, then, either Landlord or Tenant may terminate the process of determining Fair Rental Value of the Premises by giving written notice to the other within ten (10) business days following receipt of the

other party's determination of the Fair Rental Value of the Premises. In such event, the Term shall expire on the last day of the initial Term. If neither party terminates the process of determining Fair Rental Value of the Premises within such ten (10) business day period, then the Fair Rental Value of the Premises shall be the average of the two (2) determinations.

(g)    Qualifications of Brokers and Method of Valuation. Each broker appointed pursuant to Section 2.03(f) shall be an individual of recognized competence who (i) has had a minimum of 10 years' experience in the leasing of commercial office space in Washington, D.C.; (ii) is not compensated on a contingent fee basis; and (iii) is not affiliated with or, except in this limited case, otherwise employed by the Landlord or Tenant. All valuations of the Fair Rental Value of the Premises shall be in writing and, in the case of the valuation for the first Lease Year in the Extension Period, shall be expressed in terms of an annual rent per square foot of Rentable Area. Each broker shall determine the Fair Rental Value of the Premises, as a whole, for the Extension Period on the basis of the criteria set forth in Section 2.03(i). The party appointing each broker shall be obligated, promptly after receipt of the valuation report prepared by the broker appointed by such party, to deliver a copy of such valuation report to the other party in the manner provided elsewhere in this Lease for the giving of notices.

(h)    Expenses of Brokers. The expenses of each of the first two brokers appointed pursuant to Section 2.03(f) shall be borne by the party appointing such broker.

(i)    Criteria for Determining Fair Rental Value. Each broker appointed pursuant to Section 2.03(f) shall determine the Fair Rental Value of the Premises in accordance with the following criteria:

(1)    The Extension Period shall be on the same terms and conditions as set forth in this Lease, with the only changes being the change in the fixed annual rent, the change of the Base Year to the first Lease Year of the Extension Period, and the fact that there is no additional Extension Option; and

(2)    All relevant factors affecting the fair rental value, including the rent being charged for the renewal or extension of the terms of leases for comparable space in comparable office buildings located in the sub-markets of Washington, DC, occupied by tenants on floors corresponding in size to the Floors occupied by Tenant, the size of the demised premises and the length of the term, but such rent shall be adjusted to determine a net effective market rent by accounting for (a) the extent, if any, to which rent comparables include (i) landlord payment of renewal tenant

improvements, (ii) rent abatement periods, (iii) other rent concessions, (iv) brokerage fees, (v) tenant payment of operating expenses and real estate taxes; and (vi) the availability of, and charges for, parking ; and (b) the fact that Tenant will be taking the demised premises in its "as is" condition, with no abatement in its obligation to pay rent.

(j)     Documentation. At any time after Tenant exercises the Extension Option has expired Landlord or Tenant shall, within fifteen (15) days after request by the other party, join with the requesting party in executing and delivering an amendment to this Lease which sets forth the Rent per Square Foot and the Basic Rent for the first Lease Year in the Extension Period and confirms the extension of the initial Term for the Extension Period."

5.     Rent. Sections 3.01 and 3.02 of the Lease is hereby deleted in its entirety and replaced with the following:




"3.01. (a)     Fixed Rent. Tenant agrees to pay to Landlord a fixed annual rent (the "fixed annual rent") equal to the product of the number of square feet, which shall for the purposes of this Lease be deemed to be 6,870, attributable to the demised premises (the "Rentable Area"), multiplied by an annual rate ("Rent per Square Foot") of $49.50 during the first Lease Year, and for each Lease Year (or part of a Lease Year) thereafter during the Term, an amount equal to 103% of the Rent per Square Foot for the immediately preceding Lease Year and for each Lease Year during the Option Period, the amount determined pursuant to Section 2.03. Tenant shall pay the fixed annual rent for each Lease Year in equal monthly installments in advance on January 1, 2001 and thereafter on the first day of each month (or part of a month) during the Term.

(b)     Storage Rent. Throughout the Term, Landlord shall lease to Tenant, and Tenant shall lease from Landlord, storage space on the Basement Level of the Building (the "Storage Space"), for use as storage space. For the first Lease Year, Tenant shall pay, as additional rent for the storage space, an amount equal to One Hundred Forty Four and 58/100 Dollars ($144.58) per calendar month. For each Lease Year after the first Lease Year, Tenant shall pay, as additional rent for the Storage Space, an amount equal to 103% of the additional rent for the Storage Space payable for the immediately preceding Lease Year. All other provisions of the Lease shall apply to the Storage Space to the same extent, and with the same effect, as if it were a part of the demised premises.

(c)     Rent Payment. Fixed annual rent and all additional rent due under the Lease (including, without limitation, the additional rent payable for the Storage Space) shall be payable in advance on the first day of each calendar month during the Term at the office of Landlord or such other place as Landlord may designate, and Tenant shall not have the right to setoff, recoup or deduct any

amount allegedly owed by Landlord to Tenant under this Lease from any of the fixed annual rent or additional rent payable by Tenant under this Lease, except as otherwise expressly permitted by this Lease. Tenant's sole remedy with respect to any claim against Landlord (other than a setoff or credit expressly permitted by this Lease) shall be to commence an independent legal action against Landlord or file a counterclaim or third party claim (impleader) in a legal action commenced by Landlord.

3.02    The fixed annual rent, additional rent and Storage Rent shall be paid promptly when due, in lawful money of the United States, without notice or demand and without deduction, diminution, abatement, counterclaim or setoff of any amount for any reason whatsoever, except as otherwise provided in this Lease, to Landlord at Landlord's notice address or at such other address or to such other Person (including a successor to Landlord's interest in the Building) as Landlord may from time to time designate. The rent reserved under this Lease shall be the total of all fixed annual rent, additional rent and Storage Rent, increased and adjusted as elsewhere herein provided, payable during the entire Term and, accordingly, the methods of payment provided for herein, namely, annual and monthly rental payments, are for convenience only and are made on account of the total rent reserved hereunder."

6.    The provisions of Article IV of the Lease are hereby deleted in their entirety.

7.    <u>Operating Expense Definition</u>. The last sentence of Section 5.01 of the Lease is hereby deleted and the following is inserted in lieu thereof:

The following shall be excluded from the definition of Operating Expenses: (i) repairs or other work occasioned by a casualty, the costs of which are reimbursed to Landlord by insurers or any other person (or which would have been reimbursed if Landlord had carried the insurance required to be carried by it under this Lease or had otherwise enforced its right to collect such costs from such other person) or by governmental authorities in eminent domain proceedings; (ii) the cost of repairs or other work occasioned by an eminent domain, taking or condemnation; (iii) any amount paid to affiliates of Landlord (other than management fees at a rate not to exceed three percent (3%) of Landlord's gross revenue from the Building) for services or goods relating to the Property, to the extent that the cost of such services or goods exceeds competitive costs for such services rendered by unaffiliated persons with similar or reasonably equivalent skill, competence and experience or the competitive costs of such goods provided by unaffiliated persons; (iv) interest, fines or penalties due to late payment of Taxes or Operating Expenses due to Landlord's negligence; (v) financing or mortgage costs, including payment of the interest on or principal of borrowed money; depreciation expense; advertising for vacant space in the Building; leasing commissions; the cost of constructing improvements for space in the Building leased to other tenants; (vi) the cost of any specific work or service performed in

connection with the Building which, in accordance with the terms of this Lease, is to be paid for directly by Tenant or other tenants of the Building; (vii) ground rent; (viii) any costs or expenses incurred in the solicitation or execution of leases for space in the Building (including legal fees, advertising, moving expenses, design fees, rental concessions, rental credits, and lease assumptions); (ix) the cost of electricity and other utility charges for heating, ventilating and air-conditioning which are separately metered to, and payable by, other tenants of the Building; (x) expenses directly resulting from the breach of this Lease by Landlord, or the gross negligence of Landlord, its agents, contractors or employees; (xi) any repairs, alterations, additions, changes, replacements, renovations, or other expenditures which, under generally accepted accounting principles, are properly classified as capital expenditures, however, there shall be included each Lease Year in the Operating Expenses an amount equal to the amortized cost of the same determined on a straight-line basis over a period equal to the useful life of the same, and in accordance with generally accepted accounting principles applied on a consistent basis; (xii) bad debt loss, rent loss, or legal fees incurred in collecting rent or other obligations from Building tenants; (xiii) Landlord's general entity-level overhead and general and administrative expenses and other costs associated with maintaining Landlord's existence or the operation of the business of the entity that constitutes Landlord (as distinguished from the costs of operation of the Building), including accounting and legal matters (except for accountings costs specifically included in Operating Expenses); (xiv) rent associated with any management or leasing office in the Building; (xv) the wages and benefits of any employee of Landlord or Landlord's management agent who does not devote substantially all of his or her time to the Building, except to the extent such wages and benefits are reasonably, properly and equitably allocable to time spent by such employee in directly servicing the Building; (xvi) Taxes, other than sales and use taxes on items the cost of which is properly included in Operating Expenses; (xvii) salaries and other compensation paid to executive employees above the grade of building manager (including profit sharing, bonuses and other employee benefit plans) and any payroll taxes attributable to such employees; (xviii) general overhead and administrative and accounting expenses, except to the extent reasonably and properly directly allocable to the operation of the Building; (xix) legal fees or other costs of enforcing leases for space in the Building; (xx) acquisition costs of any sculpture, paintings or other art work in the Building; (xxi) costs of selling, syndicating, financing, mortgaging or hypothecating any part of or interest in the Property; (xxii) costs incurred to remove or remediate hazardous materials now or hereinafter existing in the Property; (xxiii) increased insurance premiums caused by hazardous materials brought onto, stored, used or disposed of in the Building by Landlord or any other tenant in the Building; (xxiv) the cost of settling disputes with agents which are not directly related to the management, maintenance or operation of the Building; (xxv) the cost of settling disputes with employees which relate to compensation and benefits, work rules and working conditions and other disputes related to the employees' services in managing, maintaining and operating the Building; and (xxvi) the costs incurred

in operating, managing, maintaining, repairing, resurfacing, cleaning or securing the Parking Facility.

       8.     Operating Expenses and Tax Adjustments. Section 5.03 of the Lease is hereby deleted in its entirety and replaced with the following:

      "5.03   Base Year; Tenant's Share. For the purpose of calculating Operating Expense and Tax Adjustments (as defined in Section 5.04 hereof), the base year shall be the calendar year 2001 (the "**Base Year**"), and Tenant's share of Operating Expenses shall be 3.27% and Tenant's share of Taxes shall be 3.13%. If the number of square feet of rentable area of the Building changes, then Tenant's share of Operating Expenses and Taxes shall be adjusted effective as of the date of any such change."

       9.     Tenant's Right to Review. Section 5.04 of the Lease is hereby amended to add the following:

      (d)    Initial Review. Tenant shall have the right to review the Landlord records related to Operating Expenses and Taxes for any calendar year, at any time within ninety (90) days after Tenant receives such Landlord's Operating Statement for such calendar, for the purpose of determining whether the statement correctly reflects the Operating Expenses and Real Estate Taxes for such calendar year and the Tenant's share of the same. If Tenant exercises its foregoing right, Tenant shall retain a national accounting firm or a reputable local accounting firm whose fee for its review services is not contingent, in whole or in part, on the amount of an overstatement. If Tenant fails to exercise its foregoing right of review within the 90-day period, the amount of the Tenant's share of the Operating Expenses and Taxes set forth in the Landlord's Operating Statement for the calendar year in question shall be conclusively established as the amount set forth in the Landlord's Operating Statement for such calendar year delivered by Landlord to Tenant pursuant to Section 5.04(a), except as otherwise provided in Section 5.04(f).

      (e)    Limited Review. If Tenant's review of the Operating Expenses Statement and Taxes for a particular calendar year (the "**first calendar year**") pursuant to Section 5.04(d) discloses that the Tenant's share of Operating Expenses or Taxes for the first calendar year were overstated by more than five percent (5%), Tenant shall have the additional right, within thirty (30) days after Tenant receives the Landlord's Operating Statement for the first calendar year, to review Landlord's records for Operating Expenses and Taxes for the two calendar years immediately preceding the first calendar year, subject to the limitations that Tenant's review shall be limited solely to determining whether the Operating Expenses or Taxes for the two earlier calendar

years were overstated for the same reasons that the Operating Expenses or Taxes for the first calendar year were overstated.

(f)     Expense of Review.  The costs incurred by Tenant to review the Landlord's records pursuant to Section 5.04(d) shall be paid by Tenant, except that, if it is determined on the basis of such review (or if, in accordance with the following provisions, it is otherwise ultimately determined) that the Tenant's share of the Operating Expenses and Taxes for such calendar year was overstated by more than five percent (5%) then the reasonable third party cost of the review (not to exceed $5,000) shall be paid by Landlord.  Landlord shall pay to Tenant any overpayment of the Operating Expenses and Taxes for the calendar year in question within thirty (30) days after the amount of the overpayment has been established by the review as provided in this Section.

