**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **INDEPENDENCE FEDERAL SAVINGS BANK**<br>**1229 Connecticut Avenue, N.W.**<br>**Washington, DC 20036,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**1225 CONNECTICUT CO. LLC,**<br><br>**Defendant** | ) | **C.A. No. 07-1389**<br>**Honorable John D. Bates** |

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF**
**AMENDED APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff Independence Federal Savings Bank ("IFSB" or the "Bank"), by and through counsel, hereby submits its Reply in Further Support of its Amended Application for Preliminary Injunctive Relief and states as follows:

## INTRODUCTION

Preliminary injunctive relief is necessary to preserve IFSB as a business and alleviate a massive breach of the lease and the covenant of quiet enjoyment. Since IFSB's initial filing, circumstances have dramatically changed at IFSB's leased Premises. These changes are documented in the attached declarations.[1] The

[1] Attached to this Reply, Plaintiff submits supplemental affidavits that the irreparable injuries to IFSB have already begun. Plaintiff's Request to File Supplemental Affidavits pursuant to Rule 65.1(c) of the District of Columbia Local Rules is filed separately. The undersigned is mindful of the Court's comments about the conclusory nature of the initial filing. The initial attempt was to file early enough so that the Defendant would not be faced with unnecessary expense created by the requirement to stop once construction had actually begun. With

declarations also set forth, with specificity, the grave threat to IFSB's ability to do business.  The construction project threatens IFSB's regulatory compliance by interfering with its ability to generate new and needed business to meet capital and asset requirements, and even the Bank's security requirements will be compromised.  The construction will cause the kind of catastrophic losses that are reasonably certain to result in a regulatory takeover.

In fact, IFSB has already begun suffering increased noise, vibrations and dust from the construction, as well as the general look of the construction site.  IFSB has suffered from a lack of climate control, and has found rodents on its Premises, who fled other parts of the building where demolition has already begun, and entered the building through openings created by the construction.  Moreover, IFSB objects to being subjected to the severe danger caused by asbestos abatement.  Finally, Plaintiff has essentially been evicted from part of the leased premises, the building lobby.

---

the benefit of hindsight, it seems clear that IFSB should have delayed the initial filing pending a clearer understanding of the scope and impact of the project.  In an attempt to chart a middle course between prompt filing and a more informed filing, IFSB managed to achieve neither.  While the primary cause of the problem was a refusal by the Defendant to provide meaningful information about the project, IFSB concedes that it would have been better to wait so that the record might be more fully developed.  The Court has our apology for any resulting deficiency in the initial filing.

## FACTUAL AND PROCEDURAL BACKGROUND

IFSB's headquarters and main branch is located at 1229 Connecticut Avenue, N.W., Washington, D.C. (the "Premises"). Supplemental Declaration of John Hall ("Supp. Hall Decl.") at ¶5, attached as Exhibit A. IFSB customers primarily rely on the Bank's branches, and disproportionately on the main branch.[2] Hall Decl. at ¶17. Over 95% of all customers bank at one of IFSB's branches and 50% bank at IFSB's headquarters. Id. at ¶17. In addition, over 95% of the Bank's loan activity is generated at its headquarters location. Id. at ¶25. Moreover, only approximately 200 of the more than 7500 IFSB account holders use the Bank's internet banking services. Id. at ¶17. In fact, "on-line" banking is not reasonably practicable for many IFSB customers, who are often elderly members of the minority community, and conduct their banking transactions in person. Id.

### Regulation of IFSB

IFSB is regulated by the Office of Thrift Supervision ("OTS").[3] Over the past 5 years, IFSB experienced operating losses

[2] Defendant attempts to compare IFSB to CitiBank, the other tenant in the 1225 Building. CitiBank, however, has 8100 branch locations, id. at ¶24, as compared to IFSB's four. Moreover, in 2006, 43% of Americans used internet banking and did not require access to a bank location for most of their banking needs. Id. at ¶17. This is clearly not the case for IFSB. Id.

[3] IFSB is currently listed by the OTS as a minority bank because its CEO, a majority of its board and a majority of its customers are minorities. Supp. Hall Decl. at ¶3.

exceeding $8.5 Million.  Id. at 12.  The Bank lost 39% of its assets and 32% of its deposits.  Id.  As a result, the OTS has designated IFSB as both a "problem association" and in "troubled condition."  Id. at ¶5.  The Bank is currently under a Cease and Desist Order, issued in 2006 by the OTS.  Id. at ¶13.  The 2007 Second Quarter financial statements just released show a $1.28 million loss in the first half of 2007 and total assets of $149 million.  Id. at ¶10.  Total stockholder equity was $10.96 million. Id.

The OTS can take over any underperforming bank and sell the bank in its' sole discretion.  Id. at 13.  If IFSB's financial situation does not improve in the last two quarters of 2007, IFSB will be classified by the OTS as "undercapitalized."  Id. at ¶14. Once undercapitalized, the OTS can take over IFSB at any time.  See id. at ¶13.  Such a takeover would result in a complete loss of shareholder equity.  Id. at ¶15.

Over the last six months, however, new management has been installed at the Bank and has been working diligently to emerge from the OTS designation as a "troubled" institution.  Id. at ¶6. Among the challenges is an economy in a state of great uncertainty in which troubled financial institutions are suspect.  Id. at ¶9. IFSB, however, has committed to dramatically improving its image, customer access to the bank, and its visibility throughout the community, not just from the street.  Id. at ¶16.  The Bank has

plans to renovate its headquarters, change the name of the Bank (See Exhibit E to Hall's Supplemental Declaration), change the logo, change the theme and implement a new marketing campaign. Id. at 20. Based upon the Repositioning Project, and despite IFSB's efforts, the image of the Bank, for the next 18 months, will be severely damaged by the contemplated construction. Id. at 20, 26.

**Notice of 1225's Construction Project**

IFSB and 1225 executed a Lease Amendment, extending IFSB's lease until 2010, in April 2001. It is presently undisclosed although highly likely when the Bank renewed its lease, 1225 already knew that Ernst & Young would vacate the building and that 1225 would engage in a massive construction project in the middle of IFSB's tenancy. Certainly, 1225 knew of Ernst & Young's departure at least 12 to 18 months before the end of Ernst & Young's lease in June 2007. Id. at ¶8. Defendant, however, gave IFSB only 70 days notice, without any details whatsoever. Id.

On April 24, 2007, Robert Isard, IFSB's Vice Chairman and Senior Asset Officer, met with Christine V. Olfus-Campos and Robert Fuller, representatives of 1225 regarding the proposed renovation of the 1225 Building. Declaration of Robert Isard ("Isard Decl.") at ¶3, attached as Exhibit B. 1225 refused to provide any details of the construction plan. Id. On or about May 11, 2007, Brookfield Properties, an affiliate of 1225 and the property manager for the Premises, notified IFSB by letter that construction

work would begin on July 1, 2007 and would last for 18 months ("Repositioning Project"). Id. at ¶4.

**IFSB's Attempts to Gain Information Relating to the Repositioning Project**

On June 12, 2007, Mr. Isard and Morton Bender (the largest shareholder and a Board Member of IFSB), met with representatives of Brookfield Properties as well as a representatives of the Repositioning Project architect and contractor. Id. at ¶5; Declaration of Morton Bender ("Bender Decl.") at ¶3, attached as Exhibit C. Although Defendants claim to have followed an "Agenda," most of the items in that document were not thoroughly discussed, nor was the Agenda provided to IFSB at the time. Isard Decl. at ¶5; Bender Decl. at ¶3. The meeting was more of an overview about the Repositioning Project. Id. At the June 12th meeting, Messrs. Isard and Bender again asked for plans, and about what steps would be taken to protect IFSB. Bender Decl. at ¶5. No details were provided other than an indication that the floor above the Bank would be sealed. Id. Defendant now indicates that the sealing will be accomplished with temporary materials which will be "tacked down." Affidavit of Jackie Duke ("Duke Aff.") at ¶21.

Following this meeting, on June 20, 2007, Brookfield Properties delivered a Memo setting forth a tentative schedule for the Repositioning Project. Isard Decl. at ¶7. Interior demolition was set to occur from August 2007 through April 2008, and exterior demolition was set to occur from April 2008 through June 2008. Id.

On July 2, 2007, Mr. Bender met with Paul Shulman of Brookfield Properties, and again requested a copy of the Repositioning Project plans. Bender Decl. at ¶6. Mr. Bender also expressed concern over access, leaks, debris, noise and electrical and mechanical interruptions. Id. Mr. Shulman refused to produce any plans, and provided no concrete response with regard to IFSB's concerns. Id.

**The Presence of Asbestos**

On July 25th, Brookfield Properties sent a letter to IFSB regarding the abatement of asbestos containing materials ("ACM"). Isard Decl. at ¶8. The letter stated that asbestos abatement would begin 30 days from the date of the letter, or August 24, 2007. Id. No other information relating to asbestos was provided to IFSB until this litigation. Id.

Attached to the Duke Affidavit as Exhibit C is the Asbestos Abatement Plan. The plan lays out the preparations, including the sealing of areas with asbestos with plastic sheeting and duct tape, and the use of air filtering machines. Asbestos Abatement Plan at 12. The plan also provides for extensive signage related to the asbestos abatement. Asbestos Abatement Plan at 3, 7, 8, 9, 11, 21. The signs around the Premises will read:

**DANGER**
**ASBESTOS**
**CANCER AND LUNG DISEASE HAZARD**
**AUTHORIZED PERSONNEL ONLY**
**RESPIRATORS AND PROTECTIVE CLOTHING**

**ARE REQUIRED IN THIS AREA**

Id. at 11. After asbestos materials are removed, they will be placed in large plastic bags, id. at 16, with warning labels affixed. Id. at 21. The Asbestos Abatement Plan mandates on-site storage be provided for the asbestos waste. Id. at 9, 21. The plan, however, does not provide for testing of the interior air for airborne asbestos. Declaration of John Bellingham ("Bellingham Decl.") at ¶47, attached as Exhibit D.

The Asbestos Abatement Plan identifies several areas that contain asbestos. Isard Decl. at 2. The specific areas are detailed in Appendix A to the plan, and include "Beige Vinyl Floor Tile and Associated Black Mastic" in the "Lobby Level Rear Corridor" as well as "9" x 9" Linoleum Floor Tile - Beige w/ Black Lines and Associated Black Mastic" in the "B1 Level - Independence Federal Storage." See Bellingham Decl. at ¶46.

**The Start of Demolition**

At about the time this action was filed, interior demolition began. Isard Decl. at ¶9. While Brookfield's July 20th memorandum states that emergency exits will be maintained, the Bank's two fire exits opening onto N Street were blocked. Id. at ¶10. The one closest to Connecticut Avenue serves as the handicapped entrance (there are steps at the front and side entrances). Id. There is at present no unrestricted handicapped entrance to the Bank. In addition, IFSB's access to a trash dumpster has been cut off. Id;

see Photograph 4, attached to Isard Decl.  The IFSB space is also obscured from the street by fencing with green mesh, red and white plastic barriers, staging, plywood, debris, supplies, vehicles and machinery.  See Photographs 7-10, 25-27, 31-33, attached to Isard Decl.

On the evening of August 8, 2007, Mr. Isard observed broken floor tiles and other materials were unsealed in the former Ernst & Young mailroom.  Id. at ¶11; Photographs 11-16, attached to Isard Decl; Supp. Hall Decl. at ¶7.  The broken floor tiles appear to be identified in the Asbestos Abatement Plan.  Isard Decl. at ¶11.  IFSB has observed no employees or vehicles from Ace Co., the asbestos abatement contractor.  Id.  If asbestos containing materials have been disturbed, this has occurred before the expiration of the 30-day period identified in the July 25h notice. Id.

In addition, the ongoing demolition work has resulted in significant dirt, debris and dust around the Premises.  Id. at ¶12; Declaration of Brenda W. Noel ("Noel Decl.") at ¶¶3-6, attached as Exhibit E.  There has also been regular noise and whole-building vibrations from demolition equipment.  Isard Decl. at ¶12.  The appearance of the building has deteriorated such that the building looks like it is being torn down.  Supp. Hall Decl. at ¶18.  IFSB cannot be expected to attract new customers, or even retain its old customers with unpleasant, noisy, dusty and dangerous construction

literally consuming its space. See id. at ¶¶19, 21.

**Future Construction Activities**

Based on the requirements for exterior demolition and reconstruction of the face of the building, IFSB will be totally obscured, and even be forced to close for a substantial period of time. Bellingham Decl. at ¶¶15-19, 25, 31. The construction violates several District of Columbia Fire Code provisions. Id. at ¶¶20-21, 42. The Construction also threatens the quality of the air in the Bank. Id. at ¶¶38-39, 47-48. The removal of the "skin" of the building - the outer "precast" and the windows - will pose significant dangers. Id. at ¶18, 26-30. The construction crews will requires access to IFSB's Premises to remove pipe and steel penetrations in the 2nd floor concrete slab. Id. at ¶53. No notice has been given to the Bank. Id. Finally, there has been no plan presented to the Bank related to the possibility of a major accident or any other safety plans. Id. at ¶¶35, 45.

**The Effects at the Bank**

Customers are already beginning to react to the construction and the difficult access to IFSB. Supp. Hall Decl. at ¶18. For example, IFSB's ATM machine has experienced a 27% drop in total transactions since scaffolding was erected. Id. at ¶10. Staff morale at the headquarters, where 30 employees now work, is also being devastated by their fears related to asbestos. Id. at ¶21; see Noel Decl. at ¶6. The atmosphere makes it impossible to

establish a positive sales mentality. Supp. Hall Decl. at ¶21. The Bank is also on constant alert to the possibilities of electrical or mechanical interruption, as well as leaking and flooding. See id. at ¶23-24; Isard Decl. at ¶14.

In addition, the Bank is required to maintain government-mandated levels of security. See Isard Decl. at ¶15. As part of the Repositioning Project, the outer "skin" of the 1225 Building will be removed. Id. Defendant has not stated how long this process will take, or explained how the Bank's customers, employees, property, records and computers will be protected during this process. Id.

In the Duke Affidavit, Ms. Duke attempts to alleviate IFSB's concerns. Duke Aff. at ¶23A-O. Her statements are inaccurate when compared to the actual situation at the Premises, and are insufficient to address IFSB's legitimate concerns. See Isard Decl. at ¶16A-O; Supp. Hall Decl. at ¶23.

**ARGUMENT**

As Plaintiff argued in its Application for Preliminary Injunctive Relief,[4] Application at 9, Courts assess the elements required for injunctive relief on a sliding scale. See, e.g., Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc., 295

---

[4] Due to a change in the landlord entity, Plaintiff filed an Amended Complaint and Amended Application for Preliminary Injunctive Relief ("Amended Application") on August 10, 2007. Plaintiff incorporated the original Application into the Amended Application.

F. Supp. 2d 75, 81 (D.D.C. 2003)(quoting Davenport v. Int'l Bd. of Teamsters, 166 F.3d 356, 360 (D.C. Cir. 1999)). "A particularly strong showing on one may compensate for a weak showing on another." Atlantic Coast, 295 F. Supp. 2d at 81. See also Tozzi v. EPA, 148 F. Supp. 2d 35, 48 (D.D.C. 2001) ("... the prevailing trend is to grant the relief requested if one requisite has a relatively good showing even though other requisites may not be as strong or clearly demonstrated"); Housing Study Group v. Kemp, 736 F. Supp. 321, 324 (D.D.C. 1990) ("This test is not a wooden one, for as our court of appeals has noted, relief may be granted 'with either a high probability of success and some injury, or *vice versa*.'" Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir 1985)"); WMATA v. Holiday Tours, 559 F.2d 841, 843 (D.C. Cir. 1977) ("The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to the movant's view of the merits. The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors"). Defendant entirely ignores these authorities. With this framework established, it is clear Plaintiff has succeeded in demonstrating the need for preliminary injunctive relief.

## I. PLAINTIFF HAS SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY DUE TO THE CONSTRUCTION

The Bank faces destruction without injunctive relief. As

explained in the cases cited by both IFSB and 1225, the irreparable injury element is met "where the loss threatens the very existence of the movant's business." Nichols v. Agnecy for Int'l Dev., 18 F. Supp. 2d 1, 4 (D.D.C. 1998); Varicon Int'l v. Ofc. of Personnel Management, 934 F. Supp. 440 (D.D.C. 1996). At least one Court has found that a "serious risk of going out of business" satisfied the "irreparable injury" requirement. See Housing Study Group v. Kemp, 736 F. Supp. 321, 336 (D.D.C. 1990). In addition, in Atlantic Coast, 295 F. Supp. 2d at 96, the Court found that the "irreparable injury" requirement is satisfied when "...there is no retrospective relief that would be able to cure the harm to the external business relationships, financial position, and reputation or Independence Air that will be necessary for it to compete in the business market." Similarly, in Grigsby Brandford & Co., Inc. v. U.S., 869 F. Supp. 984, 1003 (D.D.C. 1994), the Court found that, although no other requirements were met and that injunctive relief could not be granted, the irreparable harm element was met by "the loss of potential good will and useful business experience by virtue of losing the critically important role of the [designated bonding authority]."

Defendant also argues that: "Plaintiff cannot even point to one customer who has ceased doing business with it due to the presence of scaffolding or lobby partitions." At the time of the filing of this case, construction had just begun. Supp. Hall Decl.

at ¶7. Since that time, IFSB has received unsolicited comments from customers already displeased with the construction. See id. at ¶18. In addition, it is impossible to know how many customers or potential simply passed by the premises and chose an alternative bank. Id. at ¶19. By way of example only, there has been a 27% decrease in the use of IFSB's ATM located at the Premises since the scaffolding was erected. Id. at ¶¶10, 19. The total transactions in May and June remained steady but, in July, total transactions dropped. Id. at ¶10. Currently, the total transactions in August are down over 27% from the numbers in May and June. Id. Clearly, customers are ceasing to do business with IFSB.

Plaintiff cites cases in its Application that relate directly to commercial lessees. See Application at 9-10. Instead of discussing these cases, Defendant cites no fewer than 14 cases to generally describe the irreparable injury requirement, without any discussion of the cases. Defendant argues that IFSB has four branches from which to conduct business. It then cites to Duvin & Assocs., Co. v. First Union Management, Inc., 1983 WL 5783, 1983 Ohio App. LEXIS 12322 (Ohio 1983), an unreported decision of limited precedential value. Defendant merely plucks a quote from Duvin, which relates to a dispute over vacated space and whether plaintiff could force defendant to consent to a sublease. The case clearly does not relate here. IFSB has not vacated the Premises. Moreover, the Premises has been IFSB's headquarters and main branch

for over 18 years and is in a visible, busy location, unlike the other three branches. See Supp. Hall Decl. at ¶24.