(g)     Effect of Review.  If (i) Tenant timely exercises its right to review the Landlord's records pertaining Operating Expenses and Taxes for a calendar year, and (ii) Tenant gives notice to Landlord, together with a copy of the report of its review prepared by its accountants, that Tenant's review discloses an overstatement of Operating Expenses or Taxes for such calendar year, the amount of the Operating Expense and Tax Adjustment for such calendar year shall be conclusively established as the amount determined as a result of such review unless, within ninety (90) days after receipt of Tenant's notice, Landlord, at its expense, shall contest the amount thereof, in which event the amount of the Operating Expenses or Real Estate Taxes (and the amount of the Operating Expense and Tax Adjustment) for such calendar year shall be conclusively established by an arbitration conducted pursuant to Article XXXV of the Lease.  Tenant's exercise of its right to review the Landlord's records pertaining Operating Expenses and Taxes for a particular calendar year pursuant to this Section shall not suspend or defer Tenant's obligation to pay the amount shown to be due by such Annual Operating Expense and Tax Statement pursuant to Section 5.04(a).

10.     Tenant Improvement Allowance.  Tenant contemplates making improvements to the demised premises in accordance with the provisions of this Article VIII (the "Tenant Improvements").  Within five (5) business days following execution and delivery this Amendment, Landlord shall give Tenant an allowance for the demised premises (the "Allowance") in an amount equal to the product obtained by multiplying (i) $12.50, by (ii) the Rentable Area of the demised premises, which shall be used to pay or reimburse Tenant for any costs paid or incurred by Tenant to third parties in designing, preparing and completing the Tenant Improvements.  The entire amount of the Tenant Allowance shall be disbursed by Landlord to Tenant concurrently with the execution of this Amendment.  Upon request, the Tenant will supply the Landlord with lien waivers from the person or entity performing the work or providing the materials for such Tenant Improvements upon the completion of the same.

11.    Parking.    Section 42.01 of the Lease is hereby deleted in its entirety and replaced with the following:

"Throughout the Term, Landlord agrees to provide to Tenant, at Landlord's expense, two (2) parking spaces (the "**Parking Spaces**") in the below grade paring structure on the Land (the "**Parking Facility**"). The Parking Spaces shall be made available to Tenant on a self-park but, reserved or assigned basis within the Parking Facility. Tenant acknowledges that the Parking Facility is operated, managed and maintained by a tenant of Landlord (the "**Parking Facility Operator**"), that Landlord has no responsibility for the management, operation and maintenance of the Parking Facility and that Landlord's sole obligation with respect to the Parking Spaces is to obtain the Parking Spaces from the Parking Facility Operator (or its successor) and provide the Parking Spaces to Tenant at Landlord's expense. Tenant agrees that the Parking Spaces will be used solely by Tenant and Tenant's agents, employees, contractors, licensees, customers, clients and guests for the parking of passenger automobiles and other motor vehicles and for no other purpose, and that none of the Parking Spaces will be used by Persons other than the foregoing. The Parking Spaces will be available during the normal operating hours of the Parking Facility as operated by the Parking Facility Operator. If Landlord shall be unable to provide or shall be delayed in providing the parking spaces required by this Section, and if such inability or delay shall result from Landlord's inability to perform as set forth in Article XXXII, such inability or delay shall not constitute an actual or constructive eviction, in whole or in part, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience to Tenant, or injury to, or interruption of, Tenant's business, or otherwise, or entitle Tenant to any abatement or diminution of rent unless Landlord shall fail to use reasonable diligence to correct the event or circumstances causing such inability to perform."

12.    Landlord's Work.    Landlord, at its sole cost and expense, shall install, or cause to be installed, a fire suppression sprinkler system in the demised premises in conformance with applicable Legal Requirements. Landlord, at its sole cost and expense, shall renovate the area surrounding the existing Automatic Teller Machine ("ATM") to match the appearance of the Building lobby in the location and in accordance with the specifications to be mutually agreed upon by Landlord and Tenant within seven (7) business days following execution and delivery of this Amendment. Landlord shall commence such work promptly after the date Landlord and Tenant agree upon the plans and specifications for Landlord's work, and subject to Landlord's inability to perform as set forth in Article XXXII of the Lease, Landlord shall complete such work in accordance with a mutually agreed upon construction schedule.

13.    Brokers.    Landlord and Tenant each represents and warrants to the other that neither of them has employed or dealt with any broker or finder in carrying on the negotiations relative to this Amendment. Landlord and Tenant shall each indemnify and hold harmless the other from and against any claim or claims for brokerage or other

commission arising from or out of any breach of its foregoing representation and warranty.

14.    <u>Ratification of Lease</u>.  Except as expressly set forth in this Amendment, the terms and conditions of the Lease shall continue in full force and effect without any change or modification and shall apply for the balance of the term of the Lease.  In the event of a conflict between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern.

15.    <u>No Amendments</u>.  This Amendment shall not be altered, amended, changed, waived, terminated or otherwise modified in any respect or particular, and no consent or approval required pursuant to this Amendment shall be effective, unless the same shall be in writing and signed by or on behalf of the party to be charged.

16.    <u>Successors</u>.  This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and permitted assigns.

17.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts.  It is not necessary that all parties sign all or any one of the counterparts, but each party must sign at least one counterpart for this Amendment to be effective.

## [SIGNATURE PAGE FOLLOWS]

WITNESS the following signatures and seals as of the date first above written.

WITNESS/ATTEST:

LANDLORD:

BRE/CONNECTICUT L.L.C., a Delaware limited liability company

By:_____
Name:_____
Title:_____

TENANT:

INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation

By: _____
Name: _Donna F. Shulk_____
Title: _President + CEO_____

SIGNATURE PAGE TO LEASE AMENDMENT – INDEPENDENCE FEDERAL

# EXHIBIT C
# TO AFFIDAVIT

1225 CONNECTICUT AVENUE, NW

SECTION 02080
ASBESTOS ABATEMENT

PART 1 - GENERAL WORK REQUIREMENTS

1.01    GENERAL PROVISIONS

A    The General Provisions of the contract, including General and Supplementary Conditions and applicable provisions of the Contract, apply to the work specified within this Section

B    Examine all conditions, as they exist at the project, prior to submitting a bid for the work of this Section.

C    All provisions of this Section relating to the health and safety of workers and the general public, as well as protection of the environment are minimum standards.  The Abatement Contractor is responsible for determining whether any additional and/or more stringent protective measures are required by any legal requirements or prudent conservative work practices, and implementing such measures if deemed necessary.  Nothing in this Section shall be deemed to relieve the Abatement Contractor from any liability with respect to any such legal requirements or requirement of prudent conservative practice

D    Should demolition activities, as performed by the Abatement Contractor, uncover materials not readily identified as glass fiber insulation, the material should be assumed to be asbestos containing until classified otherwise.  The abatement Contractor must comply with all requirements outlined in the District of Columbia Municipal Regulation (20DCMR), Section 800 'Control of Asbestos'; U S  EPA NESHAP 40 CFR 61; and OSHA 29 CFR 1926 1101, including all additional applicable local ordinances

E    All work under this Section shall be performed by a Contractor holding a current District of Columbia Asbestos Abatement Contractor's license.  The Contractor shall furnish all labor, worker training, materials, equipment, and services for the complete and proper removal and disposal of asbestos-containing materials, as Specified in Section 1.03 of this Specification, from the building addressed1225 Connecticut Avenue, NW, Washington, District of Columbia.

F    The Owner has retained ATC Associates Inc. as the Environmental Consultant for the purpose of Project Management during Asbestos Abatement.

G.    For the purpose of this Section, the following definitions apply:

"Site" shall refer to the building addressed 1225 Connecticut Avenue, NW, Washington, District of Columbia.

"Owner" shall refer to Brookfield Properties

"Consultant" shall refer to ATC Associates Inc., who will act as designated authorized environmental representatives of the Owner for the purpose of inspecting, monitoring, and testing

1225 CONNECTICUT AVENUE, NW

1 02     SCOPE OF WORK - GENERAL

A.     The following is the Scope of Work, at a minimum, required to be performed in the Renovation Areas, under the total base bid.

1     Removal and disposal of all specified asbestos-containing materials (ACM) and specified non-ACM materials.    This shall include all asbestos-containing spray-applied duct insulation, pipe fitting insulation, pipe and duct insulation seam sealant, floor tile and associated mastic, duct pin mastic, caulking materials, fire doors, and specified non-asbestos-containing materials where necessary to access asbestos

2     Work area preparations, including pre-cleaning, installation of critical barriers and polyethylene sheeting, construction of decontamination facilities, work area enclosures, sealing, isolation, and other activities as directed by the Owner or Consultant

3     Installation and operation of HEPA filtration units in accordance with Section 3 02[c] of this Section

4     Protection of non-ACM materials and equipment inside of work areas with two layers of polyethylene sheeting

5.     Removal and disposal of all asbestos-containing spray-applied duct insulation, as indicated in Section 1.03, in accordance with Section 3.02

6     Removal and disposal of all asbestos-containing spray-applied duct insulation debris, as indicated in Section 1.03, in accordance with Section 3 02.

7     Removal and disposal of all asbestos-containing white seam sealant on non-asbestos-containing fiberglass pipe insulation, as indicated in Section 1.03, in accordance with Section 3 02   All non-asbestos-containing fiberglass pipe insulation in contact with duct seam sealant is considered to be asbestos-contaminated waste, and must be disposed of as such   The Glove Bag Removal Method, as specified in Section 3.03, may be used only at the direction of the Consultant

8     Removal and disposal of all white seam sealant on non-asbestos-containing fiberglass duct insulation, including demolition of ceiling to access material, as indicated in Section 1 03, in accordance with Section 3 02.   All non-asbestos-containing fiberglass duct insulation in contact with duct seam sealant is considered to be asbestos-contaminated waste, and must be disposed of as such.

9     Removal and disposal of all asbestos-containing floor tile and associated mastic, as identified in Section 1.03, in accordance with Section 3 02   All non-asbestos-containing materials (i.e. multi layered floor tile, etc.), in contact with the asbestos-containing mastic, will be considered as contaminated ACM waste and will be disposed of as such   Alternative methods, such as that specified in Section 3.04, may be used only at the direction of the Consultant

10.     Removal and disposal of asbestos containing caulking associated with selected façade to vent joints, as indicated in Section 1 03, in accordance with Section 3 05

11     Removal and disposal of all asbestos-containing fire doors, as identified in Section 1 03, in accordance with Section 3 06

12.     Removal and disposal of all duct pin mastic, as indicated in Section 1 03, in accordance with Section 3.02. Grinding of mastic is only permitted if work is being performed under the 'Total Isolation Method'

ASBESTOS ABATEMENT                                    02080 - 2

1225 CONNECTICUT AVENUE, NW

13    Selective demolition of finish materials to access asbestos-containing materials, including but not limited to, sheetrock walls and ceilings, carpeting and insulating materials

14    Removal and disposal of debris, scrap, trash, and all other items in the way of abatement or incidental to the proper execution of the work

15.   Decontamination and clean up following removal activities in each designated work area

16    Performance of any other work or activities required by this Specification, applicable regulations, or as necessary to perform a complete job to the satisfaction of the Owner and Consultant

17    Compliance with all applicable federal, state, and local regulations, as well as all requirements set forth in these Specifications and facility requirements.

18.   Removal and disposal of asbestos-containing materials, and specified non-ACM materials, uncovered during demolition activities including but not limited to materials found within wall and ceiling voids, not included in the base bid scope of work, in accordance with the unit price schedule as set forth in the Contract Documents

1 03    SCOPE OF WORK - DETAILED

A     Reference the attached **Scope of Work Table** for the approximate location and quantities of asbestos-containing materials to be removed, in accordance with this Section, under the Base Bid

1 04    SEQUENCE OF WORK

A     The following is a typical sequence of work that Abatement Contractor shall adhere to during the asbestos abatement project.  Consultant may authorize deviations from this typical sequence based upon the specific conditions encountered during the project.

1    Abatement Contractor shall post all required signage.

2    Abatement Contractor shall secure area from unauthorized access

3    Owner/ Abatement Contractor will remove all movable objects from the work area

4    Abatement Contractor shall cover all immovable objects and objects not removed from the work area with two (2) layers of six (6) mil polyethylene sheeting, sealed airtight with duct tape  Abatement Contractor shall install critical barriers at all points of access required by regulations

5    Abatement Contractor shall seal all rooms that do not contain ACM with two layers of six mil polyethylene sheeting sealed airtight with duct tape.

6.    Abatement Contractor shall install HEPA filtration units, as required by these Specifications, sufficient to achieve a minimum of four (4) air changes per hour. All units shall exhaust to the outside of the building through windows.

7.    Abatement Contractor shall prepare the specified Work Area for total isolation, glove bag removal or other removal methods as described in this Specification.  Preparation shall include two (2) layers of six (6) mil polyethylene sheeting, sealed with duct tape, on all floors and non-impervious surfaces, including all interior walls.