The other cases cited by Defendant for their quotations related to irreparable injury are also distinguishable from this case. See Tozzi, 148 F. Supp. 2d at 46 (finding that the "stigma" of being listed on the EPA's website as a "dioxin polluter" was not sufficient to show irreparable harm as it "would not likely be enough to threaten the livelihood of their business"); Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n, 758 F.2d 669, 672 (D.C. Cir. 1985) (denying injunctive relief because "neither party could show that the alleged loss is unrecoverable, and neither petitioner has alleged that in the interim they will be forced out of business by the loss"); American Coastal, 580 F. Supp. at 934 (finding that plaintiff had not shown it would be out of business before another opportunity to bid for another government contract several months later, nor that its other business could not sustain the company until the next bidding opportunity); Holiday Tours, 559 F.2d at 843 ("The harm to Holiday Tours in the absence of a stay would be its destruction in its current form as a provider of bus tours"); Nichols, 18 F. Supp. 2d at 2 (finding that plaintiff failed to establish irreparable injury from termination because he "says nothing about what specifically he does or how someone with

his talents will incur difficulty locating employment");[5] Wieck, 350 A.2d 384 (finding that none of the plaintiffs' claims demonstrated a "need for immediate equitable relief," a "sense of urgency" as opposed to a "hypothetical circumstance," or an "immediate or impending deprivation"). In this case, IFSB has clearly shown it faces reasonably certain destruction if the construction is allowed to entomb its main branch and essentially displace IFSB business to other, less convenient IFSB locations or other nearby banks.

Defendant also argues that Plaintiff does not receive a "lessened" standard of proof based on the "precarious position of its continued operation," citing Huron Valley Publishing Co., Inc. v. Booth Newspapers, Inc., 336 F. Supp. 659, 660 (D. Mich. 1972). Opposition at 16. The Huron case, however, related to the plaintiff's claims of anti-competitive behavior by the defendant. A substantive requirement for the plaintiff to succeed on the merits was whether defendant employed a "foul means" in attempting to force plaintiff from the market. Id. at 663. The Court denied injunctive relief because:

> Plaintiff has been, since its inception, a marginal operation. It hopes this year to make a small profit for the first time. Because plaintiff's financial position is of such a precarious nature, the potential competitive harm to plaintiff because of

---

[5] In Nichols, the Court found that it had no jurisdiction over the matter because plaintiff named the wrong defendant, the agency instead of the agency's head. Id. at 3. The findings of the Court related to injunctive relief were merely dicta.

> defendant's expansion is questionable. Even if, as plaintiff alleges, it will not be able to continue business, the court is not persuaded that this would be due to defendant's activity.

Id. at 663. Accordingly, it could hardly be argued in Huron that the plaintiff would be destroyed because of defendant's anti-competitive actions. Beyond the limited precedential value of Huron, this situation is clearly different. IFSB has over 30 years of history. Its primary location for business is being suffocated in violation of its lease and the covenant of quiet enjoyment. IFSB has alleged the construction will cause the kind of catastrophic losses that may well result in regulatory takeover. IFSB has also alleged that the construction will interfere with the Bank's compliance with security regulations.

Finally, Defendant argues that Plaintiff's fear of the impact of active asbestos abatement, and the myriad of notices posted throughout the Premises, is "nothing more than a red herring and a desperate attempt by Plaintiff to use scare tactics ... ." Opposition at 16. Defendant also claims that the asbestos abatement will be performed by a "licensed and certified asbestos removal company." Opposition at 17. There was no sealing of the room, nor, from IFSB's observations of the vehicles and personnel, was the asbestos removal company present. Id. The fears of employees as to asbestos are already documented. The reactions of

customers to asbestos notices are predictable.[6]

## II. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS THAT THE CONSTRUCTION VIOLATES THE LEASE

Based upon the provisions in the lease and the implied covenant of quiet enjoyment imposed on all leases, Plaintiff is likely to succeed on the merits. Article 16.02 of the Lease Agreement states:

> Landlord reserves the right, without the same constituting an actual or constructive eviction and without incurring liability to Tenant therefor, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, passageways, other parts of the Building; provided, however, that the demised premises shall be visible from the street, public access on the street level directly into the demised premises shall not be cut off, access to the Building shall not be cut off and that there shall be non unreasonable obstruction of access to the demised premises or unreasonable interference with the use or enjoyment thereof.

Clearly, wholesale demolition and reconstruction of the entire building is beyond the contemplation of the landlord's reserved rights under that paragraph. In actuality, Defendant has breached each of the requirements of Article 16.02. IFSB is barely visible amidst the messy, dirty and dusty construction site. See Photographs, attached to Isard Decl. IFSB customers must navigate

---

[6] Even if the Asbestos Abatement can be physically accomplished without risk to the Bank's employees and customers (which is at present unclear), 1225 ignores the "fear factor". Any reasonable person seeing the warning signs which are to be placed around the premises would have to think more than once about voluntarily entering the premises. Any reasonable customer faced with that choice would certainly find the services of other banks in the neighborhood, at least on this issue, more appealing.

a maze of bars and plywood to enter the Bank. See Photographs 22-30. IFSB's use and enjoyment of the Premises has been or will be unreasonably interrupted by:

> a Repositioning Project that will result in the near-total destruction of all but the floors and supporting beams of the 1225 Building;
>
> an asbestos abatement plan;
>
> the dust, debris, noise and vibration from construction work;
>
> the failures to provide air conditioning (See Article 21.02 of the Lease);
>
> the on-going eyesore surrounding a professional business;
>
> the plan to leave IFSB with temporary plastic sheeting as windows for an unknown period of time, which will cause a clear violation of the most basic security measures a bank is required to take; and
>
> the constructive eviction of IFSB from the lobby area (see Article 1.01 of Lease).

Defendant argues that it has a right to make repairs and improvements. Opposition at 19. This right, however, must be read in light of the requirements of the Lease and the Lease Amendment. As shown above, Defendants are already breaching the Lease.

Defendant cites five cases in its "likelihood of success on the merits" discussion relating to quiet enjoyment and constructive eviction, without any discussion of the application of those cases to this factual scenario. See Rittenberg v. Donohoe Construction, Inc., 426 A.2d 338, 342 (D.C. 1991) (reversing dismissal of complaint filed by commercial tenant against sublessor of the tenant, the Court found that the failures to provide heat and air

conditioning were sufficiently stated to withstand a motion to dismiss); Weisman v. Middleton, 390 A.2d 996, 1001 (D.C. 1978) (denying claim for breach of a covenant of quiet enjoyment in action by tenant for malicious prosecution of an eviction action).

Defendant also cites Interstate Restaurants, Inc. v. Halso Corp., 309 A.2d 108 (D.C. 1973), and Norris v. Green, 656 A.2d 282, 283 (D.C. 1995), for the proposition that its "right to make repairs and improvements under the Lease is independent from the covenant of quiet enjoyment." Opposition at 19. Plaintiff has not argued that Defendant does not have the right to repair and maintain its building; Plaintiff argues that 1225's actions violates the lease and the covenant of quiet enjoyment. In Interstate, the Court found that the landlord's rights to sue for breach of contract for failing to pay rent were independent of the tenant's claims that the landlord breached the lease. Id. at 110. Similarly, in Norris v. Green, 656 A.2d 282, 283 (D.C. 1995), the Court, citing Interstate, found that the tenant's duty to pay rent was independent of the landlord's alleged breach of the lease. Id. at 286. There is no allegation, nor could 1225 allege, that IFSB has breached the Lease. If there was, under Norris and Interstate, both parties could proceed on their claims, independent of the breach by the other party. Accordingly, Defendant's appeal to this doctrine of independent covenants is misplaced.

Finally, Defendant cites International Com. on English in

Liturgy v. Schwartz, 573 A.2d 1303 (D.C. 1990). In Schwartz, the Court found that no constructive eviction after landlord leased nearby space to a child care center. Id. at 1305. The noise, characterized by the plaintiff's executive secretary, "never greatly inconvenienced" the plaintiff. Id. The Court found:

> The mere letting of the premises to the child care center does not make the landlord responsible for whatever interference may have been caused by invitees of the child care center, *and there was nothing in the lease which restricted the landlord's ability to lease other premises in the building.*

Id. (emphasis added). In this case, 1225's ability to repair and maintain the premises is restricted by the lease provisions themselves. Moreover, the qualitative and quantitative differences in noise from a co-tenant as compared to construction equipment, used at the landlord's direction and on the landlord's behalf, destroys any similarity between the present case and Schwartz on those grounds.

Plaintiff has clearly shown it is likely to succeed on the merits on the breach of contract case because Defendant has breached Articles 16.02, 20.02 and 21.02 of the Lease. In addition, Defendant has breached the implied covenant of quiet enjoyment, which is expected to increase in severity and continue for the next eighteen months.

## III. 1225 DOES NOT PRESENT AN "INJURY" THAT COMPARES TO THE DESTRUCTION OF IFSB

Defendant, without any explanation and clearly ignoring the physical conditions surrounding the Premises, see Photographs

attached to Isard Decl., argues "Plaintiff is not currently suffering any injury." IFSB has already suffered a 27% decline in the use of its ATM, Supp. Hall Decl. at ¶10, and will continue to suffer sever economic and non-economic injuries which will result in the end of the Bank. Such injury is not compensable in monetary damages. See, supra, Pages 9-12.

1225 argues that the "infringement on 1225's property interest" would be an irreparable injury. Opposition at 19. In support, 1225 cites two cases granting injunctive relief related to easements. Campbell v. Bishields, 80 A.2d 262, 267 (Md. 1951) (holding that, without the easement, the plaintiffs had no "reasonably convenient way" to the property and that: "In case of a fire a fire engine could not get to their home, and in case of sickness a doctor could not get to them"); Fields v. District of Columbia, 443 F.2d 740 (D.C. Cir. 1971) (granting injunctive relief to prevent a permanent, Court-imposed change to an easement that would "amount to a continuing violation of the easement"). As shown above in Section II, 1225's rights are limited by its Lease with IFSB under Articles 1.01 (access to lobby), 16.02 (access to and visibility of the Bank from the street, use and enjoyment of Premises), 20.01 (quiet enjoyment), 21.02 (electrical, mechanical, air conditioning and heating).

1225 also claims that its existence is threatened if construction is stopped and cites to Paragraph 35 of the Duke

Affidavit. Id. This paragraph, however, sets forth only a monetary loss of monthly rent. Duke Aff. at ¶35. It does not set forth the effects on 1225's income and ignores the requirements of its own case citations.[7] See, e.g., Wisconsin Gas, 758 F.2d at 674; American Coastal, 580 F. Supp. at 934. Accordingly, the balance of injuries clearly favors IFSB.

**IV. THE PUBLIC INTEREST IS BETTER SERVED IN STOPPING CONSTRUCTION UNTIL THE PROPERTY IS VACANT**

Given the danger and disturbance already caused by the construction, the threat to the existence of IFSB, which employs 30 people at its main branch, and the plans for asbestos abatement, injunctive relief is necessary. This case is hardly presenting a case of a “very small or trifling matter[],” as claimed by Defendants. Defendant’s citation to Swick v. City of Chicago, 11 F.3d 85, 87 (7th Cir. 1993), indicates their dismissive attitude toward this entire proceeding. In Swick, a police officer was put on sick leave and complained it was a violation of due process. Id. at 86. The officer, however, did not lose any income, receive

[7] The overwhelming reality of this case is that the landlord perceives that its project designed to increase the asking price for the vacant space in the building by approximately $30.00 per square foot trumps the rights of the Bank to the quiet enjoyment contemplated by its lease. The landlord’s quest for profit at the expense of the economic damage to the Bank does not constitute irreparable injury to the landlord or indeed any injury at all. There as no manifest need to engage in this construction and it should not continue with all the damage visited on the Bank simply so the landlord can market the remaining space at an increased price.

any discipline or suffer any demotion from the sick leave. Id. The Court affirmed the dismissal of the case, holding that the maxim *de minimis non curat lex*, applied to the alleged injury "that results when a person is temporarily deprived of his right to wear a uniform and a badge, to carry a gun, to arrest people, and to carry out other functions of a police officer or other public officer is of this character." Id. at 87. Swick is simply inapposite. This case involves far more than a mere "dignitary" loss. See id. at 87. IFSB will lose the good will of its customers, and suffer harm to the external business relationships, financial position, and reputation. See, supra, Page 11. IFSB will suffer a large decrease in its volume of business at its main branch, as already demonstrated in the decrease in ATM usage. Indeed, IFSB may well be destroyed but for the Court's intervention with injunctive relief, at least 30 employees will be jobless and a Washington institution that caters to minority residents will be lost.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court enter the Preliminary Injunction as requested.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT & KARAS, L.L.P.

/s/

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700
efiling@cootermangold.com

***Attorneys for Plaintiff Independence Federal Savings Bank***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of August, 2007, a copy of the foregoing **PLAINTIFF'S REPLY IN FURTHER SUPPORT OF AMENDED APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF** was served via the Court's ECF system on:

Richard W. Luchs
Greenstein DeLorme & Luchs, PC
1620 L Street, N.W.
Suite 900
Washington, DC 20036-5605

***Counsel for Defendant***

/s/
Adam Pignatelli

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK )<br>1229 Connecticut Avenue, N.W. )<br>Washington, DC 20036, )<br><br>Plaintiff, )<br><br>v. )<br><br>1225 CONNECTICUT CO. LLC, )<br><br>Defendant ) | C.A. No. 07-1389<br>Honorable John D. Bates |

**SUPPLEMENTAL DECLARATION OF JOHN HALL IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

I, John Hall, depose and state as follows:

1. I am over the age of 18 and am competent to testify to the matters contained herein, and hereby testify that the following statements are true and correct and are based upon matters within my personal knowledge.

2. I am the President and Chief Executive Officer of Independence Federal Savings Bank ("IFSB" or the "Bank"). I was appointed President and CEO of the Bank on May 18, 2007.

3. IFSB is a federally-chartered savings bank, with its principal place of business in the District of Columbia. It is the oldest historically minority banking institution in the District of Columbia. IFSB is regulated by the Office of Thrift Supervision ("OTS") which defines publicly traded minority banking institutions as those institutions that have the following characteristics:

(1) The Board must be majority minority (five of the nine board members of IFSB are minorities); and

(2) The community served and account holders must be majority minority (IFSB has historically served the minority community in the District of Columbia, including minority-owned and operated businesses, and minority individuals).

Contrary to Defendant's assertion, the Bank is currently listed on the OTS website as a minority bank because IFSB met the test for each of the OTS criteria. See Exhibit A to Hall's Supplemental Declaration.

4. The address of the Bank's headquarters is 1229 Connecticut Avenue, N.W., Washington, D.C. (the "Premises"), which is located in the building whose address is 1225 Connecticut Avenue, N.W., Washington, D.C. (the "1225 Building").

5. As set forth in my original Declaration filed on July 31, 2007 ("Original Declaration"), on November 4, 2003, the OTS informed the Bank that it had determined that the Bank is both a "problem association" and in "troubled condition." This designation has not been lifted.

6. Over the last year, new management has been installed at the Bank. We have been working diligently to emerge from the OTS designation as a "troubled" institution. Nevertheless, after years of significant losses, IFSB is not yet on solid financial footing.

7. Shortly before this action was instituted, demolition

work began for the 1225 Connecticut Avenue Repositioning Project ("Repositioning Project"). Since the time my Original Declaration was filed in this action significant demolition work has taken place. This work has resulted in access restrictions to the Premises, scaffolding around the Premises (some of which consists of rusted pipes), air-conditioning problems, and significant dirt, debris and dust around the Premises, as well as constant noise (a wide range of continuous banging and motors constantly running directly outside of our windows), and damage to the Premises caused by construction equipment and machinery. Further, it appears that Defendant 1225 Connecticut Co. LLC's ("1225") demolition activities have included the disturbance and removal of asbestos containing materials ("ACM") before the expiration of the 30-day period identified in the July 25, 2007 Abatement Notice from Brookfield Properties ("July 25th Abatement Notice"). For example, floor tiles from the mail room down the hall from the Premises have already been removed. These floor tiles appear to be identified on the "Summary of Identified Asbestos-Containing Materials" included as a part of Exhibit C to the Affidavit of Jackie Duke submitted in support of Defendant's Opposition. It does not appear that, and contrary to the July 25th Abatement Notice, this demolition work was done by a licensed asbestos abatement contractor. The Declaration of Robert Isard provides details of the demolition work to date, and

its physical effects on the Premises, and the Bank's employees
and customers.

8.   According to time estimates provided by Defendant, the
Repositioning Project will continue over the next 18 months.  The
notice to the Bank of the renovations, whether it be 50 or 90
days, was superficial and too late to be considered reasonable.
Defendant knew of Ernst & Young's departure at least 12-18 months
prior to the end of their lease.  The unwillingness of the
Defendant to provide Plaintiff with the details of the renovation
plan has prevented the Bank from planning an appropriate
recourse.

9.   The economy is in a state of great uncertainty at this
time and fledgling financial institutions are suspect.  IFSB is
already very fragile at this time.  IFSB will find it difficult
without any construction to inspire confidence in the public
during this period when customers and borrowers are experiencing
a "flight to quality."  With the construction and its impacts,
IFSB's marketing campaign could become victimized by the
compounded negatives.

10.   The physical effects of the Repositioning Project are
having and will continue to have a substantial negative impact on
the business of IFSB.  For example, an analysis of the usage of
the ATM located at the Premises has revealed a dramatic reduction
in transactions.  Total transactions in May were 1,052 or an

average of 33.9 per day; in June there were 1,024 transactions or 34.1 per day; but after the scaffolding went up in July, total transactions decreased to 919 or 29.6 transactions per day for a reduction in business of 10.25% in one month. In August, once construction began, for 17 continuous days, there were 419 transactions or 24.6 per day for a reduction from June to August from 34.1 per day to 24.6 per day or a loss of 9.6 transactions per day or 27.86%. See Exhibit C to Hall's Supplemental Declaration. This is objective data on the degree to which the unbecoming exterior is creating inhibitions in customers who would normally transact at the Bank.