1225 CONNECTICUT AVENUE, NW

8       Abatement Contractor shall construct decontamination unit, and any other construction needed to complete the work area to the satisfaction of Consultant

9.      Consultant shall inspect and approve all work area preparations before permitting Contractor to begin removal work

10      Abatement Contractor shall construct demising barriers in accordance with this Specification, as deemed necessary and at the direction of the Consultant, if ceiling and wall voids are accessed during abatement activities

11.     Abatement Contractor shall remove and dispose of all asbestos-containing materials as required by these Specifications

12      Abatement Contractor shall decontaminate the work area upon completion of removal.

13.     Consultant shall perform a final visual inspection to assure that no visible debris exists in the work area.  Abatement Contractor shall re-clean the work areas as needed until they pass a visual inspection by Consultant.

14.     Abatement Contractor shall encapsulate all surfaces in the work area

15      Consultant will perform required final air clearance testing in each work area. Satisfactory results are required before containment may be removed.

16      Abatement Contractor shall remove all work area barriers, equipment, polyethylene sheeting, etc and clean any areas to the satisfaction of Consultant and Owner

17      Abatement Contractor shall submit all materials as required at the post abatement removal meeting not more than thirty days after completion of asbestos removal work.

1.05    RELATED WORK SPECIFIED ELSEWHERE

A       Related work specified elsewhere:   Examine all other Sections of the Specifications for requirements of related sections affecting the work of this Section

B.      The work of this section shall be performed as stated herein.  In performing the work of this Section, the Abatement Contractor shall refer to other Divisions for additional procedures   The Abatement Contractor is responsible for the coordination of the work of this section with other related work

C       Portions of the work herein require direct coordination with the work other Contractors.  The Owner shall coordinate this with the work of other trades, sub-Contractors and filed sub-Contractors on the site

1 06    ESTIMATES

A.      Section 1 03 represents a description of the estimated quantities of asbestos-containing materials to be removed.  This data is provided for informational purposes only, and is based on the best information available at the time of specification preparation.  Nothing in this section may be interpreted as limiting the scope of work otherwise required by this contract and related documents.

B       The quantities and location and the extent of work included in this section are only best estimates which are limited by the physical constraints imposed by occupancy of the buildings Accordingly, minor variations of plus or minus 20% of the estimated quantities of ACM within the

1225 CONNECTICUT AVENUE, NW

limits of containment for each abatement stage are considered as having no impact on the price of this contract.  Locations of ACM different than indicated but within the limits of containment are considered as having no impact on price of this contract.  Where additional asbestos abatement work is required beyond the above variations, the contract price will be adjusted according to the unit price schedule as set forth in the Contract Documents

1.07    COORDINATION AND PHASING OF WORK

A.    Abatement Contractor shall coordinate all work in this Section with all other work of this Project. Where additional regulatory requirements apply to the work in this Section, the Abatement Contractor shall ensure compliance with all requirements

B.    Abatement Contractor work schedule must be coordinated with and approved by the Owner. Abatement Contractor shall work continuously and diligently in each work area on the days and during the hours indicated on their work schedule

C.    Abatement Contractor shall cooperate fully with other Contractors at the facility

D    Abatement Contractor shall subdivide work areas and/or otherwise provide additional containments and mobilization where and when necessary to accomplish asbestos abatement in accordance with the project phasing, as determined and as specified by the Owner.

1 08    SUBMITTALS

A    Pre-Construction Meeting: The Abatement Contractor shall meet with the Owner and the Consultant for a Pre-Construction meeting prior to commencing work on the project   The meeting shall be at the facility or at the offices of the Owner, at a mutually convenient time and date    At the meeting, the Abatement Contractor shall be represented by authorized representatives and the field supervisor who shall run the project on a daily basis, and who shall present evidence that all requirements for initiation of the work have been met.  The minimum agenda for the meeting shall be:

1    Review of "Pre-Job Submittals"

2    Channels of communication

3    Construction schedule, including sequence of critical work

4.    Designation of responsible personnel

5    Procedures for safety, security, quality control, housekeeping, and related matters.

6    Use of premises, facilities, and utilities.

B    Pre-Job Submittals: The Abatement Contractor shall provide one copy of the following Pre-Job Submittals at the Pre-construction Conference:

1    Copies of all notifications, permits, applications, personal licenses and like documents required by Federal, State, or local regulations obtained or submitted in proper fashion,

2    The Abatement Sub-Contractor shall submit a Site Specific Health and Safety Plan, Hazardous Communication Program and an Emergency Response Plan for approval by Owners Representative.

3.    Copies of medical records as required by OSHA or a notarized statement by examining medical doctor that such examinations took place and when for each employee to be used on project,

ASBESTOS ABATEMENT                                                        02080 - 5

1225 CONNECTICUT AVENUE, NW

    4      Record of successful respiratory fit test performed by a Competent person (as defined by OSHA) within the previous 12 months, as required elsewhere in the documents for each employee to be used on this project,

    5.     Certificate of Insurance,

    6  .   Proposed respiratory program for employees throughout all phases of the job, including make, model and NIOSH approval numbers of respirators to be used,

    7.     Written description of all procedures, methods, or equipment to be utilized by the Abatement Contractor that differs from the Contract Specifications, including manufacturers' specifications on any equipment not specified for use by the Contract Specifications,

    8      Proposed electrical safeguards to be implemented, including but not limited to location of transformers, GFCI outlets, lighting, etc., necessary to safely perform the job, including a description of an electrical hazards safety plan for common practices in the work area,

    9      A list of all equipment to be used on site, by make and model, including negative pressure equipment, HEPA vacuums, Water Atomizing Devices, etc.,

    10    Chain of Command of responsibility at work site including supervisors, foreman, and competent person, their names, resumes and certificates of training,

    11.    Proposed Emergency plan and route of egress from work areas in case of fire or injury, including the name and phone number of nearest medical assistance center,

    12    Abatement Contractor's testing lab, AIHA PAT proficiency, and Certification in the State where work site is located,

    13    Schedule of values breaking down the work in sufficient detail so as to serve as the basis for payment, with disposal costs listed as a separate item.

    14    Project schedule detailing the phasing, including approximate days per phase, for asbestos abatement of all materials included under the base bid.

C.    <u>Post-Construction Submittals</u>: The Abatement Contractor shall submit the following to the Consultant within thirty (30) days following the completion of the project:

    1      Manifests and waste receipts acknowledging disposal of all waste material from the project showing delivery date, quantity, and appropriate signature of landfill's authorized representative,

    2      A copy of the entry-exit logbook required elsewhere in these specifications,

    3      All personnel monitoring results as required by OSHA and elsewhere in these specifications,

    4      Copy of licenses, medical, and fit tests of all workers and supervisors, who performed work on the project,

    5      All notifications as required elsewhere in these specifications.

1 09    REFERENCE STANDARDS, REGULATIONS AND CODES

ASBESTOS ABATEMENT               02080 - 6

1225 CONNECTICUT AVENUE, NW

A    All work shall be performed strictly according to the Specifications contained herein and with the regulations cited in this Article.  The Contractor undertaking asbestos abatement work and persons in their employ shall comply with and be bound to requirements of the following Federal, State, and Local standards, regulations and codes  These standards and codes shall be by reference made part of this Section and shall be complied with.  Whenever regulations are conflicting, the more stringent regulation will prevail.

   1    US Department of Labor; Occupational Safety and Health Act of 1970  (Particular attention is drawn to the Asbestos Regulations: CFR Title 29, Part 1910, Sec. 1910.1001 and Part 1926, Sec  1926.1101, and the Respirator Regulations; CFR Title 29, Part 1910, Sec. 1910.134 and the Hazard Communication Program, CFR Title 29, Part 1910 1200).

   2    US Environmental Protection Agency, CFR, Title 40, Part 61, Subparts A and M, National Emission Standards for Hazardous Air Pollutants; Asbestos NESHAP Revision; Final Rule, Dated Tuesday, November 20, 1990.

   3    US Environmental Protection Agency; TSCA Title II, Asbestos Hazard and Emergency Response Act (AHERA), 40 CFR Part 763 Subpart E - "Asbestos-Containing Materials in Schools" and also 40 CFR, Part 763, Subpart G - "Worker Protection Rule".

   4    US Department of Transportation regulations, 49 CFR Parts 172 and 173

   5.    All District of Columbia Municipal regulations and standards, including, but not limited to, the regulations 20 DCMR, Section 800 'Control of Asbestos '

   6    Other Federal, State and local statutes, ordinances, regulations, or rules pertaining to this Section and the work described herein, including the storage, transportation and disposal of asbestos

B    All regulations by these and other governing agencies in their most recent version are applicable These specifications refer to many requirements found in these references, but in no way intend to cite or reiterate all provisions therein or elsewhere   It is the Contractor's responsibility to know, understand, and abide by all such regulations and common practices.  Other provisions contained in these references may from time to time during the execution of this contract be enforced by the Owner at his own discretion.

1 10    REGULATORY SUBMITTALS

A    The Abatement Contractor shall be responsible for securing all necessary permits for asbestos related work, including hauling, removal, and disposal, fire, and materials usage, or any other permits required to perform the specified work.

B    The shall notify all agencies as required by District of Columbia Municipal regulations in appropriate manner and place of impending work, and shall provide evidence of notifications at the pre-construction conference

1 11    PROJECT CONDITIONS

A.    Take all measures and provide all material necessary for protecting fixed machinery, controls, instrumentation, equipment, and furniture from asbestos fiber, dust and debris and from water damage

B.    Working space and space available for storing materials is restricted within the confines of the project and/or at locations to be designated by the Owner

ASBESTOS ABATEMENT                                                02080 - 7

1225 CONNECTICUT AVENUE, NW

C.   Provide access and personal protective equipment (disposable suits) to the Consultants and Visitors, who are licensed and certified, to visit the Work Areas to maintain and adjust building services

D    Schedule the use of existing utilities with the Owner   No utility service, fire protection system, or communication system may be interrupted without prior approval of the Owner

E.   Water, electric power, lighting and other utilities, toilets, and other facilities shall be provided by the Owner from existing sources where Contractor's use is not excessive and does not interfere with buildings normal use   Where existing utilities of the facility are not adequate or cannot be used, the Contractor is responsible for providing alternative sources, the cost of which is to be included in bid price   The use of the Facility's utilities shall be coordinated through the Owner.

F.   Post and affix caution signs and labels as required by OSHA regulation, 29 CFR.1926 1101 (k) (1). Post safety signs outside the work project as may be required by the Owner   Obtain two copies of 29 CFR 1910.1001, 29.CFR.1926.1101, 40 CFR 61, Subpart M, and post one copy at the job site and retain one copy on file

G.   Post at the job site, or at the entrance to each independent Work Area, one copy of all Material Safety Data Sheets (MSDS's) of all chemicals and other substances to be used on this contract   These sheets shall be made available to the Consultants for review

1 12    GENERAL REQUIREMENTS

A    All work-site preparations and practices will be conducted in accordance with all Federal and District of Columbia Municipal regulations, standards and codes pertaining to worker health protection, protection of the public health and the environment, including current US Environmental Protection Agency (EPA), Department of Labor Occupational Safety and Health Administration (OSHA), US Department of Transportation (DOT), pertaining to asbestos removal, its transportation and disposal.

B.   All operations involving exposure to airborne asbestos fibers shall be carried out according to the requirements of Part 3 of this Section.

C    The Consultant will render certain technical services during the Work, including without limitation, the services described at OSHA Regulation 1926 1101 and the District of Columbia Municipal regulations and standards, including, but not limited to, the regulations 20 DCMR, Section 800 'Control of Asbestos   All services performed by such Representative shall be considered advisory to, and for the sole and exclusive benefit of the Owner   The Abatement Contractor acknowledges that the Consultant is an independent Contractor of the Owner and agrees that no act or omission by such Consultant, and no communication by said "Consultant", shall be deemed in any manner to alter or modify the terms of this Contract, or to waive any provision hereof, or to bind Owner, unless specifically agreed upon by Owner in a signed written instrument.

D    Prior to use of any design, device, material, method of operation, or process covered by letters patent or copyright, the right for such use shall be secured by suitable legal agreement with the patentee or owner of the letters patent or copyright   No arrangement involving letters patent or copyright is acceptable, if subsequent payment for permanent use following completion of the work is required or implied. The Contractor shall be responsible for any liability on the part of the Consultant that may result from violations by the Contractor.

ASBESTOS ABATEMENT                                                                   02080 - 8

1225 CONNECTICUT AVENUE, NW

1 13    SPECIAL CONSIDERATIONS

A    Final Air Clearance Tests

    1    All final air tests will be performed in accordance with District of Columbia Municipal regulations and standards, including, but not limited to, the regulations 20 DCMR, Section 800 'Control of Asbestos., and other applicable Rulings   The Owner will pay for the first set of final clearance air tests for each removal area   In the event that these air tests do not pass the clearance criteria, the Abatement Contractor shall pay for any subsequent air tests that need to be performed   All additional sampling costs will be automatically deducted from the contract price until the areas in question pass the final air clearance criteria of less than 0.010 fibers per cubic centimeter for PCM clearance testing or an average of less than 70 structures per square millimeter for TEM clearance testing

B    Exceptions to Work Area Preparation Requirements

    1.    In accordance with 20 DCMR, Section 800 8, the Administrator may, on a case-by-case basis, approve an alternative procedure for control of emissions from an asbestos abatement provided that the Contractor submit a written description of the alternative procedure to the administrator and demonstrate to the satisfaction of the administrator that compliance with the prescribed procedures is not practical or feasible, or that the proposed alternative provides equivalent control of asbestos.