11. As of our latest filing with NASDAQ for the quarter ended on June 30, 2007, IFSB experienced net losses of $1.28 Million over the first two quarters of 2007. IFSB reported Total Assets of approximately $149 Million and Total Stockholder Equity of $10.96 Million.

12. I was recruited with a mandate to turn IFSB around as it had experienced continuous net operating losses exceeding $8.5 Million over the last 5 years. The Bank simultaneously lost 39% of its assets and 32% of its deposits during this time period. My first responsibility was to "stop the bleeding" and limit operating losses. The efforts required to do this cannot be executed during the proposed construction. In an article published in *American Banker* on July 6, 2007 (Exhibit B to Hall

Supplemental Declaration), I reported a commitment to complete the turnaround to profitability over the following nine-month period and to report a profit for the first quarter of 2008.

13. The Bank is under a Cease and Desist Order issued in 2006 by the OTS. It is imperative that the Bank begins to make profits as sustained losses at the historical rates will inevitably result in a takeover of the Bank by its regulator, which can elect to have the Bank sold at its sole discretion.

14. If the Bank's financial situation does not drastically improve in the last two quarters of 2007, and if the Bank must postpone its turnaround until after the Repositioning Project while continuing to lose money at the same pace of 2006 (net loss of $2.6 Million) over the 18-month period coinciding with the proposed period of the Repositioning Project, and in the likely event the Bank has to recognize its current unrealized losses ($1.8 Million), IFSB will have lost another $7 Million bringing total Tier 1 Capital down to approximately $5.9 Million and resulting in a classification by our regulators as "undercapitalized."

15. The current Repositioning Project will make a financial turnaround to profitability impossible within our proposed nine-month period, will delay the turnaround until after the Repositioning Project, and will ultimately lead to the failure of the Bank and its takeover by the regulators due to seven years of

continuous losses and serious undercapitalization unless the Bank can attract new investors to replenish the losses created by the Repositioning Project. Such a takeover would result in a complete loss of shareholder equity.

16. In seeking to restore financial stability to the Bank, we have focused on securing new loans and deposits, both of which require creating a new confidence in the Bank. Defendant claims that IFSB customers simply need to be able to access the Bank and that it "merely be visible" from the street. In fact, in order to improve its profitability, IFSB needs to dramatically improve its image, customer access to the Bank, and its visibility throughout the community, not just from the street. The Repositioning Project makes it impossible to create a positive image of the Bank as we no longer control the appearance of the Bank. The Repositioning Project obstructs our right to improve our own image and it is a devastating marketing setback when dramatic improvement is required. The effort new management had planned to devote to improvement must now be devoted to preventing further losses or even holding on to the *status quo* which is defined by unacceptable annual operating losses.

17. Only approximately 200 of the more than 7,500 IFSB account holders use the Bank's internet banking services. According to the Pew Internet and American Life Project (See Exhibit D to Hall's Supplemental Declaration), 43% of Americans

in 2006 used internet banking and did not require access to a
bank location for most of their banking needs.  However, over 95%
of IFSB customers conduct their business in one of our banking
locations and 50% of all of our customers bank at the
headquarters branch, as opposed to "on-line" via internet
banking.  In addition, using "on-line" banking is not reasonably
practicable for many of our customers, who are often elderly
members of the minority community, and who have traditionally
(and continue to) conduct their banking transactions in person at
the Premises.

18.  Although many customers inside the Bank give us
unpleasant facial expressions when observing the construction
work, only a few have actually made comments to the staff about
their negative feelings.  Unsolicited anecdotal comments received
from customers since August 8, 2007 include the following: "Looks
like they are going to knock the building down around you."
(8/10/07); and "What's going on here?  I have to be Rambo in
order to get in here." (8/10/07).  Another customer refused to
come into the Premises on August 20, 2007 when he could not get
street parking as the six on-street, metered parking spaces
directly in front of the Bank that have historically been
depended upon by IFSB customers have been barricaded by the
demolition project and are unavailable.  Fortunately, this
particular customer drove to our Wisconsin Avenue branch and

opened a $117,000 account at that branch and complained to the Branch Manager about the lack of parking at the headquarters location and the inconvenience of having to travel so far. Several other customers have complained about the unavailability of on-street metered parking.

19. It is impossible to know how many customers refuse to drive to another branch of IFSB and merely open their accounts or do their business at the numerous alternative competitive banks located within walking distance (less than two blocks) of our headquarters (Citibank, Wachovia, Eagle Bank, SunTrust, Chevy Chase Bank, BB&T, PNC Bank, and Bank of America). If the ATM experience is any gauge, it could be as much as 25-28% in lost business. The ugly construction barriers, the noise, warning signs, and the perceived danger (construction workers wear hard hats when customers wear nothing) make it convenient for our customers to go elsewhere. Regardless of how many customers continue to come into the Bank, the number who will be inconvenienced or offended by the lack of parking and appearance of the Premises over an 18-month period is incalculable.

20. The Bank's marketing plan to renovate its headquarters, change the name of the Bank (<u>See</u> Exhibit E to Hall's Supplemental Declaration), change the logo, change the theme and implement a new marketing campaign will be hindered heavily by the construction project.

21.  Staff morale at the headquarters, where 30 employees
now work, is being devastated by the fear of asbestos poisoning.
Some staff believe they must come to work in dangerous
circumstances and this creates an atmosphere in which it is
impossible to establish a positive sales mentality among staff
when the concern distorts the bonus structure and impedes the
potential to create an incentive plan.

22.  A marked decrease in business activity at the
headquarters is completely beyond our control.  Defendant asserts
that IFSB indicated that "no steps will be adequate"; this
remains true because the fact that the construction is proceeding
at all will prevent IFSB from executing its business recovery
plan.

23.  The risk of flooding the computer system room with the
accumulation of water is incalculable because it can disrupt the
flow of information to our tellers and branches throughout our
network.  The potential for interruption of our electricity is
equally as devastating.  The potential for the interruption of
the HVAC could also cause the computer systems to crash as well
as cause the eventual evacuation of the Premises on any given
day.  Due to the numerous hazards, key staff must now be alert
for the potential for a disaster recovery event at all times.

24.  All of the Bank's Information Technology equipment is
based at its headquarters along with the executive offices and

the Accounting and Finance offices. Half of the Bank's deposit activity and 95% of the Bank's loan activity is generated at its headquarters location. Moreover, because the Bank's other branches at E Street, Eastern Avenue and Wisconsin Avenue are all in locations with inferior visibility from the street or are located on comparably low traffic corridors, 90% of the Bank's image and reputation emanates from its headquarters. The impact of destroying the appearance of IFSB headquarters is not remotely comparable to doing the same to one of Citibank's 8,100 branch locations.

25. Defendant has sought to compare the complaints of IFSB with the absence of complaints of Citibank as these are the only two remaining tenants in the Premises. Although both are financial institutions, to suggest that these two banks are similar or that the reactions to the proposed property repositioning should be similar is fanciful. As mentioned above, IFSB has three branches and its headquarters are located on the demised Premises. To the contrary, Citibank reported Net Income of $6.23 Billion for the Second Quarter of 2007, has over 8,100 branches and its headquarters are located at 399 Park Avenue in New York City. If the headquarters of Citibank were being subjected to this treatment, the management of Citibank would almost certainly act as we have.

26. Real estate is unique and this location has

irreplaceable history tied to it from over a decade of Thursday Luncheons held by its founder.  These Luncheons cannot be held in the same location at the Premises, with the same level of class and professionalism once established, while the planned construction takes place within five feet of the luncheon.  IFSB cannot merely be satisfied to maintain its existing image and expect to create a turnaround but must instead dramatically reinvent its image in order to survive.

I swear under the penalties of perjury of the District of Columbia that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in the District of Columbia on this 24th day of August, 2007.

John A. Hall
John Hall

# EXHIBIT A

# TO HALL'S SUPPLEMENTAL DECLARATION

**OFFICE OF THRIFT SUPERVISION**
**MINORITY OWNED THRIFTS**
**As of March 2007**

**TOTAL NUMBER OF MINORITY OWNED THRIFTS NATIONALLY: 22**

African American -- 12
Asian/Pacific Islander American– 6
Hispanic American– 4
Multi-ethnic (African American & Asian/Pacific Islander American) - 0
Native American – 0

| **WESTERN REGION**<br>**Number MOIs: 5**<br>African American – 1; Asian/Pacific Islander American – 4 | **<u>Ethnic Identification</u>** |
|---|---|
| **BankPacific**<br>151 Aspinall Av.<br>Hagatna, Guam 96910 | **Asian/Pacific Islander American** |
| **Broadway Federal Bank, F.S.B.**<br>4800 Wilshire Boulevard<br>Los Angeles, CA 90010 | **African American** |
| **Gateway Bank, FSB**<br>919 Clement Street<br>San Francisco, CA 94118 | **Asian American** |
| **Territorial Savings and Loan Association**<br>1132 Bishop Street, 22nd Floor<br>Honolulu, Hawaii 96813 | **Asian American** |
| **Universal Bank**<br>3455 Nogales St., 2nd Flr.<br>West Covina, CA 91792 | **Asian American** |

**MIDWEST REGION**
**Number of MOIs: 2**
African American – 2

**Columbia Savings and Loan Association** — **African American**
2000 West Fond du Lac Avenue
Milwaukee, Wisconsin 53205-1122

**Dryades Savings Bank, FSB** — **African American**
233 Carondelet St., Suite 200
New Orleans, Louisiana 70130-3002

**SOUTHEAST REGION**
**Number of MOIs: 10**
African American: 7; Hispanic American – 3

**Advance Bank** — **African American**
4801 Seton Drive
Baltimore, Maryland 21215

**FirstBank Florida** — **Hispanic American**
701 Brickell Avenue, Suite 1700
Miami, Florida 33131-2832

**Home Federal Savings Bank** — **African American**
9108 Woodward Avenue
Detroit, Michigan 48202-1612

**Ideal Federal Savings Bank** — **African American**
1629 Druid Hill Avenue
Baltimore, Maryland 21217

**Illinois Service Federal Savings & Loan Assoc.** — **African American**
4619 South Martin Luther King Jr. Dr.
Chicago, Illinois 60653-4107

**Imperial Savings & Loan Association** — **African American**
211 Fayette Street
Martinsville, Virginia 24114-0391

**Independence Federal Savings Bank** — **African American**
1229 Connecticut Avenue, N.W.
Washington, DC 20036-2601

**Interamerican Bank, FSB** — **Hispanic American**
9190 Coral Way
Miami, Florida 33165

**R-G Crown Bank (3/06)** — **Hispanic American**
105 Live Oaks Gardens
Casselberry, FL 32707

**Urban Trust Bank (7/06)** — **African American**
715 S. Goldwyn Avenue
Orlando, FL 32805-2903

**NORTHEAST REGION**
**Number of MOIs: 5**
African American – 2; Asian American – 2; Hispanic American - 1

**Abacus Federal Savings Bank** — **Asian American**
6 Bowery
New York, NY 10013-5101

**Carver Federal Savings Bank** — **African American**
75 West 125th St.
New York, NY 10027

**Chinatown Federal Savings Bank** — **Asian American**
109 Bowery
New York, NY 10002

**Dwelling House Savings & Loan Assoc.** — **African American**
501 Herron Avenue
Pittsburgh, Pennsylvania 15219-4609

**Ponce De Leon Federal Savings Bank** — **Hispanic American**
2244 Westchester Avenue
Bronx, NY 10462

# EXHIBIT B

# TO HALL'S SUPPLEMENTAL DECLARATION

CRIPTIONS: 800-221-1809

FRIDAY

JULY 6, 2007

STERDAY'S MARKETS

| | | |
|---|---|---|
| rican Banker 225 | ▼ | 0.5% |
| rican Banker 50 | ▼ | 0.6% |
| Jones Industrial Average | ▼ | 0.1% |
| lard & Poor's 500 | | unchanged |

0-year Treasury yield 5.142%, up 0.103

SHINGTON

a breaches usually do not
lt in identity theft, the GAO
orted. Page 3

IMUNITY BANKING

t Financial Bankshares in
as has changed the name
subsidiary to First Financial
k, the sixth one to be so
stened. Page 5

OS

r New York City farmers'
kets will test wireless
inals to accept credit,
it, and EBT cards. Page 6

Canadian payments
dors introduced a payroll
l in that country. Page 6

JRANCE/INVESTMENT
DUCTS

chovia's bank brokerage
ness will follow the parent's
nsion in California and
is. Page 7

INOLOGY

rtland Payment Systems
provide processing
ices for 1,500 merchant
its of Bremer Financial of
Paul. Page 9

merchant ATM company
n has introduced its first
hine aimed at financial
panies. Page 9

/POINTS

lesale lenders must
tice controlled growth;
s at play in decision to join
ndicated loan arrangement;
s need to market their job
rtunities; managing debt
everaged buyouts. Page 10

TGAGES Page 17

KETS

# AMERICAN BANKER

THE FINANCIAL SERVICES DAILY

Volume CLXXII No. 129 www.americanbanker.

## Credit Lines In Spotlight At Block Unit

■ BY WILLIAM LAUNDER

H&R Block Inc., no stranger to deadlines in its tax-preparation business, is facing another significant one as it looks to close the sale of Option One Mortgage Corp., its subprime unit, by Oct. 31.

One of the key conditions Block accepted when it reached the deal with Cerberus Capital Management LP in April was that Option One would have at least $8 billion of warehouse lines at the closing.

As of Tuesday the unit was well above that minimum, with $10 billion of warehouse lines. However, $2 billion of those lines were uncommitted. And the cushion is narrower after Lehman Brothers decided recently not to renew its $1.5 billion line.

In fact, Option One's committed lines might have fallen below the minimum had Bank of America Corp. not agreed to increase its line temporarily by $250 million. That increase is good only until the sale to Cerberus closes or Oct. 31, whichever is sooner.

Moreover, a $1.5 billion warehouse line Option One has from Citigroup Inc. is set to expire this

See page 2

In Turnaround

After five years in the red, D.C.'s Independence Federal will return to profitability in the first quarter, says new CEO John A. Hall.

## 'Base to Build On:' Thrift Exec Plans Fast Revival

■ BY LUKE MULLINS

As the new president and chief executive officer of Independence Federal Savings Bank in Washington, John A. Hall is in for a challenge.

The $159 million-asset thrift, which focuses on African-American customers, is struggling to recover from years of turmoil caused by a racially charged battle for control of the company. Assets and deposits shrank, legal fees mounted, and earnings evaporated as its board, managers, and shareholders became ensnared.

The distracting feud ended in March when the Office of Thrift Supervision gave Morton A. Bender, a Washington developer and Independence Federal's largest shareholder, approval to acquire up to 51% of the stock. Mr. Bender, who is white, was intent on taking over because he believed the thrift was being mismanaged. His opponents argued that it should remain black-owned.

Able now to focus on a turnaround, Mr. Bender said he plans to maintain the thrift's minority heritage.

He has turned to Mr. Hall, a black executive, to steer Independence Federal back to profitability. Mr. Hall, whose experience includes work in banking, consulting, and private equity, said he intends to achieve this by the first quarter of next year.

"We have a solid base to build on," Mr. Hall, 61, said in an interview at the company's headquarters last week. "If I was starting from scratch, I'd have a lot more trepidation."

See page 5

## Efficiency Gap

**Large institutions' edge in efficiency ratios has widened during the past year**

68%
66
64
62
60
58
Under $1B
Over $1B

## Regulatory Look-Backs On Rise, So Is Their Cos

*Bankers, consultan question, regulator: defend, the practic*

■ BY CHEYENNE HOPKINS

WASHINGTON — The "look-ba a requirement to hire outside c sultants to sift through a ba past transaction data, has beco one of the most feared provisi in enforcement orders.

Once limited primarily fair lending cases, regulators increasingly using look-ba when acting against a bank failures in its anti-money-la dering policies. They frequer require institutions to pore o months or years of old data detect suspicious activities t may have been missed.

Though look-backs vary scope, period covered, and me odology, bankers argue that t are a costly new burden, su ing up money and personnel yielding few demonstrable b efits. Regulators defend them a way to ensure a bank's systems working properly, and both si say their use is on the rise.

"Banks are doing more lo backs because they are be required as part of possi failure[s] or enforcement by re lators," said Richard Small, global anti-money-launderi leader at GE Money, the consun and small-business financial s vices division of General Elec Co., and a former top anti-lau dering official at Citigroup I and the Federal Reserve Boa where he was a deputy associ

See pag

AMERICAN BANKER COMMUNITY BANKING FRIDAY, JULY 6, 2007 5

# A CEO from Outside Plans Fast Revival at D.C. Thrift

Continued from page 1

The base includes an experienced staff and promising new directors, he said. (The seven-member board is now filled with people Mr. Bender recommended, including three African-Americans.)

Mr. Hall's revival plan includes a recently begun marketing campaign to attract low-cost deposits and a recruiting effort that would nearly double the commercial lending staff. When the thrift starts making money again, he also intends to add what would be its sixth branch.

But some observers are skeptical about the thrift's chances for so quick a rebound.

"I'll believe it when I see it," said William Michael Cunningham, the president and CEO of Creative Investment Research, a Minneapolis consulting firm that specializes in minority banking. "I don't hear anything that is broadly innovative or would really cause

Tough Job
Independence's new CEO is charged with turning around a company that has not made money since 2001
$0.5
0
-0.5
-1.0
-1.5
-2.0
-2.5
-3.0
Net income Dollars in millions
'01 '02 '03 '04 '05 '06
Source: FDIC

laundering scandal involving executives of the Washington Teachers Union, and this added to its multimillion-dollar legal bills.

It has been floundering so badly that the OTS told the thrift in a cease-and-desist issued in June 2006 to do a thorough review of Fitzgerald's chair is something I couldn't pass up," said Mr. Hall, who occupies the same office Mr. Fitzgerald once did.

Independence Federal lost some luster after Mr. Fitzgerald died in 1998 and its well-publicized troubles began, he said. "But I still think there is a halo over this bank."

Mr. Hall blamed the thrift's poor performance largely on the protracted legal battle, saying it distracted management and made customers skittish. Many African-Americans believed the thrift would become a more mainstream bank and withdrew their deposits, he said, but Mr. Bender's recent appointments to the board and management team have eased much of that concern.

Mr. Hall said the deposit hemorrhage has stopped — "a very positive sign."

Cost cuts are a part of his recovery plan. Mr. Hall said he is "reviewing every dollar being expended," in search of efficiency.