C    Additional Considerations

    1.    Storage: Limited storage space may be provided by the Owner inside the facility   Abatement Contractor will supply any additional temporary storage as needed.   All materials and equipment are to be kept in orderly fashion in designated areas, free and clear of halls and doorways, and in conformance with all regulations, codes, and in consideration of building usage.  Abatement Contractor will be allowed to store waste in a waste dumpster on-site, to be coordinated with the Owner

    2    Working Hours: Working hours will be determined by the Owner in the Pre-Construction meeting prior to the start of the Project

    3    Security

        a.    The Owner will provide specific access as required during the project to the Abatement Contractor and personnel assigned to the project   The Abatement Contractor will be responsible for the security of the section of the building involved in the abatement project.   It will also be the Abatement Contractor's responsibility to allow only authorized personnel into the work area, and to secure all assigned entrances and exits at the end of the workday

        b    Any person entering or leaving the contained areas must sign the Abatement Contractor's bound logbook and enter the date and time of entry   The logbook must be located immediately outside the entrance to the Decontamination Unit at all times, and be open for inspection by the Owner

    4.    Contractor shall be responsible for the condition of existing light fixtures, fire suppression sprinkler heads, etc. in those areas where demolition of existing ceilings is necessary to access asbestos-containing materials.  Contractor shall secure all fixtures etc in a manner that will not damage these utilities   Contractor is responsible for repairing all damage to existing utilities to their original condition

1225 CONNECTICUT AVENUE, NW

## PART 2 - PRODUCTS

2 01    ASBESTOS ABATEMENT SUPPLIES

A    Respirators:  Respirators shall be selected from those jointly approved by the National Institute for Occupational Safety and Health (NIOSH), US Department of Health and Human Services and the Mine Safety and Health Administration (MSHA), US Department of Labor

B    Surfactant (Amended Water): All water to be used for removal and wet wiping of asbestos-contaminated materials during clean-up operations shall be amended through the addition of a surfactant  (a 50/50 mixture of polyoxyethylene ether and polyoxyethylene ester, or equivalent) mixed and supplied in accordance with manufacturer's instructions

C.    Sealer:  All surfaces from which asbestos-containing materials have been removed shall be sealed with a colored-asbestos sealer, mixed and applied in accordance with manufacturer's instructions The proposed brand and product shall be submitted to the Consultant for approval

D.    Polyethylene Sheeting: All polyethylene sheeting used on the Project shall be fire resistant, and shall meet and be approved as called for in local, Fire Prevention Codes

E    Encapsulant:  a bridging encapsulant such as Childer's Product Co , Chilcare CP215 bridging encasement/encapsulant; Barrier Systems Inc., Slaytex Asbestos Encasement System; CRSI/ISP Guardian Bridging encapsulant; IPC Serpiflex shield encapsulant; or equivalent shall be used   The proposed brand and product shall be submitted to the Consultant for approval

F    Plaster impregnated glass-fiber cloth

G.    Mastic Remover - Sentinel 747, or approved equal

1225 CONNECTICUT AVENUE, NW

## PART 3 - EXECUTION

3.01   GENERAL CONSIDERATIONS

A.   Approvals and Inspection

    1   All temporary facilities, work procedures, equipment, materials, services, and agreements must strictly adhere to and meet these contract specifications along with EPA, OSHA, NIOSH, regulations and recommendations as well as any other federal, state, and local regulations. Where an overlap of these regulations exists, the most stringent one applies. All work performed by the Contractor is further subject to approval of the Owner

    2.   Modifications to these isolation and sealing methods, procedures, and design may be considered if all elements of proper and safe procedures to prevent contamination and exposure can be demonstrated. Written modifications to these specifications must be made to the Owner for review before they can be used for work on this project

B.   HVAC Systems

    1   All ductwork, heating units and HVAC equipment shall either be removed or wrapped in two layers of six-mil polyethylene, prior to any other work taking place, or excluded from work area boundaries by airtight polyethylene sheeting.

C.   Barriers and Isolation Areas

    1   The Abatement Contractor shall construct and maintain suitable critical barriers within the building to separate work areas from spaces occupied by the Owner. Critical barriers shall be of sufficient size and strength to prevent staff, residents, the public and others from entering the work areas. Critical barriers shall be constructed at all hallways, doorways, grille openings, or other open entrances to the work area. Critical barriers shall be constructed with plywood and 2" x 4" lumber, reinforcing it, and placed in the locations specified and designated by the Owner's Representative. Any seams in the critical barriers shall be sealed airtight with caulking or an approved equal method. These barriers shall be removed by the Abatement Contractor at the completion of construction work.

    2   Warning signs shall be posted on all critical barriers at the commencement of the work area preparation, as required in 1926 1101 of the Occupational Safety and Health Standards Federal Register, Volume 59, Number 153, August 10, 1994. The signs shall display the proper legend in the lower panel, with letter sizes and styles of a visibility at least equal to that specified in OSHA Standard 1926 1101 (k)(6)(ii) The signs will read as follows:

**DANGER**
**ASBESTOS**
**CANCER AND LUNG DISEASE HAZARD**
**AUTHORIZED PERSONNEL ONLY**
**RESPIRATORS AND PROTECTIVE CLOTHING**
**ARE REQUIRED IN THIS AREA**

    3   The signs shall be posted at the perimeters of asbestos removal, demolition or construction areas where the asbestos-containing material to be removed exists

    4   The Abatement Contractor shall maintain all temporary and critical barriers, facilities and controls as long as needed for the safe and proper completion of the work. Any breaches in the containment will be corrected at the beginning of each shift and as necessary during the workday. Work will not be allowed to commence until all control systems are in place and operable.

1225 CONNECTICUT AVENUE, NW

5      No barriers shall be removed until the work areas are thoroughly cleaned and all debris has been properly bagged and removed from work areas, and the air has passed final clearance tests, in accordance with provisions detailed herein

3.02    ACM LOCATION PREPARATIONS AND REMOVAL

A.    Preparation

1    Primary Barriers

Prior to construction of the asbestos removal area, all primary barriers shall be sealed with a minimum of one layer of six-mil plastic sheeting and duct tape. Primary barriers consist of all windows, vents, closed and locked doors and openings to adjacent spaces from the work area. HVAC systems shall be sealed, where applicable, as described previously with two layers of 6-mil polyethylene sheeting.

2    Critical Barriers

a    Critical barriers consist of the boundaries of the work area including floors, walls, and any constructed barrier to restrict public access to the work area. Floors shall be sealed with a minimum of two layers of six-mil polyethylene sheeting. There shall be a minimum overlap of two feet (24") at the floor seams and the sheeting will run a minimum of two feet (24") up the walls.

b    The containment walls shall be constructed using a minimum of two layers of six-mil polyethylene sheeting after sealing the floors. This shall be done using a minimum of one layer of six-mil polyethylene sheeting. Overlaps between the walls and floors shall be interwoven as follows:

c    The first floor layer shall be taped up the wall a minimum of two feet (24"). The first wall layer shall be sealed to the floor layer at the corner of the floor and wall. The second floor layer shall be sealed to the first wall layer at a minimum of a two-foot (24") overlap. The second wall layer shall cover all overlaps and be sealed to the floor.



(A) 1st floor layer taped 2' up wall
(B) Wall layer, taped to first floor layer (A), on wall
(C) 2nd floor layer, taped to wall layer (B)

Floor

d    The enclosure shall be constructed so as to allow the removal of interior layers of plastic without damaging the exterior layer. The exterior layer shall stay intact for the duration of the project and be designated the critical barrier

B    Decontamination Unit and Procedures

1    It is the Abatement Contractor's responsibility to provide decontamination chambers consisting of an Equipment Room, Shower, and Clean Room for personnel involved in asbestos removal. Each of the three rooms shall be of sufficient size to accommodate

1225 CONNECTICUT AVENUE, NW

authorized personnel and related equipment. Each room shall be separate of other rooms by a double flap of 6-mil polyethylene sheeting acting as an airlock. This shall be designed to minimize fiber migration and airflow between the decontamination unit rooms. The rooms shall be framed with 2"x 4" lumber, masked, sealed and attached to the entry/exit ways of asbestos work areas. The three rooms together shall be referred to as the Decontamination Unit. A Decontamination Unit will be required for each separate containment area, if work is to be divided into sections.

2    The Equipment Room shall serve as a transfer room and an intermediate area between the work area and any decontamination procedures to occur in the shower room. This room shall be vacuumed and washed whenever necessary in order to prevent asbestos dust and debris accumulations or when required by Consultant. The Equipment Room will also serve as an access area to the shower for personnel leaving the work area. Workers leaving the containment shall remove and dispose of disposable protective suits and wear only respirators into the Shower. At the end of each day, bags of asbestos waste and contaminated materials shall be removed after a thorough decontamination procedure as described in the contract specifications. Workers performing this operation will wear respirators and disposable full-body protective suits.

3.   The Shower Room shall have a continuous supply of cold and hot water, and be suitably arranged for complete showering during decontamination. The Shower Room with curtained doorways will comprise an airlock between contaminated and clean areas. All materials being passed from the equipment room to the clean room must pass through the shower and be thoroughly decontaminated. The shower floor will not be allowed to sit at ground level, but must be elevated a minimum of six inches off of the floor with a suitable catch basin for drainage into a filtration system. The shower will be equipped with a sump pump and an in-line two-stage filter. The first stage will efficiently filter fibers greater than twenty (20) microns in length and the second stage will filter bulk material and fibers greater than five (5) microns in length. Alternatively, shower water may be re-routed back into the work area to be bagged and disposed of as asbestos contaminated waste. The Contractor shall provide disposable towels and soap in the shower area.

4    The Clean Room shall store asbestos worker's clean protective clothing and clean respirator equipment. Contaminated clothing, respirators, tools, equipment, or other materials shall not be allowed into the Clean Room or beyond. The Clean Room will serve as an access for personnel entering the work area, and for the donning of respiratory protection and protective clothing. The Contractor shall provide space in the clean room for the worker's personal clothing. This may be in the form of hangers or lockers.

1225 CONNECTICUT AVENUE, NW

**TYPICAL DECONTAMINATION UNIT**



5   The above decontamination enclosure is called a "three-stage" decontamination enclosure and shall be the type constructed and used for this project in specified areas.  A "two stage" unit resembles the "three-stage" unit in construction detail, but it is built without a shower section

C.   HEPA Filtration

1   Adequate negative pressure shall be provided within the enclosure as specified below

2   After the work area is totally isolated, and prior to commencement of work, the Consultant will perform a visual inspection of the work area   This will consist of checking the integrity of barriers including smoke testing the containment if deemed necessary by Consultant.  This does not in any way relieve the Contractor's responsibilities to ensure the isolation of the work area   The volume of air within the contained work area shall be changed a minimum of four (4) times per hour.  A pressure differential reading of 0.02 inches of water shall be maintained in the negative pressure work area relative to adjacent areas.  Equipment used for producing a negative pressure work area shall have a filtering device that is at least 99 97% efficient at a 0.3 micron pore size   Filters meeting these standards are referred to as High Efficiency Particulate Absolute (HEPA) filters.

3   The HEPA filtration units shall be equipped with the following:

a   Magnehelic gauge to monitor the unit's air pressure difference across the filters and be able to interpret magnehelic reading to cubic feet per minute (CPM).

b   An affixed label, clearly marked and conspicuous, showing the most recent installation date and hour reading of the primary internal HEPA filter

c.   A clock to record the unit's operation time

d   Automatic shut off for filter failure or absence.

e   Audible alarm for unit shutdown.

f   Amber flashing warning light for filter loading.

ASBESTOS ABATEMENT                                         02080 - 14

1225 CONNECTICUT AVENUE, NW

g    The unit must be equipped with a safety system that prevents it from being operated with the HEPA filter in an improper orientation.

h.    All flexible ducting, vent tubing, adapter plates and other equipment used for the passage of filtered air shall be undamaged, uncontaminated, and free of air leaks at all points.

4    Pre-filters shall be changed frequently during the removal.

5    Air movement will flow uninterrupted from outside the work area through the Decontamination Unit into the work area. There shall be no other openings for air to enter the containment unless approved by the Consultant in writing.

6.    HEPA filtration units shall be placed as far as possible from the air intake to the containment to prevent short-cycling of fresh air.

7    This containment, along with the decontamination chamber, shall constitute the critical containment of the work area from the surrounding areas. All openings to this critical containment are to be sealed except where air must enter the worksite due to the use of exhaust equipment. Unless approved by the Consultant, air shall enter the critical containment only through the Decontamination Unit.