Hall: "We have a solid base to build on. If I was starting from scratch, I'd have a lot more trepidation" about turning around the troubled thrift.

na, Va., is less enthusiastic about the selection of Mr. Hall. "The ideal candidate would have been a local-based lender," Mr. Danielson said. "But there are not many of those to go around, so they picked someone from out of the area."

Mr. Hall said he lived in the that leveraging his local contacts enabled him to double deposits within 18 months. He returned to private equity in 2003.

Kevin Cohee, OneUnited's chairman and CEO, described Mr. Hall as a strong executive and commended his work for the bank. But

me to look at the numbers and say, 'Oh boy, we can certainly expect — on the basis of their plan — for the numbers to turn around in 18 months.' "

Independence Federal has lost more than $8.4 million since 2001 — the last year for which it reported a profit.

During the past five years, its balance sheet has shriveled; assets have dropped 39%, and deposits have fallen 32%.

Besides trying to fend off Mr. Bender during this period, the thrift was caught up in a money- its operations and to consider selling itself if it lacked the resources to turn itself around. This order remains in effect.

Mr. Hall, who worked for a private equity firm in Miami before joining Independence Federal in May, said his goal of reviving the African-American institution is partly personal. A close relationship with the thrift's founder, William Fitzgerald 3rd, whom he considered a second father, motivated his application for the CEO job, he said.

"The opportunity to sit in Bill For example, switching information technology support service providers is expected to save $300,000 a year.

But Mr. Hall said Independence Federal also intends to invest for growth. It wants to add three to five commercial lenders in the next three years, he said, so that it can make more loans and capitalize on the Washington area's economic boom.

"The shareholders and the board are not saying, 'I want you to make this bank profitable by just cutting costs,' " he said. "We're going to have to spend some money to make money."

The thrift also plans to apply to participate in the Treasury Department's Community Development Financial Institutions Fund, which grants money to banks, thrifts, and credit unions certified as community development financial institutions.

Mr. Bender, who has raised his stake in the company to about 28%, said he feels certain he has found the right leader for Independence Federal. He was impressed enough by Mr. Hall to make an immediate job offer when they met for an interview May 8.

"He and I related to each other very quickly," Mr. Bender said. "We knew where we wanted to go and how we were going to take this bank and turn it around."

David G. Danielson, the president of Danielson Capital LLC, a bank consulting firm in Vien- Washington area for roughly 20 years before moving to Miami in 1985, so he is not a newcomer. "I know the people," he said. "I know this market."

The Oklahoma City native earned his undergraduate degree at Howard University in Washington. Then, after attending Harvard Business School, Mr. Hall returned to Washington, where he was the president and CEO of Mark Battle Associates Inc., a consulting firm specializing in federal, state, and local government agencies.

It was during that time that Mr. Hall got to know Mr. Fitzgerald, a former real estate broker who founded Independence Federal in 1968. The thrift was Mr. Fitzgerald's answer to discriminatory lending practices that kept many African-Americans from owning homes or starting businesses.

"He was a real hero to me," Mr. Hall said. "When he passed, someone sent me his obituary from *The Washington Post*, and I framed it."

After his move to Miami, Mr. Hall began developing minority venture capital funds for the Beacon Council, the official economic development agency of Miami-Dade County.

Several years later, he became a regional president at OneUnited Bank, a $649 million-asset African-American-owned Boston bank that also has offices in Los Angeles and Miami. At the time, OneUnited's Miami operation was bleeding deposits. But Mr. Hall said Mr. Hall has a challenging task at Independence Federal, he said.

"Independence's problems are pretty significant, and I don't know if there is any one person that can turn the situation around," Mr. Cohee said. "It's going to require a team to get it done, and I certainly wish him the best of luck trying to make it happen."

For his part, Mr. Hall exuded confidence. He said he hopes to use his existing lending team's market knowledge to beef up the commercial loan portfolio, partly by identifying opportunities that competitors overlook.

"Because so many of our employees have been here for some 20 years, there is a sense of closeness to this community, so we feel things and see things that big nationwide banks don't see and feel," Mr. Hall said. "We can go into rooms and businesses that they don't go into, and we hear conversations they don't hear."

Mr. Hall also said Mr. Bender, who was often perceived as a divisive figure in the battle for control of the thrift, is essential to its future.

"The reality is that Morton Bender is an unfortunate enemy to have for anyone involved in litigation, but he is a very, very beneficial friend to have," Mr. Hall said. "And when he made the commitment to keep this a minority financial institution, that meant we had a minority financial institution with a very good friend." ■

# A Tex. Company Renames Unit

First Financial Bankshares Inc. in Abilene, Tex., has changed the name of another one of its 10 subsidiaries.

The $140 million-asset City National Bank of Mineral Wells has been renamed First Financial Bank, the company announced Thursday. The subsidiary is the sixth to be given that name — and the fifth since 2005.

Scott Dueser, the holding company's president and chief executive, said in an interview that it expects to change the names of other subsidiaries within the next two years to trim marketing costs and build the First Financial brand.

"We are moving systematically to utilize the First Financial name and build that franchise," Mr. Dueser said.

The time was right for the Mineral Wells bank to be renamed, because it was recently remodeled and added some new services, he said.

Though several of the units now have similar names, the $2.9 billion-asset First Financial is not planning to consolidate their charters.

In 2005 its banks in Eastland, Stephenville, Southlake, and Abilene were renamed First Financial Bank. Its bank in Cleburne was given that name in 2000.

Mr. Dueser said that several of the banks are in the same markets, and that giving them a common name reduces advertising costs. Customers can use any of the company's banks, he said.

— *Marissa Fajt*

# EXHIBIT C

# TO HALL'S SUPPLEMENTAL DECLARATION

# 1229 Connecticut Ave ATM Transactions

| DAY | JULY | AUGUST |
|---|---|---|
| 3 | 27 | 40 |
| 4 | 43 | 30 |
| 5 | 23 | 13 |
| 6 | 39 | 27 |
| 7 | 33 | 12 |
| 8 | 21 | 34 |
| 9 | 31 | 41 |
| 10 | 12 | 24 |
| 11 | 25 | 16 |
| 12 | 32 | 20 |
| 13 | 40 | 14 |
| 14 | 46 | 21 |
| 15 | 32 | 23 |
| 16 | 24 | 33 |
| 17 | 19 | 25 |
| 18 | 35 | 27 |
| 19 | 33 | 19 |
|  |  |  |
| TOTAL | 515 | 419 |
| AVG | 31 transactions | 25 transactions |

EFT

7510 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

07/03 20:44 FOR JUL 03, 2007

CLIENT: 25407007 LOGO: 3185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 10 |
| FIGSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| NASTXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| PLUSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 20 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 2 | 0 | 25 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 12 |
| FIGSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| NASTXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| PLUSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 20 | 0 | 0 | 0 | 3 | 0 | 2 | 0 | 2 | 0 | 27 |

EFT

07/04 20:36 FOR JUL 04, 2007

CLIENT: 25407007 LOGO: 8185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: DADC0007 DC WASHINGTON 1220 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 12 |
| FIGSXT | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 21 |
| CIRSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| MSTRXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 36 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 2 | 0 | 43 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 12 |
| FIGSXT | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 21 |
| CIRSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| MSTRXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 36 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 2 | 0 | 43 |

EFT

07/05 20:31 FOR JUN 05, 2007

CLIENT: 26407007 LOGO: 6185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADCOUU7 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| XCHANG | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 4 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| FIGSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 10 |
| CIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 7 |
| TOTAL | 14 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 3 | 0 | 19 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 3 |
| FIGSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 10 |
| CIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 7 |
| XCHANG | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| TOTAL | 14 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 5 | 0 | 23 |

FFT

T510 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000306

07/04 20:48 FOR JUL 06, 2007

CLIENT: 25407007 LOGO: B155 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 10 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 14 |
| FIGNXT | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| MASTXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| PLUSXT | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 7 |
| RSTNXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| TOTAL | 28 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 5 | 0 | 37 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 10 | 0 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 16 |
| FIGNXT | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| MASTXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| PLUSXT | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 7 |
| RSTNXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| TOTAL | 28 | 0 | 1 | 0 | 3 | 0 | 2 | 0 | 5 | 0 | 39 |

CLIENT: 25407007 LOGO: 0185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: EA0C0007 DC WASHINGTON 2339 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| VISAXT | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| CIRSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| MASTXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| MSTRXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| TOTAL | 31 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 33 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| VISAXT | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| CIRSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| MASTXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| MSTRXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| TOTAL | 31 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 33 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000004

07/08 20:32 FOR JUL 08, 2007

CLIENT: 25407007 LOGO: EIBS NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: 9ADC0007 DC WASHINGTON 1220 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CU-US | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CU-US | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| FIUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| CIRSXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 6 |
| MSTPXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 13 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 21 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CU-US | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| FIUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| CIRSXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 5 |
| MSTPXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 13 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 21 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000000

07/09 20:37 FOR JUL 09, 2007

CLIENT: 26407007 LOGO: 8185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 8 |
| VIGSXT | 11 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 15 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| NOTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 4 |
| TOTAL | 19 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 5 | 0 | 30 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 4 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 9 |
| VIGSXT | 11 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 15 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| NOTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 4 |
| TOTAL | 19 | 0 | 0 | 0 | 6 | 0 | 1 | 0 | 5 | 0 | 31 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

07/10 20:42 FOR JUL 10, 2007

CLIENT: 25407007 LOGO: B165 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADCOOO7 DC WASHINGTON 1230 CONNECTICUT AVE, TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| FIGSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| PLUSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| TOTAL | 9 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 2 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 4 |
| FIGSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| PLUSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| TOTAL | 9 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 12 |

CLIENT: 35407007 LOGO: 3185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| VISANT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| FIGSXT | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| CIRSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 5 |
| VISANT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| FIGSXT | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| CIRSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 24 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 25 |

EFT

T31C TERMINAL TRANSACTION SUMMARY REPORT PAGE [illegible]

07/12 30:43 FOR JUL 12, 2007

CLIENT: 25407507 LOGO: EIBS NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BABCOG07 DC WASHINGTON 1220 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 8 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BIGSXT | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| PLUSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 3 |
| STRXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 27 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 31 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 9 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BIGSXT | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| PLUSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 3 |
| STRXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 27 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 32 |

Case 1:07-cv-01389-JDB Document 14-2 Filed 08/24/2007 Page 35 of 65

CLIENT: 35407007 LOGO: B165 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1225 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 4 |
| TOTAL | 1 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 4 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 10 |
| FIGSXT | 13 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 14 |
| PLUSXT | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| ESTEXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 32 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 36 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 0 | 0 | 4 | 0 | 2 | 0 | 0 | 0 | 14 |
| FIGSXT | 13 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 14 |
| PLUSXT | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| ESTEXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 33 | 0 | 0 | 0 | 5 | 0 | 2 | 0 | 0 | 0 | 40 |

EYT

T510 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000005

07/14 20:49 FOR JUL 14, 2007

CLIENT: 25407007 LOGO: 8185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PLUSXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 9 |
| CIGSXT | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 20 |
| PLUSXT | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 11 |
| MSTRXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 36 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 6 | 0 | 45 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 9 |
| CIGSXT | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 20 |
| PLUSXT | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 12 |
| MSTRXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 36 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 7 | 0 | 46 |

EFT

T310 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000005

07/15 20:31 FOR JUL 15, 2007

CLIENT: 25407007 LOGO: 3145 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BABC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 4 |
| FIGSXT | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| PLUSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| MSTRXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 24 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 28 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 8 |
| FIGSXT | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| PLUSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| MSTRXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 24 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 4 | 1 | 32 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

07/16 23:33 FOR JUL 16, 2007

CLIENT: 25407007 LOGO: 8105 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NI-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NI-US | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| BIGSXT | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| PLUSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| ESTPXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NI-US | 8 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 9 |
| BIGSXT | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| PLUSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| ESTPXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 23 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 24 |

Case 1:07-cv-01389-JDB Document 14-2 Filed 08/24/2007 Page 38 of 65

EFT

T510 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000009

07/17 20:35 FOR JUL . 17, 2007

CLIENT: 25407007 LOGO: B1BS NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US-US | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| [illegible]EXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| PLUSEXT | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| [illegible]EXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 17 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 18 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US-US | 5 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 7 |
| [illegible]EXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| PLUSEXT | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| [illegible]EXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 17 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 19 |

EFT

T310 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

07/18 20:33 FOR JUL 18, 2007

CLIENT: 25407007 LOGO: B1BS NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADCOUDY DC WASHINGTON 1030 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| XCHANG | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 13 |
| [illegible]SANT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| [illegible]GSNT | 11 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 13 |
| [illegible]USNT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| [illegible]TNET | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 24 | 0 | 1 | 0 | 6 | 0 | 0 | 0 | 2 | 0 | 33 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 1 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 14 |
| [illegible]SANT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| [illegible]GSNT | 11 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 13 |
| [illegible]USNT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| [illegible]TNET | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| TOTAL | 24 | 0 | 1 | 0 | 6 | 0 | 1 | 0 | 3 | 0 | 35 |

Case 1:07-cv-01389-JDB Document 14-2 Filed 08/24/2007 Page 41 of 65

CLIENT: 35407007 LOGO: B185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: DABC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | DD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |

HOST/NETWORK AUTHORIZED

| NTWK | DD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 10 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 12 |
| TIGSXT | 9 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 11 |
| CIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 27 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 31 |

GRAND TOTAL

| NTWK | DD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 11 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 14 |
| TIGSXT | 9 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 11 |
| CIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 28 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 33 |

EFT

7810 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000036

08/03 21:13 FOR AUG 03, 2007

CLIENT: 25407007 LOGO: DIDS NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: DADCOHOV DC WASHINGTON 1220 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 11 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 15 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DIGSXT | 11 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 12 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| XCHANG | 3 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 5 |
| TOTAL | 32 | 0 | 1 | 0 | 5 | 0 | 0 | 0 | 1 | 0 | 39 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 11 | 0 | 1 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 15 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIGSXT | 11 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 12 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| XCHANG | 3 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 5 |
| TOTAL | 32 | 0 | 1 | 0 | 5 | 0 | 1 | 0 | 1 | 0 | 40 |

EFT

TR10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000066

09/04 21:11 FOR AUG 04, 2007

CLIENT: 25407007 LOGO: 5185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BAPC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | SD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

HOST/NETWORK AUTHORIZED

| NTWK | SD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 4 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| FIGSXT | 16 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 17 |
| PLUSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| XCHANG | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL | 27 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 30 |

GRAND TOTAL

| NTWK | SD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 4 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| FIGSXT | 16 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 17 |
| PLUSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| XCHANG | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL | 27 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 30 |

EFT

T210 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000054

08/05 20:54 FOR AUG 05, 2007

CLIENT: 25407037 LOGO: 3185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TICSXT | 4 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| CIPSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 12 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 13 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TICSXT | 4 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| CIPSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 12 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 13 |

Case 1:07-cv-01389-JDB Document 14-2 Filed 08/24/2007 Page 45 of 65

CLIENT: 25407007 LOGO: B105 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1220 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 11 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 5 |
| PIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MASTXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 5 |
| TOTAL | 16 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 5 | 0 | 25 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 1 | 0 | 13 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 5 |
| PIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MASTXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 5 |
| TOTAL | 16 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 6 | 0 | 27 |

EFT

T310 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000009

08/07 20:55 FOR AUG 07, 2007

CLIENT: 25407007 LOGO: B195 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| XCHANG | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| NET1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NET2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 7 |
| NET1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NET2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| TOTAL | 10 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 12 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

08/08 20:59 FOR AUG 08, 2007

CLIENT: 25407007 LOGO: 8155 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADCBUD7 DC WASHINGTON 3229 CONNECTICUT AVE. TIME ZONE: EAUTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| FIGSXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| PLUSXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 3 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 10 |
| FIGSXT | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| FIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| STRXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL | 27 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 31 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 11 |
| FIGSXT | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 12 |
| FIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 7 |
| STRXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL | 27 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 2 | 0 | 34 |

Case 1:07-cv-01389-JDB Document 14-2 Filed 08/24/2007 Page 48 of 65

CLIENT: 25407007 LOGO: B18S NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BA0C0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 4 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 4 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| CIGSXT | 14 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 3 | 0 | 19 |
| PLUSXT | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| MSTRXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL | 31 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 3 | 0 | 37 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 5 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 10 |
| CIGSXT | 14 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 3 | 0 | 19 |
| PLUSXT | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| MSTRXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| XCHANG | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL | 31 | 0 | 1 | 0 | 2 | 0 | 2 | 0 | 5 | 0 | 41 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

08/10 21:33 FOR AUG 10, 2007

CLIENT: 25407007 LOGO: 8185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: 0ADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 3 |
| FIGSXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 4 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| FIGSXT | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 7 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 10 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| FIGSXT | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 9 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 20 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 24 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000005

08/11 11:14 FOR AUG 11, 2002

CLIENT: 25407337 LOGO: 3185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADCODU7 DC WASHINGTON 1220 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| PIGSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| AIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 3 |
| PLUSXT | 4 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 12 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 16 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| PIGSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| AIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 3 |
| PLUSXT | 4 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 12 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 16 |

FFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

08/12 20:57 FOR AUG 12, 2007

CLIENT: [illegible] LOGO: B105 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON [illegible] CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| CIGSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 9 |
| PLUSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| ESTRXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| XCHANG | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 15 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 20 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| CIGSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 9 |
| PLUSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| ESTRXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| XCHANG | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 15 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 20 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT 

08/13 20:55 FOR AUG 13, 2007

CLIENT: 25402007 LOGO: B185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BAPCU007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| [illegible]IGSNT | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| PLUSNT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| [illegible]STRNT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 12 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 13 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 4 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| [illegible]IGSNT | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| PLUSNT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| [illegible]STRNT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 12 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 14 |

Case 1:07-cv-01389-JDB Document 14-2 Filed 08/24/2007 Page 53 of 65

CLIENT: 25407007 LOGO: B18S NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BABCOOOT DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | DD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |

HOST/NETWORK AUTHORIZED

| NTWK | DD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| [illegible]IGSXT | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| PLUSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| [illegible]STRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 17 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 19 |

GRAND TOTAL

| NTWK | DD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 6 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 10 |
| [illegible]IGSXT | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| PLUSXT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| [illegible]STRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| XCHANG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 17 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 21 |