8    Modifications to these isolation and sealing methods, procedures, and design may be considered if all elements of proper and safe procedures to prevent contamination and exposure can be demonstrated. Written modifications to these specifications must be made to the Owner for review before they can be used for work on this project.

D    ACM Removal

1    Asbestos removal will not begin until the Consultant has given authorization to proceed The Consultant, based on the criteria presented herein will give this authorization after the removal area has passed a visual inspection

2.    All asbestos-containing material must be soaked with amended water before removal The material shall be sufficiently saturated to reduce fiber release so that the airborne fiber concentration does not exceed the established OSHA Permissible Exposure Limits, (PEL's). The amended water shall not be applied in amounts that will cause leakage or runoff of contaminated water from the removal area Dry removal will not be permitted during this project.

3    Asbestos-containing material shall be carefully removed and placed immediately into bags. Bags must be filled with water to the point where all asbestos is adequately wetted as defined by Federal Regulations 40 CFR 61 Subpart M. Asbestos will not be permitted to let fall or sit on the ground before being bagged

4    Fine cleaning of residual asbestos-containing material shall consist of carefully scraping or brushing the material from surfaces The recommended method for brushing a substrate after gross removal has taken place is to use a nylon brush Wetting of the substrate shall also occur while this brushing is performed, since the chance of airborne fiber generation during fine cleaning still exists

5.    Water Atomizing Devices, commonly termed "misters," shall be utilized by the Contractor during asbestos removal and fine cleaning phases, to provide further dust control protection in the work area The misters shall be supplied with amended water and in operation continuously during these phases.

1225 CONNECTICUT AVENUE, NW

6.    Asbestos waste must be double bagged before it is removed from the contained area  The inner bag will be HEPA vacuumed and showered before being placed in the outer bag. Vacuuming must take place in the Equipment Room of the Decontamination Unit  Washing must take place in the Shower Room of the Decontamination Unit.  Bags will normally be removed at the end of each working day and transported from the job site

7    Any materials considered contaminated by the Owner or the Owner's Representative that cannot be double bagged shall be wetted and containerized in disposal drums  Oversized contaminated materials shall be wrapped airtight in two layers of 6-mil polyethylene sheeting

8    All bags, containers or wrapped materials transported out of the work area shall be labeled with preprinted labels required by Federal EPA, OSHA and the Department of Transportation regulations  Any carts used to transport asbestos waste to the on-site holding dumpster should be HEPA vacuumed and wet wiped each day, and may be inspected by the Owner or Consultant every day

9    Carts that are not made of an impermeable material shall be lined with a minimum of one layer of 6-mil polyethylene sheeting. to be removed after each shift and disposed of as contaminated waste.  The transport route and the transport of waste out of the work area shall be coordinated with the on-site Owner's representative

10.   The work area shall be cleaned of residual asbestos debris on a daily basis    The Decontamination Unit floor (top layer) shall be picked up and replaced on a daily basis, if required by Consultant.

11    Air testing will be performed continuously outside the enclosed area  If fiber concentrations exceed **0.010 fibers/cc** or background levels, work shall stop and the Abatement Contractor shall perform clean up activities in the affected areas and check the integrity of the critical barriers  Clean up activities shall include but not be limited to wet wiping and vacuuming surfaces with a HEPA-equipped vacuum   Work may continue only after the source of contamination is identified, corrected and proper cleaning activities are implemented.  The Consultant will perform air testing on site in the affected areas  If the results of these air tests are not below **0.010 fibers/cc**, the Abatement Contractor shall perform a thorough decontamination of the affected areas, to the satisfaction of the Consultant.

12.   After brushing and scraping, surfaces shall be free of visible debris and fibers  A final wipe-down of the substrate with wet, lint-free rags shall take place in order to ensure proper cleaning.  All surfaces including floors, walls, and ceilings shall also be HEPA vacuumed clean.  All visible asbestos-containing material is to be removed by the Contractor before encapsulation procedures are allowed to begin.  The Consultant will perform an inspection of the work area prior to giving approval to begin encapsulation of work area   Removal substrate must be clean and bare, and the entire work area must be free and clear of any suspect material for the Contractor to pass this visual inspection and begin encapsulation

13    Where insulated substrates penetrate walls or other demising structures, remove asbestos through to the opposite side of the demising structure  After the removal of the asbestos materials at the demising structures, any resulting spaces or breeches shall be foamed or sealed airtight

E    Removal of Critical Barriers

1    No critical barrier shall be taken down until the final visual inspection and final clearance air tests are found to below either **0.010 fibers/cc.**

2    After a successful final visual inspection, encapsulation, and a successful final air test, Abatement Contractor shall perform post abatement takedown

ASBESTOS ABATEMENT                                                02080 - 16

1225 CONNECTICUT AVENUE, NW

3    All encapsulated polyethylene sheeting used in the construction of the Decontamination Unit and Containment Area shall be bagged and disposed of as asbestos contaminated waste. Areas exposed during this process shall be examined for traces of suspect material. If any is found, it will be picked up by HEPA vacuuming and wet cleaning, and a coat of encapsulant be applied to the affected areas.   Based on the amount of suspect material found, the Consultant may request the use of misters in the surrounding area   The Abatement Contractor will then implement the use of misters as a precautionary measure

E.    Encapsulation Procedures

1.    The polyethylene barriers shall be cleaned of gross contamination before a lock-down sealant can be applied to the substrate   After the substrate has been cleaned and all polyethylene barriers of the work area are cleaned of all visible debris, the Contractor shall request a visual inspection of the work area by the Consultant. Prior to the inspection of the work area, the Abatement Contractor shall remove the inside layer of the work area polyethylene sheeting, after cleaning, and dispose of it as contaminated waste   The work area will still have all primary barriers intact and one layer of polyethylene sheeting over floor, walls, and permanent structures within the work area during the inspection

2.    Workers performing lock-down must wear disposable protective clothing and respirators suitable for asbestos   The encapsulation process shall not be treated any differently from the removal process in this respect.

3.    The lock-down material shall be applied with a low-pressure (less than 500 p.s.i.), airless spray-type mechanism

4.    All surfaces in the work area will be encapsulated.  A minimum of one coat of lock-down encapsulant will be applied to prevent the generation of airborne residual fibers.  The lock-down encapsulant will be applied to both the substrate and the polyethylene sheeting serving as the containment barrier.  During the encapsulation process, the Abatement Contractor shall decrease the negative pressure of the work area by shutting down some of the air filtration devices in the work area   If the lock-down material is being applied to irregular, grooved, or corrugated surfaces, it shall be administered from the opposing side or at a right angle to the direction of the previous application   The encapsulant shall be left to dry before the commencement of final air testing   After final air clearance and inspection criteria have been met, the Abatement Contractor shall begin final takedown procedures.

3.33    GLOVE BAG REMOVAL METHOD

A.    Removal of asbestos containing white seam sealant on pipe/pipe-fitting insulation shall be in accordance with the following procedure, only at the direction of the Consultant:

1    Glove bags may be used as a method of asbestos removal as an alternative to total isolation removal or in conjunction with total isolation removal in areas identified in the scope of work for pipe insulation removal, but only if the area will be unoccupied during all phases of abatement   Several restrictions, which apply to the use of glove bags for asbestos removal purposes, may be found at OSHA Regulations 29 CFR 1926.1101.

2.    Abatement Contractor shall set up a containment barrier around the immediate area of glove bag removal. This containment is to consist of two layers of six (6)-mil polyethylene sheeting walls and a two layer six-mil polyethylene sheeting floor forming a fully enclosed "cocoon"-like work area enclosure.

3    As an alternative to the "cocoon" enclosure described above, Abatement Contractor is permitted to erect a containment enclosure where all openings, windows, vents, and doors in the work area are sealed with two layers of six-mil polyethylene sheeting and duct tape   In

ASBESTOS ABATEMENT                                                    02080 - 17

1225 CONNECTICUT AVENUE, NW

addition, walls adjacent to the piping, floor surfaces below the piping, and any object in the work area shall be covered with two layers of six-mil polyethylene sheeting

4    In either case, the containment area surrounding the glove bag area shall be under adequate negative pressure to achieve a minimum of four air changes per hour    Criteria for filtering and exhausting the work area shall be the same as in the total isolation method for removal

5    Pipes and fittings where glove bags are to be used must be no warmer than 150°F, as the glove bag material may melt or stick to the pipes.

6    All workers must wear full protective suits and respirators during all phases of glove bag work, including preparation, removal, clean up, and encapsulation

7.    Preparation of the area will include a minimum double-stage Decontamination Unit at the entrance to the contained area, equipped with a HEPA vacuum for personal decontamination, in accordance with OSHA 1926.1101    Glove bags will be placed on pipes or fittings and securely taped with tools enclosed.  Bags will not have any holes that might allow air to escape during removal    Bags will be checked with smoke tubes provided by the Abatement Contractor.  A HEPA vacuum will be inserted through the appropriate hole in the bag along with the nozzle for the water sprayer containing amended water.  When such preparations are completed, approval of the Consultant will be obtained for each glove bag work area before removal begins.

8    It is required (per OSHA) that two-person (minimum) teams perform glove bag removal.  One will support the vacuum and assist with wetting the material in the bag while the other does the actual cutting of the material    Once the material is removed and the pipes are clean and bare, the material in the bag will be thoroughly wetted down and forced to the bottom of the bag    All air in the bag will be vacuumed out, and the bottom portion of the bag where all the asbestos must be located will be twisted around before separating the bag from the pipe.  Bags will then be immediately placed in another labeled bag for disposal purposes.  Glove bags are not permitted to be left in the work area for any length of time after the removal.

9    All surfaces in the glove bag removal area will then be wet-wiped and HEPA- vacuumed    Polyethylene sheeting used to protect the immediate area will be discarded as asbestos waste.  Enclosure barriers will be left up until results of clearance air samples are acceptable    Abatement Contractor will encapsulate the pipes and fittings for Consultant inspection

10    Lock-down must be performed with a pre-approved encapsulant, after the pipe is essentially dry    Workers performing lock-down must wear disposable protective clothing and suitable respirators    The lock-down material shall be applied with a low-pressure (less than 500 psi), airless, spray-type mechanism or be hand-applied    A minimum of one coat of lock-down encapsulant will be applied    The lock-down encapsulant will be applied to both the substrate and the polyethylene sheeting, if in place.  If the lock-down material is being applied to irregular, grooved, or corrugated surfaces, it should be administered from the opposing side or at a right angle to the direction of the previous application

11    Personal samples, containment area samples taken during glove bag operations, and/or final clearance air samples must not exceed 0.010 fibers/cc or background levels.  If this occurs, the area inside the containment must be thoroughly cleaned and encapsulated    Clearance air samples will then be collected with acceptance criteria, as described herein, required before the enclosure can be dismantled

3 04    METHOD FOR THE REMOVAL OF VAT AND ASSOCIATED MASTIC

A    Removal of vinyl asbestos tiles (VAT) floor covering and associated asbestos-containing mastic shall be in accordance with all applicable regulations including Part II, Department of Labor – Occupational

1225 CONNECTICUT AVENUE, NW

Safety and Health Administration, 29 CFR Parts 1926, et al , dated Wednesday, August 10, 1994  At a minimum, the following work practices shall apply:

1.    Workers shall wear protective clothing and half-mask, dual-cartridge, HEPA-filtered respirator, at a minimum

2     The work area shall be isolated as required by regulations and to the satisfaction of the Consultant.  As minimum, critical barriers, a negative pressure system, and a personal Decontamination Unit shall be erected in accordance with Section 3.02 of this Specification. All areas were VAT and mastic are to be removed shall be sealed off by the use of polyethylene sheeting on all openings and HEPA filtered negative pressure shall be established in each work area sufficient to achieve four (4) air changes per hour.

3     VAT and mastic shall be wet prior to and during removal

4.    Each tile shall be removed as a complete unit, with no breakage, wherever possible.

5     The exposed floor will be cleaned with a HEPA vacuum cleaner and wet-scraped.  Repeat the process until the floor area is clean and smooth.

6     Grinding of mastic is not permitted unless work is being performed under the 'Total Isolation Method'

7     Any chemicals to be used for removal of the mastic must be approved by the Consultant, Owner and General Contractor prior to use.

8     Dispose all asbestos-containing waste in an EPA approved landfill


3.05    METHOD FOR THE REMOVAL OF CAULKING AT FAÇADE TO VENT JOINTS

A    Contractor shall remove and dispose of all asbestos-containing caulking materials as required by these Specifications    Removal of asbestos-containing caulking shall be in accordance with all applicable regulations including Part II, OSHA, 29 CFR Parts 1926, et al , dated August 10, 1994  At a minimum, the following work practices shall apply:

1     Workers shall wear protective clothing and half-mask, dual-cartridge, HEPA-filtered respirator, at a minimum

2     The work area shall be isolated as required by regulations and to the satisfaction of the Consultant.  As a minimum, critical barriers, and a personal decontamination facility shall be erected in accordance with Section 3.02 of this Specification  All areas where caulking is to be removed shall be sealed off by the use of polyethylene sheeting on all interior openings.