EFT

TS10 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000005

08/15 20:59 FOR AUG 15, 2007

CLIENT: 25407007 LOGO: 8105 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BASCOCC7 DC WASHINGTON 2123 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |
| FIGEXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 3 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 4 | 0 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 8 |
| DIGEXT | 6 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 8 |
| PLUSEXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| STREXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 13 | 0 | 1 | 1 | 4 | 0 | 0 | 0 | 1 | 0 | 20 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 4 | 0 | 1 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 10 |
| FIGEXT | 6 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 9 |
| PLUSEXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| STREXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 13 | 0 | 1 | 1 | 4 | 0 | 1 | 0 | 3 | 0 | 23 |

EFT

TSID TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

08/16 10:59 FOR AUG 16, 2007

CLIENT: 25407007 LOGO: B185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADCOOOT DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 0 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 14 |
| FIGSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 11 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 4 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| TOTAL | 18 | 0 | 0 | 1 | 5 | 0 | 0 | 0 | 8 | 0 | 32 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 0 | 1 | 5 | 0 | 1 | 0 | 0 | 0 | 15 |
| FIGSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 11 |
| PLUSXT | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 4 |
| XCHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| TOTAL | 18 | 0 | 0 | 1 | 5 | 0 | 1 | 0 | 8 | 0 | 33 |

EFT

T510 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

08/17 21:07 FOR AUG 17, 2007

CLIENT: 25407007 LOGO: B185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: SAD00007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |

HOST/NETWORK AUTHORIZED

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 5 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 8 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| VISEXT | 6 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 6 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 18 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 1 | 0 | 23 |

GRAND TOTAL

| NTWK | WD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 5 | 0 | 0 | 1 | 2 | 0 | 2 | 0 | 0 | 0 | 10 |
| VISANT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| VISEXT | 6 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 |
| PLUSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 6 |
| MSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 18 | 0 | 0 | 1 | 3 | 0 | 2 | 0 | 1 | 0 | 25 |

EFT

T810 TERMINAL TRANSACTION SUMMARY REPORT PAGE 00000006

08/15 21:00 FOR AUG 16, 2007

CLIENT: 25407007 LOGO: B185 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADC0007 DC WASHINGTON 1229 CONNECTICUT AVE. TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CIRSXT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 9 |
| FIGSXT | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 |
| CIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PLUSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| STRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 24 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 26 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 8 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 9 |
| FIGSXT | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 |
| CIRSXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| PLUSXT | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| STRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 24 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 27 |

EFT

08/19 20:49 FOR AUG 19, 2007

CLIENT: 25407007 LOGO: B105 NAME: INDEPENDENCE FEDERAL SAVINGS BANK

TERMINAL: BADCOOT DC WASHINGTON 1229 CONNECTICUT AVE TIME ZONE: EASTERN

TERMINAL TRANSACTION COUNTS BY NETWORK

SWITCH AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

HOST/NETWORK AUTHORIZED

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CIGSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| PLUSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| NSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ECHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 16 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 16 |

GRAND TOTAL

| NTWK | UD/POS PURCH | NONCASH DISPENSE | DEPOSIT | TRANSFER | BALANCE INQUIRY | PREAUTH | MISC | SUSPECT | DENIED | REVERSAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ON-US | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| CIGSXT | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| PLUSXT | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| NSTRXT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ECHANG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL | 17 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 19 |

Case 1:07-cv-01389-JDB Document 14-2 Filed 08/24/2007 Page 58 of 65

# EXHIBIT D

# TO HALL'S SUPPLEMENTAL DECLARATION

It is an initiative of the Pew Research Center.

Pew Internet & American Life Project

P. 1

Findings

# Online Banking 2006: Surfing to the Bank

By Susannah Fox and Jean Beier
June 14, 2006

Way back in 1994, when few Americans had even heard of the internet, most people still walked to their bank's nearest branch to do whatever check cashing or bill paying they couldn't do at the corner store or by mail. When a survey by the Pew Center for the People & the Press asked the principal bill-payer in each household, "Do you ever do 'electronic banking' from home—that is, use a computer or the telephone to pay bills or move money from one account to another?" fewer than one in ten (9%) among this group said yes, they had done such a transaction. By 1995, that figure had risen to 13% of bill-payers. In 1998, when the Pew Research Center switched to asking all internet users if they ever paid bills or banked online, 13% of this larger group, or about 10 million American adults, said yes.

By 2000, when the Pew Internet & American Life Project fielded our first survey, the proportion of internet users who said they ever did any banking online had risen to 17% or about 16 million Americans. Over the next few years, internet users ramped up a range of online financial and transactional activities, trusting more and more of their personal financial information to the Web. Among categories of activities, online banking and online auctions grew the most rapidly, especially among men, home broadband users, and internet users under the age of 50.[1]

Other forms of financial housework joined banking as popular online activities. In January 2005, 38% of internet users reported paying bills online. In December of that year a study fielded by Harris Interactive found that 35% of bills were paid online, up from 25% the year before.[2] By

comparison, 37.5% of bills are paid by paper check and 27.5% are paid some other way, such as in cash or by debit card.[3]

Ever larger numbers of internet users also turn to the web to seek financial advice and information. While the proportion of internet users who say they go online to get financial information such as stock quotes or interest rates has stayed constant at 44% since we began polling in 2000, the internet population base has risen steadily.[4] By April 2006, according to comScore Media Metrix, four websites that combined money-management content with financial services ranked among the 20 most popular in the Business/Finance category: AOL Money & Finance, MSN Money, Yahoo! Finance, and CNN Money.[5] In addition, a group of online magazines and websites, such as Motley Fool, contribute content to the larger information providers both print and online.

Financial sites are also hopping on the social networking bandwagon. A recent conference sponsored by Forrester Research focused on the online shift in retail financial services. Companies such as Yahoo! and Google discussed the benefits of creating online social networks for exchanging advice and pairing lenders with borrowers.[6]

Our December 2005 poll confirmed that online banking is holding steady as a mainstream internet activity, growing along with internet use generally, though not accelerating as have some other forms of online activities. Fully 43% of internet users, or about 63 million American adults, bank online. Home broadband users continue to lead the way, with 55% of these internet users banking online, compared with 35% of home dial-up users. Online banking is equally common among all age groups under the age of 65. Forty-two percent of internet users age 18-29, 47% of internet users age 30-49, and 42% of internet users age 50-64 bank online. However only 27% of internet users age 65 and older use their internet hookups for online banking. Also, we now find that men and women are equally likely to bank online.

One reason why online banking has not outpaced growth in internet use generally may be what industry analysts dub the "trust gap." Trust is a big factor in choosing to bank online and then sticking with it despite news headlines about identity theft and phishing. Some industry analysts predict that online banking sites will have trouble attracting new customers because of the "trust gap" between internet users who are experienced with online financial transactions and those who are not.[7] A 2005 report by Consumer WebWatch found that internet users who have used an e-commerce or financial management site are more trusting of online banking sites, automatic bill pay sites, credit history sites, and others. And internet users who have bought items online are more likely to say they have a lot of trust in online banking sites.[8]

Not surprisingly, those with more disposable income are more likely to take advantage of the perks of online banking, such as 24-hour access to accounts and higher interest rates. As of December 2005, 55% of internet users living in households with $75,000 or more in annual income say they bank online, compared with 29% of internet users living in households with less than $30,000 in annual income.

The Pew survey question did not distinguish between internet users who can access their regular bricks-and-mortar bank accounts online for such things as checking balances, paying bills, etc. and those who maintain accounts in internet-only banks. But there is evidence that internet users may be moving quite a bit of cash to their internet-only bank accounts. A 2005 report by the Federal Deposit Insurance Corporation reports that in December 2003, when online banking was still on a steep adoption curve among internet users, the average total assets of an internet-only bank were $3.5 billion, compared with only $1 billion for all banks.[9]

One reason for this gap is that a few huge internet-only banks are skewing the average. For example, ING Direct, which was established in 2000, already has 4 million customers and $59 billion in assets.[10] Another reason for the difference is that many banks and thrifts draw from a local customer base, not a national one. For example, Adams County Building and Loan

Company in West Union, Ohio, was established in 1907 and currently has $24 million in assets.[11] The two banks simply serve different customers and different needs.

Moreover, while the percentage of internet users banking online is holding steady, internet users are increasing the frequency of their visits to banking and other financial websites. According to comScore Media Metrix, the number of unique visitors to Business/Finance websites grew by 9% between April 2005 and April 2006.[12] The top five sites in that category for April 2006 were Bank of America, PayPal, JPMorgan Chase Property, AOL Money & Finance, and Capital One. What was the sixth most popular finance site in April? IRS.gov, of course.

**END NOTES**

[1] See "America's Online Pursuits" by Mary Madden, Pew Internet & American Life Project, December 12, 2003. Available at: http://www.pewinternet.org/PPF/r/106/report_display.asp
[2] See "Internet Activities," Pew Internet & American Life Project. Available at: http://www.pewinternet.org/trends/Internet_Activities_4.26.06.htm
[3] See "Pay Bills With a Click? More Americans Are Doing It and Banks Are Loving It," by Bob Tedeschi, *The New York Times*, May 29, 2006.
[4] See "Usage Over Time," Pew Internet & American Life Project, at http://www.pewinternet.org/trends.asp.
[5] Data provided on May 31, 2006, by Andrew Lipsman of comScore Networks, Inc
[6] See "Banking Shift: Advice, Service Get Less Formal," by Marilyn Geewax, *The Atlanta Journal-Constitution*, May 31, 2006.
[7] See "Online Banking Customers: Attitudes and Activities," by David Hallerman, eMarketer, November 2005. Available at: http://www.emarketer.com/Report.aspx?banking_on_nov05
[8] See "Leap of Faith: Using the Internet Despite the Dangers," by Princeton Survey Research Associates International, for Consumer Reports WebWatch, October 26, 2005. Available at: http://www.consumerwebwatch.org/dynamic/web-credibility-reports-princeton.cfm
[9] See "Limited-Purpose Banks: Their Specialties, Performance, and Prospects," by Chiwon Yom, *FDIC Banking Review*, 2005, Vol. 17, No. 1.
[10] See http://www2.fdic.gov/structur/search/isinsured.asp?CERT=35489
[11] See http://www2.fdic.gov/idasp/main_bankfind.asp (search for FDIC Certificate #32304)
[12] Data provided on May 31, 2006, by Andrew Lipsman of comScore Networks, Inc.

# EXHIBIT E

# TO HALL'S SUPPLEMENTAL DECLARATION

 

# BASIC BUSINESS LICENSE APPLICATION

Department of Consumer & Regulatory Affairs
District of Columbia Government
Business and Professional Licensing Administration

## Trade Name Registration Form

INSTRUCTIONS: Complete the form below to register your trade name. Make copies of this form to register additional trade names. There is a $50 fee for each registration. Make check payable to DC Treasurer. Mail your completed form and payment to the address below.

DCRA
CORPORATIONS DIVISION
ATTN: TRADE NAME REGISTRATION
941 N. CAPITOL STREET, NE, ROOM 7200
WASHINGTON, D.C. 20002

FEES:
$50.00 for registration of each trade name
$50.00 for renewal of each trade name
$25.00 for each amendment to a registered trade name
$25.00 for each cancellation of a registered trade name

1. TRADENAME: *(Please print the Trade Name as it should appear on the certificate)*
INDEPENDENCE BANK

2. FULL LEGAL NAME OF ENTITY/INDIVIDUAL USING THE TRADENAME:
INDEPENDENCE FEDERAL SAVINGS BANK

3. TYPE OF ENTITY: *(Check only one)*
___ Sole Proprietor (If your business is located outside of DC, a resident/registered agent is required).
_X_ Corporation
___ Limited Liability Company
___ Limited Liability Partnership
___ Limited Partnership
___ General Partnership

4. FEIN NUMBER: *(Use your Social Security Number if you do not have a Federal Employee Identification Number)*
52-0883392

5. FULL LEGAL NAME OF PERSON SUBMITTING THIS FORM: *(If same as Question 2, indicate "Same as Question 2")*
JOHN A. HALL

6. APPLICANT'S TITLE IN BUSINESS ENTITY:
PRESIDENT & C.E.O.

7. COMPLETE BUSINESS ADDRESS: (*Provide business address of entity/individual indicated in Question 2*)

1229 CONNECTICUT AVE NW
Street address

WASHINGTON DC 20036
City State Zip code

**For corporations, partnerships and limited liability companies:**

8. NAME AND HOME ADDRESS OF ONE OFFICER/DIRECTOR/MANAGER/PARTNER:

Name ROBERT B. ISARD Title VICE CHAIRMAN

8122 FAIRVIEW RD.
Home address

ELKINS PARK PA 19027
City State Zip code

9. NAME AND ADDRESS OF REGISTERED AGENT:

Name ______ Company S. F. H. & T. Corporation

3299 K STREET NW SUITE 100
Street address

WASHINGTON DC 20007-4444
City State Zip code

I certify that the information in this TRADE NAME REGISTRATION APPLICATION in the District of Columbia is true.

[signature] 7/31/07
Signature of Business Owner (Required) Date
President + CEO

(202) 628-5500 jhall@ifsb.com
Business Telephone Number E-Mail Address

*For Office Use Only* . Registration Number ______

**CRIMINAL PENALTIES FOR MAKING FALSE STATEMENTS**

Any person convicted of making false statements shall be fined not more than $1,000 or imprisoned for not more than 180 days, or both. A person commit the offense of making false statements if that person willfully makes a false statement that is in fact material, in writing, directly or indirectly to any instrumentality of the District of Columbia government, under circumstance in which the statement could reasonably be expected to be relied upon as true. (D.C. Code §22-2405)

**D.C. INSPECTOR GENERAL HOTLINE**

If you are aware of corruption, fraud, waste, abuse, or mismanagement involving any D.C. government agency, official or program, contact the Office of the Inspector General (OIG) at the OIG Hotline, (202) 727-0267 or (800) 521-1639 (toll free). All reports are confidential and you may remain anonymous. By law, government employees are protected from reprisals or retaliation by their employers for reporting to the OIG. The information you provide may result in an investigation leading to administrative action, civil penalties or criminal prosecution in appropriate cases.

**NOTICE OF NON-DISCRIMINATION**

In Accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Code section 2.1401.01 et seq., ("the Act") the District of Columbia does not discriminate on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, matriculation, political affiliation, disabilities, source of income, or place of residence or business. Discrimination in violation of the act will not be tolerated. Violators will be subject to disciplinary action.

**EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK
1229 Connecticut Avenue, N.W.
Washington, DC 20036,

Plaintiff,

v.

1225 CONNECTICUT CO. LLC,

Defendant

C.A. No. 07-1389
Honorable John D. Bates

**DECLARATION OF ROBERT ISARD IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

I, Robert Isard, depose and state as follows:

1. I am over the age of 18 and am competent to testify to the matters contained herein, and testify that the following statements are true and correct and are based upon matters within my personal knowledge.

2. I am the Vice Chairman of the Board of Independence Federal Savings Bank ("IFSB" or the "Bank"). I also work at the Bank as its Senior Asset Officer.

3. On April 24, 2007 I met with Christine V. Olfus-Campos, and Robert Fuller, two representatives of Defendant 1225 Connecticut Co. LLC's ("1225") (and/or its affiliated management company, Brookfield Properties), regarding the proposed renovation of the building in which the Bank's headquarters is located. I asked that they provide us with a comprehensive plan of what was to be done with the building, a copy of the plans,

specifications, general conditions and time-line for the work.  I
was told these were not available to the Bank, and their response
to my request was to ask me for "a list of questions or
concerns."  I explained that there was no way the Bank could
determine its concerns without knowing the extent of the plans.

    4.  On or about May 11, 2007, Brookfield Properties
delivered a letter to IFSB (attached as Exhibit D to the Duke
Affidavit).  The letter states that on July 1, 2007, work would
commence for the 1225 Connecticut Avenue Repositioning Project
("Repositioning Project").  The letter further advised that the
project is currently scheduled to continue for approximately 18
months.

    5. On June 12, 2007, I met with representatives of
Brookfield Properties regarding the proposed Repositioning
Project.  Morton Bender also represented the Bank at this
meeting.  A representative of the project architect and the
contractor were also present.  In her Affidavit, Ms. Duke states
that "a copy of the meeting agenda is attached hereto as Exhibit
E."  Duke Affidavit at 14.  The "Agenda" was not provided to
either Mr. Bender or myself.  The items listed in the agenda were
either not discussed, or were discussed only in a limited way.
For example, with regard to "Item 3) Scope of Work," the only
discussion regarding "cladding" is that the skin of the building
would be removed, and that IFSB would be "protected"; the

representatives would not tell us their specific plans for "protecting" the Bank. Other than to tell us that temporary chillers would be installed, and that the heating system would be replaced, there was no specific description of the plans in these areas. There was no discussion with regard to the electrical systems, the elevators, the common areas, the roof top, or the "Fitness Center." There was no description of the work to be done in the lobby, although we were told that there would be access interruptions in the main lobby area, which includes the security entrance into the Bank. With regard to Item 4, there was no discussion about the completion date of the project. Although there was limited discussion about mechanical systems (as set forth above), most of the other matters identified in Item 5 were not discussed, e.g., hours, noise, staging, dust, air quality, lighting, etc. were not even mentioned. We were informed that the ownership planned to provide us with temporary signs, but we had no input into the planning and had no opportunity to present our needs.

6. Further details of the June 12th meeting are set forth in the Affidavit of Morton Bender.

7. On or about July 20, 2007, Brookfield Properties delivered a Memo setting forth a tentative schedule for the Repositioning Project (attached as Exhibit F to the Duke Affidavit). According to the July 20, 2007 Memo, "Initial

Construction Set-Up" was to take place from July 23 through August 3, 2007; interior demolition will occur August 2007 through April 2008 and the exterior demolition April 2008 through June 2008.

8. On July 25, 2007, Brookfield Properties sent a letter to IFSB regarding "Asbestos Containing Materials Abatement Notice" (attached as Exhibit F to Plaintiff's Memorandum in support of its Application for Preliminary Injunction). Pursuant to this Notice, IFSB has been informed that "abatement of certain Asbestos Containing Materials will be taking place within the building soon[.]" The letter further states that the abatement work will begin thirty days from the date of the July 25, 2007 letter (i.e., by August 24, 2007). Exhibit C to the Duke Affidavit is a document identified as "the Asbestos Abatement Plan." Neither this document, nor the "Summary of Identified Asbestos-Containing Materials" included as a part of Exhibit C, were previously provided to us.