3     Place polyethylene sheeting below area where caulking is being removed, both inside and outside the building

4.    Using wet methods, remove the caulking in a manner that precludes the caulking from being sanded, ground or abraded

5     Properly decontaminate all non-ACM materials in contact with the asbestos-containing caulking, and dispose of as construction debris.  All non-ACM materials in contact with the asbestos-containing caulking, not properly decontaminated, shall be wrapped in two layers of six-mil polyethylene sheeting and disposed of as asbestos-contaminated waste

ASBESTOS ABATEMENT                                                              02080 - 19

1225 CONNECTICUT AVENUE, NW

6 Contractor may elect to segregate the asbestos containing window caulking from the existing frames prior to disposal   If this segregation occurs, the asbestos-containing caulking material shall be removed in a manner that precludes the material from being sanded, ground, or abraded   Properly decontaminate all building components in contact with the asbestos-containing caulking and dispose of accordingly   All non- asbestos-containing building components in contact with the asbestos-containing caulking, which have not been decontaminated, shall be wrapped in two-layers of polyethylene sheeting for proper disposal

7. Properly wet and double bag all caulking and all non-ACM materials contaminated with asbestos for disposal as ACM debris.

8. Using a HEPA vacuum clean all residual asbestos-containing caulking remaining in the work area

9. Dispose all asbestos-containing waste in an EPA approved landfill

3 06 METHOD FOR THE REMOVAL OF ASBESTOS-CONTAINING FIRE DOORS

A. Removal of Fire Doors shall be in accordance with all applicable regulations   At a minimum, the following work practices shall apply:

1 Workers shall wear protective clothing and half-mask, dual-cartridge, HEPA-filtered respirator, at a minimum.

2 The work area shall be isolated as required by regulations and to the satisfaction of the Consultant.   As a minimum, critical barriers shall be erected in accordance with Paragraph 3 02 of this Section.

3. Place polyethylene sheeting below area where items are being removed.

4 Wet and remove items with minimal breakage

5 Immediately wrap items in two layers of polyethylene sheeting

6 Properly wet and double bag for disposal.

7 Dispose all asbestos-containing waste in an EPA and MA DEP approved landfill.

3 07 DISPOSAL OF ASBESTOS WASTE

A. **ALL WASTE MANIFESTS MUST BE PRE-SIGNED BY THE OWNER PRIOR TO WASTE LEAVING THE SITE.**   CONTRACTOR MUST SUBMIT MANIFESTS INDICATING THE OWNERSHIP ENTITY NAME AND ADDRESS, AND TRANSPORTER AND LANDFILL INFORMATION AT LEAST THREE (3) BUSINESS DAYS PRIOR TO REMOVING ANY WASTE FROM THE SITE.   No date or quantity of waste is to be indicated on the manifests until the manifests are pre-signed and the appropriate Consultant confirms the date and quantity of waste removed at the time the asbestos waste leaves the site   Contractor must return all fully executed original manifests to the Owner within 30 days of the waste leaving the site.

B Waste removal procedures shall be done in accordance with all regulations as set forth by the agencies having authority to regulate.

C. The Abatement Contractor shall provide proof that disposal sites for the waste materials have current and valid permits to dump asbestos waste at the time of the pre-construction meeting

1225 CONNECTICUT AVENUE, NW

D.  Receipts shall be obtained by the Abatement Contractor from the dumping site(s), and submitted to the Owner upon request for final payment.

E   Warning labels having permanent, waterproof print and adhesive shall be affixed to all bags, trucks, drums (lids and sides), and other containers used to store and/or transport asbestos-containing material. Labels must be conspicuous and legible and contain the following warning:

CONTAINS ASBESTOS FIBERS<br>
AVOID CREATING DUST<br>
CANCER AND LUNG DISEASE HAZARD

F.  The Abatement Contractor shall be responsible for all necessary precautions to prevent pollution by spilling during the performance of services and shall assume full responsibility for all Abatement Contractor caused spills, which shall be cleaned up at the Abatement Contractor's expense

G   Temporary on-site storage of asbestos waste must be approved by the Owner.

3 08   HOUSEKEEPING

A   Throughout the work period, the Abatement Contractor shall maintain the building and site in a standard of cleanliness as specified throughout these specifications.

    1   Contaminated disposable clothing, respirator filters, and other debris shall be bagged and sealed at the end of each workday

    2.  All asbestos generated by either removal or repair shall be bagged immediately and not allowed to remain exposed at the end of each workday

    3   Respirators shall be thoroughly cleaned at the end of each workday and stored for the next day's use

    4   The Abatement Contractor shall retain all stored items in an orderly arrangement allowing maximum access, not impeding traffic, and providing the required protection materials.

    5.  The Abatement Contractor shall not allow the accumulation of scrap, debris, waste material, and other items not required for completion of the work.

    6   The Abatement Contractor shall provide adequate storage for all items awaiting removal from the job site, observing all requirements for fire protection and protection of the ecology

    7   Daily and more often if necessary, the Abatement Contractor shall inspect the work areas and adjoining spaces, and pick up all scrap, debris, and waste material   Remove all such items to the place designated for their storage

    8.  The Abatement Contractor shall maintain the site in a neat and orderly condition at all times.

3 09   .QUALITY CONTROL

A   The Owner will retain the services of an Owner's Representative to provide project administration, monitoring of Abatement Contractor work practices and performance, inspection of the work-sites, bulk fiber identification, and air sampling and analysis throughout the asbestos removal project Many references to Owner will in fact be managed by the Owner's Representative (Consultant) in lieu of the Owner, at the Owner's request, and the Contractor is required to regard the requests and interpretations of the Consultant as having full force unless expressly informed otherwise by the Owner.

1225 CONNECTICUT AVENUE, NW

1225 CONNECTICUT AVENUE, NW

3.10    AIR MONITORING

A.    Pre-abatement air sampling and appropriate dust samples may be taken to document existing background conditions before the Contractor begins abatement preparations.

B.    During removal activities, area samples will be collected by the Consultant (Owner's Representative) outside the containment, inside and outside the Decontamination Unit, at critical points outside the work areas, inside the contained work areas, and at HEPA exhaust locations. Abatement Contractor shall be responsible for all OSHA personal sampling.

C.    Final clearance air samples will be collected inside the contained removal work area after acceptable visual inspection criteria are met (no visible asbestos dust or debris) Air will be agitated by means of a small leaf blower prior to the test, and kept agitated by means of a small electric fan The results of all air samples must be less than 0.010 fibers per cubic centimeter (f/cc) for PCM analysis or less than an average of 70 structures per square millimeter (s/mm$^2$) for TEM analysis, in accordance with 20 DCMR regulations. The Owner will pay the first set of final clearance air tests for each removal area. In the event that these air tests do not pass the clearance criteria, the Contractor shall pay for any subsequent air tests that need to be performed If the Contractor fails to meet the clearance criteria, the Contractor will be required to re-clean the designated work area, and then the Consultant shall repeat the final air clearance testing Cleaning and testing will be repeated until the specified clearance criteria are met.

3.11    WORK REVIEW

A.    Consultant will review Abatement Contractor's work practices prior to the start of and during all asbestos related work and will report any specification violations to the Abatement Contractor If the Abatement Contractor fails to correct deficiencies in a timely manner, the Owner will be notified in writing, and work may be stopped. The Consultant will review the containment structure and negative air pressure readings before work begins. Airborne fiber concentrations, outside each containment, must not exceed 0.010 fibers/cc, or pre-abatement background levels, whichever is greater If concentrations exceed this level, then work must be stopped, conditions reviewed as to the probable cause, and then corrected.

B.    Consultant will keep a daily log of Abatement Contractor's work practices and will make these daily logs a part of the final project documents

3.12    INSPECTIONS

A.    In addition to various daily inspections of containment and work practices, Consultant will make three (3) mandatory inspections throughout the removal work These inspections include: a pre-abatement visual inspection, a post-abatement visual inspection, and a post tear-down visual inspection

B.    Each inspection must be requested by the Contractor and performed by Consultant, to the satisfaction of the Consultant, **and be signed off by the Consultant,** before work is to continue on next task in the phase Failure on the part of the Contractor to obtain sign-off before proceeding is regarded as a serious violation of the contract and unacceptable

3.13    RESPIRATORS AND PROTECTIVE CLOTHING

A.    Personal protection, in the form of disposable Tyvek suits, and NIOSH approved respirators, are required for mechanics, Abatement Contractor supervision, Consultant and visitors at the work site during the set-up, removal, and cleaning operations Abatement Contractor shall provide all protective equipment for workers, Consultant, and authorized personnel to access this work site

1225 CONNECTICUT AVENUE, NW

B      Each worker shall be supplied with a minimum of two complete disposable uniforms daily   Removal workers shall not be limited to two uniforms, and the Abatement Contractor will be required to supply additional uniforms as is necessary   Under no circumstances will anyone entering the removal area be allowed to reuse a contaminated uniform.

C.     Work clothes shall consist of disposable full body suits, head covers, gloves, footwear, and eye protection

D     The Abatement Contractor shall supply workers and supervisory personnel with NIOSH approved protective respirators and HEPA filters.  Appropriate respirator selection shall be determined by the daily personnel samples being taken and strictly follow the guidelines set forth in the OSHA respiratory program 29 CFR 1910.134 and the 20 DCMR regulations   The respirators shall be sanitized and maintained according to the manufacturer's specifications.   Appropriate respirators shall be selected using the information provided in OSHA Title 29 CFR Part 1910.1001 and 1926.1101 Final Rules   This determination has been made for this project   The Abatement Contractor shall supply PAPR's for all personnel associated with this work, where warranted. Disposable respirators shall not be acceptable in any circumstance.  The Abatement Contractor will maintain on site a sufficient supply of disposable HEPA filters to allow workers and supervisory personnel to change contaminated filters at least three (3) times daily.  The Abatement Contractor is solely responsible for means and methods used and for compliance with applicable regulations.

E.     Respirators shall be individually assigned to removal workers for their exclusive use.  All respiratory protection shall be provided to workers in accordance with the submitted written respiratory protection program, which includes all items in OSHA 29 CFR 1910 134  A copy of this program shall be kept at the worksite, and shall be posted in the Clean Room of the Decontamination Unit

F.     Workers must perform negative and positive pressure fit tests each time a respirator is put on, whenever the respirator design so permits   Powered air purifying respirators shall be tested for adequate air flow as specified by the manufacturer.

G     Workers shall be given a qualitative fit test in accordance with procedures detailed in the OSHA Respiratory Protection Standard (1910.134 Appendix A) for all respirators to be used on this abatement project   An appropriately administered quantitative fit test may be substituted for the qualitative fit test.

H.     Upon leaving the active work area, pre-filters shall be discarded, cartridges removed, and respirators cleaned in disinfectant solution and clean water rinse.  Clean respirators shall be stored in plastic bags when not in use.  The Abatement Contractor shall inspect respirators daily for broken, missing, or damaged parts

I     Abatement Contractor shall provide daily personal sampling to check employee exposure levels for the purpose of establishing respiratory protection needs  Samples shall be taken for the duration of the work shift or for eight hours, whichever is less   Personal samples need not be taken every day after the first day if working conditions remain invariant, but must be taken every time there is a change in the removal operation, either in terms of the location or the type of work.  Sampling will be to determine eight-hour Time-Weighted-Averages (TWA)   The Abatement Contractor is responsible for personal sampling as outlined in OSHA Asbestos Standard 1926 1101.

J.     Sampling personnel shall be proficient in the collection and analysis of air samples under NIOSH Method 7400, and must be supervised by an individual who has completed the NIOSH 582 training course or equivalent.