9. The demolition project began about the time that this action was filed. Attached to this Affidavit are several photographs, which have been taken by me, or by other IFSB personnel, over the last several weeks since the beginning of the demolition project.

10. While Brookfield's July 20th memorandum states that emergency exits will be maintained, as the attached photographs

indicate, the building was immediately isolated and the Bank's two fire exits opening onto N St were blocked. The one closest to Connecticut Avenue serves as the handicapped entrance (there are steps at the front and side entrance), as is seen in Photographs 1, 2, and 3. In addition, our access to a trash dumpster has been cut off. See Photographs 4 and 5. Moreover, the IFSB space is obscured from the street, including scaffolding at the front door. See Photographs 6-10. Recently, the sidewalk along the Bank has been transformed into a parking area where plywood, construction materials and large trucks block our view and further restrict access to the Bank. See Photographs 31-33.

11. On the evening of August 8, 2007, I observed that the space previously identified as the Ernst & Young mailroom had already undergone partial demolition. Broken floor tiles and other materials were left unsealed in that open and unlocked space. See Photographs 11-17 taken with my cell phone camera. The broken floor tiles appear to be identified on the "Summary of Identified Asbestos-Containing Materials" included as a part of Exhibit C to Ms. Duke's Affidavit. Contrary to the July 25th Abatement Notice, it does not appear that this demolition work was done by a licensed asbestos abatement contractor, because we have not been notified that any such work was occurring, and I have not observed any employees or vehicles identified as being from Ace Co. (the identified asbestos abatement contractor).

Moreover, if asbestos containing materials have been disturbed, this has occurred before the expiration of the 30-day period identified in the July 25th Abatement Notice from Brookfield Properties.

12. In addition to the access restrictions described above, and the disturbance of the floor tiles, the ongoing demolition work has resulted in significant dirt, debris and dust around the Premises, as well as regular noise and whole-building vibrations from demolition equipment.

13. In response to Duke Affidavit ¶20, the openings created by the removal of the building skin were neither sealed, nor covered with plywood. The openings, as shown in Photographs 18-21 are covered by a hanging piece of plastic material.

14. Duke Affidavit ¶21 states that Defendant intends to remove "the entire skin (including windows) of the Property... ." At that point, Defendant apparently intends to put a "tacked down" roof over the Premises because it is only "temporary" and "does not need complete protection from the elements." If such a temporary roof is acceptable in some circumstances (for example, for unoccupied space), it is not acceptable in protecting an on-going business. Ms. Duke states "all penetrations of the membrane will be sealed and any water will be routed to Property's roof/storm drain system." This does not address what happens if a leak occurs before any "penetration of the membrane

is sealed." Ms. Duke further states that "roofing will be installed on the 2nd floor to <u>*reduce the risk*</u> of leakage into the retail space." Duke Affidavit, ¶23 L (emphasis added). IFSB has staff, banking records, computers and other equipment in the Premises. *Any* leak would cause serious damage to the Bank's records and equipment, as well as cause discomfort to its staff.

15. IFSB's space is located at the corner of 18th and N Streets, N.W. Approximately half of its demising walls are exterior windows, so once the skin is removed, the entire bank headquarters will be exposed to the elements, with nothing more than a temporary protection. Defendant has not stated how long this process will take, or explained how the Bank's customers, employees, property, records and computers will be protected and maintained during this process. Moreover, there appears to be no plan for how IFSB, as a bank, will be able to maintain government-mandated levels of security with no permanent exterior walls, or roof.

16. In ¶23 of her Affidavit, Ms. Duke states that Defendant 1225 has undertaken various actions to "satisfy its obligations under the Lease." The following is a response to the enumerated items:

A. The description is inaccurate. The entire area in front of the Bank is roofed over, giving it a dark and foreboding appearance. There is no lighting provided. The Bank is viewed through a maze of bars. On August 21, 2007, construction workers began attaching sheets of plywood to the scaffolding in front of the building, further

obstructing visibility from the street and reducing available light. See Photograph 30. This does not comport with the description of 10-foot high tube and pipe scaffolding. Plywood is currently installed to present its support structure to the street, a particularly unattractive sight when looking at the front of our office. Finally, the lighting referred to has yet to be installed in the dark tunnel.

B. The temporary plastic fabric signs may be large, but they appear cheap, and do not convey a sense of a secure and well-established banking institution. On several occasions, the signs have blown loose, and have been installed so as to be obstructed and/or were mounted in such a fashion as to leave off our logo. See Photographs 22-24. We were never consulted regarding the style, content, placement or size of the signs. The "OPEN FOR BUSINESS" sign is more appropriate for a "going out of business sale" than for the headquarters of an historic financial institution. See Photograph 25.

C. The N Street side of the property is a long glass wall broken up by structural units. Prior to the beginning of the Project, the Bank offices and its employees were visible from the street and the sidewalk. Prior to the erection of the scaffolding the Connecticut Avenue/18th Street side was a convenient loading zone for customers and vendors making deliveries. The entire length of the building on N Street had metered parking that was important for our customers who could stop briefly to transact business without having to enter a garage. Those spaces are now occupied by construction fencing covered with green mesh, surrounded by barricades. This fence has blown over during wind gusts. See Photograph 26. In addition, a recent inspection has shown us that the "water filled barricades" lining N Street are actually just empty plastic containers, and thus provide no substantive protection. These barricades are specified on the Streets Permit.

D. Entry and exit points are only maintained and cleared when we have gone to the trouble of pointing out the issue, and it appears that the demolition crews have not been instructed to accommodate the continued operation of the bank. Our N Street fire doors were obstructed until construction personnel saw us photographing the doors. Our handicapped access was obstructed until we were seen photographing the "handicapped access" sign. See Photographs 1-3. Although a tunnel is now available for handicapped access, there is no sign at the street end

designating it as such, and the entrance to the tunnel is blocked with yellow tape. See Photographs 27 and 28. No pedestrian walkway has been maintained on the N Street side of the building under the "covered arcade area." Customers and pedestrians are forced to walk across the street, or in the street to get from our offices to the garage.

E. With regard to "service interruptions", since the end of July 2007 there has been a consistent reduction in cooling capacity, which is provided to us in the form of chilled water. In the past the building's cooling towers produced enough chilled water to satisfy the needs of eight floors of occupancy. Now the system is insufficient to maintain less than 85 degrees on hot days.

F. The demolition site has been disorderly and poorly maintained since the arrival of the contractors. Debris is piled in a haphazard fashion and the "secure" area is sometimes left wide open with no supervision and unauthorized persons inside. See Photograph 29.

G. The "day porter" is only available if we call Brookfield Properties in their office across Connecticut Avenue. When no one is available in the office we get a telephone operator who offers to take a message. Since the demolition has begun, mice have been found on the Bank Premises, and there has been a failure to maintain a coordinated vermin abatement program as promised. In addition, access to the trash dumpster in the alley has been interrupted. The dumpster was put behind a construction fence, and eventually under lock and key. We were provided with a copy of the key, but then told we could no longer have access to the dumpster through the building, as we had in the past. It is necessary to have our trash carried out the front of the building, across N Street, down the block, across the street again and down the alley to the dumpster. Shortly thereafter we were told that we will not have access to the dumpster and to leave the trash in a container in the lobby or give it to the day porter. Although we have been told that a rolling bin will be available for us each evening in the lobby, the bin has not consistently been available. No consideration has been given to our need to move trash out during the day. This has increased the burden on our cleaning people, who are already dealing with the increased debris caused by the demolition work, which is tracked into the Bank each day from the street.

H. The promise that all utilities and fire/life safety

systems will remain operational gives little comfort in light of consistent failure to perform up to promises and expectations.

I.   The security access control has already been cut off, without proper notice or explanation for our cleaning people.

J.   See E above regarding the chillers.

K.   See E above.

L.   See ¶14 above regarding the roofing.

M.   We are not aware of the new location of temporary toilet facilities and have no knowledge as to whether they are installed in a safe and sanitary fashion.

N.   The construction site has not been kept "tidy." Demolition is progressing as though no tenants are in the building.

O.   It is unknown what is or will happen with the outside air filters, or what will occur with regard to the asbestos abatement.

17.  As a result of the ongoing demolition, Larry Alexander, IFSB's security officer and I need to be constantly vigilant with regard to debris and access.  In addition to the issues identified above, the demolition has resulted in significant noise and vibrations which interrupt and distract our employees, and negatively impact their ability to serve our customers.

I swear under the penalties of perjury of the District of Columbia that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in the District of Columbia on the 22nd day of August, 2007.

Robert Isard



ISARD DECLARATION
Photograph 1

FDIC
Accessible

FDIC
INSURED
Accessible

ALL DELIVERIES:
PLEASE USE THIS ENTRANCE ONLY

PRIVATE
TOWING ENFORCED
LONG FENCE

PUBLIC
PARKING
WELCOME
YOUR BUSINESS
SIDEWALK
CLOSED
PARK
1225 Connecticut Ave.

ISARD DECLA[illegible]
Photograph 7

15
M.P.H.

INDEPENDENCE
FEDERAL SAVINGS BANK
N
truction

SARO DECLARATION
Photograph

EXIT

ISARD DECLARATION
Photograph 20

ISARD DECLARATION
Photograph 22

BANK

INDEPENDENCE
FEDERAL SAVINGS BANK
Photograph 24

OPEN
During Construction

ISARD DECLARATION
Photograph 26

N
1700
18
1200
INDEPENDENCE
PUBL
PARK

SORRY
FOR THE
INCONVENIENCE
WHILE THIS AREA
IS UNDER
CONSTRUCTION

NOTICE



ISARD DECLARATION
Photograph 29

ISARD DECLARATION
Photograph 30



ISARD DECLARATION
PHOTOGRAPH 33

ISARD DECLARAT
PHOTOGRAPH

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK )
1229 Connecticut Avenue, N.W. )
Washington, DC 20036, )
)
Plaintiff, ) C.A. No. 07-1389
) Honorable John D. Bates
v. )
)
1225 CONNECTICUT CO. LLC, )
)
Defendant )
)

DECLARATION OF MORTON BENDER IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

I, Morton Bender, depose and state as follows:

1. I am over the age of 18 and am competent to testify to the matters contained herein, and testify that the following statements are true and correct and are based upon matters within my personal knowledge.

2. I am one of the "Plaintiff's representatives" referred to in Paragraphs 14-16 of the Jackie Duke Affidavit filed in support of Defendant's Opposition to Plaintiff Independence Federal Savings Bank's ("IFSB" or the "Bank") Application for Preliminary Injunction.

3. On June 12, 2007, Mr. Isard and I met with representatives of Brookfield Properties (an affiliate of Defendant 1225 and the manager of the building) regarding the proposed Repositioning Project. A representative of the project architect and contractor were also in attendance. Although a

"meeting agenda" is attached to the Duke Affidavit, Mr. Isard and I were not provided with the agenda, and at most, we were provided a brief overview of how they were going to keep IFSB operating. Mr. Isard's Declaration sets forth a description of the discussion (or lack of discussion) with regard to various of the "agenda" items.

4. I have 57 years of experience in the construction business. By virtue of my experience, I am aware of a variety of things that can and do go wrong during any construction or renovation project, specifically when tenants are operating in the building. My understanding is that the "Repositioning Project" (the "Project") is going to result in the demolition and renovation of all existing construction on all floors of the 1225 Connecticut Avenue building, other than the first floor retail spaces now occupied by IFSB and Citibank, including all exterior walls, mechanical and electrical systems, as well as the roof.

5. The Duke Affidavit states, in reference to the June 12th meeting, that as "the 1225 representatives attempted to address the specific concerns raised by the Plaintiff, the Plaintiff's representative indicated that, regardless of what steps 1225 took to address their concerns, they would not be adequate." Duke Affidavit ¶14. Her Affidavit does not provide an accurate portrayal of what transpired. During the meeting, I asked for a copy of their plans for the work contemplated and what steps were

to be taken to ensure that there would be no interruption to IFSB's operation. I specifically expressed concern about the potential for water leaks, debris, dust, noise and interruption of access, as well as the potential for mechanical and electrical failures. I also inquired as to whether any funds had been budgeted to allow 1225 to be able to immediately correct problems relating to IFSB's continued occupation of the Premises during the Project. The Brookfield Properties representatives refused to give me a copy of the plans and any information on how 1225 intended to "protect" IFSB's business, employees and customers. Although they indicated that the floor above the Bank would be sealed to prevent water penetration into IFSB's space, even the Duke Affidavit indicates that the "sealing" will be accomplished with <u>temporary materials</u> which will be "tacked down." Duke Affidavit at ¶21. In my experience, this is not adequate to protect the facilities, equipment, customers and employees of an on-going business. The June 12th meeting lasted approximately one hour. Because I was not satisfied with the lack of interest in our concerns from the management company representatives, I subsequently asked for a meeting with "the person who was in charge."

6. On July 2, 2007, I met with Paul Schulman of Brookfield Properties. At the time, I believed he was an officer of the owner of the building, although I did not know at that time that

the owner was 1225.  Apparently, Mr. Schulman is another employee

of Brookfield Properties, which is the management company, which

I have now learned is an affiliate of 1225.  During this meeting,

I reiterated my request for a copy of the plans, and repeated my

concerns about access, leaks, debris, noise, and electrical and

mechanical interruptions.  Mr. Schulman repeated the earlier

refusal to produce the plans, and provided no concrete response

with regard to my concerns.  I even suggested that they consider

relocating IFSB.

I swear under the penalties of perjury of the District of Columbia that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in the District of Columbia on the 22 day of August, 2007.

Morton Bender

# EXHIBIT D

UNITED STATES DISTRICT COUT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK )
1229 Connecticut Avenue, N.W. )
Washington, DC 20036, )
)
Plaintiff, ) C.A. No. 07-1389
) Honorable John D. Bates
v. )
)
1225 CONNECTICUT CO. LLC, )
)
Defendant )
______________________________)

**DECLARATION OF JOHN D. BELLINGHAM IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

I, John D. Bellingham, FCIOB, FAIC, depose and state as follows:

1. I am over the age of 18 and am competent to testify to the matters contained herein, and testify that the following statements are true and correct and are based upon matters within my personal knowledge.

2. I am 58 years of age, and I am the President of Monarc Construction Inc.

3. I was educated and trained in Great Britain by an international Construction firm called George Wimpey Company, based in London.

4. I was awarded a scholarship with George Wimpey in 1968 and undertook 5 years of training, in which I worked for 6 months

on various large construction projects and for the next six months, I took courses at Ewell Polytechnic, London, for my National Diploma Degree in Construction Management. I was awarded a Higher National Diploma in 1972, with Honors, for Planning and Scheduling of Construction Projects. In 1973, I passed my Professional Examination to become a Member of the Chartered Institute of Builders (M.C.I.O.B). In 1986, I was elected to a Fellow of the Chartered Institute of Builders. I am also a Fellow of the American Institute of Constructors (F.A.I.C.). In addition, I am the Treasurer and Vice President of the District of Columbia Preservation League (DCPL).

5. In 1973, at the completion of my training, I was offered a job in Washington, D.C., working for a major construction company. I have spent the last 34 years working on numerous renovation projects in the Washington, D.C. area, the great majority of which are in downtown Washington.

6. In 1987, I started Monarc Construction with the nationally-recognized developer, Trammel Crow. After 5 years, Monarc separated from Trammel Crow during the real estate downturn in 1992, and I am the principal owner.

7. Monarc Construction specializes in downtown renovation project such as:

- The Palm Restaurant Building at 1225 19th Street,

where the façade was removed and replaced on an occupied building;

- The restoration of the Tivoli Theater; and

- The facade restoration of Ronald Reagan National Airport Terminal A - just to mention a few projects.

8. A fuller explanation of my background is attached as Exhibit A.

9. I have been asked by the Plaintiff to express a professional opinion on the repositioning renovation of 1225 Connecticut Avenue and its affects on the premises occupied by Independence Federal Savings Bank at the northwest corner of the 1225 building.

10. The Defendant/Developer has refused to make available to the Plaintiff any drawings or details of the proposed building repositioning project renovation. In addition, no access to the building, other than the Bank space, has been allowed. In fact, the Defendant's attorney has threatened to have anybody arrested for trespassing should they go into the building.

11. The following opinions are based on the limited information provided - Public Space Plan, Asbestos Abatements Specifications, etc. - and my 34 years of experience undertaking projects similar to this in downtown Washington.

**Visibility of the Bank Space**

12. Article 16.02 of the Bank Lease states calls for:

> . . . the Demised Premises to be visible from the street. Public access on the street level directly into the Demised Premises shall not be cut off, and there shall be no unreasonable obstruction of access to the demised Premises or unreasonable interference with the use and enjoyment thereof.

13. The Developer has advised the Plaintiff/Tenant in a Memo dated August 13th, 2007, that initial construction work would start on August 14th, 2007, with interior demolition running from August 2007 - April 2008. Exterior demolition would run from October 2007 - June 2008, as shown in the Memo dated August 1, 2007.

14. The Developer provided the Owner with a copy of the Public Space Traffic Plan. This Plan calls for a staging area to be built along the entire length of the building façade on N Street. In addition, the Developer's claims that no opaque mesh will be installed on the fence to ensure visibility of the premises from N Street (Document #9, Page 7, Item iii) In fact, a 6'-0" high fence with an opaque mesh has been installed, clearly, cutting off visibility of the space.

15. The fact is that a construction staging area along N Street for a project of this size will completely obscure visibility from N Street. When I inspected the site on August 21st, 2007, it appeared the building was empty and no business was operating in this building. The appearance of the building

from N Street does not allow any visibility of the Bank Premises,
and the Independence Federal Savings Bank sign looks like a
typical advertisement put up by the Lender on Construction
Projects, not a sign indicating the Bank is still open for
business behind all the barricades and fences.  This obstruction
will only become worse as the project gets underway, and the
building will appear even more vacant and not welcoming to
potential Bank customers.

    16.  The schedule provided by the Developer states that
demolition of the facade will start in October 2007 and run
through June 2008.  The building has four faces, all of which
will be demolished.  The Contractor has erected overhead
protection and barricades, with solid plywood panels, along the
Connecticut Avenue facade.  This appears to be, at a minimum, at
least 30 weeks too early, and one would anticipate that this
could be delayed until the Spring of 2008 before any of this
overhead protection and barricades should need to be erected.