1225 CONNECTICUT AVENUE, NW

K.   Air sampling results shall be available at the job site in written form no more than twenty-four (24) hours after the completion of a sampling cycle.  The document shall list each sample's result, sampling time and date, person monitored, flow rate, sample duration, microscope field area, number of fibers per fields counted, cassette size and analysts name and company.  Air sample analysis results will be reported in fibers per cubic centimeter

END OF SECTION<br>02080

ASBESTOS ABATEMENT                                                           02080 - 25

1225 CONNECTICUT AVENUE, NW

# Appendix A
# Asbestos Abatement Scope of Work Table

## SUMMARY OF IDENTIFIED ASBESTOS-CONTAINING MATERIALS

| Material Description | Material Location | Friable | NESHAP Category | Estimated Quantity |
|---|---|---|---|---|
| Brown Spray-Applied Duct Insulation | Wet Chases | Y | RACM | 1,350 SF - 27 Chases, 50 SF Per Chase |
| Brown Spray-Applied Duct Insulation – Debris / Residue | Throughout Previously Abated Wet Chases | Y | RACM | 15 Chases, Each ~2' x 3' x 10' |
| Brown Spray-Applied Duct Insulation – Debris / Residue | Lobby Level Above Ceiling Adjacent to Mail Room | Y | RACM | ~360 SF of Duct |
| Black Façade to Vent Sill Joint Caulk | Penthouse Exterior | N | CAT II | 80 LF |
| Residual Red Façade Caulk | Penthouse Exterior | N | CAT II | 275 LF |
| Black Seam Sealant on Fiberglass Pipe Insulation / Fittings | B1 Level, Lobby Level, 8th Floor, Return Shaft | N | CAT II | ~300 Fittings |
| White Seam Sealant on Fiberglass Duct Insulation | 8th Floor - Office Area Above Ceiling | N | CAT II | ~2,000 LF of Various Size Duct |
| White Exterior Vent Caulk | Exterior – Southeast Side | N | CAT II | 100 LF |
| Black Seam Sealant on Fiberglass Duct Insulation | Main Duct Chases | N | CAT II | 1,920 SF - 120 SF Per Chase, 2 Chases Per Floor |
| Brown Duct Pin Mastic | Main Duct Chases | N | CAT II | 1,920 SF - 120 SF Per Chase, 2 Chases Per Floor |
| Brown Duct Pin Mastic | Penthouse – AHUs | N | CAT II | ~4,000 SF |
| Brown Duct Pin Mastic | Return Shaft | N | CAT II | ~2,000 SF |
| Brown Duct Pin Mastic | B1 Level, Lobby Level | N | CAT II | ~960 SF |
| 9" x 9" VFT – Grey Mottle and Associated Black Mastic | Floors 2-8 Electric / Mechanical Closets | N | CAT I | 1,575 SF |
| 9" x 9" VFT – Tan / Beige Streaks and Associated Black Mastic | B1 Level - Main Phone Room, Light Bulb Storage Room, Office | N | CAT I | ~1,500 SF |
| Black Mastic Associated w/ 12" x 12" Light Beige Mottle VFT | Lobby Level Rear Corridor | N | CAT I | 850 SF |
| Beige Vinyl Floor Tile and Associated Black Mastic | Lobby Level Rear Corridor | N | CAT I | 850 SF |

# SUMMARY OF IDENTIFIED ASBESTOS-CONTAINING MATERIALS

| Material Description | Material Location | Friable | NESHAP Category | Estimated Quantity |
|---|---|---|---|---|
| 9" x 9" Linoleum Floor Tile – Beige w/ Black Lines and Associated Black Mastic | B1 Level – Independence Federal Storage | N | CAT I | 325 SF |
| Pipe Saddle Block Insulation | Penthouse, B1 Level, and 8th Floor | Y | RACM | ~135 Pipe Saddles |
| Boiler Components (Assumed) | Penthouse | Y | RACM | 2 Boilers |
| Boiler Insulation (Assumed) | Penthouse | Y | RACM | 800 SF |
| Boiler Breeching (Assumed – Covered with Metal Jacket) | Penthouse | Y | RACM | 430 LF |
| Fire Doors (Assumed) | Throughout | N | CAT II | ~ 100 ea. |

# EXHIBIT D
# TO AFFIDAVIT

**Brookfield Properties**

Brookfield Properties Management LLC
U.S. Commercial Operations
1250 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20036

Tel  (202) 659-8349
Fax (202) 467-5620
www.brookfieldproperties.com

_Via Hand Delivery & Mail_

May 11, 2007

Mr. Robert B. Isard, President & CEO
Independence Federal Savings Bank
1229 Connecticut Avenue, N.W.
Washington, DC 20036

Dear Mr. Isard:

We are excited to announce that on July 1, 2007, work will commence for the 1225
Connecticut Avenue Repositioning Project. This project which is currently scheduled to
continue for approximately 18 months, will bring a completely "new" look to the entire
building. Detailed drawings of the completed project are not yet available, however a
rendering is attached.

Realizing that Independence Federal Savings Bank will be a tenant of the building during
the length of this project, it would be beneficial to meet to discuss any concerns you may
have with regard to its impact on your operations. At your convenience, we would like to
schedule this meeting within a few weeks. Please provide a date that best fits your
schedule. If you have any questions or concerns, I can be reached at 202-659-8349.

Looking forward to meeting with you.

Sincerely,

Christine V. Olitis-Campos
Assistant Property Manager

cc:    Jackie Duke, General Manager – Brookfield Properties



# EXHIBIT E
# TO AFFIDAVIT

# 1225 Connecticut Ave – Independence Federal Meeting

**Tenant Presentation Agenda**

1) **Introduction of Project Team – Christine/John**
   a) Christine, Kevin, Hank, Tony, Ed,

2) **Project History and Overview - John**
   a) Age
   b) Ernst & Young departure
   c) Systems at the end of their service life
   d) Opportunity

3) **Scope of Work - Tony**
   a) Cladding
   b) Mechanical & Electrical
   c) Main lobby
   d) Elevators
   e) Common area – Restrooms, elevator lobbies
   f) Rooftop terrace
   g) Fitness Center

4) **Schedule – John**
   a) Start date
   b) Completion date

5) **Impact to Retailers – Ed/John**
   a) Hours and Days of the Week – Noisy Vs. Normal Work - Ed
   b) Work zone staging area - Ed
   c) Replacement of retail storefront - Ed
   d) Exterior arcade soffit - Ed
   e) Lobby renovations - Ed
   f) Mechanical, Electrical & Plumbing - Ed
   g) Smells - John
   h) Dust - John
   i) Air Quality - John
   j) Noise - John
   k) Signage (Temp and New) - John
   l) Exterior light - John
   m) Parking garage – John

6) **Questions**

7) **Conclusion - Christine**

EXHIBIT F
TO AFFIDAVIT

**Brookfield** Properties

ENTERED JUL 2 4 2007

# Memo

| | |
|---|---|
| **To:** | Tenants of 1225 Connecticut Avenue |
| **From:** | Karen Hunt, Property Manager |
| **Re:** | 1225 Renovation – Scheduling/Notification |

**Date/Time:**   July 20, 2007

As you know, Brookfield Properties will soon begin the renovation of 1225 Connecticut Avenue. To give you an understanding of the scope and timing of the work, we are providing a tentative schedule from our general contractor, Davis Construction. As with any construction project, these dates will be subject to change. Also, updated schedules and notices detailing the various project phases and any service interruptions will be provided in advance and coordinated directly with each affected tenant.

The parking garage will remain open during these renovations; however, some spaces will be impacted due to shoring during certain phases. We will continue to provide elevator service from the garage to the building's main lobby. Emergency egress exits will be maintained for the duration of the project for both retail spaces and they shall be clearly marked at all times.

The current schedule for construction is as follows:

A.    INITIAL CONSTRUCTION SET-UP: July 23 – August 3, 2007
- Monday, July 23 – Friday, July 27, 2007 – Davis Construction will be adding partitions in the lobby area to separate constructions crews, offices and entrances from the rest of the main lobby and the tenants' areas.
- Saturday, July 28, 2007 – The sidewalk tree planters will be demolished and completely removed. A crane will be placed on the N Street side of the building in order to install trash chutes for interior demolition.
- Monday, July 30 – Friday August 3, 2007 – The metered parking and one lane of traffic will be blocked off on N Street to allow for the construction staging area.
- Saturday, August 4, 2007 Scaffolding in the form of a covered walkway will be erected on 18th Street in front of the retail spaces and temporary signage will be installed so that the retail spaces remain clearly visible during construction. Entrances will remain unobstructed.

B.    INTERIOR DEMOLITION: August 2007 – April 2008
The first phase of construction will consist of interior demolition. Demolition will initially take place on the upper floors and then progress down the building.

C.    EXTERIOR DEMOLITION: April 2008 – June 2008

We will provide regular updates as construction progresses. For any questions throughout this process, please do not hesitate to call the management office at (202) 659-8349. Thank you.



# EXHIBIT G
# TO AFFIDAVIT



# Department of Consumer and Regulatory Affairs
Permit Center
941 North Capitol St. NE Room 2100
Washington DC 20002

Tel:(202) 442-4589

## Building Permit

### THIS PERMIT IS VALID ONLY FOR THE PREMISES OF THE PROJECT ADDRESS

PERMIT NO.  104968

DATE: 7/12/2007

| ADDRESS OF PROJECT: | SSL: | SQ: 159 | SX: | LOT: 82 |
| 1225 CONNECTICUT AVE NW | | WARD: 2 ZONE: C3C | | |

DESCRIPTION OF WORK:
DEMOLITION OF INTERIOR AND FACADE

| PERMIT TYPE: | PLANS (Y/N): | EXISTING USE: | PROPOSED USE: |
| ALTERATION AND REPAIR/DE | Y | BUSINESS | Business |

| PERMISSION IS HEREBY GRANTED TO | PERMIT FEE: |
| OWNER: BROOKFIELD PROPERTIES | $28,030.00 |

AGENT NAME:
CARLOS ROJAS 202-969-9694

CONDITIONS / RESTRICTIONS:
ALL CONSTRUCTION DONE ACCORDING TO THE CURRENT BUILDING CODES ; ALL CONSTRUCTION DONE ACCORDING TO THE CURRENT ZONING REGULATIONS ;  THIS PERMIT IS FOR DEMOLITION WORK ONLY AND NO NEW MECH/PLUMB. WORK IS PERMITTED.

TO REPORT WASTE, FRAUD OR ABUSE BY ANY DC GOVERNMENT OFFICIAL, CALL THE DC INSPECTOR GENERAL AT 1-800-521-1639.

| Acting DIRECTOR: | PERMIT CLERK: | EXPIRATION DATE: |
| Linda K Argo | | 7/11/2008 |

CONDITIONS: As a condition precedent to the issuance of this permit, the owner agrees to conform with all conditions set forth herein, and to perform the work authorized hereby in accordance with the approved application and plans on file with the District Government and in accordance with all applicable laws and regulations of the District of Columbia. The District of Columbia has the right to enter upon the property and to inspect all the work authorized by this permit and to require any change in construction which may be necessary to ensure compliance with the permit and with all the applicable regulations of the District of Columbia. Work authorized under the Permit must start within one (1) year of the date appearing on this permit or this permit is automatically void. If work is not started, any application for partial refund must be made within six months of the date appearing on this permit.

THIS PERMIT MUST ALWAYS BE CONSPICUOUSLY DISPLAYED AT ADDRESS OF WORK UNTIL WORK IS COMPLETED.

Separate permits are required for all Plumbing, Refrigeration, Gas Fitting, and Electrical Work.



# Office of Finance and Treasury

Date:    7/12/2007 4:08 PM
Office:  941NCap    Term:D4HPOLB1
Batch:   10    Batch Date:07/13/07
Cashier:ncap24
Trans #:167

DCRA                        Rcpt: 00116768
Comment/Document:

Payment Total:        $28,030.00
Payment Distribution:
9999  MISC                    $28,030.00
            CK Tendered: $28,030.00

Thank you for your payment.
Have a nice day!

# EXHIBIT H

# TO AFFIDAVIT

**District Department of Transportation**
Public Space Management Administration
941 North Capitol Street N.E. room 2300
Washington D.C 20002
Tel. (202)442-4670     Fax (202)442-4867     Inspections: (202) 535-2347

d.

Date:  8/8/2007

**PERMIT NO. PA 29092**

| Address of work: | 1225 CONNECTICUT AVE NW | Ward:  2 | Lot: 0052 | Square: 0159 |

Permission is Hereby granted to:     DAVIS CONSTRUCTION

| | | |
|---|---|---|
| Deposit Number:S     03440 | Permit Fee: | $114.00 |
| Inspection Number:W | Deposit Amount: | $105,740.00 |
| Meter Fee Number:M     01596 | Inspection Amount: | $0.00 |
| | Meter Fee Amount: | $31,567.50 |

Description:     Occupancy: Staging Area(s), Cover Walk-way(s), Temp. Parking/Meter(s), Crane, AS PER
APPROVED TCP

**Permission is granted to the entity named above to perform the work described herein
at the address shown above in strict accordance with all conditions stated on all pages
of this permit as well as on the application submitted.**

Approved Trafic Control Plan must be on site at all times.
Only commercial vehicles directly needed for construction are permitted to be parked in the area defined by this
permit.
No work is permitted before 7:00am or after 7:00pm Monday through Saturday No work is permitted on Sunday
SCOPE OF WORK :
BUILDING RENOVATION / OCCUPANCY PER TCP
All work must comply with all District regulations and statutes.Violation of any District regulations or statute may
result in the revocation of this permit.
No crossing of sidewalk with trucks.
No sales permitted in public space
This permit must be on site at all times.
This permit is revocable at any time at the discretion of MPD and DDOT.
No blocking of alley with trucks or construction equipment.
No work in public space permitted during official DC government holidays.
For return of deposits please call the Permit Office at (202) 535-2347 to schedule an inspection.
Permit holder responsible for obtaining any additional permits required by statute or regulation including DDOE and
DCRA.
Permit holder is responsible for all damage to public space as a result of work done under this permit.
New TCP is required every six months.
Prior to street and alley closures permittee must contact local fire station.