    17.  The overhead protection and barricades block visibility
of the Bank from Connecticut Avenue and N Street.  When you look
from the street, it is difficult to see if the Bank is still
open.  If the Developer was sincere in their desire to maintain
the Bank's visibility, they would not put up this protection
until the Spring of 2008.  In addition, there are overhead

protection systems readily available that are completely open and do not require tube and pipe scaffolding, which obviously cuts off visibility of the premises from the street.

18. The current design of the overhead protection is clearly not sufficient to protect the general public from falling debris such as a piece of precast stone being removed from the facade. The Public Space Plan also calls for debris netting to be installed to catch falling debris. For this to work effectively, the netting needs to hang down in a catenary so that falling debris will be caught and arrested. This netting will completely obscure the facade and take away any visibility. To remove the building facade, which is made up of large, individual pieces of precast and windows, the Contractor is proposing using a roof hoist system. To remove the windows and precast, the Contractor will have to close down the area beneath the demolition operation to comply with OSHA Safety Regulations. This will completely block visibility of the space. This will also occur when the new facade is re-assembled and built.

19. It is clear to me that the entrance to the Bank will need to be closed during these operations, which I would predict will take 10-14 weeks for reinstallation, at a minimum. Given the staging area on N Street, I see no way that visibility and access to the Bank can be maintained. The Bank will effectively

be totally obscured and isolated from street visibility and

access.

20.  The current overhead protection and barricades do not

meet D.C. Code for safety.

- The overhead protection does not have lights to
illuminate the walk area and they do not have safety
signs.

- The handicap entrance to the Bank is no longer
available, as it is blocked off.

- The emergency exits from the Bank are blocked off,
and not useable - a clear safety violation, which puts
the Bank's clients and staff at risk.

- The emergency exits from the Bank along N Street
also obscures Pepco vaults.  Given the current problem
with Pepco vaults, this seems very dangerous.  Access
to the vaults in an emergency would require the
overhead protection to be taken down.

21.  The D.C. Fire Code calls for emergency standpipe to be

clearly identified by a sign and be extended out to the street

during construction in case of an emergency.  Neither of the

emergency standpipes are extended to the street and they are

completely obscured.  In an emergency situation, they would be

difficult to find and access, resulting in valuable time being

lost, putting the building occupants at greater risk.  The D.C.

Fire Code also calls for the building street address to be

clearly visible.  The current overhead protection obscures any

street address.

22. It is clear that the way the site staging area overhead protection and barricades have been laid out and set up, the Contractor has not been tasked by the Developer to maintain visibility to the demised space. Clearly, the staging area is required, and placing the staging area along N Street is the only logical location for the staging area. However, given the urban, congested location, the staging area is too big and extends too far towards the corner of N Street and 18th Street. The staging area should be reduced in size to maintain visibility to the Bank premises.

23. Clearly, the overhead protection and barricades have been erected far too early. As per the Developer's Memo of August 1st, 2007, the facade demolition is supposed to start, at the earliest, in April 2008 and be complete by June of 2008. In this same Memo, the interior demolition is scheduled to start in August 2007 and be complete by April 2008. Given the nature of the demolition and the complete interior removal of all partitions and core area, and the method by which it is being undertaken - by diesel-powered Bobcat machines - none of the facade can be taken off until the demolition is completed in April 2008.

24. In addition, the interior of the building requires asbestos abatement. This also will require the restoration of

the facade until after all asbestos has been abated. There is no visible indication that asbestos abatement has been started from the exterior. The Specification Document 9.4 calls for the negative air machines to be vented through windows in the facade. Based upon the information supplied by the Owner, the erection of the overhead protection and barricades along Connecticut Avenue and 18th Street, and for about 50'-0" along N Street, would not need to be erected until, at the earliest, April of 2008. The demolition should start along N Street above the staging area and away from the visibility of Connecticut Avenue to work out any "bugs" in the demolition procedure.

25. When, eventually, overhead protection is required in 2008, a system using pre-engineered steel columns and steel beams to give adequate protection yet still maintain visibility should be erected. The current overhead protection system is inadequate and does not allow visibility of the Bank. It also makes the area appear unfriendly, unsafe, and not conducive for Bank customers to even attempt to find their way into the Bank should they know that it is open and find the entrance.

26. When the facade is removed from the front and side of the building above the Bank premises, I cannot see how the Bank entrance can remain open safely, given the nature of the work. The facade consists of large, individual precast panels that are

attached to the building by weld plates.  I estimate that the
panels weigh two to three tons each.  To remove these precast
panels, the Contractor will have to remove the windows, which
will necessitate breaking the glass, with potential for glass to
fall to the street below.  The glass has been in these windows
since the building was built in the 1960's, and the framing
system into which the glass was set has become brittle.  The
removal of the glass will probably not be possible until it is
broken.  Although not mentioned in the Hazmat Report provided,
given the age of the building, I would predict that the caulking
at the windows and precast will contain asbestos, which will need
to be abated.  This will pose a big public relations issue as
suited and face-masked "space men" will be working on the
building facade.

        27.  The precast panels will then need to be broken loose
from the facade.  We understand that the Contractor is proposing
using a roof-mounted hoisting system.  This system will lift the
panels off the face of the building once the welds holding the
panels onto the building are broken.  To break the welds, they
will either be cut with an acetylene cutting torch or ground off
with an abrasive cutting wheel.  Both methods pose the potential
of burning sparks and naked flames which can cause a fire.  Since
the building was erected some 40 years ago, a considerable amount

of very fine dust and debris, not to mention rats and mice nests, will have accumulated behind the precast. This dust can be explosive under certain conditions, and the other accumulated debris will be extremely flammable.

28. The precast, given its age, could also be deteriorating due to water infiltration and corrosion of the reinforced steel. As the panels are lifted off the building, they will need prying loose, which could dislodge pieces of the precast that will fall to the street. In some cases, the actual panels being lifted could also break apart and fall to the street.

29. The Contractor indicates on its Public Space Permit Plan that they propose to use arresting nets to catch any falling debris. I find it difficult to understand how these nets will be installed to achieve their desired goal of catching falling debris. To undertake this façade removal and to lift off the precise panels, the demolition crew will need a platform on the exterior of the building to facilitate the handling of the precast panels.

30. This team, probably comprised of 2-3 operatives, will be working from a swing stage scaffold hung from the roof. The hoisting equipment will also be mounted on the roof. We are led to believe that, in addition to the independent life line labels, the Contractor intends to install an arresting net (debris

netting for structural modifications) to catch falling debris. For this net to work, it will have to be suspended from the building. This will not be possible if they are removing panels, as it will get in their way and be dangerous.

31. The obvious location for this netting is at the 2nd floor level, directly above the Bank premises level. The precast to be removed goes all the way down to the top of the glass store front enclosing the Bank. To achieve the placement of the debris arresting netting, it will have to hang down in front of the first floor window, completely blocking any visibility of the Bank.

32. The facade that exists above the Bank premises is about 30% of the building perimeter. Based on the schedule outlined in the Developer's Memo of August 13th, 2007, the façade removal will take 9 months - October 2007 to June 2008. This would mean the Bank's premises will be completely obscured for approximately 14 weeks, just for demolition.

33. It is my opinion that the proposed method of facade demolition outlined by the Contractor will render access to the Bank impossible, given the need for absolute safety. In fact, the higher the level of safety, the more equipment, overhead protection and safety netting will be required, making visibility of the Bank from the street impossible.

34. I seriously question whether the Bank space should remain open during this removal, given the nature and extent of the renovation and the selected way the Developer is approaching the renovation.

**Health & Safety of the Bank Premises**

35. To date, with the renovation already underway, the Bank has not been advised of any safety plans to protect the Bank's clients or employees during the proposed renovation. The renovation project is scheduled to take 15-18 months, starting in August 2007.

36. The Contractor has set up their staging area along "N" Street, and erected overhead protection around the street sides of the building - Connecticut Avenue, 18th Street and N Street. The Contractor has removed two sections of the facade windows along N Street to facilitate access for equipment into the building and to facilitate demolition.

37. The project requires the removal of asbestos and asbestos containing materials (ACM's) from numerous places throughout the building, including areas within the Bank's premises. In addition, the demolition will require the removal of the existing heating and cooling equipment, which consists of air handlers and perimeter fan coils. The fan coils, given their age and condition, will contain mold, which is widely

acknowledged to cause respiratory health issues. This will potentially get into the Bank premises through voids in the slab.

38. The building is also infested with rats and mice. Rats and mice will all move away from noisy building activities and will go towards areas of confinement and a quieter environment, *i.e.*, the Bank. These vermin are known to spread disease through their droppings, which will get into the air in the building and the demised space.

39. In addition, the demolition of the interior of the building will release many other potential harmful materials into the building's air. The demolition is being undertaken using diesel-fueled Bobcats, which produce large quantities of carbon monoxide. This highly dangerous gas is invisible and cannot be smelled. This exhaust gas is liable to seep into the Bank space and will pose a serious health threat to the Bank staff and clients.

40. The biggest cause of damage in the building industry is fire. At least 35-45 major fires occur every day on construction sites in the U.S., on average. To date, the Bank has not been given an emergency evacuation plan in case of a fire or an accident. Such accidents may include partial collapse of the building as well as asbestos releases, a gas leak, a major water leak, etc.

41. In my opinion, it is a serious event for the Developer to start construction without adequately preparing for a major accident in the building. Clearly, the Developer and Contractor are not planning this job to the standard or duty of care required when the building has occupied space in the building.

42. Currently, there are at least three serious deficiencies:

1) - The emergency standpipe Siamese connection that allows the Fire Department to pump water into the building in the event of a fire are not visible and not accessible from the street. The D.C. Fire Code requires that during construction, the standpipe Siamese connection are to be clearly sign-posted and extended out to the street so that the Fire Department can use them in an emergency. Failure to make the standpipe connection to the street puts the entire building at risk, especially the Bank employees and customers.

2) - The emergency exits from the Bank are blocked off, and the overhead protection is not completed.

3) - The building address required by D.C. Code is not visible from the street to guide fire and emergency vehicles to the building in an emergency.

43. These serious infringements on basic life safety regulations are extremely serious conditions that render the building unsafe and subject to closure if used as an occupied business.

44. In planning a major renovation of a partially occupied building, the first issue is safety of the building occupants.

The personnel and clients in the Bank are there to conduct and carry out business. Their primary focus is to do the work involving these tasks. The Bank clients and employees are relying on the professional planning of the construction company and the Developer to protect them. This is clearly not the case with this project, where basic safety regulations are not being observed or implemented.

45. The Bank has not been provided with an Emergency Safety Plan; the Bank staff has not been provided an orientation; and the communication between the Developer and the Bank has not been focused on providing information, but rather hiding information. To undertake this project, given the scope and risks from fire, collapse, release of hazardous material, etc., without providing any emergency safety plan is completely unacceptable. To proceed with the construction work, ignoring the basic safety requirements, is at the very least reckless.

**Other Areas of Concern**

46. The Asbestos Specifications provided in Document 9-4, Appendix A, Pages 40-42, clearly define the presence of asbestos. The Affidavit provided by Ms. Duke, the Property Manager, describes the asbestos as being in "discrete" areas. I see nothing discrete about friable asbestos on ducts and pipes above and adjacent to Bank space.

47. Neither the Developer, nor the Contractor, has indicated that they will set up a monitoring program to test the air within the building for airborne asbestos. The chases that extend through the building from the basement to the roof are open above the ceiling in the Bank. The Bank's customers and staff deserve the protection of an air monitoring system to insure that no airborne asbestos or other airborne pollutants, such as lead, PCB's, dust, bacteria from vermin, mold spores, etc., can get into the Bank.

48. The people in the Bank are basically sedentary during the day's work activities - sitting at a desk in a confined space the majority of the time -they are not walking around. Moving from confined spaces, the air into the Bank is being provided from an exterior source from within the building. No provision to protect this air supply to the Bank has been made. Such basic protection as carbon monoxide detection has not been installed, and no air monitoring system has been set up.

49. As I noted above, fire is the biggest cause of accidents in construction projects. Fire can come from many sources, the biggest being demolition - at this stage, the use of cutting torches with naked flames and sparks for grinding wheels. This equipment will be used to cut pipes. These pipes run through vertical chases that terminate, in many cases, in the

ceiling above the first floor ceiling. If directed above and inside the Bank space when this building was built, these chases would not have been sealed at each floor, and they are open from the top floor to the first floor ceiling. Cutting of pipes results in mortar slag (melted steel) falling down these chases and starting fires inside the chases.

50. The demolition which is underway at this time is starting at the top floor and proceeding downward. No provision to isolate these chases at the 2nd floor to insure the burning debris cannot get down to the ceiling at the 1st floor has been made. Once a fire is underway in a chase like this, it is impossible to get to it quickly, and despite the presence of a fire sprinkler system, which may or may not be in operation, the fire will spread, as the fire sprinkler system is not installed in these mechanical chases. In an unoccupied business, the chases would be wet down to limit the possibility of a fire. As the ground floor is occupied, it will not be possible to do this.

51. In Document #9, Page 5 of 21, the Defendant alludes to the installation of a waterproof membrane above the 1st floor at the 2nd floor slab. This is installed to protect the occupied space from water infiltration during the facade renovation. Clearly, this cannot be installed until the 2nd floor is demolished and the concrete slab is exposed. This does not happen

until April of 2008 as per the Owner's schedule.

52. As a prudent General Contractor working above an occupied space, it would seem sensible to demolish the 2nd floor space by hand first so the construction and the occupied space could be separated and the safety of the occupied space below could be assured. Clearly, using a machine to demolish the construction on the floor is totally impractical in the 2nd floor due to noise and other serious safety concerns, such as carbon monoxide, falling pipes and debris & concerns about overloading the concrete slabs. No evidence that the construction company has tested the strength of the existing slabs to carry the Bobcat machines has been produced.

53. By demolishing the 2nd floor first to separate the space, clearly, the demolition construction will have to access the Bank's space to remove pipe and steel penetrations in the slab. No mention of this access has been given to the tenant, and clearly, large areas of the Bank's operating space would need to be accessed with ceilings having to be totally removed. This would necessitate the abatement of asbestos clearly visible on the pipe insulation. The abatement will require the Bank to be closed down.

54. The amount of pipe work, electric cables and general building systems above the Bank ceiling is extensive. This will

have to be removed during the demolition. It is not uncommon for pipes that are relying on their continuity between floors for support to fall when they are cut during demolition. Unless the Contractor does a detailed survey, they have no way of knowing what pipes will potentially fall, potentially killing or seriously injuring people on the Bank's Premises. To do this work will completely shut down the Bank's operations.

55. The Bank's safe operation relies on the supply of essential services, *i.e.*, fire sprinklers, fire alarms, electrical supply, security surveillance and alarms, heating and air conditioning, and fresh air supply, to mention a few basic services.

**Fire Sprinkler System**

56. As the building interior is demolished, the sprinkler system will need to be shut down on a regular basis to facilitate its modification to allow demolition. It is very common during this type of demolition, especially using machines, that sprinkle pipes will be broken and water will rush into the space. This water will get down to the ground floor to the Bank. The current procedure is that all drywall ceiling tiles or any other "soft" building materials, i.e., carpets, etc., have to be removed because if they are not dried out within 72 hours, harmful mold will develop. I see this as a major threat to the Bank's safety

and healthy operation. As noted previously, the Developer claims that the Contractor will install a "roofing" on the 2nd floor slab above the Bank premises (see Document 9-2, Item 21 of Jackie Duke's Affidavit).

57. Unfortunately, the Contractor and the Developer have only addressed the need to waterproof (roofing) the slab above the Bank once the facade is off. As I noted above, any prudent Contractor would do the 2nd floor demolition first to separate the Bank from the construction project above and install the roofing now to stop water getting into the Bank Premises from sprinkler leaks and other leaks through the opening in the building that are already open and not adequately protected.

58. To continue the safe operation of the Bank, the D.C. Code requires that during construction in a sprinkled business, the fire sprinkler system must be operational on the floor above the occupied space and the floor below. To keep a full sprinkler system operational during this renovation will be, in my opinion, virtually impossible. Without an operating sprinkler system, the Bank employees and clients are at a great risk, given the serious potential of fire during construction to maintain the sprinkler system in an operating condition will be a serious challenge, and no evidence of the necessary modifications is evidenced.

**Fire Alarm System**

59. The current fire alarm system will need to be kept in working order to notify the occupants of the building of a fire. It appears that the fire alarm system has been updated since the original construction in the 1960; However, depending on how the system is wired, it may be virtually impossible to maintain an operational system, as this will require that the system be shut down on a regular basis; and in addition, doing demolition with machines, the probability of the fire alarm being damaged and setting off a false alarm is very likely on a regular basis - this will disrupt the Bank operations if all the staff have to make the Bank safe before they are evacuated. Again, no emergency evacuation plans has been prepared or provided, and currently, all emergency fire escape routes are ***blocked***.

60. The provision of the basic services, i.e., electrical, water, heating and cooling, security lines, telephone and data, to the Bank space on an "uninterrupted" basis takes a lot of planning and scheduling. Absolutely no evidence that any of this has been planned has been made available by the Developer or the Contractor to the Bank.

61. I am amazed that a project of this size and complexity, with tenants remaining on the ground floor, and what amounts to the total destruction of the building infrastructure and exterior envelopes, has not been described in detail to the remaining

tenants.

62. The tenant should be provided with:

(1) A detailed schedule listing all the planned activities;

(2) A detailed scope of work that will affect the tenant's business operations & safety;

(3) A detailed safety plan outlining an emergency evacuation plan showing routes of escape;

(4) An emergency contact list in case of emergency after hours;

(5) Notices required by law for all hazardous material removal - asbestos, lead, PCB's, mold, etc.;

(6) A schedule of all planned interruption of services to the Bank Space;

(7) A schedule of regular meetings, so the tenant is current with all activities going on in the building, so that disruption to the Bank's operations are planned and minimized;

(8) An air monitoring program to insure the safety of the air;

(9) A separate fire and smoke detection system on the tenant space - the current system has no smoke detector heads on the system. This is essential during a demolition project like this. The possibility of a fire on this job is very high.

**Security of Bank Operations**

63. In my past experience, construction projects in the Washington area attract theft and crime - be it a passing opportunist looking for a quick source of cash to service an addiction habit, or somebody looking to hide. In addition, the

Bank will now become a more attractive target, as the visibility from the street is now virtually non-existent. When you stand in the Bank and look out, you cannot see the street clearly. Likewise, when you look into the Bank from the street, you cannot see what is going on. In fact, the building looks abandoned.