Permit Effective:     8/14/2007

Permit Expires:     2/14/2008

*Eben Metzger*
Eben Metzger

**Civil Engineering Technician**

Emeka Moneme

Director





# 1225 CONNECTICUT AVE, NW

LOT: 52  SQUARE: 159  WARD: 2

NOTES:
TO TEMP OCCUPY THE SOUTH CURB LANE, AND SIDE WALK OF N ST NW, BETWEEN 18TH ST NW AND CONNECTICUT AVE NW TO USE AS A STAGING AREA FOR DEMO CRANE AND TRASH CHUTES. ALSO TO OCCUPY THE SIDE WALK OF CONNECTICUT AVE NW TO PUT UP COVERED WALKWAY FOR 6 MONTHS 24 HRS A DAY 7 DAYS A WEEK

CONDITIONS:
1) ALL SIGNS MUST BE 48"X48" RETROREFLECTIVE SIGNS ON SPRING LOADED STANDS AND MUST MEET FEDERAL REQUIREMENTS FOR TEMPORARY TRAFFIC CONTROL.
2) MUST HAVE FIRE MARSHALL APPROVAL FOR ROAD CLOSURES
3) NOTIFICATIONS TO FIRE MARSHALL, MPD AND METRO MUST BE MADE 72HRS IN ADVANCE.
4) MUST POST NO PARKING SIGNS 72HRS IN ADVANCE.
5) CONTRACTORS ARE RESPONSIBLE FOR FOLLOWING ALL DDOT GUIDELINES FOR TEMPORARY TRAFFIC CONTROL AS PER THE 2003 EDITION OF THE MUTCD MANUAL
6) TRAFFIC ENGINEERING SERVICES ASSUMES NO RESPONSIBILITY FOR ANY CONTRACTORS WHO FAIL TO FOLLOW ABOVE CONDITIONS.

## KEY

 - ROOF HOIST SYSTEM FOR GLASS INSTALLATION

 - TRASH CHUTE

- CONSTRUCTION FENCE

- COVERED WALKWAY

 - TEMPORARY TOILETS

 - SPRING LOADED STAND

 - 48 X 48 INCH RETROREFLECTIVE SIGN

- DEBRI NETTING FOR STRUCTURAL MODIFICATIONS

TRAFFIC ENGINEERING SERVICES
4700 SANDY SPRING RD
BURTONSVILLE, MD 20866
PH: 301-549-1950
FX: 301-549-1951

# EXHIBIT I
# TO AFFIDAVIT









# EXHIBIT J
# TO AFFIDAVIT





15  12:01PM





OPEN

15  12:02PM











15  12:10PM

























# EXHIBIT K
# TO AFFIDAVIT







2    2:46PM









2    2:49PM

# EXHIBIT L
# TO AFFIDAVIT



15  12:07PM

# EXHIBIT M
# TO AFFIDAVIT

# GREENSTEIN DeLORME & LUCHS, P. C.

LAW OFFICES

WILLIAM H. HARRIS, JR.
RICHARD G. WISE
ABRAHAM J. GREENSTEIN
GILBERT E. DeLORME
VINCENT MARK J. POLICY
RICHARD W. LUCHS
JUDITH R. GOLDMAN
JACQUES B. DePUY
JEFFREY H. GELMAN
ALAN S. WEITZ
WILLIAM C. CASANO
JOHN PATRICK BROWN, JR.
LEWIS F. MORSE
ROGER D. LUCHS
JAMES D. SADOWSKI
DONALD F. HOLMES, JR.

1620 L STREET, N.W., SUITE 900

WASHINGTON, D.C. 20036-5605

————

TELEPHONE (202) 452-1400

FACSIMILE (202) 452-1410

www.gdllaw.com

ANITRA ANDROH-POWELL
ABRIELLE B. ANDERSON
STEPHANIE A. BALDWIN
RACHEL K. BLACKBURN*
LYLE M. BLANCHARD
GREGORY T. DuMONT
ALFRED M. GOLDBERG
JOSHUA M. GREENBERG
JARED S. GREENSTEIN
MONIC Y. HALSEY
DAVID J. WALKER
MACKENZIE H. YATES**

————

*ADMITTED IN FL ONLY
**ADMITTED IN VA ONLY

RWL@GDLLAW.COM

July 23, 2007

BY FIRST CLASS MAIL
BY FACSIMILE (202) 364-3664

Dale A. Cooter, Esq.
Cooter, Mangold, Tompert & Karas, LLP
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015

Re:    1225 Connecticut Avenue, N.W.
       Response to Letter dated July 19, 2007

Dear Mr. Cooter:

This firm represents BRE/Connecticut LLC (the "Landlord"). Your letter dated July 19, 2007, has been referred to me for response. We have reviewed the Lease dated December 16, 1988 (the "Lease"), as well as the First Amendment to the Lease dated April 21, 2001, regarding the tenancy of Independence Federal Savings Bank's ("Independence") tenancy at 1225 Connecticut Avenue, N.W. (the "Property"), specifically the Independence branch located in the main lobby of the premises and the first basement (the "Premises"). Our review of the pertinent provisions of the Lease differs significantly from your interpretation of the applicable provisions, as set forth in your letter of July 19, 2007.

Specifically, Article 16.02 of the Lease entitles the Landlord to undertake the planned work provided certain conditions are met. All of these conditions have been, or will be, satisfied. Article 16.02 states in its entirety:

> Landlord reserves the right, without the same constituting an actual
> or constructive eviction and without incurring liability to Tenant

318321v1

GREENSTEIN DeLORME & LUCHS, P.C.

Dale A. Cooter
July 23, 2007
Page 2

       therefor, to change the arrangement and/or location of public
       entrances, passageways, doors, doorways, corridors, elevators,
       stairways, toilets and other public parts of the Building; provided,
       however, that the demised premises shall be visible from the street,
       public access on the street level directly into the demised premises
       shall not be cut off, access to the Building shall not be cut off, and
       that there shall be no unreasonable obstruction of access to the
       demised premises or unreasonable interference with the use or
       enjoyment thereof.

      In order to satisfy its obligations under the Lease, the Landlord has undertaken to do the
following:

      1.      The 18th Street side of the Property will have a "tube and pipe" scaffolding
approximately ten (10) feet high (the initial three (3) feet from the street will also contain wood
panels to provide protection from falling objects). This type of scaffolding was selected primarily
to ensure maximum visibility during construction.

      2.      Temporary signage will be affixed to the scaffolding identifying Independence so
that it is clear to the public that Independence is open for business during the construction
activities at the Property.

      3.      The N Street side of the Property will be bounded by a jersey wall and chain link
fence surrounding the "staging area." The contractor has been instructed to not install any
opaque mesh on the fencing to ensure visibility of the Premises from N Street. The contractor
has been requested to consider a relocation of the "staging area" further east and away from the
retail portion of the Premises, as well as relocating the two (2) dumpsters and trash chutes to not
be in front of the Property. Temporary signage for the N Street side of the Premises and
Property will be affixed to the chain link fence.

      4.      All entrance and exit points for the Premises will be maintained. There will be
covered walkways leading to and from the Premises and the Property. On the N Street side, a
pedestrian walkway will be maintained under the existing covered "arcade" area. During lobby
renovations, if Independence requires access into the Premises lobby area, the Landlord will
provide escorted access through the work area. Temporary partitions will be installed in the
lobby area to separate pedestrians from the work area and construction activities.

      5.      The Landlord will be scheduling service interruptions after normal business hours
so as to minimize or avoid inconvenience to the tenants of the Property, including Independence.

      6.      The parking garage will remain available for use. The Landlord is taking steps to
have contractors maintain the construction site in a tidy fashion so as to not negatively impact the
appearance of the Property.

318321v1

GREENSTEIN DELORME & LUCHS, P.C.

Dale A. Cooter
July 23, 2007
Page 3

      7.     Landlord has a "day porter" available to respond should there be dust or water infiltration.

      8.     All utilities and fire/life safety systems will remain operational for the first floor.

As your client is aware, the Property is vacant except for Independence and the other first floor tenant, Citibank, and the Property has not been re-rented in anticipation of the performance of the building renovations. My client will suffer significant damages if the construction is delayed, which will far outweigh any potential damages to your client.

Moreover, because of the precautions taken by the Landlord, as contemplated by the Lease, we do not believe that your client can demonstrate any irreparable injury, or, for that matter, any injury at all. However, in the unlikely event that Independence suffers any loss, the same is clearly compensable by monetary damages. Therefore, the Landlord is not willing to delay commencement of the construction. However, if your client has some alternative proposal to present, we will certainly consider it.

Sincerely,

Richard W. Luchs

RWL:jmg

cc:    Mr. Paul Schulman
       Mr. Simon Carney
       Ms. Jackie Duke
       Joshua M. Greenberg, Esq.
       Abraham J. Greenstein, Esq.

318321v1

# EXHIBIT N
# TO AFFIDAVIT

## Joshua M. Greenberg

**From:**    Karen E Hunt [Karen.Hunt@brookfieldproperties.com]
**Sent:**    Monday, August 13, 2007 4:52 PM
**To:**      Simon Carney; Jackie S Duke; Hank Doyle; Kevin D Parks
**Subject:** FW:Trash Facilities

Here is the e-mail to Larry. No response yet.


**Karen Hunt**
2001 M Street NW
Washington, DC., 20036,
Direct: (202) 331-1337 , Ext. 104 ; Fax: (202) 331-1387
Karen.Hunt@brookfieldproperties.com
www.brookfieldproperties.com

**Brookfield** Properties    

---

**From:** Karen E Hunt
**Sent:** Friday, August 10, 2007 3:13 PM
**To:** 'Larry Alexander'
**Cc:** Robert B. Isard; roscoe@anagodc.com; Darren Williams
**Subject:** RE: Trash Facilities

If there are continuous problems with the dumpster access at all, I would like to make a suggestion. If your cleaning crew would like to gather their trash each evening and consolidate it by your emergency egress on N Street (we could provide a rolling bin there each evening) we would be happy to dump it on your behalf each morning. Please let me know and I will inform our day porter. Thank you.

---

**From:** Larry Alexander [mailto:LAlexander@ifsb.com]
**Sent:** Friday, August 10, 2007 2:40 PM
**To:** Karen E Hunt
**Cc:** Robert B. Isard; roscoe@anagodc.com; Darren Williams
**Subject:** RE: Trash Facilities

I received two keys this morning from Kevin Parks for the locked dumpster.

I will leave one copy for the cleaning crew (Anago) this evening.

Thanks,

Larry C. Alexander Jr.
Independence Federal Savings Bank
Security Officer/Facilities Manager
202-626-0437
202-293-2295 fax

---

**From:** Karen E Hunt [mailto:Karen.Hunt@brookfieldproperties.com]

**Sent:** Thursday, August 09, 2007 11:25 AM
**To:** Robert B. Isard; Yolanda S. Bonner
**Cc:** Larry Alexander; John A. Hall; Andrea Couttenye
**Subject:** RE: Trash Facilities

Hi, Robert.

I apologize for the delay in responding. The dumpster was indeed placed inside the construction fencing, though it should not have been. It will be moved and dumped today. We should have a lock and keys for the dumpster by tomorrow and will provide multiple keys to the tenants for their use. This will keep other neighbors from using our building dumpster. I agree with you that trash should not be left in the open and I thank your staff for being sensitive to that. Please do not hesitate to contact me if there are any other issues regarding this matter. Thank you for bringing it to my attention.


**Karen Hunt**
2001 M Street NW
Washington, DC., 20036,
Direct: (202) 331-1337 , Ext. 104 ; Fax: (202) 331-1387
Karen.Hunt@brookfieldproperties.com
www.brookfieldproperties.com



**Brookfield** Properties

This email and any files transmitted with it are intended solely for the use of the individual or entity to which they are addressed.
It may contain confidential or proprietary information and may be subject to theattorney-client privilege, solicitor-client privilege or other confidentiality protections.
Any other distribution, copying or disclosure of this email and/or files is strictly prohibited.
If you have received this email in error please notify us immediately and then delete this message from your system.

---

**From:** Robert B. Isard [mailto:BIsard@ifsb.com]
**Sent:** Wednesday, August 08, 2007 9:39 PM
**To:** Karen E Hunt; Yolanda S. Bonner
**Cc:** Larry Alexander; John A. Hall; Andrea Couttenye
**Subject:** Trash Facilities

Karen:

This evening our cleaning service approached me as to where to put trash. Not only was the dumpster in the alley full, it was locked behind a construction fence. Rather than have her leave bags in the corridor, I told her to put the trash in one of the rolling bins in the old Ernst & Young Mail Room. Please advise us what facility you would like us to use in the future. It is unsanitary to leave trash around in bags and it attracts rats.

thank you for your cooperation.

Bob Isard


Robert B. Isard, Vice Chairman

Independence Federal Savings Bank

1229 Connecticut Ave. N.W.

Washington, D.C. 20036

202 626 0441

bisard@ifsb.com

This message is confidential, intended only for the named recipient(s) and may contain information that is privileged or exempt from disclosure under applicable law. If you are not the intended recipient(s), you are notified that the dissemination, distribution or copying of this message is strictly prohibited. If you receive this message in error, or are not the named recipient(s), please notify the sender at the e-mail address, fax number, or telephone number above and shred or discard this email/fax. Thank you.

8/14/2007