64. With all the overhead protection and barricades, the staging area along N Street and the eminent arrival of potentially 100-150 workers on a daily basis, the Bank will become a target due to the lack of visibility and the ease in which confusion could be staged. With the fire alarm going off on a regular basis due to false alarms with the flow of strangers/workers in the area, and with the opportunity to set up a false operation disguised as a construction crew, the Bank, in my opinion, will become a very attractive target for a potential robbery attempt.

**The Effects of Construction Activity on the Bank's Operations**

65. It is my opinion that the Bank's customers and potential customers will be scared away from using the Bank during the repositioning renovation of this building.

66. The complete enclosure of the Bank space within a construction site will stop clients coming to the Bank. The

major issues will be as follows:

(1)   Lack of street parking due to the closure of the south
      side of N Street.

(2)   The difficulty of getting to the parking garage, which
      will be caused by obstructions by vehicles unloading
      and loading.

(3)   The increase street activity of construction workers
      entering and leaving the building by the garage
      entrance. This will be particularly bad around:

      -     9:00 - 9:30 a.m., when the Bank first opens, as the
            100-150 construction workers go off to get their
            breakfast or look for a suitable place to eat their
            breakfast on the street to watch the world go by;[1]

      -     11:30 a.m. - 12:30 p.m., when the construction
            workers will be leaving and entering the building to
            get their lunch and also to watch the world go by.
            This is also a prime time for the Bank's operations,
            as the clients come to the Bank during their lunch
            breaks; and

      -     3:00 - 3:30 p.m., when the construction
            activity is closing down and all the
            construction equipment and workers leave the
            site for the day.

(4)   Lack of Visibility of the Bank:

      -     "Is the Bank open?";

      -     The construction activity in and around the Bank;

      -     The inhospitable appearance of the building - that's

---

[1]    Clearly, the garage will get an influx of Construction workers
who will park in the garage.  I am sure the garage operation will
target this constant source of reliable clients.  Access to N
Street, despite the traffic plan, will be chaotic, and the garage
will be constantly cut off from the paying clients looking for
somewhere to park.

a construction site;

- The noise, the congestion;

- The construction workers milling around and sitting in and around the Bank during break times; and

- The apparent lack of safety precautions and the resulting risk involved in getting into the Bank through a construction site.

(5) Once you enter the Bank:

- The structural-borne noise of jack hammering, drilling, breaking;

- The smell of construction material; and

- The very real possibility of a fire alarm.

All of these factors will all affect the regular customer and will definitely affect the potential customer who attempts to get near the Bank.

(6) The Bank staff will be subjected to difficulty of parking, getting into the Bank to work and the challenge of exiting the Bank for breaks or to leave at the end of the day.

- The constant noise that will go on day after day, hour after hour, along with the "startling", alarming bangs and thuds;

- The building will shake, and weird noises will constantly affect the Bank operations;

- Working in a Bank with the possibility of an armed robbery will be exacerbated by the unpredictability of sudden noise;

- The potential of the building fire alarm going off;

- The influx of smells from construction - burning, acrid smells;

- The real possibility of smoke/dust getting into the Bank; and

- The real possibility that the power will go out, the water will be shut off, the alarm will be cut, the phone and data line wires go down.

These will be the constant, daily worries and anxieties of the Bank staff.

69. I have worked on construction projects for 40 years, and I am still "taken aback" by sudden noises. There will be no way of stopping this on this job. The building is a cast-in-place concrete framed building. If you knock on the column of the 8th floor, you will be able to hear this via the structure and through vibrations in the Bank Space. If you are doing demolition on the 2nd floor, the noise will be unbearable to conduct business. You will not be able to talk on the phone; and conducting business with clients at the teller lines will be difficult due to the barrier separating the clients from the teller and the constant background noise. Conducting Bank business will also be affected by constant dust invasion caused by vibrations and dislodging parts of the ceilings and dust coming in from demolition and other construction activity.

(1) The very real possibility of water leaks;

(2) The potential damage to equipment;

(3) The very real possibility of mold growth from water getting into the ceiling crawl space;

(4) The Bank's alarm system will also be affected by dust, water and mostly by vibrations, which will potentially trigger the vault alarm.

Major items that need to be addressed are:

(1) The removal and replacement of the Bank store front;

(2) Entrance door vestibule;

(3) Handicapped entrance; and

(4) Heating and cooling.

70. How will these tasks be achieved without total disruption to the Bank's operations? Clearly, visibility will be totally obscured. In order to remove the exterior store front, a partition will need to be installed on the inside of the Bank, with enough space to work. This will protrude into the Bank space by 4-5 feet. This will require that the teller lines be re-worked and all security systems removed. Removing the Bank's entrance and handicap entrance will necessitate the closing of the Bank street entrance. This will require major structural modifications to install a handicap ramp required by the Americans With Disabilities Act (ADA), which is required by law for all public access buildings. Heating and cooling during construction will become a serious issue, as the building above

the Bank will be totally open, the slab is not insulated, so the Bank will need supplemental heating or cooling due to the exposure of the slab above the Bank being fully exposed to the outside. To date, none of these issues have been discussed with the Bank, and based on the information provided, none is planned nor the necessity foreseen by the Developer or the Contractor.

**CONCLUSION**

71. As a Professional Master Builder, I am honestly amazed at the way this project is being handled by the Developer and the Contractor. The obvious lack of planning and communication with the tenant, the serious lack of safety, and the serious breach of safety code regulations that are currently apparent, which are putting the Bank staff and clients at risk of injury or worse, is totally unacceptable. The method and sequence of the construction that the Developer and Contractor have alluded to are clearly not planned to facilitate the continued operation of the Bank during construction. The requirement of the lease to maintain visibility of the Bank and to maintain access to the Bank during construction has clearly not been planned, and in my professional opinion is impossible, given the method that has been proposed. It is my belief that to continue the operation of the Bank during this construction project is very unsafe, and the possibility of running a Bank successfully under the condition

that will develop as this project moves forward will be impossible. I see no way that this repositioning renovation job can be completed without total disruption to the Bank's operations. There is no way to insure the safe operation of the Bank during this work. It is my opinion that the Developer is intentionally planning the project in such a manner that the Bank will find it impossible to conduct business and will have to relocate. If the Bank attempts to continue to conduct business during construction, I believe that the number of existing customers will dwindle due to the extremely low level of visibility and safety fears, and that potential new clients will not come to the Bank. In addition, I believe the Bank staff will leave as they will not be able to tolerate the working conditions during construction, i.e., noise, congestion, anxiety, that will develop as the job proceeds. One item that the Developer and Contractor have not discussed is the renovation of the Bank Space, which will clearly need to be renovated to match the image of the redesigned building. I see no evidence, given the information provided, that the Developer and/or Contractor are taking the continued operation of the Bank seriously, and consequently, they are setting the stage for the Bank's closure during construction due to the totally unacceptable conditions and safety concerns. I see no effort being made by the Developer

and/or the Contractor to assure the Bank that all measures will be taken to allow the Bank to continue to operate during construction.  Even if the Developer did make efforts to do this, I can see no logical or cost-effective way to provide the Bank with a suitable environment in which to continue their banking operations, given the extent of construction and the safety issues that can only be addressed as a totally unoccupied building.

72.  The foregoing is my honest, professional opinion, without bias.

I swear under the penalties of perjury that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in Falls Church, Virginia on the 24th day of August, 2007.

John Bellingham

# EXHIBIT A

TO DECLARATION OF JOHN D. BELLINGHAM
IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF



MONARC
CONSTRUCTION INC.

**JOHN D. BELLINGHAM, FCIOB, FAIC**

**PRESIDENT**

*Founder, President of Monarc Construction, Inc., Falls Church, Virginia. Responsible for the overall management of the company.*

**NOTABLE PROJECTS:**

- Embassy of Sweden
- House of Sweden
- Embassy of Slovenia and Ambassador's Residence
- Embassy of Lithuanian
- Embassy of Iraq - Security Design - Build
- Tivoli Theater - Renovation and revitalization of historic cultural DC landmark – specifically, the complete restoration of the exterior façade and the restoration of the interior plaster ceilings
- National Airport - Exterior concrete renovation/restoration of the historic façade of the main terminal building
- British Ambassador's House, 3100 Massachusetts Avenue, NW - Historic renovation
- Glen Echo Park, Maryland - Historic restoration of the Spanish Ballroom and reconstruction of the North Arcade
- George Washington University Faculty Club - Historic renovation
- Warder/Totten Mansion, 2633 16th Street – Historical renovation
- Folger Shakespeare Memorial Library, 201 East Capitol Street, SE
- Decatur House, 748 Jackson Place, N.W. – Renovation and restoration
- Sewall Belmont House, 144 Constitution Avenue, NE – Restoration circa 1720
- Tivoli Theater, 14th and Park Road, N.W. – Historical renovation
- British Ambassador's Residence, 3100 Massachusetts Avenue, NW - Sir Edwin Lutyen's design; built by Harry Wardman in 1928 - Renovation
- Australian Ambassador's Residence, 1601 Massachusetts Avenue, NW – former residence of General Patton – Renovation
- American Society of International Law, 2233 Massachusetts Avenue – Renovation
- Norwegian Ambassador's Residence, 3401 Massachusetts Avenue, NW - Restoration
- Namibia Embassy, 1605 New Hampshire Avenue, NW – Renovation
- Embassy of Botswana, 1533 New Hampshire Avenue - Renovation
- Embassy of Kazakhstan, 1501 16th Street, NW - Renovation





MONARC
CONSTRUCTION INC.

**Resume of John D. Bellingham**
**Page Two**

- Folger Shakespeare Library Education Center, 201 and 301 East Capitol Street, SE – Renovation and addition of Education Center
- George Washington University Faculty Club, 1914/1918 F Street, NW – Renovation and restoration of two row houses circa 1800
- European Commission Ambassador's Residence, 2534 Belmont Road – Renovation and addition of third floor to residence.
- Tiny Jewel Box, 1147 Connecticut Avenue, NW, Washington, D.C. - Historical renovation. Winner of the 1996 WBC Craftsmanship Award and 1997 ABC Award of Excellence.
- Adam J. Weschler & Sons Auctioneers and Appraisers – Renovation of building facade
- Various Work for Australian Embassy Residence, Washington, D.C.
- Various Work at Swedish Ambassador's Residence, Washington, D.C
- Various Work for British Embassy Residences, D.C. MD, VA
- Various Work at Embassy of Venezuela, Washington, D.C.
- Wyndham Bristol Hotel, 2430 Pennsylvania, N.W. - Phased renovation of the fire alarm and sprinkler system
- Quebec House Electrical and Fire Alarm Upgrades, Washington, D.C.
- Merrifield Village Apartments, Vienna, VA
- Forrest-Marbury House - Historical Renovation – Built circa 1788, Washington, D.C.
- Lowell School Historical Renovation, Washington, D.C.
- 515 King Street - Raising the roof in winter 1994/1995.
- The Palm, 1225 19th Street – Building façade' and window replacement

**PREVIOUS EXPERIENCE:**

- Vice President of Base Building, Sigal Construction Company, Washington, D.C. Responsible for overseeing the day-to-day supervision of superintendents and project managers. Negotiated with new clients for future jobs. Reviewed proposals from pre-construction prior to submission to clients. Initiated Project Management and Cost Control Systems.

  Projects Completed with Sigal Construction:
  - The Bond Building - 14th and N.Y. Avenue, N.W.
  - The Evening Star Building - 11th and Penn. Avenue, N.W.
  - Gallery Row - 7th and D Streets – Historical Rebuilding
  - Trammell Crow - 1025 Thomas Jefferson Street
  - DRG Group Headquarters – 1099 30th Street

20th
ANNIVERSARY
1987 - 2007





**Resume of John D. Bellingham**
**Page Three**

- Alice Roosevelt Longworth Mansion – Historical renovation
- Barclay House Condominiums
- Governor Connoly's Office
- Cooper and Lybrand, etc.

- Project Manager, George Hyman Construction Company, Bethesda, Maryland. Directly responsible for two major clients, as well as negotiating new work. Worked with architects and owners from onset of project, preparing budget estimates and value engineering proposals for various alternate schemes designed to speed up contract time and minimize costs.
  - 730 15th Street, N.W.
  - 1501 Pennsylvania Avenue
  - Argentinean Naval Attaché Headquarters

- Project Manager for Blake Construction Company, Washington, D.C. Responsible for National Institutes of Health ACRF Phase 2A concrete superstructure. Prepared proposals for contract changes, identified, prepared, and negotiated claims, requisitions, submittals, etc. Also worked on the National Naval Medical Center and Walter Reed Army Hospital.

- USA Superintendent for British Government Building Maintenance. Responsible for all British Government property in the USA (Building and Civil).

- Assistant Project Manager, Blake Construction Company, Washington, D.C. Worked on HEW Building - South Portal, George Washington University, and the Sports Center.

- Building Management Trainee, George Wimpey and Company, London, England.

**EDUCATION/MEMBERSHIPS:**

- Higher National Diploma in Construction Management, HND University of London, England.
- Ewell College of Advanced Technology, London, England.
- Fellow of the Chartered Institute of Building (F.C.I.O.B.), Great Britain and the Commonwealth
- Fellow of the American Institute of Constructors (FAIC)
- Vice President and Treasurer of District of Columbia Preservation League (DCPL)

2781 Hartland Road, Falls Church, VA 22043
Ph: (703) 641-8500 Fax: (703) 641-8504





MONARC™
CONSTRUCTION INC.

**Resume of John D. Bellingham**
**Page Four**

- Francis Cup - Best Student, final year.
- Award of Merit - Final Planning Examination for Professional Qualifications.
- Past president of the American Institute of Constructors (AIC) Washington Metro Chapter.
- Board of Trustees Treasurer and V.P. of D.C. Preservation League (DCPL).
- Board Member, DCPL Project Review.

20th
ANNIVERSARY

2781 Hartland Road, Falls Church, VA 22043
Ph: (703) 641-8500 Fax: (703) 641-8504



# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **INDEPENDENCE FEDERAL SAVINGS BANK**<br>**1229 Connecticut Avenue, N.W.**<br>**Washington, DC 20036,** | ) | |
| **Plaintiff,** | ) | **C.A. No. 07-1389**<br>**Honorable John D. Bates** |
| **v.** | ) | |
| **1225 CONNECTICUT CO. LLC,** | ) | |
| **Defendant** | ) | |

**DECLARATION OF BRENDA W. NOEL IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

I, Brenda W. Noel, depose and state as follows:

1. I am over the age of 18 and am competent to testify to the matters contained herein, and testify that the following statements are true and correct and are based upon matters within my personal knowledge.

2. On July 2, 2007, I began working as the Chief Financial Officer at the headquarters of Independence Federal Savings Bank ("IFSB" or the "Bank") located at 1229 Connecticut Avenue, N.W., Washington, D.C. (the "Premises"), which is located in the building whose address is 1225 Connecticut Avenue, N.W., Washington, D.C. (the "1225 Building").

3. Intermittently, from July 16, 2007 to the present, dust and debris have continually fallen from the ceiling in my office. Initially, the falling debris occurred on days when there was also noise in the section of the building above my office.

Thereafter, the falling debris seemed to be random and not necessarily related to the noise and vibrations.

4. I often find my desk covered with dust upon my arrival to work. On at least two occasions, I was assisted in the vacuuming and desk clean-up by Larry Alexander, also an employee of the Bank. He gave me a bottle of "Fantastic Cleaner" to keep for my personal use. So, now I often perform quick clean-ups without his assistance throughout the day.

5. There are missing ceiling tiles in various places throughout the Bank. The ceiling in my work area is missing six tiles and there are another ten or so missing tiles in the Accounting Department and adjoining areas. See Photographs 1-3 attached to my Declaration.

6. At the very least, if these ceiling tiles are not replaced, I would like the falling dust and debris tested to determine whether or not it is hazardous.

7. On two occasions in July, I also found evidence of overnight rat/mouse activity in my work area.

8. Due to the construction and the interruption of our ventilation and air conditioning systems, we have experienced extremely warm temperatures in the rear area of the Bank, particularly between July 30, 2007 and August 10, 2007. I was forced to use six fans in my workspace to keep cool.

9. During this time, numerous building management personnel

have found it necessary to walk through to check the temperatures and cooling problems.  On August 15, 2007, two construction representatives came by in response to our complaints about vibrations and tremors in the Bank.  While they were here, I asked if they would replace the missing ceiling tiles.  One of them responded, "It is not our problem.  The tenant is responsible for stuff like that."

I swear under the penalties of perjury of the District of Columbia that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in the District of Columbia on this 24th day of August, 2007.

Brenda W. Noel







**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **INDEPENDENCE FEDERAL SAVINGS BANK**<br>**1229 Connecticut Avenue, N.W.**<br>**Washington, DC 20036,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**1225 CONNECTICUT CO. LLC,**<br><br>**Defendant** | ) | **C.A. No. 07-1389**<br>**Honorable John D. Bates** |

**PLAINTIFF'S NOTICE OF FILING OF BULKY EXHIBITS**

Plaintiff Independence Federal Savings Bank, by and through counsel, hereby submits its Notice of Filing of Bulky Exhibits and states as follows:

Plaintiff attaches the Declarations of Robert Isard, Brenda Noel and John Bellingham in support of its Reply in Further Support of its Amended Application for Preliminary Injunctive Relief. Attached to these Declarations are color photographs that exceed the limit allowed for e-filing attachments:

Exhibit B Declaration of Robert Isard;

Exhibit D Declaration of John Bellingham; and.

Exhibit E Declaration of Brenda W. Noel.[1]

These photographs are available for viewing and copying at the Clerk's Office during its regular business hours from 9:00 a.m. to 5:00 p.m., Monday through Friday.

---

[1] For ease of reference, these Exhibit letters are consistent with the Reply Exhibits.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT & KARAS, L.L.P.

/s/

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700
efiling@cootermangold.com

***Attorneys for Plaintiff Independence Federal Savings Bank***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of August, 2007, a copy of the foregoing **PLAINTIFF'S NOTICE OF FILING OF BULKY EXHIBITS** was served via the Court's ECF system and by first-class mail, postage-prepaid, on:

Richard W. Luchs
Greenstein DeLorme & Luchs, PC
1620 L Street, N.W.
Suite 900
Washington, DC 20036-5605

***Counsel for Defendant***

/s/

Adam Pignatelli